**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, | No. 1:22-cv-04774 |
| Plaintiffs, | |
| v. | Honorable Harry D. Leinenweber |
| CITY OF HIGHLAND PARK, ILLINOIS, | Honorable Jeffrey T. Gilbert |
| Defendant. | |

**DEFENDANT CITY OF HIGHLAND PARK'S**
**<u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

      A.    Enactment of Highland Park's Ordinance. ...................................................4

      B.    The Mass Shooting at the Highland Park Parade.........................................7

      C.    Procedural History. ....................................................................................12

LEGAL STANDARD..........................................................................................................12

ARGUMENT .....................................................................................................................13

    I.    Plaintiffs Have Not Shown They Are Likely to Succeed on the Merits...............13

      A.    Legal Framework for Second Amendment Analysis.................................13

      B.    Plaintiffs Have Not Met Their Burden to Show That Assault Weapons Are "Arms" Protected by the Second Amendment.....................17

            1.    Assault Weapons Are Not "In Common Use."............................17

            2.    Assault Weapons Are "Dangerous" and "Unusual." ....................21

      C.    Assault Weapons Bans Are Consistent with the National Tradition of Firearm Regulation. ...............................................................28

            1.    Particularly Dangerous Types of Weapons Were Regulated During Early America. ...............................................................31

            2.    Particularly Dangerous Types of Weapons Were Regulated in the Late 19th Century. ....................................................35

            3.    Particularly Dangerous Types of Weapons Were Regulated in the Early 20th Century.....................................................37

            4.    Consistent with Historical Tradition, Highland Park's Ordinance Regulates Particularly Dangerous Types of Weapons in the Modern Era. ...................................................39

      D.    Large-Capacity Magazines Are Not Within the Scope of the Right Protected by the Second Amendment. ......................................................41

      E.    A Ban on Large-Capacity Magazines Is Consistent with the National Tradition of Firearm Regulation. .................................................45

i

II.     Plaintiffs Have Not Met Their Burden to Establish That They Will Suffer
        Any Irreparable Injury If Their Motion Is Denied..................................................46

III.    The Balance of the Equities and the Public Interest Favor Highland Park............49

CONCLUSION.............................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page(s)**

*Beckman v. Chicago Bear Football Club,*
2018 WL 11200576 (N.D. Ill. Dec. 13, 2018) ........................................................49

*Bolton v. Bryant,*
71 F. Supp. 3d 802 (N.D. Ill. 2014) ........................................................................51

*Braam v. Carr,*
37 F.4th 1269 (7th Cir. 2022) .................................................................................13

*Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.,*
24 F.4th 640 (7th Cir. 2022) ...................................................................................49

*Cassell v. Snyders,*
990 F.3d 539 (7th Cir. 2021) ..................................................................................13

*Culp v. Madigan,*
2015 WL 13037427 (C.D. Ill. Dec. 7, 2015) ...........................................................51

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................................ *passim*

*Ditton v. Rusch,*
2014 WL 4435928 (N.D. Ill. Sept. 9, 2014) ...........................................................49

*Friedman v. City of Highland Park,*
68 F. Supp. 3d 895 (N.D. Ill. 2014) ........................................................................51

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ................................................................6, 16, 17, 50

*Fyock v. Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ..................................................................................16

*Halczenko v. Ascension Health, Inc.,*
37 F.4th 1321 (7th Cir. 2022) ...........................................................................13, 47

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ..............................................................................16

*Illinois Republican Party v. Pritzker,*
973 F.3d 760 (7th Cir. 2020) ..................................................................................13

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago,*
-- F.4th --, 2022 WL 17829283 (7th Cir. Dec. 21, 2022) .......................................49

*Jackson v. City and County of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ............................................................43

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ...........................................................30

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) ...........................................................16

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ...........................................................50

*Lujan v. G & G Fire Sprinklers, Inc.*,
  532 U.S. 189 (2001).........................................................................16

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................13, 50

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022).............................................................*passim*

*Nken v. Holder*,
  556 U.S. 418 (2009).........................................................................50

*Ocean State Tactical v. Rhode Island*,
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) ..............................43, 45

*Oregon Firearms Fed'n, Inc. v. Brown*,
  2022 WL 17454829 (D. Or. Dec. 6, 2022) ...............................*passim*

*Orr v. Shicker*,
  953 F.3d 490 (7th Cir. 2020) ..............................................13, 29, 47

*Second City Music, Inc. v. City of Chicago*,
  333 F.3d 846 (7th Cir. 2003) ......................................................47, 48

*Staples v. United States*,
  511 U.S. 600 (1994).........................................................................39

*Troogstad v. City of Chicago*,
  576 F. Supp. 3d 578 (N.D. Ill. 2021) ...............................................13

*United States v. Hasson*,
  2019 WL 4573424 (D. Md. Sept. 20, 2019) ......................................43

*United States v. Miller*,
  307 U.S. 174 (1939)............................................................19, 29, 43

*Walters v. Kemp*,
   2020 WL 9073550 (N.D. Ga. May 5, 2020) ............................................................ 49

*Winter v. Nat. Res. Def. Council, Inc*.,
   555 U.S. 7 (2008) .......................................................................................... 13, 50

**Treatises**

4 Sir William Blackstone, *Commentaries on the Laws of England* 149 (1789) ........................... 22

Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky*
   482 (1822) ........................................................................................................ 22

Henry Stephen, *Summary of the Criminal Law* 48 (1840) ............................................... 22

Francis Wharton, *A Treatise on the Criminal Law of the United States* 63 (1852) ...................... 22

## INTRODUCTION

Plaintiffs claim that the Second Amendment grants them the right to own weapons of military origin, designed so that a shooter with minimal training can easily fire bullets from a distance with high accuracy and with a force capable of tearing through the human body with uncommon lethality. The City of Highland Park knows all too well the extraordinary damage these weapons can inflict on a community.

On July 4, 2022, the Highland Park Independence Day parade became a massacre. A lone shooter, hidden atop a roof along the parade route, fired 83 bullets within roughly 60–90 seconds from an AR-15-style assault weapon. He used 30-round magazines, enabling him to reload only twice. Police were there as part of the festivities and responded immediately, yet the gunman was able to flee the scene because no one could determine his location before he stopped firing. Before police could identify the source of the attack, 55 people had been shot, 7 fatally. The wounds were horrific. The scene resembled a war zone. The psychological trauma experienced by those who were present reverberates still.

According to Plaintiffs, the Second Amendment prevents Highland Park from banning the type of weapon and accessories that enable individuals to inflict such horror so quickly. They seek the drastic remedy of a preliminary injunction against Highland Park's ten-year-old ban.

Highland Park passed its ordinance in reaction to various mass shootings with similar weapons and large-capacity magazines—including in 2012, at a school in Sandy Hook, Connecticut that killed 20 first graders and 6 adults with an AR-15-style weapon with 30-round magazines. Highland Park knew that no law could eliminate the risk of a mass shooting with an assault weapon within the city. Laws prohibiting murder cannot guarantee an end to murder. But, in Highland Park's considered legislative judgment, a ban would reduce the risk. The ordinance

1

tracked similar bans passed by state and local governments around the country, including Cook County (which borders Highland Park). The Seventh Circuit rejected a Second Amendment challenge to Highland Park's ban in 2015.

Plaintiffs argue that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), has changed everything, so that the Second Amendment now invalidates Highland Park's ordinance. Plaintiffs are wrong. *Bruen* "decide[d] nothing about … the kinds of weapons that people may possess." *Id.* at 2157 (Alito, J., concurring). It did not address assault weapons bans. The Supreme Court has never struck down an assault weapons ban—or a ban on *any* particular type of weapon. Instead it has done the opposite, holding that a ban on short-barreled shotguns does not violate the Second Amendment. As the Court has explained, "the Second Amendment right … extends only to certain types of weapons." *District of Columbia v. Heller*, 554 U.S. 570, 623 (2008). The Second Amendment protects some weapons but not others.

*Bruen*'s approach to the Second Amendment supports Highland Park's ordinance. It first requires Plaintiffs to establish that the weapons in question are "Arms" protected by the Second Amendment. Only weapons "in common use" that are not "dangerous and unusual" are protected. Plaintiffs must satisfy *both* standards. On the merits, Plaintiffs will not likely carry their burden as to *either*.

The AR-15, AK-47, and other high-powered weapons prohibited by the ordinance are remarkably and unusually lethal: they devastate their victims' bodies with horrific wounds and shoot more quickly than other weapons, creating more victims in less time. They place military firepower in civilian hands. Indeed, their marketing emphasizes their use for attack. These are not traditional weapons of self-defense. It is no accident that they are mass shooters' guns of choice. These weapons, which invoke terror from their mere public display, are precisely the

type of weapon the "dangerous and unusual" test was designed for.

Nor are these weapons "in common use." Plaintiffs emphasize the large growth in the raw number of assault weapons in circulation in America. But those numbers conceal a deeper truth: the proportion of Americans who own them is, in fact, quite low. The Supreme Court's Second Amendment decisions demand much wider acceptance before ownership of a weapon becomes a matter of right, no longer subject to legislative judgments regarding public safety.

Even if Plaintiffs could bring assault weapons within the scope of the Second Amendment, their claim would still likely fail at *Bruen*'s second step. Highland Park can and will prove that its assault weapons ban "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. For over two centuries, the Second Amendment has never barred legislative responses to the menace of weapons of increasing lethality, even as those weapons grew in popularity. Highland Park has compiled that history with the help of multiple experts who explain the longstanding tradition of regulating—including prohibiting—particularly dangerous *types* of weapons, especially firearms designed to produce mass harm in a short time before any meaningful response may be mounted. Tellingly, even *before* the substantial influx of assault weapons into the marketplace upon which Plaintiffs rely, the Federal Government had banned their sale. After that ban expired, communities across the country expressed their opposition to assault weapons with their own regulations. *Bruen* demands respect for this history.

Plaintiffs must also show irreparable harm. Susan Goldman claims she is irreparably harmed because she cannot bring her AR-15-style weapon to her Highland Park home to protect her family and property. But Highland Park's ordinance leaves Ms. Goldman free to protect herself, her loved ones, and her home with an unlimited number of handguns, shotguns, and many different types of rifles, all enhanced with ten-round magazines. Highland Park is a safe

place. Until the July 4 shooting, there had not been a homicide in 20 years. A Highland Park resident does not need a military-style assault weapon or any weapon loaded with more than 10 rounds of ammunition to defend her home.

Finally, the balance of equities and the public interest strongly favor Highland Park, a community still reeling from the parade massacre. Statements from citizens, police officers, and doctors who experienced the horror caused by a single assault weapon used for 60–90 seconds, carry overwhelming weight that Plaintiffs cannot overcome. The public interest weighs heavily in favor of allowing Highland Park to heal in 2023, including at its next Fourth of July parade.

There is and has long been a robust public debate about whether strict or lax gun laws better protect the public against the increasing lethality of weapons entering the marketplace. Last week the State of Illinois expressed its view about assault weapons, passing its own regulation of them and large-capacity magazines, partially in reaction to the July 4 tragedy in Highland Park. Plaintiffs ask this Court to declare this debate out of bounds for communities acting through their representatives. Nothing in our Nation's history, in the history of assault weapons' circulation, or in *Bruen* authorizes courts to intrude upon the solemn duty of legislatures to exercise their common-law police power to protect public safety as they best see fit from the dangers of assault weapons.

The preliminary injunction should be denied.

## BACKGROUND

### A.   Enactment of Highland Park's Ordinance.

In 2013, Highland Park adopted Ordinance No. 68-13, amending the City Code to prohibit the manufacture, sale, and possession of assault weapons and large-capacity magazines within the City. Ex. 1, Highland Park Ordinance No. 68-13 ("Ordinance"). "Assault weapons" are defined in the Ordinance to include semi-automatic rifles, pistols, and shotguns with certain

4

features, such as semi-automatic rifles with the ability to accept a large-capacity magazine and at least one of: (1) a pistol grip without a shoulder stock; (2) a protruding grip for the non-trigger hand; (3) a folding, telescoping, or thumbhole stock; (4) a barrel shroud; or (5) a muzzle brake or compensator. Highland Park City Code § 136.001. "Large capacity magazines" are defined as ammunition-feeding devices that can accept more than 10 rounds of ammunition. *Id.* The Ordinance also lists specific models of firearms it covers, including, for example, the AR-15, AK-47, Bushmaster XM15, MAC-10 and MAC-11 pistols, and Streetsweeper shotgun. *Id.*

Highland Park's City Council passed the Ordinance because it determined that assault weapons "pose an undue threat … to residents, property owners, and visitors" and "are not traditionally used for self-defense in the City." *Id.* at 1. In particular, Highland Park wanted to reduce the risks that assault weapons and large-capacity magazines pose to public safety, especially given the increasing occurrence of mass shootings in suburban communities at the time. *See id.* In 1988, for example, there was a mass shooting near Highland Park: an individual attempted to ignite a bomb at an elementary school in Highland Park, and then went on a shooting rampage at a school in a neighboring town. Ex. 9, N. Rotering Decl. ¶ 10. Additional mass shootings happened in other cities after that, including in Aurora, Colorado, Tucson, Arizona, and Santa Monica, California. *Id.* ¶ 9. And in 2012, just six months before the Ordinance was enacted, the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut took place, in which 26 people, including 20 children, were killed with an AR-15-style assault weapon. *Id.* ¶ 10. By the time Highland Park enacted its Ordinance, the preceding two decades had seen more than 50 mass shootings in the United States. *See* Ex. 5, Klarevas Decl., Fig. 1. The majority of mass shootings resulting in double-digit fatalities had involved some kind of assault weapon or large-capacity magazine. *Id.* ¶ 22 & Table 6.

Highland Park believed that the Ordinance was one tool to mitigate the threat of mass shootings. *See* Ex. 9, N. Rotering Decl. ¶¶ 12, 36. City officials feared that they "could just as easily be those panicked and grief-stricken parents" familiar from news coverage of other towns' mass shooting incidents, and wanted to reduce the risk that this would occur in their city. *Id.* ¶ 10.

Soon after Highland Park enacted the Ordinance, a Highland Park resident and a gun rights organization challenged it as unconstitutional under the Second Amendment. This Court and the Seventh Circuit upheld the Ordinance against that challenge. *See Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 577 U.S. 1039 (2015).

Assault weapons have been—and remain—extremely rare in Highland Park. Ex. 9, N. Rotering Decl. ¶ 11. However, the ability to remove these dangerous weapons from the community "provides an affirmative tool for law enforcement to protect the community." *Id.* ¶ 12. Since the Ordinance's passage, police have recovered and secured prohibited firearms and magazines during red-flag law visits, domestic violence calls, and other police encounters. *Id.* ¶ 13.

Highland Park was not alone. Numerous state and local governments enacted similar laws in the wake of mass shootings involving military-style weapons and large-capacity magazines. *See, e.g.*, Ex. 1, Ordinance at 1. For example, as of 2013, Cook County had a similar law banning assault weapons, which had already survived constitutional challenges. Ex. 9, N. Rotering Decl. ¶¶ 6–7. Highland Park used Cook County's law as a model for its Ordinance. *Id.* As of this filing, nine states plus the District of Columbia, covering 30% of the Nation's population, have enacted similar laws—including, most recently, significant assault-weapon and large-capacity-magazine regulations enacted by the State of Illinois on January 10, 2023, with the assault weapons provision not in effect until 2024.[1] Ex. 5, Klarevas Decl. ¶ 25.

---

[1] In addition to the law's January 1, 2024 effective date, the provision banning possession of

Research shows that laws like the Ordinance reduce the risk of mass shootings. Over the past 30 years, jurisdictions with similar prohibitions had 62% fewer high-fatality mass shootings involving assault weapons or large-capacity magazines than jurisdictions that did not. *Id.* ¶ 37.

**B.     The Mass Shooting at the Highland Park Parade.**

Highland Park's worst fear—a mass shooting—became a horrific reality on July 4, 2022. A single shooter wielding an AR-15-style assault weapon with multiple 30-round cartridges killed 7 people, injured 48 others, and terrorized the community. The effects will be felt for decades to come.

After a pandemic hiatus, the July 4, 2022 parade was Highland Park's opportunity to celebrate in person for the first time in several years. In the early hours of the day, people began arriving with lawn chairs and picnic blankets along Central Avenue in downtown Highland Park. *See* Ex. 12, D. Cohn Decl. ¶ 7. Nearly 3,000 people had gathered along the parade route by mid-morning. Ex. 9, N. Rotering Decl. ¶ 17. There were generations of families at the parade. Children decked out in red, white, and blue took many of the front row seats. For some, this was their first Fourth of July parade; for others, it was the continuation of a 50-year tradition. *See, e.g.*, *id.* ¶ 22.

The parade is also a chance for the community to celebrate and connect with Highland Park's emergency responders. Nearly the entire Highland Park Fire Department was at the parade. Ex. 10, O'Neill Decl. ¶ 17. Approximately half of the Highland Park Police Department was also either in the parade or on the parade detail, securing the perimeter. *Id.* ¶¶ 17–19. And Community Emergency Response Team volunteers were riding bikes through the parade route,

---

assault weapons includes a grandfather clause allowing continued possession of certain assault weapons possessed before January 1, 2023. 720 ILCS 5 § 24-1.9(c), (d)(2). And the provision banning possession of large-capacity magazines allows up to 15 rounds for some firearms and does not go into effect for 90 days. *Id.* § 24-1.10(a)(1), (c). Highland Park's Ordinance thus will remain the sole law in Highland Park that prohibits the possession of any assault weapons and certain magazines.

helping with crowd control. *See* Ex. 15, Ring Decl. ¶ 11.

At 9:30 a.m., the festivities began with a bike and pet parade. *Id.* ¶ 8. More than 100 children, parents, and pets biked and walked down the parade route, waving to their neighbors and friends before hurrying back to watch the main parade themselves. *Id.* ¶¶ 8–9.

The main parade began at 10:00 a.m. The front featured first responders and service members, including members of the Fire Department in their fire trucks, officers from the Police Department with their beloved new K-9 "paw-ficer," and members of the armed forces. *Id.* ¶¶ 10–11; Ex. 12, D. Cohn Decl. ¶ 14. The Mayor, City Council members, and other elected officials followed behind. Ex. 12, D. Cohn Decl. ¶ 14. Next was the Highland Park High School marching band, playing familiar songs as it passed through the intersection of Central Avenue and Second Street. *See id.* ¶ 15.

At 10:14 a.m., everything changed. Armed with a Smith & Wesson M&P15 (an AR-15-style firearm) and several 30-round magazines, a man had climbed unseen onto the roof of Ross Cosmetics, a local business. *See, e.g.*, Ex. 10, O'Neill Decl. ¶¶ 21, 36. He started firing into the crowd gathered at Central Avenue and Second Street. *Id.* ¶¶ 21–29; Ex. 9, N. Rotering Decl. ¶ 16. In less than 90 seconds, and potentially less than 60 seconds, he had fired 83 shots. *See* Ex. 9, N. Rotering Decl. ¶ 16; Ex. 10, O'Neill Decl. ¶ 24; *see also, e.g.*, Ex. 16, *Highland Park Shooting Reveals Limits of Illinois's Gun Restrictions*, N.Y. Times (July 6, 2022); Ex. 17, *How the Highland Park Parade Shooting Unfolded*, Wash. Post (July 6, 2022).

Most parade goers did not realize what was happening at first. *See, e.g.*, *id.*; Ex. 12, D. Cohn Decl. ¶ 16; Ex. 14, V. Rotering Decl. ¶ 8. They heard the sound of "pop, pop, pop, pop," but, through the noise of the parade, they did not know what it was. *See, e.g.*, Ex. 12, D. Cohn Decl. ¶ 16; Ex. 15, Ring Decl. ¶ 12; Ex. 14, V. Rotering Decl. ¶ 8. Some thought it was

fireworks. Others thought it was the drum cadence from the marching band. *See, e.g.*, Ex. 13, M. Cohn Decl. ¶ 11; Ex. 9, N. Rotering Decl. ¶ 18.

The popping noise stopped for a few seconds. It began again, and by then the crowd had realized something was wrong. Some parents grabbed their children and took off running. Ex. 15, Ring Decl. ¶¶ 12–21. Others stayed in place, dropping to the ground and covering their heads as they had learned in active shooter drills. *See* Ex. 12, D. Cohn Decl. ¶ 18. One woman described seeing "golden raindrops" raining down. *Id.* ¶¶ 17–18. A certified EMT, she immediately turned her attention to her cousin, who appeared to have fainted. But in fact, her cousin had been shot, and she died at the scene. *Id.* ¶¶ 20–32; Ex. 13, M. Cohn Decl. ¶¶ 14–27.

Because many in the Highland Park Police Department were on the scene as participants or security for the parade, emergency response times were minimized. Armed with their duty weapons and non-rifle-rated ballistic vests, officers bravely ran toward the shooter's location. Ex. 10, O'Neill Decl. ¶¶ 21–29, 50–54. Many were only a block or two away when the shooting began, but the shooting was already over by the time they reached the intersection. *Id.* ¶ 29.

The shooter escaped into the crowd of fleeing parade goers. He then drove to Madison, Wisconsin, considered committing another shooting at another Fourth of July celebration, but instead drove back to Highland Park. *Id.* ¶ 43. He was apprehended later that day. *Id.* ¶ 42.

In total, the shooting lasted a mere 60–90 seconds. Within those seconds, the perpetrator fired 83 shots and killed 7 people: 88-year-old Stephen Straus, 78-year-old Nicolas Toledo-Zaragoza, 69-year-old Eduardo Uvaldo, 64-year-old Katherine Goldstein, 63-year-old Jacki Sundheim, 37-year-old Kevin McCarthy, and 35-year-old Irina McCarthy. Ex. 9, N. Rotering Decl. ¶ 20. The shooter also injured 48 others. *Id.* ¶ 16.

The stories from the scene are horrifying and too numerous to recount here. As an

9

example, Kevin and Irina McCarthy died shielding their two-year-old son from gunfire. Ex. 9, N. Rotering Decl. ¶ 27. An only child and now an orphan, their son was later found by parade goers, unharmed but soaked in his parents' blood. Ex. 15, Ring Decl. ¶¶ 22–36. Another example: Three members of the Roberts family were injured in the shooting, including eight-year-old Cooper Roberts, who is paralyzed from his injuries, which included a severed spinal cord, shredded esophagus, and ripped liver. Ex. 9, N. Rotering Decl. ¶¶ 29–30. His twin brother took shrapnel to his leg. *Id.* ¶ 29. And their mother, a local school superintendent, required surgery for gunshot wounds, after which she left the hospital early, against doctors' advice, to be with her sons. *Id.* Dozens of other victims had serious wounds that required, and continue to require, advanced medical care. *Id.* ¶¶ 31–32; *see also* Ex. 11, McKenzie Decl. ¶¶ 10–14.

Doctors on the scene described what they saw as "wartime injuries." Ex. 16, *'Those Are Wartime Injuries': Doctor Describes the Horrific Scene at the Highland Park Shooting*, CNN (July 5, 2022). For example, Dr. David Baum and Dr. Loren Schechter were both at the parade with their families when shots rang out. See Ex. 19, *At Highland Park Parade Mass Shooting, Doctors Went From Watching to Treating the Wounded*, Chi. Sun Times (July 8, 2022). They raced toward the wounded, applying pressure, tying tourniquets, starting IVs, and, in one instance, performing CPR on a child. *Id.* Dr. Baum described the injuries he saw as the type "that only happen when bullets can blow bodies up." *'Bodies Were Down': Witness Breaks Down Scene of Mass Shooting at Illinois Fourth of July Parade*, NBC News (July 4, 2022).[2] There was "an unspeakable head injury," and a person with "an evisceration injury" from "the power of th[e] gun and the bullets." *Id.* Paramedics had no difficulty identifying who was dead "because

---

[2] Available at https://www.nbcnews.com/video/illinois-doctor-recalls-moments-he-saw-bodies-down-at-fourth-of-july-parade-shooting-143393349888 (last visited Jan. 16, 2023).

they had horrific injuries, the kind of injuries you probably see in wartime." *Id.*; *see also* Ex. 7, Schreiber Decl. ¶ 30.

By 10:23 a.m., the first victim arrived at Highland Park Hospital, informing the five nurses and one doctor in the emergency room about the shooting. *See* Czink & Bair, *'They Just Kept Coming': Highland Park Medical Staff Recalls Parade Shooting*, WGN TV (July 12, 2022).[3] For the next hour, victims continued arriving at the emergency room, with increasingly serious injuries. *Id.* Doctors and nurses described the wounds they saw as "war wounds." *Id.* Dr. Ana Velez-Rosborough, the only surgeon present when Cooper Roberts arrived, described Cooper's wounds as "devastating"—the shots had destroyed organs, soft tissue, and bones. *Id.*; *see also* Ex. 20, *Highland Park Hospital Doesn't See Many Victims of Gun Violence. Then July Fourth Happened. Here's How the Day Unfolded*, Chi. Trib. (Aug. 14, 2022); *see also* Ex. 7, Schreiber Decl. ¶ 30.

Physical wounds reflect only a part of the suffering. The trauma reaches many more, still to this day. *See* Ex. 15, Ring Decl. ¶¶ 36–39; Ex. 9, N. Rotering Decl. ¶ 34. Witnesses have described the scene as a war zone, with bodies, blood, and glass everywhere. Ex. 15, Ring Decl. ¶ 29; Ex. 12, D. Cohn Decl. ¶ 32. Some parade goers saw their family, friends, and neighbors killed or seriously wounded. *See* Ex. 12, D. Cohn Decl. ¶¶ 16–34; Ex. 13, M. Cohn Decl. ¶¶ 14–29. Others experienced the fear of running for their lives, many with their children. *See* Ex. 15, Ring Decl. ¶¶ 13–29. For a period in the aftermath of the shooting, more than 1,200 people per day sought trauma-informed care, and many are still in therapy and counseling to this day. *See id.* ¶¶ 38–39; Ex. 9, N. Rotering Decl. ¶ 34.

---

[3] Available at https://wgntv.com/video/they-just-kept-coming-highland-park-medical-staff-recalls-parade-shooting/7826906/ (last visited Jan. 16, 2023).

### C.    Procedural History.

Barely two months after the parade, the National Association for Gun Rights ("NAGR") and individual plaintiff Susan Goldman filed this suit to challenge Highland Park's Ordinance as unconstitutional under the Second Amendment. *See* Dkt. 1. Their Complaint seeks a declaratory judgment that the Ordinance is unconstitutional, an injunction to prohibit enforcement of the Ordinance, and compensatory damages and other monetary relief under 42 U.S.C. § 1983. *Id.* ¶¶ 36–39. Around the time they filed this suit, NAGR also filed nine copycat cases challenging other laws prohibiting assault weapons and large-capacity magazines, including in Naperville, Illinois, and in Connecticut, Colorado, Hawaii, and Massachusetts.[4]

On October 7, 2022, Plaintiffs filed a Motion for Preliminary Injunction (Dkt. 7, the "Motion" or "Mot.").[5] The Motion asks this Court to enjoin enforcement of the Ordinance during the pendency of this suit because, according to Plaintiffs, they are likely to succeed on the merits of their claim that the Ordinance is unconstitutional under *Bruen*.

### <u>LEGAL STANDARD</u>

A preliminary injunction is an "extraordinary remedy" that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v.*

---

[4] *See Bevis v. City of Naperville*, No. 22-cv-4775 (N.D. Ill.); *NAGR v. Lamont*, No. 22-cv-1118 (D. Conn.); *Rocky Mountain Gun Owners ("RMGO") v. Town of Superior*, No. 22-cv-1685 (D. Colo.); *NAGR v. City of Louisville*, No. 22-cv-2111 (D. Colo.); *RMGO v. City of Boulder*, No. 22-cv-2112 (D. Colo.); *RMGO v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 22-cv-2113 (D. Colo.); *RMGO v. Town of Superior*, No. 22-cv-2680 (D. Colo.); *NAGR v. Shikada*, No. 22-cv-404 (D. Haw.); *Capen v. Healey*, No. 22-cv-11431 (D. Mass.).

[5] As of this writing, two other motions are also pending: Highland Park's motion to dismiss NAGR for lack of standing (*see* Dkt. 26), and Highland Park's motion to reassign this case to Chief Judge Pallmeyer's docket as a case related to *Viramontes v. The County of Cook*, No. 1:21-cv-04595 (N.D. Ill.), which challenges the Cook County law on which Highland Park modeled its Ordinance (*see* Dkt. 39).

*Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). To obtain this drastic remedy, the plaintiff bears the burden of showing "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).

Under this test, Plaintiffs' burden is "significant." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Plaintiffs can carry that burden only with a "clear showing" on each of the four factors, including in constitutional cases. *Troogstad v. City of Chicago*, 576 F. Supp. 3d 578, 583 (N.D. Ill. 2021) (denying preliminary injunction motion involving Due Process challenge), *aff'd sub nom. Lukaszczyk v. Cook Cnty.*, 47 F.4th 587 (7th Cir. 2022); *see also, e.g.*, *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) (same for Fourth Amendment challenge); *Cassell v. Snyders*, 990 F.3d 539, 544–50 (7th Cir. 2021) (same for First Amendment challenge). Plaintiffs' burden is especially heavy when, as here, they sue a governmental entity. "[A]ny time" a municipality or state is "enjoined by a court from effectuating statutes enacted by representatives of its people," it "suffers a form of irreparable injury" that weighs against a preliminary injunction. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted).

## **ARGUMENT**

### I.      **Plaintiffs Have Not Shown They Are Likely to Succeed on the Merits.**

Plaintiffs' Motion should be denied because they have not shown that they are likely to succeed on the merits, with respect to either assault weapons or large-capacity magazines.

#### A.      **Legal Framework for Second Amendment Analysis.**

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. Amend. II. The Supreme Court in *Heller* held that the Amendment protects "an individual

right to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125. But it has long been understood and remains true that the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Put simply, some weapons remain subject to legitimate government regulation despite the Second Amendment, not only as to *where* and *why* they may be possessed by individuals, but also as to *whether* they may be possessed at all.

The Supreme Court has directed a two-step analysis for determining when government regulations of weapons survive a Second Amendment challenge.

*First*, a court must determine whether the weapons at issue are "Arms" within the plain meaning of the Second Amendment. The Supreme Court has acknowledged that the Second Amendment right "extends only to certain types of weapons." *Heller*, 554 U.S. at 623. That is, since the Founding, it has been understood that not all weapons are the types of "Arms" that the people may "keep and bear." *Id.* at 622–23 (explaining that the Second Amendment's protection may not extend to a particular "*type of weapon*"). Rather, "Arms" refers to "weapons that are 'in common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). In addition, "Arms" excludes "dangerous and unusual weapons." *Id.* (quoting *Heller*, 554 U.S. at 627).[6] Both categories, weapons not "in common use" at the time of the regulation at issue and "dangerous and unusual" weapons, are simply outside the scope of the Second Amendment. If a weapon fails either the "common use" test or the "dangerous and unusual" test, the Court need

---

[6] As discussed below (*see infra*, n.8), the historical sources *Heller* cited for the phrase "dangerous and unusual weapons" demonstrate that both "dangerous" weapons and "unusual" weapons were prohibited historically. Thus, Plaintiffs are wrong that the Court can ignore the word "dangerous" in this analysis and ask merely whether assault weapons are "unusual." Mot. 8–9. Nevertheless, because assault weapons are both "dangerous" and "unusual," this issue should not matter to the outcome.

proceed no further and should uphold the regulation.

*Second*, the regulation of "Arms" covered by the Second Amendment remains constitutional if the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. That historical tradition, of course, is necessarily as varied as the sentiments of the American people reflected in the laws passed by their state and local representatives, and the geographical and other circumstances that impact their judgments about public safety.

Given today's immensely more lethal and powerful firearms (likely unimaginable to the Founders), the Court must compare past regulations and circumstances by analogy to present regulations and circumstances. *Id.* at 2130, 2156. To make those comparisons, courts faced with Second Amendment cases since *Bruen* have been hearing evidence from historical experts about analogous regulations. Highland Park provides such evidence here.

Critically, the Supreme Court has split the burden of proof in Second Amendment cases between the parties. Challengers bear the burden at the first step, and the government bears the burden at the second step. Plaintiffs here proceed as if they have no burden at either step. *See* Mot. 7–10. But the Supreme Court was clear: It shifted the burden of proof to the government *only* for step two. *Bruen*, 142 S. Ct. at 2130. As a result, the general rule applies at step one: "As the party challenging the statutory [] scheme," the plaintiff "bears the burden of demonstrating its unconstitutionality," and "statutes [are] presumed constitutional." *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 198 (2001).

Just as critically, the Supreme Court has never struck down a law banning possession of certain types of weapons. As Justice Alito observed, *Heller* and *Bruen* have "decide[d] nothing about … the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J.,

concurring). Thus, the Supreme Court has not decided whether the Second Amendment prohibits assault weapons bans (or any other specific-weapon bans).

The Seventh Circuit, however, has done so, upholding this same Ordinance eight years ago, in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). The plaintiffs there tried to make a similar argument—that Supreme Court cases not about specific-weapon bans should be interpreted to mean that the Ordinance was unconstitutional. In rejecting that argument, the Seventh Circuit cautioned against over-reading the Supreme Court's Second Amendment rulings to reach beyond their holdings. *Id.* at 412 ("The best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate, not by parsing ambiguous passages in the Supreme Court's opinions."). Other circuits have uniformly agreed that similar restrictions on assault weapons and large-capacity magazines are constitutional. *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011); *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc). Make no mistake: Plaintiffs are asking this Court at this preliminary stage to blaze a new constitutional path and override a legislative judgment already approved by the Seventh Circuit.

Under the Supreme Court's Second Amendment standard, Plaintiffs have not met their burden at step one. They have not demonstrated that assault weapons are "in common use" as that term was understood at the time of the Founding. And they have not demonstrated that assault weapons are not "dangerous and unusual," ignoring entirely the "dangerous" component of this test. The Court should thus end its analysis at step one and deny Plaintiffs' motion.

Even if Plaintiffs could meet their burden at step one, Highland Park has more than met its burden at step two to justify its Ordinance, as to both assault weapons and large-capacity magazines. There is a long, consistent tradition in American law that restricts private citizens from

16

owning weapons like those covered in the Ordinance. Their mere presence inspires immediate, widespread fear and terror. They are capable of producing mass harm in a matter of seconds. Such weapons have, throughout American history, been the subject of legitimate regulation soon after their use among even a small portion of the population became salient to legislatures.

**B.  Plaintiffs Have Not Met Their Burden to Show That Assault Weapons Are "Arms" Protected by the Second Amendment.**

**1.  Assault Weapons Are Not "In Common Use."**

The Supreme Court has not specified how legislatures and courts are to determine whether a modern weapon is "in common use." *See Friedman*, 784 F.3d at 409 ("what line separates 'common' from 'uncommon' ownership is something the Court did not say"). The Court said that handguns—America's "most popular" firearm—are "in common use" today. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2134. But Plaintiffs do not suggest that the assault weapons at issue, primarily AR-15-style assault weapons, are as commonly used as handguns. Instead, they assert that these weapons must be considered in "common use" because "the number of AR-15 rifles and other modern sporting rifles in circulation in the United States exceeds twenty-four million." Mot. 15. That is not sufficient to carry their burden.

Plaintiffs' statistic does not address the question that *Heller* and *Bruen* require Plaintiffs to answer. The number of weapons "in circulation" merely counts the number of such weapons produced or imported into the country, less exports. *See* Ex. 22, NSSF, "Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation" (July 20, 2022). This figure, which presumably includes weapons in the possession of law enforcement agencies and criminals, and those on store shelves or in warehouses, is almost certainly an over-estimation of the number of weapons lawfully possessed by civilians. The number also says nothing about the frequency with which these weapons are *used* for lawful purposes.

Even starting with this inflated number, this lone statistic does not carry Plaintiffs' burden. *Heller* and *Bruen* command an approach rooted in "history." *Bruen*, 142 S. Ct. at 2128–29. The Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right." *Id.* at 2128. According to the historical approach, the general meaning of the Second Amendment is "fixed," but also "applies to new circumstances." *Id.* at 2132. In other words, courts must extract general principles or definitions from the historical understanding, and then apply them to modern weapons and circumstances. *Id.* The "common use" rule emerges from that historical understanding. *Id.* at 2128. That is, the Supreme Court has declared that weapons "in common use" at the time of the Founding were protected by the Second Amendment. *Id.* At a minimum, the Supreme Court's historical approach indicates that a modern weapon can be considered "in common use" only if it is as commonly used as weapons that the Second Amendment protected at the time of the Founding.

On this score, Plaintiffs offer nothing. They provide *no* evidence to show how "common" were the weapons protected at the time of the Founding. For this reason alone, they have failed to meet their burden. And the historical evidence presented by Highland Park shows that Plaintiffs cannot prevail on this score: assault weapons are not nearly as "commonly used" today as were the types of weapons protected by the Second Amendment at the time of the Founding.

The "common use" principle was connected to militia service in the Founding era. *Heller*, 554 U.S. at 624–25; *Bruen*, 142 S. Ct. at 2128. Specifically, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624; *see also id.* at 624–25 ("In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.") (quoting *State v. Kessler*, 289 Ore. 359, 368 (1980) (citing G.

18

Neumann, *Swords and Blades of the American Revolution* 6–15, 252–254 (1973)). These were the paradigmatic "commonly used" weapons protected by the Second Amendment. Historical evidence shows that they were exceedingly common. The rates at which Americans possessed these weapons were substantially higher than the rates at which Americans today possess assault weapons.

In the Founding era, 50% to 60% of households owned a firearm, which was typically a musket or hunting rifle (single-shot firearms that had to be re-loaded through the muzzle before each shot). Ex. 6, Roth Decl. ¶ 15. Historical evidence shows that these weapons were the weapons used in militia service. *Id.* Indeed, Founding-era statutes frequently commanded all able-bodied men to own a musket or hunting rifle, precisely because these weapons were brought from home to militia service, and therefore needed to be commonly owned in society to fill the ranks of militiamen. *See United States v. Miller*, 307 U.S. 174, 179–82 (1939) (collecting statutes).

Relative to this historical baseline, assault weapons are not nearly so "commonly used" for lawful purposes as to merit constitutional protection. The parties agree that there are 24 million assault weapons in circulation in the United States today, *see* Mot. 15, but that represents just 5% of the approximately 462 million firearms in circulation nationwide. Ex. 5, Klarevas Decl. ¶ 13. And ownership is concentrated: on average, each civilian owner of an assault weapon owns 3.8 such firearms, and the total estimated number of people who own assault weapons is only 6.4 million—less than ***2%*** of the current population of approximately 333 million Americans. *Id.* ¶ 27. There are 124 million households in America today, so even on the doubtful assumption that each owner of an assault weapon does not share a household with any other, that would mean that at most only ***5%*** of households in America own an assault weapon,[7] a far cry

---

[7] For population and household data, *see, e.g.*, U.S. Census Bureau, https://www.census.gov

from the 50% to 60% range that was considered "common" in the Founding era.

Moreover, the actual rates of lawful civilian ownership of assault weapons must be lower than these estimates, because the data reporting that there are 24 million assault weapons in circulation presumably include assault weapons by police forces and criminals. *See supra*, pp. 17–18. And on top of that, it is doubtful that each lawful civilian possession of assault weapons equates to common *use* of those weapons for self-defense or other lawful purposes. The features of assault weapons are neither designed nor necessary for self-defense, *see* Ex. 3, Busse Decl. ¶¶ 16–23; Ex. 2, Andrew Decl. ¶¶ 58–61, and assault weapons are only rarely used for defensive purposes. For example, an FBI database covering 2000–2021 reflects defensive use of an assault weapon in only 0.2% of active shooter incidents. Ex. 5, Klarevas Decl. ¶ 25.

In sum, the evidence strongly supports the conclusion that assault weapons are owned by a niche group of Americans; that is, they are not commonly owned, much less commonly used for lawful purposes. There is no legal basis in any Supreme Court decision to conclude that a weapon that has become popular among a niche group of Americans thereby becomes exempt from public safety regulations adopted by the representatives of the American people in their various legislatures.

Contrast the breadth of handgun ownership in present-day America with that of assault weapons. The Supreme Court has emphasized that handguns are the "quintessential" self-defense weapon, and the weapon of choice of American citizens. *See, e.g.*, *Heller*, 554 U.S. at 629. Approximately 50% of the 462 million firearms in circulation nationwide—approximately 231 million—are handguns. Ex. 5, Klarevas Decl. ¶ 28 & Fig. 1. Handguns are protected by the

---

/quickfacts/fact/table/US/HCN010217 (accessed Jan. 16, 2023); *see also* U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022 (cited in Ex. 5, Klarevas Decl. ¶ 27 n.22).

Second Amendment under *Heller* and *Bruen* precisely because they can meet the historical standard for "commonly used" that assault weapons cannot.

2.    **Assault Weapons Are "Dangerous" and "Unusual."**

There is not—and cannot be—any genuine dispute that assault weapons are "dangerous." Nor can there be any dispute that they are "unusual," in the Founding-era sense that they are unusually likely to cause public terror.

As *Heller* teaches, the tradition of prohibiting "dangerous" weapons and "unusual" weapons traces back to early English (and eventually American) law. A key part of what it meant for a weapon to be "dangerous and unusual," as that phrase was historically understood, was that it was not just dangerous, but also had a unique tendency to "terrify[] the good people of the land." 4 W. Blackstone, Commentaries 148–49 (1769); *see also Heller*, 554 U.S. at 627 (citing Blackstone as support for the "historical tradition" of prohibiting such weapons);[8] *Bruen*, 142 S. Ct. at 2142 (considering whether "public carrying of a handgun would terrify people"). And the same tradition extends to weapons that are "dangerous and unusual" today. A telling example:

---

[8] Plaintiffs put great weight on *Heller*'s use of the word "and" in the phrase "dangerous and unusual," 554 U.S. at 627, which Heller used to describe Blackstone's statement about the historical traditional of gun regulations. Blackstone's actual statement cited by *Heller* was that "dangerous *or* unusual" weapons were historically prohibited. *See, e.g.*, 4 Sir William Blackstone, *Commentaries on the Laws of England* 149 (1789) ("The offense of riding or going armed, with dangerous *or* unusual weapons, is a crime against the public peace, by terrifying the good people of the land.") (emphasis added). *Heller* must have meant that Blackstone was describing a tradition of prohibiting both dangerous weapons and unusual weapons, i.e., prohibiting both "dangerous and unusual" weapons. The other authorities cited by *Heller* immediately after Blackstone confirm the tradition was of prohibiting both dangerous weapons and unusual weapons. *See* Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous *or* unusual weapons, is a crime against the public peace.") (emphasis added); Henry Stephen, *Summary of the Criminal Law* 48 (1840) (includes section titled "riding or going armed with dangerous *or* unusual weapons) (emphasis added); Francis Wharton, *A Treatise on the Criminal Law of the United States* 63 (1852) (referring to "unusual" but not "dangerous" weapons). But in any event, the difference should not matter here, because assault weapons are both "dangerous" and "unusual."

21

*Heller* instructs that weapons of modern warfare may be banned. 554 U.S. at 627 ("weapons that are most useful in military service—M-16 rifles and the like—may be banned").

Plaintiffs have offered no evidence on this question, even though it is their burden. But again, even at this preliminary stage, the evidence shows that modern assault weapons fit the historical understanding of a "dangerous and unusual" firearm.

Assault weapons were originally created as weapons of modern warfare during the Cold War, in the 1950s and 1960s. Ex. 6, Roth Decl. ¶ 49; Ex. 2, Andrew Decl. ¶¶ 25; Ex. 3, Busse Decl. ¶ 24. They have a collection of distinctive features that make them exceptionally dangerous offensive weapons.

Assault weapons shoot extremely high-powered rounds. They were designed for "maximum wound effect." Ex. 2, Andrew Decl. ¶ 34. The bullets they fire "travel nearly three times the speed of sound"—i.e., approximately 3,300 feet per second. *Id.* ¶ 34; *see also* Ex. 6, Roth Decl. ¶ 49. "As the bullet strikes the body," the "kinetic energy rips open a cavity inside the flesh," which "collapses back on itself, destroying inelastic tissue, including nerves, blood vessels and vital organs." Ex. 2, Andrew Decl. ¶ 34; *see also* Ex. 7, Schreiber Decl. ¶ 35. As one surgeon and retired Navy captain put it: "It's a perfect killing machine." Ex. 2, Andrew Decl. ¶ 34. "A handgun [wound] is simply a stabbing with a bullet," and "[i]t goes in like a nail." *Id.* But "[w]ith the high-velocity rounds of the AR-15 … it's as if you shot somebody with a Coke can." *Id.*

When AR-15s were first tested on the battlefield in Vietnam, they were deemed "ideal" because of their "[e]xcellent" killing power. *Id.* ¶ 31. They literally ripped opponents apart—for example, a single shot to the "bottom of the right foot" of an enemy soldier caused "the leg to split from the foot to the hip," resulting in "instantaneous" death—prompting military reports to remark on their "phenomenal lethality." *Id.* ¶¶ 26–32.

22

Emergency room doctors in the United States now see the same kinds of injuries on victims of domestic mass shootings. Ex. 7, Schreiber Decl. ¶¶ 28–34; *see also* Ex. 2, Andrew Decl. ¶ 43. According to one trauma surgeon with extensive experience treating both military and civilian patients, the wounds that assault weapons cause "differ substantially from those caused by other firearms, notably handguns, both in impact on the body and their relative fatality and complication rates." Ex. 7, Schreiber Decl. ¶ 33. Patients injured by assault weapons "often require a series of operations instead of just one, unlike with handguns," *id.* ¶ 36, and face a "very high mortality rate," *id.* ¶ 41. Even when those patients survive, "they typically require prolonged hospitalizations and follow-up" and "suffer much greater disability." *Id.* ¶ 36. And in the aftermath of mass shooting events involving assault weapons, the victims' needs "frequently exceed the capacity of civilian trauma systems and trauma surgeons to treat." *Id.* ¶ 41. The impact on children is even more severe. A child's smaller torso and lower blood reserve means that assault weapons wounds are not only "markedly different" from wounds from other guns, but also are more likely to be fatal to children than adults. Ex. 11, McKenzie Decl. ¶¶ 11, 14; *accord* Ex. 4, Hargarten Decl. ¶ 35.

Scientific studies explain the physics behind these effects. A round shot by an AR-15-style rifle releases four to nineteen times the energy of a round from a handgun, depending on the handgun. Ex. 4, Hargarten Decl. ¶ 26. These rounds also tear larger "cavities" as they pass through the human body, and fragment to a greater degree inside the body. *Id.* ¶ 27. This makes them more likely to damage critical organs, cause bleeding, shatter bones, and pose particular risks in "pediatric victims." *Id.* ¶¶ 31–35. These weapons also represent significant technological advances over the firearms—even automatic or semi-automatic firearms—available in the early 20th century. For example, a single round from a modern AR-15-style rifle releases *three times*

the energy of a round from a Thompson submachine gun (or "Tommy" gun), *id.* ¶ 26—a World War I weapon that attained popularity in the 1920s, and has been banned for nearly a century, *see, e.g.*, Ex. 8, Spitzer Decl. ¶¶ 23–26.

Plaintiffs contend that there is a significant "practical difference" between military and civilian assault weapons—military weapons (like M-16s) can fire in either semi-automatic or full automatic mode, while civilian weapons (like AR-15s) can fire only in semi-automatic mode. Mot. 13. But this does not help Plaintiffs. The fact that fully automatic weapons are banned by federal law, as Plaintiffs point out, does not mean that weapons dissimilar to them *in any respect* may not be banned. The Supreme Court has also upheld a ban on short-barreled shotguns, which also cannot fire multiple rounds with a single pull of the trigger.

The difference in trigger mechanism is immaterial compared to what *does* matter: whether semi-automatic weapons are unusually dangerous. The evidence is clear that they are. Indeed, semi-automatic weapons are, in fact, even *more* lethal than fully automatic weapons. The military has concluded that semi-automatic is the more lethal mode. It is the mode recommended by most Special Forces trainers. Ex. 3, Busse Decl. ¶ 26. It is also the mode most commonly used on the battlefield by U.S. soldiers to target and kill enemy troops. *Id.* And the Army Field Manual teaches that semi-automatic is "the most important firing technique during fast-moving, modern combat." Ex. 2, Andrew Decl. ¶ 33. The reason is that semi-automatic allows a rapid rate of fire, while maintaining accuracy. *Id.* ¶¶ 31–33, 41; *see also, e.g.*, Ex. 3, Busse Decl. ¶ 26; Ex. 6, Roth Decl. ¶ 49. In other words, assault weapons available to civilians use the same mode— semi-automatic—that the military favors for its lethality on the battlefield. Bearing this out, data from domestic mass shootings show that shootings with *semi*-automatic rifles lead to more deaths on average than shootings with fully automatic weapons. Ex. 6, Roth Decl. ¶ 54.

24

Assault weapons also have a collection of other distinctive features that enhance their capability as lethal offensive weapons. They are exceptionally lightweight. Ex. 2, Andrew Decl. ¶¶ 25, 31, 39. They have low recoil. *Id.* They are highly maneuverable. *Id.* And they are extremely accurate from long distances, even hundreds of yards. *Id.* ¶ 41. Together, as put by a law enforcement expert with more than 20 years of experience with the FBI, these features give assault weapons "a highly disproportionate impact on public safety and present a unique modern public safety threat." *Id.* ¶ 19.

In short, assault weapons put military firepower in civilian hands. Indeed, their advertising promises as much. Advertisements tell purchasers to arm themselves with what the military and the police use. *See, e.g.*, Ex. 3, Busse Decl. ¶¶ 36–38 ("USE WHAT THEY USE"); *see also* Ex. 8, Spitzer Decl. ¶¶ 51–57. They highlight the dangerous, *offensive* capabilities of these weapons. Ex. 3, Busse Decl. ¶ 40 (advertising the "URBAN SUPER SNIPER"). And they sometimes portray these weapons as tools of private (and highly aggressive) vigilante action— for example, showing vigilantes bearing assault weapons and dressed in tactical gear, confronting protesters. *Id.* ¶¶ 38–39. One company even highlights, in its name no less, the use of these weapons from rooftops—the well-concealed location favored by snipers and assassins, like the Highland Park shooter. *Id.* ¶ 41 ("Rooftop Arms"). None of this marketing promotes lawful civilian use of these weapons. And the marketing contradicts Plaintiffs' assertion that the phrase "assault weapon" is a "political term." Mot. 2. The term has been used for decades by not just analysts and regulators but those promoting the weapons' sale. Ex. 8, Spitzer Decl. ¶¶ 51– 57; Ex. 3, Busse ¶¶ 32–36.

These weapons have had catastrophic effects. There has been an epidemic of mass shootings in the United States in recent decades, and assault weapons have been used in the

overwhelming majority of them. Ex. 5, Klarevas Decl. ¶¶ 11–23; *see also* Ex. 6, Roth Decl. ¶¶ 51–61. The dangerous offensive capabilities of these weapons allow a shooter to murder or maim large numbers of people very quickly, before victims can escape or police can respond. Ex. 6, Roth Decl. ¶¶ 51–61; Ex. 2, Andrew Decl. ¶¶ 41–51 (an "unmitigable threat"). And even if police are able to return fire, an assault weapon's firepower allows the shooter to match forces with the police, even if the shooter has no training. Ex. 2, Andrew Decl. ¶¶ 35, 39–42, 55–57; *see also* Ex. 6, Roth Decl. ¶ 51 (a shooter can "maintain parity with law enforcement in a standoff"). In fact, the shooter can even *outmatch* the police; many standard-issue police vests (including those worn by the Highland Park police) do not protect the body from bullets fired by assault weapons, and extra gear that might provide such protection limits officers' movement, which creates its own safety risks. Ex. 2, Andrew Decl. ¶¶ 49, 54–57; *see also* Ex. 10, O'Neill Decl. ¶ 8. Compounding all these ills are the profoundly traumatic effects these attacks have on the broader community. Ex. 2, Andrew Decl. ¶¶ 22–23; Ex. 9, N. Rotering Decl. ¶ 34.

For similar reasons, assault weapons are uniquely suited for illegal attacks on law enforcement officers. Ex. 2, Andrew Decl. ¶¶ 54–57 (assault weapons put criminals on "equal, and sometimes greater, footing" with law enforcement); *see also* Ex. 6, Roth Decl. ¶¶ 49–51. Assault weapons pose risks that are exceptionally difficult for police departments to mitigate. Ex. 2, Andrew Decl. ¶¶ 23, 46–51. They are frequently used to ambush police officers or resist lawful arrest. *Id.* ¶¶ 52–54. To subdue criminals armed with these weapons, police officers are forced to use dangerous and aggressive tactics—such as "charging structures with armored vehicles, use of explosives, robots, and drones with explosives." *Id.* ¶ 54; *see also* Ex. 6, Roth Decl. ¶ 51 (police departments have acquired "armored vehicles to defend themselves"). These weapons have endangered the lives of law enforcement officers. In the most recent years for

26

which statistics are available, nearly one in four of police officers killed in the line of duty (23%) were killed with an assault weapon. Ex. 2, Andrews Decl. ¶ 52.[9]

Highland Park knows this all too well. At the parade, the shooter fired 83 high-powered shots from his assault weapon within about 60–90 seconds, killing seven people and wounding 48. Ex. 9, Rotering Decl. ¶ 16; Ex. 10, O'Neill Decl. ¶ 24. Even though half of Highland Park's police force was at the parade before the shooting began, the shooter was able to escape before police, or anyone else, could even determine where he was located. *See, e.g.*, Ex. 10, O'Neill Decl. ¶¶ 17, 21–42. Doctors and nurses who saw the victims afterward described "horrific injuries," the kind that occur in "war zone[s]" when bullets "can blow bodies up." Ex. 7, Schreiber Decl. ¶ 30. One pediatric hospitalist who treated victims from the shooting described "flesh and tissue splayed open that was shredded to pieces," and a contusion on a patient's lung, "even though the lung itself never came into contact with the bullet," due to "reverberations in deeper tissue" caused by the bullet. Ex. 11, McKenzie Decl. ¶ 12. In another victim, a bullet fragment—no bigger than an eraser at the end of a pencil—created "severe life-threatening damage to multiple vital organs and a serious spinal cord injury." *Id.*

Residents from Highland Park have testified to the terror that AR-15-style weapons instilled in them both before the mass shooting at the Fourth of July Parade—and certainly after it. *See, e.g.*, Ex. 9, N. Rotering Decl. ¶ 40; Ex. 10, O'Neill Decl. ¶¶ 60–61; Ex. 12, D. Cohn Decl. ¶¶ 46–47; Ex. 13, M. Cohn Decl. ¶ 35; Ex. 14, V. Rotering Decl. ¶ 19; Ex. 15, Ring Decl. ¶¶ 40–42. And given the carnage that assault weapons can cause, it should come as no surprise that they

---

[9] Plaintiffs' assertion that rifles are the murder weapon in only 315 homicides per year ignores that the FBI statistics on which they rely report *thousands* of gun homicides where the type of gun is "not stated." *See* U.S. Dept. of Just., Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States, 2019, FBI, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls.

induce extraordinary fear in many other Americans, too. To give only one recent example, newspapers reported "panic, terror, and the evacuation" of a grocery store in Atlanta, Georgia, after customers spotted a man in the bathroom with an AR-15 rifle. Ex. 21, *A Heavily Armed Man Caused Panic at a Supermarket. But Did He Break the Law?* N.Y. Times (Jan. 2, 2023). Assault weapons "create public terror" and have "profound" effects on communities, to an extent "where just seeing someone carry an assault weapon in public can cause mass panic and fear" due to the "exceptional risks that they pose." Ex. 2, Andrew Decl. ¶ 22.

Plaintiffs have failed to carry their burden at *Bruen* step one, and certainly have not made the kind of "clear showing" required to obtain a preliminary injunction. *Orr*, 953 F.3d at 501. That is reason enough to deny Plaintiffs' motion.

C.    **Assault Weapons Bans Are Consistent with the National Tradition of Firearm Regulation.**

Though unnecessary to consider, Plaintiffs also have failed to show that they are likely to succeed at *Bruen* step two. An assault weapons ban is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As they did at step one, Plaintiffs' Motion fundamentally misstates the law and misframes the historical inquiry.

Plaintiffs argue that the Supreme Court has, in effect, already decided this case. *See* Mot. 8 ("the Supreme Court has already done the historical spadework"). But the Supreme Court has never decided an assault weapons case. It has never held that any law banning a particular type of weapon violates the Second Amendment. And *Heller* and *Bruen* expressly stated that they were not deciding what types of weapons may be possessed based on historical analysis, besides handguns. *Heller*, 554 U.S. at 626–27 ("we do not undertake an exhaustive historical analysis today"); *Bruen*, 142 S. Ct. at 2128 ("we cautioned that we were not 'undertak[ing] an exhaustive historical analysis'") (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2157 (Alito, J., concurring)

28

("Our holding decides nothing … about the kinds of weapons that people may possess.").

In fact, when the Supreme Court has analyzed prohibitions on specific types of weapons, it has upheld them, with the explanation that the Second Amendment only covers some types of weapons. In *United States v. Miller*, the Court rejected a Second Amendment challenge to an indictment relating to short-barreled shotguns, and held that such shotguns are not protected by the Second Amendment. 307 U.S. 174, 178 (1939). Later, *Heller* emphasized that the basis for *Miller*'s decision upholding the government ban was that "the *type of weapon at issue*" received no Second Amendment protection: "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 554 U.S. at 622–23; *see also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("*Heller*[] … endorses the proposition that the legislature can impose some categorical bans on the possession of firearms.").

Under the framework established in *Heller* and particularly *Bruen*, the key question at step two is whether America's history includes a tradition of firearms restrictions analogous to bans on assault weapons like Highland Park's. Neither *Heller* nor *Bruen* addressed that question.

The historical record answers that question with a resounding "yes." Time and again, advances in weapons technology have created new weapons with dangerous new capabilities. Each time these weapons started becoming available to civilians, their presence created new social problems. These problems prompted a legislative response, including bans on possession. This evolving process—technological advancement of weapons, slow emergence into the general marketplace, legislative regulation of the new weapon only after the technology begins to reach a general audience and its dangers become apparent—has happened *throughout* U.S. history. To be sure, the technological advances have been dramatically different over time. But the process of regulatory reaction to those advances has been a feature of American gun laws and the Second

29

Amendment throughout our history.

Plaintiffs run from this history. They argue that America's tradition of firearms regulation is irrelevant because the specific weapons regulated *today* were not regulated at the Founding. *See* Mot. 14 ("[T]he first 'assault weapon' ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective. Obviously, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment."). This is an absurd argument because nothing close to an assault weapon existed 200 years ago. It also ignores the Supreme Court's explanation about how to perform this historical analysis. The Court has emphasized that the historical inquiry looks for a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original).

The Second Amendment is not a "regulatory straightjacket." *Id.* Rather, the historical inquiry recognizes that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," and "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Today it is AR-15s and the like, while past generations addressed weapons such as historical multi-shot firearms and trap guns.

Accordingly, the relevant question is whether the historical record discloses a tradition of *analogous* regulations of *analogous* weapons. The Supreme Court has identified two "central" metrics, among others, that guide this analysis: first, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and second, "whether that burden is comparably justified." *Id.* at 2133. Highland Park's evidence demonstrates a well-settled tradition of regulating, even altogether prohibiting, particularly dangerous *types* of weapons—that is, weapons that created distinctive risks or dangers when in the hands of the

30

general public, and especially firearms designed to produce mass killing in an extremely short time before any meaningful response can be mounted.

Importantly, Highland Park need not demonstrate that the historically analogous regulations were uniformly adopted across the country. The Supreme Court has never suggested that, and it would be a baseless imposition. Our federal system encourages local variation. *See McDonald*, 561 U.S. at 785 (the Second Amendment "limits (but by no means eliminates) [states'] ability to devise solutions to social problems that suit local needs and values," and "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment"). What matters is not whether all or most jurisdictions in America have concluded that public safety would be better served by regulating the use or ownership of advances in weapons technology. For most of our Nation's history, firearms regulation occurred at the state and local, not federal, level. Analyzing historical analogues unsurprisingly reveals variation in local approaches as the people, acting through their legislatures, decide whether and how to react to advances in weapons technology that are believed to threaten public safety. *Heller* and *Bruen* counsel that the Constitution demands protection of the right to lawful self-defense. But it does not demand uniformity in all aspects of firearm regulation, nor does it preempt the ability of local legislature to regulate firearms simply because a different, faraway locality reacted differently to new weapons technology.[10]

### 1. Particularly Dangerous Types of Weapons Were Regulated During Early America.

While our Nation has now become accustomed to the immense and terrifying toll from

---

[10] Surveys of relevant statutes, laws, or regulations have also been submitted by defendants in other post-*Bruen* cases. *See, e.g.*, *Miller v. Bonta*, No. 3:19-cv-1537, Dkt. Nos. 163, 163-1, 163-2 (S.D. Cal. Jan. 11, 2023); *Duncan v. Bonta*, No. 3:17-cv-1017, Dkt. Nos. 163, 163-1, 163-2 (S.D. Cal. Jan. 11, 2023).

mass shootings and other gun violence, violence from firearms was not a significant social problem in 18th-century America, due in substantial part to the limitations of then-existing firearm technology. *See* Ex. 6, Roth Decl. ¶¶ 14–22; *see also* Ex. 8, Spitzer Decl. ¶ 34. The most popular firearms of the time were the "musket" and "fowling pieces." Ex. 6, Roth Decl. ¶ 15. These guns could fire only a single round at a time. *Id.* They took a half a minute to reload. *Id.* And they could not be kept loaded because the firing powder would corrode the gun. *Id.* These weapons were generally used for lawful purposes like hunting and militia service, whereas the vast majority of homicides were committed by means other than firearms, such as with bare hands. *Id.* Overall, homicide rates were low in most states. *Id.* And mass murder committed by a single individual in a single incident (as opposed to mass murders committed by group, such as angry mobs) essentially did not exist. *Id.* ¶¶ 41–43.

Nonetheless, even in the Founding era, when the threat of gun violence was considered very low, laws still restricted particularly dangerous *types* of arms, especially when they were associated with interpersonal violence. For example, the late 18th century and early 19th century saw widespread bans on the carrying of blunt weapons, like clubs, which were frequently used in fights, and described as "wicked, cowardly" weapons, "[s]oaked in blood," by historical sources. Ex. 8, Spitzer Decl. ¶¶ 72–80; Ex. 6, Roth Decl. ¶¶ 24–26. Between 1750 and 1799, six states (or soon-to-be states) passed anti-club laws. Ex. 8, Spitzer Decl. ¶ 75 (citing Exhibits C & E). Among these, Massachusetts and Maine passed laws in 1750 and 1786, respectively, that prohibited people from assembling in groups "being armed with clubs."[11]

---

[11] Ex. 8, Spitzer Decl., Ex. E at 39 (citing 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1); *id.*, Ex. E at 35 (citing An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in *Cumberland Gazette* (Portland, Maine), Nov. 17, 1786, at 1).

When people developed novel, dangerous ways of using firearms, legislatures responded to that, too. In the 18th century, people made notorious use of "trap guns," firearms that could fire automatically based on a signal, such as a trip wire. *Id.* ¶¶ 82–84. These weapons were referred to as "infernal machines" because of the unique dangers they posed, such as a "likelihood" of killing or injuring "innocent persons." *Id.* ¶¶ 83–84. They were also viewed as an "arbitrary and excessive" means of "meting out of 'justice,'" even to intruders. *Id.* ¶ 83. Over time, some jurisdictions banned them. *Id.* ¶ 85. The earliest known ban was enacted by New Jersey in 1771. *Id.* ¶ 85 & Ex. E (citing 1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10). Eight other states passed similar anti-trap-gun laws later in the 1800s. *Id.*

Legislatures also responded to advances in pistol technology. As noted above, the most popular firearm of the Founding era, the musket, could not be kept loaded because the firing powder would corrode the barrel and firing mechanism. Ex. 6, Roth Decl. ¶ 16. However, in the early 19th century, "percussion-lock mechanisms" emerged, which addressed the corrosion problem and allowed pistols to be kept loaded for longer periods, and therefore usefully carried concealed on the person. *Id.* ¶ 25. Southern and frontier states saw a rise in gun violence in the early 19th century, exacerbated by this new weapons technology. *Id.* ¶¶ 23–26. And in response, many of these states enacted laws banning the concealed carrying of pistols, specifically. *Id.* ¶ 26; Ex. 8, Spitzer Decl. ¶ 81. The distinctive feature of these laws was that they applied to all persons (unlike many prior bans in Southern states, which targeted particular classes of people, such as Native Americans and Blacks), and were tailored specifically to particular *types* of firearms thought to pose unusual dangers. Ex. 6, Roth Decl. ¶ 26.

The Bowie knife provides another example of a weapon regulated because it was viewed

33

at the time as especially dangerous. *Id.* ¶¶ 24–26; Ex. 8, Spitzer Decl. ¶¶ 61–71. Developed in the early 19th century, the Bowie knife represented a "technological advance" over prior knives—it was specifically designed for fighting, and had an improved cross guard and blade. Ex. 6, Roth Decl. ¶ 25; Ex. 8, Spitzer Decl. ¶ 62. These knives made for violence became preferred over pistols, and they were notorious and widespread in fights and assaults. Ex. 6, Roth Decl. ¶ 24; Ex. 8, Spitzer Decl. ¶¶ 62–63 (contemporary sources described a "craze for the knives"). In the early 19th century, states widely enacted restrictions on Bowie knives, including bans on possession and criminal laws. Ex. 6, Roth Decl. ¶ 26; Ex. 8, Spitzer Decl. ¶¶ 64–71. In 1837, for example, both Georgia and Tennessee criminalized the sale of Bowie knives. Ex. 8, Spitzer Decl., Ex. H. And "15 states effectively banned the possession of Bowie knives outright (by banning both concealed carry and open carry)." *Id.* ¶ 69.

The technology may seem primitive to modern eyes, but the governing principle is the same. The Founding generation recognized that, consistent with the Second Amendment, legislatures could outright ban or otherwise regulate particular types of weapons thought to pose unusual social dangers or risks because their characteristics made them particularly dangerous *in comparison to other weapons of the time*. And they did so while preserving the core lawful self-defense right.

Indeed, it is instructive to examine what was *not* banned. Muskets and "fowling pieces" were the most common firearms of the day, used for lawful purposes like self-defense, hunting, and militia service. Ex. 6, Roth Decl. ¶ 15. These firearms are most analogous to today's handguns—the "quintessential" modern weapon. *Heller*, 554 U.S. at 629. While these were not banned in the Founding era, other weapons thought to pose unusual dangers were restricted then—even banned. And the same tradition supports a ban on today's weapons that create

34

distinctive risks to society because of characteristics that make them particularly dangerous.

### 2. Particularly Dangerous Types of Weapons Were Regulated in the Late 19th Century.

Historical practices "through the end of the 19th century" can also be a "critical tool of constitutional interpretation." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). That is true, in part, because the Fourteenth Amendment, which incorporated the Second Amendment against the states, was ratified in 1868. *See id.* And the practice of restricting weapons when new technology poses social dangers, established by the Founding era, continued unabated through the 19th century. Regulations of multi-shot firearms specifically—again, including bans—emerged in parallel with the growing prospect of their increased availability and use.

It is important to note how the technology regarding multi-shot firearms developed. Plaintiffs' motion asserts that multi-shot firearms "predate the founding by more than a century." Mot. 21–23. The suggestion is that there has been a long tradition of the public owning multi-shot firearms without government regulation. That is simply wrong.

By the early 19th century, inventors had created a small number of prototype multi-shot firearms—but these weapons functioned extremely poorly, even by the low standards of the day, and were essentially non-existent in society at large. Ex. 8, Spitzer Decl. ¶¶ 32–41. For example, one early multi-shot weapon, the "Jennings" multi-shot flintlock rifle (created in 1821), had a "fatally defective" firing mechanism and—according to a firearms publication at the time—had a production quantity so low as to be "unknown," and was "extremely rare." *Id.* ¶ 38. Another early multi-shot weapon, the "Girandoni" air rifle (used by Lewis and Clark in 1804), was "expensive, fragile, and complex," and plagued by technical problems—no more than 1,500 were ever made, and it was discontinued from military service in 1815. *Id.* ¶ 39. Contemporaries joked that another early prototype had injured no one but the company's shareholders. *Id.* ¶ 36

35

("Fear not, my friends, this terrible machine. They've only wounded who have shares therein.").

The first passably effective multi-shot gun was the Colt revolver, created in the 1830s, which eclipsed the earlier "heavy, lumpy, and impractical" "pepperbox" pistol. *Id.* ¶¶ 42–44 (the Colt was the "first widely used multishot weapon"). However, multi-shot weapons, including the Colt revolver, were initially dismissed as "novelties," and for many decades the Colt's inventor failed to find a market—either military or civilian—which "drove him to bankruptcy." *Id.* ¶ 44. The same fate befell other early manufacturers of multi-shot weapons in the mid-19th century. *See, e.g.*, *id.* ¶ 40. As one court considering this issue recently held, "while multi-shot rifles existed as early as the late 1500s, those firearms were experimental, designed for military use, rare, defective, or some combination of these features." *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022).

The absence of early regulation of such rare novelties reveals nothing about the Founding era's understanding of the scope of government authority to regulate such weapons. The rarity and ineffectiveness of the weapons created no social problem that required legislative attention. However, when "technological changes" improved these weapons, and they gained measurable success with the public, the "societal concerns" they raised became apparent, and they *were* regulated. *Cf. Bruen*, 142 S. Ct. at 2132.

Multi-shot weapons came into society in appreciable quantities in the post-Civil-War period in the late 19th century, when the Colt revolver (and similar firearms) were finally widely adopted. Ex. 8, Spitzer Decl. ¶ 44. This period also saw the introduction into civilian life of the first effective and popular multi-shot rifle, the Winchester rifle. *Id.* ¶ 45.

Soon after these early multi-shot guns emerged into society, they were regulated. Their new capabilities contributed to the dangerous and rising problem of gun violence of the late 19th

36

century. *Id.* ¶ 47; *see also* Ex. 6, Roth Decl. ¶¶ 29–34. And, just as in the Founding era, this social problem prompted a legislative response. States enacted nearly universal restrictions on concealed carry of multi-shot handguns in the late 19th and early 20th centuries. Ex. 8, Spitzer Decl. ¶ 47; Ex. 6, Roth Decl. ¶¶ 28, 35–36. And these restrictions were not limited to carrying— half a dozen states outright banned possession, including California, Illinois, Iowa, Kansas, New York, and North Dakota. Ex. 8, Spitzer Decl. ¶ 47 & n.104.

### 3. Particularly Dangerous Types of Weapons Were Regulated in the Early 20th Century.

Evidence from periods between the late 19th century and the modern world—such as the early 20th century—can also help to "guide" interpretation of constitutional provisions by showing how early historical practices ripened into a "regular course of practice." *Bruen*, 142 S. Ct. at 2136–37. That is particularly true in a case that deals with new weapons technology.

The early 20th century saw the emergence of the first true handheld semi-automatic and automatic weapons. Ex. 8, Spitzer Decl. ¶¶ 13–14, 47. One that rose to particular prominence was the Thompson submachine gun (the "Tommy" gun), an automatic weapon. *Id.* ¶ 14. Like modern assault weapons, the Tommy gun was originally developed as a weapon of war (World War I in that case). *Id.* It reached civilians in appreciable quantities in the late 1920s—along with other similar weapons, such as the Browning Automatic Rifle. *Id.* ¶¶ 14–16.

As with prior weapons technologies, the presence of these new and dangerous weapons in civilian life created new social problems. The weapons were acquired by criminals, who were attracted to their military firepower. *Id.* ¶¶ 14–15; Ex. 6, Roth Decl. ¶ 46. They contributed to violent conflicts between gangs, and with law enforcement, including some of the first mass casualty events, such as the St. Valentine's Day Massacre. Ex. 8, Spitzer Decl. ¶¶ 14–15; Ex. 6, Roth Decl. ¶ 46. These weapons "were actually used relatively infrequently by criminals

generally, but when they were used, they extracted a devastating toll and garnered extensive national attention." Ex. 8, Spitzer Decl. ¶ 15. Numerous newspaper articles of the time documented rising social concern. *Id.* ¶¶ 16–20.

As in earlier eras, legislatures responded. *Id.* ¶ 21 (problems "built pressure on the states to enact anti-machine gun laws"). Between 1925 and 1933, 32 states passed anti-machine-gun laws. *Id.* ¶¶ 21–22. Eventually, Congress enacted the National Firearms Act of 1934, which imposed a federal ban on machine guns—along with other types of dangerous weapons, such as short-barreled shotguns. *Id.* ¶¶ 23–26; Ex. 6, Roth Decl. ¶ 47.

These restrictions were *not* limited to fully automatic weapons and short-barreled shotguns. During the same period, weapons manufacturers were developing semi-automatic rifles intended for military applications, such as the Thompson "Autorifle," a "strictly semiautomatic rifle." Ex. 8, Spitzer Decl. ¶ 27. In 1932, Congress banned the possession in the District of Columbia of any semi-automatic rifle capable of firing more than twelve shots. *Id.* ¶ 23. This law followed a model drafted by the National Conference of Commissioners on Uniform State Law (the predecessor to today's Uniform Law Commission)—and was endorsed by the National Rifle Association as legislation that should be "used as a guide throughout the states of the Union." *Id.* At least seven other states enacted laws restricting semi-automatic weapons too.[12] *Id.* ¶ 27.

---

[12] Plaintiffs claim that *Staples v. United States*, 511 U.S. 600, 612 (1994), observed a "tradition in this country of lawful private ownership of semiautomatic rifles." Mot. 13. But *Staples*—a case about the *mens rea* requirement for a statute regulating machine guns—is beside the point here. What matters here is whether there is a historical tradition of lawful weapons *regulation* analogous to regulation of semiautomatic rifles. That is precisely what Highland Park's historical evidence demonstrates. Indeed, it demonstrates that, in this vast and diverse nation, there is a tradition of regulation of semiautomatic rifles themselves that runs *alongside* any history of their lawful private ownership.

### 4. Consistent with Historical Tradition, Highland Park's Ordinance Regulates Particularly Dangerous Types of Weapons in the Modern Era.

Restrictions on contemporary assault weapons—like AR-15s—focus on modern technologies, and are motivated by modern social problems. These regulations are not new. They are part of America's long tradition of analogous restrictions on particularly dangerous weapons.

As described above, modern assault weapons were developed by the military as weapons of war in the 1950s and 1960s. But they did not enter civilian life in appreciable quantities until decades later. As late as the 1990s, AR-15s were "not common," and promoting them "was thought to be irresponsible" within the firearms industry. Ex. 3, Busse Decl. ¶ 29. In fact, from 1964 to 1994 (the date the federal assault weapons ban took effect), AR-15 sales averaged fewer than 27,000 units per year. *Id.* ¶ 30. The largest retailers refused to carry assault weapons, and that "remained true as late as 2006." *Id.* ¶ 31.

However, even in small quantities, the gradual accumulation of these new weapons in society began to cause highly disproportionate harms. In 1977, the original patent for the technology that allows the AR-15 to fire so rapidly with minimal recoil expired, and the technology thus became available for copying by other firearms manufacturers. *Id.* ¶ 29. The 1980s then saw an epidemic of mass shootings—carried out with AR-15-style weapons. Ex. 5, Klarevas Decl. ¶¶ 19–21. These attacks, which had previously been largely unknown in American life, prompted a legislative response, beginning with California's 1989 assault weapons ban, and culminating in the ten-year federal assault weapons ban in 1994. Ex. 8, Spitzer Decl. ¶ 11. During the life of the ban (from 1994 to 2004), only a single double-digit mass shooting took place. Ex. 5, Klarevas Decl., Table 6.[13]

---

[13] Plaintiffs argue that the ban was ineffective (Mot. 14 n.4), but the paper they cite reaches the opposite conclusion: "restrictions on these weapons have the potential to reduce deaths and

After the federal assault weapons ban expired, norms in the gun industry and their marketing practices began to change. *See* Ex. 3, Busse Decl. ¶¶ 31–42. In the late 2000s, sales of assault weapons rose. *Id.* ¶¶ 31–33. And, beginning in 2009, America saw a renewed epidemic of mass shootings, at dramatically higher rates than in the 1980s. Ex. 5, Klarevas Decl. ¶¶ 21–23. Once again, these attacks prompted a renewed regulatory response from states and local governments, of which Highland Park's Ordinance is a part. In 2013, like many communities that had already passed their own assault weapons bans, Highland Park looked at recent mass shootings—such as the 2012 shooting at Sandy Hook Elementary School in Newtown, Connecticut, where 20 elementary school children and 6 others were murdered with an assault weapon—and was terrified that their own community could be next. Ex. 9, N. Rotering Decl. ¶ 9.

Highland Park turned to a strategy that had been widely used by legislatures across American history in response to new weapons technology causing special societal harms: banning particular types of weapons most closely linked to these harms. Its Ordinance specifies particular types of weapons that it covers, based on specific technical characteristics, and follows the City's finding that these weapons pose distinctive public safety risks. *See* Ex. 1, Ordinance at 1–4. And, as with historical regulations, the Highland Park Ordinance leaves undisturbed the right to possess the predominant weapons of the day chosen for self-defense by Americans, such as handguns. *Id.*; *see also Heller*, 554 U.S. at 629.

The Ordinance also reflects the Nation's tradition of local variation in the regulation of dangerous weapons. Highland Park found that assault weapons are "not traditionally used for

---

injuries from mass shootings, at least modestly and perhaps by more substantial margins, especially for nonfatal injuries." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim'y & Pub. Pol'y 147, 148 (2020).

self-defense *in the City of Highland Park*." Ex. 1, Ordinance at 1 (emphasis added); *see also* Ex. 9, N. Rotering Decl. ¶ 11 ("When considering the Ordinance, the City Council considered that crime was low and that the Highland Park Police were not encountering assault weapons used in crimes or in self-defense."). Nor is this ordinance an outlier. Today, nine states plus the District of Columbia have enacted laws restricting assault weapons, covering 30% of the population—including a law passed by the State of Illinois on January 10, 2023. Ex. 5, Klarevas Decl. ¶ 34. The same pattern has been seen many times throughout American history, where some, but not all, jurisdictions have restricted or banned a new weapons technology that created new social problems. Highland Park's Ordinance is not a departure—it is a continuation of America's longstanding "historical tradition" of firearm regulation. *Bruen*, 142 S. Ct. at 2130.

It is of no moment that Highland Park's ban on assault weapons did not prevent Highland Park and its citizens from being a victim of yet another assault weapon mass shooting in our Nation. Laws cannot produce perfect compliance—as to assault-weapon possession, murder, or otherwise. They can only lower the likelihood of the harm they seek to deter. The death and mayhem that Highland Park's Ordinance could not prevent does not mean that the Constitution has deprived the Highland Park City Council and legislative bodies around the country of the latitude to determine whether such bans promote public safety better than allowing civilians to own assault weapons. American history and tradition demonstrate that legislatures have the authority—and the responsibility—to reach their own conclusions about whether assault weapons bans promote public safety better than allowing civilians to own assault weapons.

### D. Large-Capacity Magazines Are Not Within the Scope of the Right Protected by the Second Amendment.

Highland Park's Ordinance also bans large-capacity magazines, defined as a magazine with the capacity to accept more than ten rounds (subject to certain exclusions). Plaintiffs are

unlikely to prevail on their argument that the Second Amendment protects the right to possess a large-capacity magazine, for at least two reasons.

First, a large-capacity magazine is not an "Arm" within the meaning of the Second Amendment text. That is the conclusion that courts have reached in similar post-*Bruen* challenges. *See Oregon Firearms Fed'n*, 2022 WL 17454829, at *9 (denying motion for preliminary injunction to enjoin ban on large-capacity magazines); *Ocean State Tactical v. Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) (same).

Some authorities (cited by Plaintiffs) have held that ammunition—although not an "Arm" that is "explicitly protect[ed]" by the Constitution's text—must nonetheless be understood as included within the scope of the right, on the ground that a ban on ammunition would make it "impossible" to use "arms" for their intended purpose. *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see also Miller*, 307 U.S. at 180 (discussing historical sources). But the Ordinance does not ban ammunition. Citizens are free to buy an unlimited number of bullets, as well as magazines that hold up to ten rounds. The sole items banned are large-capacity magazines, which are neither "Arms" nor ammunition. They are firearm *accessories* capable of holding larger quantities of ammunition. "They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling." *Ocean State Tactical*, 2022 WL 17721175, at *13; *cf. United States v. Hasson*, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019) (explaining that silencers, another accessory "generally have no use independent of their attachment to a gun," and "you can't hurt anybody with [one] unless you hit them over the head with it."), *aff'd*, 26 F.4th 610 (4th Cir. 2022), *cert denied*, 143 S. Ct. 310 (2022). At least some gun manufacturers do not list magazines on their websites as "guns parts," but rather as firearms "accessories."

*Ocean State Tactical*, 2022 WL 17721175, at *13 n.26.

Firearm accessories are nowhere mentioned in the plain text of the Second Amendment. And there is no "impossibility" ground that could justify contorting the plain text to cover them. Unlike a ban on ammunition, a ban on large-capacity magazines would not be tantamount to a ban on the underlying "arms" themselves. A large-capacity magazine is not necessary to "keep" or "bear" any "arm." There is not "a single existing firearm that requires a large-capacity magazine to function as designed." Ex. 3, Busse Decl. ¶ 23. Rather, "all firearms that can accept a large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended." *Id.* Evidence in other cases on this issue has been in accord. *See Oregon Firearms Fed'n*, 2022 WL 17454829, at *9 (explaining that there is no evidence that "weapons can *only* operate with magazines that accept more than ten rounds of ammunition and cannot operate with magazines that contain ten or fewer rounds").

Second, as explained above (*supra*, Section I.A), the Second Amendment protects only weapons that are "'in common use at the time' for lawful purposes like self-defense," and excludes those that are "dangerous and unusual." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179); *see also Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627).

Large-capacity magazines are not necessary, much less "commonly used," for self-defense, sporting marksmanship, or any other lawful purpose. Rather, many "widely popular" guns, such as Sig Sauer pistols (the same guns used by the Highland Park Police Department, for example, *see* Ex. 10, O'Neill Decl. ¶ 9), are "designed to function with seven or eight round magazines," not ten rounds. Ex. 3, Busse Decl. ¶ 23. Such guns with seven- or eight-round magazines have been "widely acclaimed by dozens of notable firearms industry experts as among the most effective concealed carry/self defense firearms on the market." *Id.* And again,

there is not "a single existing firearm that requires a large-capacity magazine to function as designed." *Id.*; *see also* Ex. 2, Andrew Decl. ¶¶ 58–61.

Other courts have also found that large-capacity magazines are not commonly used for self-defense. *See Ocean State Tactical*, 2022 WL 17721175, at *24 ("[A]n occasion in which a victim threatened with violence might need to rapidly fire that eleventh, twelfth, or twentieth bullet is so speculative as to be non-existent."); *Oregon Firearms Fed'n*, 2022 WL 17454829, at *10 (explaining that it "is exceedingly rare for an individual, in a self-defense situation, to fire more than ten rounds," and citing an NRA Armed Citizen Database finding that only 2 out of 736 instances of self-defense involved the defender firing more than 10 bullets).

The sole evidence that Plaintiffs have offered about large-capacity magazines is a single, conclusory sentence from an expert declaration, which states: "At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes." Mot. 20 n.7 (quoting Curcuruto Decl. ¶ 7). Even if true, that fact does not mean such magazines are "Arms" rather than popular "accessories," and it says nothing about whether large-capacity magazines are "in common use" for lawful purposes, or "usual" relative to other types of magazines. Plaintiffs' threadbare evidence comes nowhere close to making the showing they need to obtain the extraordinary remedy they seek.

Finally, large-capacity magazines are manifestly dangerous. For example, when mass shootings occur with non-assault-weapon guns, the average death toll from shootings using large-capacity magazines is *26%* higher than the toll from shootings without large-capacity magazines. Ex. 5, Klarevas, Decl. ¶ 16 & Table 5. And that figure increases to *92%* when an assault weapon and large-capacity magazine are used in combination. *Id.*, Table 5; *see also Oregon Firearms Fed'n*, 2022 WL 17454829, at *11 ("[H]igh-capacity magazines are

44

disproportionately used in the commission of mass shooting events," and "shootings involving large-capacity magazines are deadlier than shootings involving those without these magazines."). The conclusion that follows from this data is unsurprising and undeniable: by increasing the number of bullets that a shooter has at his disposal before he must either stop shooting or pause to re-load, large-capacity magazines increase the lethality of firearms and pose a higher level of danger than other types of magazines.

### E. A Ban on Large-Capacity Magazines Is Consistent with the National Tradition of Firearm Regulation.

Even if large-capacity magazines were construed to be "Arms" protected by the Second Amendment—which they are not—restrictions on these "Arms" would comport with the long national tradition of restricting specific types of weapons that create distinctive social harms. *See, e.g.*, *Oregon Firearms Fed'n*, 2022 WL 17454829, at *13 (finding that large-capacity magazines bans are in accord with historical regulations prohibiting "dangerous weapons commonly used for criminal behavior and not for self-defense").

As noted above, multi-shot firearms were regulated historically as soon as they became a practical technology and entered society in appreciable numbers. *See supra*, pp. 35–37. Plaintiffs cite a handful of experimental multi-shot firearms in the early 19th century that were not regulated (Mot. 21–22), but these poorly functioning prototypes were neither prevalent nor effective enough to create social problems or spur regulation. Ex. 8, Spitzer Decl. ¶¶ 32–50. As relevant to large-capacity magazines, *most* states—representing 58% of the population—enacted restrictions in the 1920s and 1930s on the number of rounds that could be fired without reloading by either an automatic, a semi-automatic, or any firearm, depending on the state. *Id.* ¶¶ 29–31. For example, South Dakota banned any semi-automatic or automatic firearm capable of firing more than 5 rounds without reloading; Minnesota banned any automatic firearm capable of firing

more than 12 rounds without reloading; and Missouri banned any weapon capable of using

particular "round-feeding devices." *Id.* ¶ 30. Contemporary bans on large-capacity magazines are

the latest example of this tradition.

The reason to limit magazine capacity has become only more compelling over the

decades since they first appeared. A large-capacity magazine was used in *every* mass shooting in

which more than 20 people were killed, 94% of all mass shootings in which more than 10 people

were killed, and 77% of all mass shootings in which more than 5 people were killed. Ex. 5,

Klarevas Decl. ¶ 14 & Fig. 8. The reason is obvious: large-capacity magazines are "force

multipliers." *Id.* ¶ 22. The ability to fire large numbers of rounds quickly, without reloading,

makes it easier for a single person to murder large numbers of other people, before victims can

escape or the police can respond. *Id.* ¶¶ 21–29; Ex. 6, Roth Decl. ¶¶ 51–61. For example, the

Highland Park shooter—using multiple large-capacity magazines—was able to fire *83 rounds*

within approximately 60–90 seconds, killing seven people and injuring 48. *See* Ex. 9, N.

Rotering Decl. ¶ 16.

Regulation of these dangerous firearm accessories—to the extent they are considered

"Arms" at all—is a continuation of America's tradition of firearm regulation.

## II. Plaintiffs Have Not Met Their Burden to Establish That They Will Suffer Any Irreparable Injury If Their Motion Is Denied.

Plaintiffs' Motion should be denied for an additional, independent reason: they have "not

shown that they are likely to suffer irreparable harm absent [a] preliminary injunction." *Orr*, 953

F.3d at 502; *see also, e.g.*, *Halczenko*, 37 F.4th at 1324–26 (affirming denial of preliminary

injunction because plaintiff "ha[d] not shown an irreparable harm"); *Second City Music, Inc. v.

City of Chicago*, 333 F.3d 846, 849–50 (7th Cir. 2003) (same).

Plaintiffs' Motion does not argue that NAGR faces any irreparable harm. Instead, their

46

"irreparable harm" argument focuses solely on Plaintiff Susan Goldman. *See* Mot. 3. But Goldman has failed to show that she would likely be irreparably harmed absent the extraordinary remedy of a preliminary injunction. That is especially so given that the Ordinance has been in place since 2013. She has offered no justification for disrupting the status quo of the past decade.

Goldman claims in a conclusory fashion that she is irreparably harmed because she "own[s] an AR-15" and "the City's prohibitions require [her] to store [her] firearm outside the city limits, which renders it useless for the defense of [her] home and [her] person, especially in light of incidents such as the recent July 4, 2022 shooting." Dkt. 7-1, Goldman Decl. ¶¶ 3, 7. But the absence of a preliminary injunction will not stop Goldman from arming herself in self-defense. She may still lawfully possess numerous other types of firearms—and as many of them as she wants—that fall outside the scope of the Ordinance (*see* Ex. 1), including, for example, pistols and handguns with 7- or 8-round magazines, which dozens of industry experts have deemed the most effective for self-defense. Ex. 3, Busse Decl. ¶ 23. Because an adequate alternative "can be had," "the lack of an injunction does not lead to irreparable harm." *Second City*, 333 F.3d at 850 (affirming denial of preliminary injunction in First Amendment case).

Moreover, there is no reason to believe assault weapons are necessary for Goldman's self-defense. Their defining features "are not necessary to use a firearm effectively for self-defense." Ex. 3, Busse Decl. ¶¶ 16–23; *see also* Ex. 2, Andrew Decl. ¶¶ 58–61. And the notion that Goldman's AR-15 could be useful for self-defense in a mass shooting incident like the one on the Fourth of July is unfounded. While assault weapons are disproportionately and increasingly used to perpetrate mass shootings, *see* Ex. 5, Klarevas Decl. ¶ 23, they are almost never used in self-defense to protect against such terror. For example, out of the 406 active shooter incidents the FBI has identified between 2000 and 2021, only 15 (3.7%) involved instances of defensive

gun use by civilians—and only one of those 15 instances involved an assault rifle (and even then, use of the assault rifle did not stop the shooter, who was still able to flee the scene). *Id.* ¶ 25 & n.16. In general, a civilian acting in self-defense requires "significant training and expertise to effectively confront an attacker," and still only "rarely has the opportunity to respond under the surprise circumstances" of a mass shooting. Ex. 2, Andrew Decl. ¶ 55.

Unable to show irreparable harm, Plaintiffs argue that they need not, citing cases holding that an alleged loss of First or Second Amendment rights can sometimes be presumed to cause irreparable harm. *See* Mot. 4–5. But no authority has ever held that such a presumption applies to any purported right to possess AR-15s. *See, e.g.*, *Walters v. Kemp*, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020) ("[N]either the Eleventh Circuit nor the Supreme Court has held that the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm."); *see also Ditton v. Rusch*, 2014 WL 4435928, at *5 (N.D. Ill. Sept. 9, 2014) ("injury to constitutional rights does not *a priori* entitle a party to a finding of irreparable harm").

Moreover, "[p]resumptions can of course be rebutted." *Beckman v. Chicago Bear Football Club*, 2018 WL 11200576, at *8 (N.D. Ill. Dec. 13, 2018). And when there is competing evidence on the issue of irreparable harm, courts must weigh that evidence. *See, e.g.*, *id.* (evaluating competing evidence on irreparable harm in First Amendment case); *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, -- F.4th --, 2022 WL 17829283, at *8–9 (7th Cir. Dec. 21, 2022) (same); *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 24 F.4th 640, 651 (7th Cir. 2022) (same). Even if a presumption applied here, Highland Park has rebutted it with evidence that Goldman is still fully able to use an unlimited number of effective firearms to defend herself and her home, and that the characteristics of her AR-15 are wholly unnecessary for that purpose. *See* Ex. 1, Ordinance; Ex. 3, Busse Decl. ¶¶ 16–23.

**III.      The Balance of the Equities and the Public Interest Favor Highland Park.**

Finally, Plaintiffs' Motion should be denied because the balance of the equities and the public interest overwhelmingly favor Highland Park. Plaintiffs do not even attempt to—and cannot—demonstrate that it is in the public interest to enjoin a duly-enacted, decade-old Ordinance designed to mitigate an obvious threat to public safety. Not only does Highland Park have an interest in enforcing its laws, it also has a strong interest in protecting the public and law enforcement from assault weapons and large-capacity magazines. That is all the more true after the mass shooting at the Fourth of July parade.

To evaluate Plaintiffs' Motion, the Court "must balance the competing claims of injury and consider the effect" of the requested relief, with "particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Winter*, 555 U.S. at 24. Plaintiffs bear the burden to establish that "the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. The balance of the equities and the public interest analysis "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). "The aim is to minimize the costs of a wrong decision." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

Further, as this Court recognized in the *Friedman* litigation, Highland Park maintains a "strong interest" in protecting the public from the acute risks posed by assault weapons and large-capacity magazines, which "derive from military weapons with the decidedly offensive purpose of quickly acquiring multiple targets and firing at those targets without a frequent need to reload." *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908–09 (N.D. Ill. 2014),

*aff'd*, 784 F.3d 406 (7th Cir. 2015). Those risks and harms have been detailed throughout this brief and need not be repeated here. *See, e.g.*, Section I.B.2. The "harm to the public that would result from allowing … individuals to" possess such weapons is "self-evident." *Bolton v. Bryant*, 71 F. Supp. 3d 802, 818 (N.D. Ill. 2014) (denying motion for preliminary injunction in Second Amendment case based solely on the balance of equities and public interest); *Culp v. Madigan*, 2015 WL 13037427, at *17–18 (C.D. Ill. Dec. 7, 2015) (same), *aff'd*, 840 F.3d 400 (7th Cir. 2016). Highland Park's "strong interest" has only strengthened because of the July 4th massacre.

That mass shooting demonstrates the unmitigable risk that assault weapons and large-capacity magazines pose to law enforcement and civilians. Half of Highland Park's police force was at the parade before the shooting began, and when it started, officers sprang into action, running toward the assault weapon fire—with protective vests that could stop a shot from a handgun, but not from an assault weapon. *See* Ex. 10, O'Neill Decl. ¶¶ 44–61. Even with immediate, courageous actions from the police officers already on the scene, they were helpless to prevent the horrific harm—or the shooter's escape—because the massacre was effectuated so quickly. Armed with an assault weapon and three large-capacity magazines, he needed just 60–90 seconds to leave 48 people on the pavement with war-like wounds and 7 others dead.

Plaintiffs cannot show that an interest in possessing assault weapons and magazines containing more than ten rounds outweighs the risk of injury and death to civilians and law enforcement. The "costs of a wrong decision" are simply too "substantial" to permit the extraordinary relief they seek. *Bolton*, 71 F. Supp. 3d at 818.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: January 19, 2023

Respectfully submitted,

*/s/ David H. Hoffman*
David H. Hoffman (No. 6229441)
Robert N. Hochman (No. 6244222)
Neil H. Conrad (No. 6321947)
Caroline A. Wong (No. 6324863)
Paul J. Rogerson (*pro hac vice* application pending)
Claire G. Lee (No. 6339280)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
david.hoffman@sidley.com
rhochman@sidley.com
nconrad@sidley.com
caroline.wong@sidley.com
claire.lee@sidley.com

Steven M. Elrod (No. 6183239)
Hart M. Passman (No. 6287062)
ELROD FRIEDMAN LLP
325 N. LaSalle St.
Suite 450
Chicago, IL 60654
Telephone: (312) 528-5200
steven.elrod@elrodfriedman.com
hart.passman@elrodfriedman.com

Douglas N. Letter (*pro hac vice* application forthcoming)
Erin Davis (*pro hac vice*)
Philip Bangle (*pro hac vice* application forthcoming)
Shira Lauren Feldman (*pro hac vice*)
BRADY
840 First Street NE
Washington, DC 20002
Telephone: (202) 370-8100
dletter@bradyunited.org
edavis@bradyunited.org
pbangle@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Defendant City of Highland Park, Illinois*