# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF HIGHLAND PARK, ILLINOIS,<br><br>Defendant. | No. 1:22-cv-04774<br><br>Honorable Harry D. Leinenweber<br><br>Honorable Jeffrey T. Gilbert |

**DECLARATION OF RYAN BUSSE**

## DECLARATION OF RYAN BUSSE

I, Ryan Busse, declare that the following is true and correct:

1.     I am a former senior executive in the firearms industry and the author of

*Gunfight: My Battle Against the Industry that Radicalized America* (New York:  PublicAffairs,

2021).

2.     This declaration is based on my own personal knowledge and experience, and if I

am called to testify as a witness, I could and would testify competently to the truth of the matters

discussed in this declaration.

3.     I have been retained by the City of Highland Park, Illinois to render expert

opinions in this case. I am being compensated at a rate of $200/hour for my work on this

declaration, and $350/hour for any travel or testimony in connection with this matter.

### BACKGROUND AND QUALIFICATIONS

4.     I was raised with firearms as an integral part of my life.  I began shooting with

various guns as a young boy and continued to regularly use and study guns throughout my life (I

am now 52).  After graduating college, I entered the firearms industry in 1992.  I became a sales

executive in the firearms industry in 1995, and I spent more than 25 years in this role. While in

the industry, I developed innovative sales teams, maintained relationships with the largest

national retailers, and was responsible for worldwide sales of millions of firearms. I built a

dealer-direct sales network that included more than 2500 firearms dealers including locations in

all 50 states, and I regularly visited these dealers. In my job, I also studied and built sales

programs that relied on understanding the technical nature of most firearms available in the U.S.

market, including AR platform guns and other types of rifles.  During my career, I played an

integral role in building one of the largest firearms companies in the United States, Kimber, and I

was nominated by shooting industry leadership many times for the SHOT Business "Shooting Industry Person of the Year" Award. I served in an executive sales capacity as Vice President of Sales until August 2020. While in the industry I served as an advisor to the United States Senate Sportsmen's Caucus, and as the North American board chairman for Backcountry Hunters & Anglers, a national wildlife conservation and hunting organization.

5.      I left the firearms industry because I was concerned about what I believed to be irresponsible and dangerous marketing and sales practices. Since I left, I have served as an advisor to the 2020 Biden presidential campaign, I have testified twice before the U.S. Congress about the firearms industry and gun policy (before the House Committee on Oversight and Reform and the Joint Economic Committee, respectively), I have been called to testify in closed-door briefings at the U.S. Senate, and I currently serve as a Senior Advisor to Giffords. I remain a proud and active gun owner, outdoorsman, and advocate for responsible gun ownership. I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01536-BEN-JLB (S.D. Cal.), and *Duncan v. Bonta*, No. 3:17-cv-1017-BEN-JLB (S.D. Cal.).

**OPINIONS**

## I.      Terms In Highland Park's Ordinance

6.      I have reviewed the definition of "assault weapon" as defined under Highland Park's Ordinance No. 68-13, codified at Highland Park Code § 136.001 (the "Highland Park Ordinance" or "Ordinance"). According to this definition, certain firearms may qualify as an "assault weapon" under the Ordinance if they have certain accessories attached to them or if they are configured in certain ways.

7.      I have also reviewed the definitions of "ammunition" and "large capacity magazine" as defined under the Ordinance. The Ordinance defines "large capacity magazine" to

3

mean an "Ammunition feeding device with the capacity to accept more than ten rounds," with certain exceptions set forth in the definition.

8.      Under subsection (1) of the Ordinance's definition of "assault weapon," a semiautomatic rifle that has the capacity to accept a large capacity magazine, detachable or otherwise, qualifies as an assault weapon if it has one or more of the following: (a) only a pistol grip without a stock attached; (b) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (c) a folding, telescoping or thumbhole stock; (d) a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or (e) a "muzzle brake," defined under the Ordinance to mean a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil, or a "muzzle compensator," defined under the Ordinance to mean a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

9.      Under subsection (2) of the Ordinance's definition of "assault weapon," a semiautomatic pistol or any semiautomatic rifle that has a fixed magazine qualifies as an assault weapon if it has the capacity to accept more than ten rounds of ammunition.

10.      Under subsection (3) of the Ordinance's definition of "assault weapon," a semiautomatic pistol that has the capacity to accept a detachable magazine qualifies as an assault weapon if it has one or more of the following: (a) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (b) a folding, telescoping or thumbhole stock; (c) a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but

excluding a slide that encloses the barrel; (d) a muzzle brake or muzzle compensator; or (e) the capacity to accept a detachable magazine at some location outside of the pistol grip.

11.     Under subsection (4) of the Ordinance's definition of "assault weapon," a semiautomatic shotgun qualifies as an assault weapon if it has one or more of the following: (a) only a pistol grip without a stock attached; (b) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (c) a folding, telescoping or thumbhole stock; (d) a fixed magazine capacity in excess of five rounds; or (e) an ability to accept a detachable magazine.

12.     In addition, subsection (7)(a) of the Ordinance lists specific rifles that qualify as assault weapons for purposes of the Ordinance, including the following models: (i) AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR; (ii) AR-10; (iii) AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR; (iv) AR70; (v) Calico Liberty; (vi) Dragunov SVD Sniper Rifle or Dragunov SVU; (vii) Fabrique National FN/FAL, FN/LAR, or FNC; (viii) Hi-Point Carbine; (ix) HK-91, HK-93, HK-94, or HK-PSG-1; (x) Kel-Tec Sub Rifle; (xi) Saiga; (xii) SAR-8, SAR-4800; (xiii) SKS with Detachable Magazine; (xiv) SLG 95; (xv) SLR 95 or 96; (xvi) Steyr AUG; (xvii) Sturm, Ruger Mini-14; (xviii) Tavor; (xix) Thompson 1927, Thompson M1, or Thompson 1927 Commando; or (xx) Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

13.     Subsection (7)(b) of the Ordinance lists specific pistols that qualify as assault weapons for purposes of the Ordinance, including the following models: (i) Calico M-110; (ii) MAC-10, MAC-11, or MPA3; (iii) Olympic Arms OA; (iv) TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or (v) Uzi.

14.     Finally, subsection 7(c) of the Ordinance lists specific shotguns that qualify as assault weapons for purposes of the Ordinance, including the following models: (i) Armscor 30 BG; (ii) SPAS 12 or LAW 12; (iii) Striker 12; or (iv) Streetsweeper.

15.     Semiautomatic rifles, including AR-platform rifles, as well as semiautomatic pistols and shotguns, are capable of firing one shot per each pull of the trigger. Centerfire firearms are chambered with centerfire ammunition, which has the primer located in the center of the base of the cartridge case (as opposed to the rim of the cartridge). Today's modern rimfire ammunition is almost always confined to small and less powerful cartridges, such as the .22LR. Bullets fired from these cartridges are small and light and move slower than almost all centerfire rifle ammunition. Rimfire chamberings are common in youth and "beginner" hunting rifles because they are relatively quiet and inexpensive and have low recoil. Conversely, modern centerfire ammunition requires a detonation of a primer in the center of the cartridge (CENTERfire) and these cartridges are generally much more powerful than rimfire cartridges. As an example, the .223, which is the most common AR-15 cartridge, fires bullets at more than 3000 feet/second, whereas a rimfire cartridge typically propels bullets at around 1100 feet/second. This increased centerfire velocity greatly increases the range and lethality of centerfire cartridges. Most handgun cartridges are also now centerfire and these cartridges generally fire bullets much larger than rimfire cartridges, usually at velocities of between 800 and 1500 feet/second. Generally, centerfire weapons fire higher-caliber ammunition and/or fire it at higher velocities. The AR-platform, in particular, is the civilian version of the military's select-fire M-16 and M-4 rifles, which are capable of fully automatic or burst firing. Based on my familiarity with the firearms industry, AR-platform rifles and similar semiautomatic rifles did

6

not begin to sell in significant numbers until the late 2000s and particularly after the 2012 shooting at Sandy Hook Elementary in Newtown, Connecticut.

16.    The AR-platform is highly modular, enabling owners to customize their rifles with a variety of interchangeable components. Some components of a firearm are integral to its operation, such as a trigger mechanism or barrel, and the firearm will not function properly without them. But as I discuss here, the particular components identified in the AWCA, which qualify a weapon as an "assault weapon" if it is equipped with them, are not integral to the basic operation of any firearm and are not necessary to use a firearm effectively for self-defense or sporting purposes, such as hunting.

17.    **Pistol grip without a stock attached.** Pistol grips beneath the action of a rifle or shotgun are not necessary to operate those weapons as designed. A pistol grip is a feature incorporated into some firearm stocks that allows the shooter to control and aim the rifle during periods of rapid fire. For many decades, alternative stock designs have been incorporated into firearms such as Remington 870 shotguns which are widely accepted to be among the most effective home defense guns ever built. Even on AR-15s and similar rifles, stocks that do not incorporate this feature are currently sold in states such as California, and prominent, widely referenced firearms authorities on these topics, such as www.caligunner.com, assess those options and the function of these "compliant" (non-pistol grip) rifles in this manner: "Everyone has a preference on what looks the 'best' but the top picks below are *all great functioning options*."[1]  As also noted on that website, while "[s]ome people that are critical of the featureless option complain of the aesthetics of the available options," "the overall function of the rifle is mostly maintained," and "several companies continue to innovate and provide new products that

---

[1] https://caligunner.com/california-compliant-featureless-rifle/ (last visited Dec. 30, 2022).

look decent and perform well considering the constraints of the law." While a pistol grip beneath the action of a rifle may be useful during military operations because it helps the shooter stabilize the weapon and reduce muzzle rise during rapid fire, a pistol grip is not necessary to operate a firearm safely in lawful self-defense situations.

18.    **Protruding grip that can be held by the non-trigger hand.** This feature is also commonly referred to as a "forward grip"or "foregrip" and is designed to aid in rapid firing, especially in confined spaces such as buildings. The feature first gained prominence inside special operations military units where "cluttering" from accessories and extreme heat generated from the firing of fully auto (submachine) rifles were problems for troops. A concise description of the feature's origin is found in this firearms industry review from Lucky Gunner: "One of the items issued in this kit was a Knight's Armament vertical forward grip, and it was included in order to deal with the problem of the forward rails becoming too cluttered to hold correctly when the other accessories were mounted. It also retained the benefits of recoil control and heat mitigation that made it a popular feature on submachine guns."[2]  As this article details, forward grips can be an effective feature for troops charged with fast and efficient killing of enemy combatants in urban warfare, but in my opinion they are not a necessary feature for self defense.

19.    **Folding, telescoping, or thumbhole stock.** The stock is the part of a firearm that allows it to be held at the shoulder for firing. A folding or telescoping stock can be collapsed to shorten the length of the rifle (or extended to extend its length). A firearm does not need an adjustable stock to operate as designed and can be equipped with fixed-length stocks instead. Original rifles on which the current existing and newly manufactured AR-15s are based, and that were accepted by hundreds of thousands of military officers as their weapon of choice for

---

[2] https://www.luckygunner.com/lounge/how-to-hold-an-ar15-foregrip/ (last visited Jan. 10, 2023).

decades, did not incorporate a folding stock and no credible firearms authority claims that those firearms did not function properly. Further, there are still non-folding stock options available today and all are sold and advertised as fully functioning options for semiautomatic rifles.

20.     **Shroud attached to the barrel.** A barrel shroud wraps around the barrel of a rifle or pistol, enabling the shooter to grasp the barrel during firing without burning the non-trigger hand as the rifle heats up in rapid-fire and continuous-fire situations. A barrel shroud is not necessary to operate a rifle or pistol as designed in self defense situations.

21.     **Muzzle brakes and muzzle compensators.** Muzzle brakes, and compensators are devices added to the end of a firearm barrel that are designed to direct the gas produced from firing in directions that result in reduced "felt recoil" and "muzzle rise." These devices are therefore designed to aid the shooter in staying on target in rapid fire situations. Some of these devices are also commonly referred to as flash suppressors, which are devices that are attached to the muzzle of a firearm to also reduce or redirect the flash when shooting. This feature is affixed to military rifles to redirect the light (muzzle flash) generated from the burning of gasses while firing which reduces the prevalence of "night blindness" that can develop during low-light firefights. A flash suppressor also disguises the origin of fire and avoid detection by enemy forces but has marginal benefit in civilian self-defense situations, even in low-light conditions. It is widely accepted that the most effective self-defense guns are handguns and home-defense shotguns. These guns also produce muzzle rise and muzzle flash just like an AR-15 and yet none require a "flash suppressor," "muzzle brake," or "compensator" device to operate effectively in self defense situations.

22.     **Fixed magazine with the capacity to accept more than 10 rounds.** A fixed magazine capable of holding more than 10 rounds of ammunition is not necessary to operate any

firearm as designed. As explained below in connection with detachable magazines, all firearms are capable of functioning with magazines capable of holding fewer than 10 rounds, including magazines that were originally capable of holding more than 10 rounds but have been permanently modified to hold 10 rounds or less. A fixed magazine of 10 rounds or more is generally a "work around" to avoid the regulations on detachable magazines, but the same functional realities apply to both detachable and fixed magazines.

23.     **Detachable magazines.** Detachable magazines enable a shooter to replace an empty or depleted magazine with a fresh magazine to resume firing. Detachable magazines may hold more than 10 rounds of ammunition, which the Ordinance defines as "large capacity magazines." Despite the recent popularization of large capacity magazines, it is important to note that I am not aware of a single existing firearm that requires a large-capacity magazine to function as designed. By this I mean that all firearms that can accept a large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended. This is true even of AR-platform rifles. Although many AR-platform rifles are sold with a 30 round magazine, the manufacturers all offer the optional purchase of 10 round or even lower capacity magazines. There are many pistols (such as the very popular Model 1911—which was the accepted sidearm of the U.S. Military for decades and is still one of the most widely sold guns in the United States) that are built for magazines of eight rounds or less. Other widely popular guns such as the Sig P938 are also designed to function with seven or eight round magazines and these guns have been widely acclaimed by dozens of notable firearms industry experts as among the most effective concealed carry/self defense firearms on the market.[3] While

---

[3] USA Carry review of Sig 938 9mm handgun: https://www.usacarry.com/sig-sauer-p938-subcompact-9mm-review/ (last visited Jan. 10, 2023).

larger 10-plus round magazines exist for these pistols, a smaller magazine (standard seven or eight round) is considered preferable by almost all consumers because the physical size/profile of the shorter magazine is easier to carry, shoot and conceal. Still today, guns such as the 1911 and Sig938 are built to function with sub-10 round magazines. With regards to the 1911 design, it is so respected that it is currently reproduced by many gun companies (Smith and Wesson, Ruger, Kimber, Springfield, Rock Island, Dan Wesson, and many other companies build and sell these 1911 pistols) and they are sold in high volumes by most retailers in the United States. These guns are still considered extremely effective self-defense firearms by many of the leading firearms trainers in the country and have even been widely labeled as an "expert's gun." For most AR-15s and now for many handguns, even where magazines with capacities of more than 10 rounds are prevalent, the industry always offers 10-round or "compliant" magazines as an option. I am not aware of a single case where those magazines have been advertised as inadequate or ineffective.

## II.    Features And Marketing of AR-15s and Similar "Assault Rifles"

24.     All AR-15 firearms are derivatives of the Armalite Rifle (AR) model 15, which was originally designed for the United States Military in the late 1950s. The AR-15 was specifically designed to satisfy clearly-stated military requirements for an "assault rifle."  The AR-15 incorporated features that achieved these requirements and those requirements included: being lightweight, easily portable, accurate, high-capacity-capable, low recoil, and fast-firing. The AR-15 was therefore adopted by the U.S. military in the early 1960s.

25.     While there is no universally accepted definition of "assault rifle," the term generally refers to a firearm that incorporates a set of physical features that increase the effectiveness of killing enemy combatants in offensive battlefield situations, usually in close and medium-range warfare. This list of features generally includes, but is not limited to, the features

11

enumerated in the Highland Park Ordinance and includes pistol grips, semi-automatic or fully-automatic fire control systems, the capability to accept detachable magazines, folding or telescoping stocks, and barrel shrouds.

26.     Military versions of the AR-15, such as the Armalite Rifle model 15, are generally capable of "fully automatic" and "burst" rates of fire. These firing modes, which produce multiple shots with one trigger pull, are generally used to suppress enemy fire. In addition, these guns can be switched between "fully automatic" mode and "semi-automatic" mode. The "semi-automatic" mode, which is the most commonly used mode on military rifles, is the mode that is most often deployed in battle to efficiently target and kill enemy troops. It is my experience that most respected Special Forces trainers teach that "semi-auto" is the preferred and most lethal setting in most wartime scenarios.

27.     United States civilian-legal versions of the AR-15 (and other "assault rifles" sold into the U.S. commercial market) are "semi-automatic" firearms.

28.     While the AR-15 and its derivatives are by far the most common assault-style rifles in the United States, there are many other firearms that share the same purpose and generally have the same defining features. Those firearms include firearms utilizing all or part of the AK47 platform as well as many others enumerated in the Highland Park Ordinance.

29.     The original patent for the gas operating system that assists the AR-15 with being rapidly fired with minimal recoil expired in 1977,[4] which subsequently allowed the engineering prints for the AR-15 to be publicly available to all firearms companies. From that point forward, there could have been a large-scale, immediate, and legal proliferation of direct copies of these

---

[4] Gas Operated Bolt and Carrier System, U.S. Patent No. 2,951,424 (accessible at https://patents.google.com/patent/US2951424A/en).

rifles into the United States commercial market. But that did not happen, at least not immediately. In fact, when I first started my work in the gun industry in the 1990s, AR-15s were not common and the acceptance or promotion of this product category was thought to be irresponsible.

30. This self-imposed industry "regulation" is evidenced in the commercial sales of AR-15s. During the period between 1964 and 1994, first for Colt, and then also for all companies who produced the guns after Colt's patent sunset, commercial AR-15 sales averaged fewer than 27,000 units per year for a total of about 787,000 units in the 30-year period 1964-1994[5]. Even during the 10-year period of the federal assault weapons ban (1994-2004), AR-15s were legal to produce and sell as long as they did not incorporate and combine additional features as enumerated in that legislation. Even after that federal legislation expired, the gun industry did not immediately begin producing or selling these guns in large numbers. That is because there was a continued unspoken agreement in the industry that these guns, which were designed for military-style, offensive (i.e., attacking) use, and related gun paraphernalia—including virtually all large capacity magazines, which were generally also considered to be for military-style, offensive use—would not be displayed at trade shows or used at industry-sponsored shooting events.

31. This voluntary prohibition also extended to the largest sporting goods retailers in the country, none of which would sell or display the guns. Individuals in the shooting industry were asked not to bring such rifles to industry events or promote them publicly. This remained true as late as 2006. It was not until very recently that the gun industry began to push AR-15s

---

[5] Estimating AR-15 Production, 1964-2017 (Nov. 9, 2019), http://www.alternatewars.com/Politics/Firearms/Count/AR15_Production.htm (last visited Jan. 12, 2023) (compiling data from the Bureau of Alcohol Tobacco, Firearms & Explosives' *Annual Firearms Manufacturing and Export Reports*, among other sources).

and other assault-style guns, leading to their well-documented proliferation today, as shown in the following table of data compiled by the National Shooting Sports Foundation (NSSF), the leading trade group in the firearms industry:[6]

| Year | US Production less exports of MSR/AR platform | US Import less exports of MSR/AR, AK platform | ANNUAL TOTAL |
|------|------|------|------|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 245,000 | 1,605,000 |
| 2016 | 2,217,000 | 230,000 | 2,447,000 |
| 2017 | 1,406,000 | 158,000 | 1,564,000 |
| 2018 | 1,731,000 | 225,000 | 1,956,000 |
| 2019 | 1,679,000 | 169,000 | 1,848,000 |
| 2020 | 2,466,000 | 332,000 | 2,798,000 |
| TOTALS | 18,901,000 | 5,545,000 | 24,446,000 |

---

[6] https://www.nssf.org/wp-content/uploads/2022/07/EstMSR1990_2020.pdf (last visited Jan. 12, 2023).

32.     In 2009, the firearms industry through the NSSF facilitated a public re-branding of "assault rifles" in an effort to make them more socially acceptable. As such, the NSSF broadly encouraged an industry-wide effort to rename such guns to "Modern Sporting Rifles" or MSRs. Even though the guns themselves were steadily "improved" in the functional areas that generally impact lethality of an assault rifle, industry members, including me, were then strongly encouraged to stop using the term "assault rifle" because that term was thought to portray an offensive military use and therefore harm the public perception of such guns.

33.     During the late 2000s and continuing through today, there has been a rapid increase in the number of companies that manufacture and market their own versions of AR-15s and other similar assault rifles. This has resulted in a transformation of the marketplace from only a few AR-15 manufacturers in 2000, to several hundred AR-15/assault rifle companies today. The list of AR-15 manufacturers now includes small, medium, and the largest firearms companies in the United States, all of whom are striving to obtain market share with versions of what is effectively the same rifle. This reality has created a highly competitive market resulting in thousands of "continuous improvements" in the AR-15-style firearms sold to the general public as a way to encourage consumers to buy one rifle over another. Over time these improvements have generally been incorporated on most rifles across the marketplace and therefore result in firearms that are more accurate, more portable, and more specifically tailored to produce lethal outcomes. Relative to the AR-15 assault rifles requested and then adopted by the U.S. military in the early 1960s, these commercially available AR-15s of today are generally more reliable, more accurate, more ergonomic, and therefore more effective. For example, this is

a typical marketing page[7] for AR-15 manufactures in which a prominent company advertises the various ways in which its features "improve" upon the basic AR-15:



---

34.     The increase in the AR-15 market has also facilitated an increase in accessory availability for the AR-15 and similar firearms (commonly referred to as "furniture"). Most AR-15s and similar firearms now incorporate features designed to accept one or more of dozens of accessories, all of which are designed and marketed to increase the effectiveness of the rifle in live-fire situations. The list of accessories includes highly-effective electronic optics, more sensitive triggers, forward and pistol grip options, tactical lights, laser-pointing devices, high-capacity magazines, and many others. Almost none of these accessories were available to the United States military at the time of the rifle's adoption in the early 1960s. There are now hundreds of companies and retailers who encourage customers to make their rifles more effective by accessorizing. The following are examples of marketing images illustrating this trend:[8]

 

---

[8] AR-15 accessory article examples: https://www.tactical-life.com/gear/top-10-black-guns-ar-accessories/ (last visited Jan. 10, 2023), and https://www.pewpewtactical.com/best-ar-15-furniture-accessories/ (last visited Jan. 10, 2023).

35.     The competitive AR-15/assault rifle marketplace has also resulted in manufacturers creating new customers through professional, targeted marketing campaigns. Most of these marketing campaigns target young American males such as this example from 2010:[9]



---

[9] Bushmaster XM15 Mancard advertising article: https://www.ammoland.com/2010/05/bushmaster-man-card/#axzz7q0HQao58 (last visited Jan. 10, 2023).

36.     Other prevalent AR-15 marketing encourages potential customers, most of whom are young men, to buy the same weaponry as elite special forces units of the U.S. military. In other words, marketing within the industry itself characterizes AR-15-style weapons as military-style weapons, as in this example:[10]



---

[10] Michael Daly, *Uvalde Shooter's Gunmaker Hypes 'Revolutionary' New Killing Machine*, https://www.thedailybeast.com/uvalde-shooter-salvador-ramos-gunmaker-daniel-defense-hypes-revolutionary-new-killing-machine (last visited Jan. 10, 2023) (showing Daniel Defense advertisement).

37.     Smith and Wesson's AR-15 variant is now widely reported to be the best-selling AR-15 in the United States. One of these rifles was used in the Highland Park July 4th shooting. Smith and Wesson's primary customers for this rifle are U.S. civilians who are not trained in military or police tactics, but the company's chosen name for this rifle, the M&P15, which means "Military and Police AR-15," suggests buyers will be equipped with the same rifles as trained military and police units.[11]



---

[11] https://www.smith-wesson.com/product/mp-15-sport-ii (last visited Jan. 10, 2023).

38.    Smaller AR-15 manufacturers often seek to grow their market by advertising in ways that depict young men inciting or engaging in armed urban warfare, such as in this example from AR-15 maker Spike's Tactical:[12]



39.    Other AR-15 manufacturers often depict men using their AR-15s in self-appointed vigilante actions, such as this advertising image supplied by the AR-15 maker Patriot Ordnance Factory:[13]

---

[12] Spikes Tactical Antifa advertisement: https://www.spikestactical.com/press/left-wing-media-outlets-lose-minds-over-gun-ad-disregard-basic-rules-of-journalism/ (last visited Jan. 10, 2023).

[13] https://pof-usa.com/wallpapers/ (last visited Jan. 10, 2023).



40.     Some prominent AR-15 companies design and market their rifle models with specific suggested uses that bear obvious similarity to the July 4th shooting in Highland Park. This is one relevant example from AR-15 maker Wilson Combat:[14]



41.     There are many AR-15 companies that combine the trends of continuous improvement, accessorization and modern digital marketing to encourage potential customers to personalize and optimize their rifles through an online ordering process. Below is one such

---

[14] https://www.wilsoncombat.com/ar-calibers/224-valkyrie/super-sniper/ (last visited Jan. 10, 2023).

example.[15] The official corporate name of this manufacturer suggests use of their AR-15s is from "rooftops," which is how the shooter during the July 4th Highland Park parade deployed his rifle.



42.     In my experience, many individuals in the firearms industry operate under the belief that the Protection in Lawful Commerce in Arms Act (PLCAA),[16] which became law in 2005, provides a liability shield for these marketing practices. It is also my experience that the AR-15/assault rifle marketing as detailed in the examples above has increased in frequency and become more explicit since that time.

---

[15] https://rooftoparms.com/ (last visited Jan. 10, 2023).

[16] 15 U.S.C. §§ 7901–7903.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 13, 2023 at _Kalispell, Montana_ .

/s/
Ryan Busse