# EXHIBIT 10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF HIGHLAND PARK, ILLINOIS,<br><br>Defendant. | No. 1:22-cv-04774<br><br>Honorable Harry D. Leinenweber<br><br>Honorable Jeffrey T. Gilbert |

## DECLARATION OF CHRIS O'NEILL

1. I have personal knowledge of the matters set forth in this declaration and can testify competently to such matters.

2. I serve as Patrol Division Commander for the City of Highland Park, Illinois ("Highland Park") Police Department. I have served as Patrol Division Commander since April 2018 and plan to retire on January 24, 2023.

**Highland Park & The Highland Park Police Department**

3. I have worked as a police officer in Highland Park and the surrounding area for more than 30 years. I started as a part-time dispatcher before joining the Police Department as a full-time officer in 1991. Between 1991 and October 2003 I held multiple roles, including patrol officer, investigations officer, and SWAT team member and marksman. From October 2003 until 2007 I was a Police Sergeant, and from 2007 until April 2018 I served as the Police Traffic Sergeant. Additionally, I worked part-time as a patrol officer for the Bannockburn, Illinois Police Department between April 2016 and April 2018.

4. As Patrol Division Commander I oversee the entire patrol division, comprised of seven patrol sergeants and 35 sworn officers.

5. Highland Park currently employs approximately 57 sworn police officers.

1

6. According to the 2020 Census, there are approximately 30,176 residents in Highland Park. 24.7% of Highland Park residents are under 18, and 6.9% are under the age of five.

7. As a result, there are roughly 1.89 officers per 1,000 residents in Highland Park.

8. The Police Department issues each sworn officer a ballistic vest to wear while engaged in uniform duties. The ballistic vests are not rifle-rated; they are designed to stop handgun rounds, such as 9mm, .40 caliber, and similar rounds.

9. Sworn officers also carry a pistol while on-duty that they must qualify for annually. The Police Department either issues a Sig Sauer P220 .45 caliber pistol, or allows officers to carry an approved 9mm, .40 caliber, or .45 caliber Beretta, Glock, Heckler & Koch, Sig Sauer, Smith & Wesson, or Springfield Armory pistol of their choice.

10. Additionally, a Department-issued Sig Sauer Sig516 patrol rifle is secured in each patrol vehicle and certain other Police Department vehicles used by officers.

11. Patrol vehicles also carry heavy ceramic plates, which can be added to an officer's ballistic vest for additional protection, and hard armor.

12. Since passage in 2013, Highland Park's ordinance banning assault weapons and large-capacity magazines has been enforced through non-traffic citation or administrative hearing tickets more than 20 times. A total of twelve individuals were cited for at least 16 violations of the prohibition on large-capacity magazines and 11 violations of the prohibition on assault weapons.

13. Between June 2003 and July 4, 2022, there was not a single homicide in Highland Park.

14. In the years prior, there were four homicides between October 1996 and June 2003.

15. On July 4, 2022 there were seven homicides, all of which occurred in connection with the mass shooting at the July 4, 2022 holiday parade.

16. Since July 4, 2022, there have been two homicides in Highland Park, each caused by a stabbing.

**July 4, 2022 Mass Shooting**

17. On July 4, 2022, I was assigned to manage the Fourth of July parade detail. Approximately half of the Police Department and nearly all of the Fire Department was at the parade either working the detail or in the parade.

18. The Highland Park Chief of Police, Deputy Chief, Investigations Commander, two sergeants, a number of officers, and citizen support staff were also working the parade detail.

19. In the morning on July 4th I was driving a marked police vehicle and checking the perimeter.

20. Around 10:00 am, I was at the intersection of Laurel Street and First Street talking with an officer on foot. At that time, I was one block south and one block east from the intersection where the shooting occurred.

21. At approximately 10:14 am I heard gunfire. I recognized it because of the rapid succession of the shots, the volume, and my training. However, due to echoes of the sound I could not tell exactly where it was coming from.

22. The officer and I split up. The officer ran on foot, west on Laurel Street toward Second Street. I drove approximately 60 feet north on First Street and parked.

3

23. I had my Department-issued ballistic vest on and Glock 41 duty pistol (a .45 caliber) with me.

24. When I parked, I heard a second volley of gunfire consistent with the sound and volume of the first. In total, I recall the shooting lasting between approximately 60 and 90 seconds and hearing at least 60 shots fired.

25. During the second volley, neither I nor my fellow officers could identify where the gunfire was coming from because of echoes bouncing off of the nearby buildings and the sound caused by parade-goers running for their lives.

26. I entered Port Clinton Square Plaza from the south, via the First Street sidewalk access. I saw broken glass, abandoned property, and several persons with serious, traumatic injuries on the east side of Walker Bros. Pancake House.

27. I quickly surveyed the area and saw additional injured persons with traumatic injuries near the benches on the south side of Central Avenue at the intersection of Central Avenue and Second Street.

28. As I walked around the area, I saw at least five individuals with traumatic injuries. They appeared lifeless, with blood everywhere. One victim had a catastrophic head injury. These wounds appeared to be fatal, given the obvious extent of the damage to their bodies and the amount of blood in the street.

29. I continued to try and find the shooter, but could not. By the time I reached the intersection where I now understand the shooter was, the shooting had stopped.

30. At that point, I and other officers began communicating on the radio that there was a mass-casualty event with numerous people shot and a rapid medical response was needed.

31. I and other officers started handing out medical supplies to first responders and victims, established a triage area in front of the Walker Bros. Original Pancake House at the southeast corner of Central Avenue and Second Street, and notified the Coroner.

32. I became the Incident Commander on the scene. I requested law enforcement mutual aid, and established a staging area and command post for incoming law enforcement from the surrounding area. I and my fellow officers also managed resources on the scene, directed our resources to securing the crime scene and business district, and assisted in coordinating the treatment and transportation of victims to area hospitals.

33. Police officers, Community Emergency Response Team ("CERT") members, off duty doctors and nurses, and other civilians were on the scene and responded immediately. Within approximately one to two minutes medical responders from the Fire Department arrived and very quickly began treating victims as well.

34. Due to the severity of injuries and number of wounded, the Police Department helped transport the injured in unmarked vehicles, and citizens self-transported to get victims to hospitals quickly.

35. I also led and helped coordinate the efforts to begin securing the business district, teaming officers up to search buildings and structures one-by-one.

36. The Police Department quickly received information that there was evidence on the roof of Ross Cosmetics. Officers secured the rooftop, finding multiple high-capacity 30-round magazines with casings. A Smith & Wesson M&P 15 weapon, an AR-15 style weapon, was located nearby and secured by police.

5

37. The Police Department also received descriptions of the suspect. At approximately 12:55 pm I was assigned to appear before the gathered news media and gave a description of the suspect.

38. At that point, I turned the scene over to a sergeant and went to the unified command post at Station 33 to focus on apprehension and mitigation efforts. This meant coordinating with other law enforcement, securing the business district perimeter, and evacuating those that sheltered-in-place.

39. In total over 100 law enforcement officers from multiple agencies, including the FBI, Illinois State Police, and Lake County Sheriff's Office, responded and aided in the efforts to secure the scene and apprehend the suspect.

40. The Police Department also established a reunification point at the local train station for families that had separated, and law enforcement officers helped manage families that lost a family member in the shooting.

41. At approximately 5:00 pm law enforcement identified a person of interest in the shooting and released his name and information about his car to the public.

42. At approximately 6:30 pm, more than eight hours after the shooting began, law enforcement apprehended the suspect in Lake Forest, Illinois, about five miles from the scene of the crime.[1]

43. We later learned, after the shooting, the suspect had driven to the Madison, Wisconsin area with another high-powered weapon in his car, and considered committing a

---

[1] *Robert Crimo III captured after six killed in shooting at Highland Park July 4 parade*, CBS Chicago (July 4, 2022), https://www.cbsnews.com/amp/chicago/live-updates/6-dead-highland-park-july-4-parade/#app.

second attack on a Fourth of July celebration in Madison. He decided not to and turned back toward Highland Park, and was ultimately apprehended in a nearby suburb.[2]

**Prohibited Firearms & Magazines Present A Serious Risk To Law Enforcement**

44. Semi-automatic weapons, which include high-powered rifles like AR-15s with high-capacity magazines and other militaristic features, are commonly referred to by the public as assault weapons and are defined as assault weapons under Highland Park's ordinance. These weapons are not designed for self-defense, but are instead designed for combat situations with the goal of killing as many people as possible in a short period of time. To that end, they are designed to produce rapid fire at a high velocity, are accurate at long distances, are light and maneuverable typically with a low recoil when fired so that they can be handled easily while on the move, and generally have higher magazine capacity that allows for the possibility to engage many targets quickly. These characteristics are not necessary for an effective self-defense weapon.

45. Assault weapons are also not appropriate for hunting. Hunting strategy requires a weapon to accurately kill an animal humanely, preferably with one shot. Accordingly, the magazine capacity is generally much smaller. The large magazines and rapid-fire capability of assault weapons exceed these hunting requirements and could endanger other hunters and bystanders.

46. I do not believe that civilians in Highland Park need assault weapons to adequately protect themselves, their families, or their properties. If required, there are numerous

---

[2] Andy Grimm & Manny Ramos, *Highland Park suspect confessed to July 4 massacre, drove to Wisconsin but opted not to open fire there, prosecutors say*, Chicago Sun Times (July 6, 2022) https://chicago.suntimes.com/2022/7/6/23196101/highland-park-mass-shooting-suspect-robert-crimo-iii-ordered-held-without-bond.

other types of firearms that are available and may be possessed lawfully by Highland Park residents that would serve the intended self-defense purposes.

47. The presence of assault weapons in civilian hands would significantly increase public safety risks to Highland Park residents, visitors, and law enforcement officers.

48. On July 4th, I saw first-hand the immense destruction that an assault weapon can cause. Seven citizens died from catastrophic gunshot wounds delivered in an instant, and dozens of others suffered serious, traumatic injuries that require extensive recovery and rehabilitation. Many Highland Park residents, including those who escaped without physical injury, are suffering from and will continue to suffer from the trauma caused by the mass shooting.

49. I also saw first-hand the outsized risk to law enforcement that assault weapons pose and the difficulty of mitigating and responding to a mass shooting where the perpetrator has an assault weapon. On July 4th, law enforcement personnel and first responders were already close by and could respond immediately to the mass shooting, and yet we were not able to stop the shooter or save those killed in time.

50. The shooting occurred very quickly, without any notice, and was over in approximately 60 to 90 seconds. I and other officers immediately split up to try to find the shooter, but there was no way to locate him. And when we jumped into action, we put ourselves further into harm's way, facing unique risks caused by assault weapons.

51. For example, I attempted to locate the shooter or shooters (at the time we did not know how many there were) with just my ballistic vest, which is not rifle-rated and would not have been able to stop the penetrating gunfire of an AR-15 style weapon. Time is critical in an active-shooter scenario, so while hard armor or ceramic plates may have been able to provide more protection, there was no time to add them. Further, hard armor and ceramic plates make

8

moving around more difficult, and in responding to an active shooter law enforcement needs to be as fast and nimble as possible.

52. Additionally, I ran toward rapid active gunfire with only my Glock 41 pistol. As a result, I was at a severe disadvantage to the shooter; I was armed with a much less powerful weapon, many fewer rounds, and my weapon was not as accurate at long distances, limiting my ability to defend the public, my fellow officers, and myself. This disadvantage is only amplified if there are multiple active shooters. While patrol vehicles are equipped with high-powered rifles, for safety and practicality reasons, patrol officers carry their duty pistol and not the rifle on their person. An officer responding to an active shooter is unlikely to have the time to get the rifle from the vehicle.

53. Even an officer that does respond with a patrol rifle, at best, may have equal firepower as the active shooter.

54. Moreover, responding officers have limited information and often do not know where the shooter or shooters is located. During the July 4th shooting, due to echoes and the sound caused by civilians running for their lives, I did not know where the gunfire was coming from. That meant that I was running toward gunfire without knowing exactly where it was coming from or when I would be in the line of fire.

55. Even when officers know where the shooter is, assault weapons and large-capacity magazines make neutralizing the shooter extremely difficult. They typically allow active shooters to shoot dozens of rounds without the need to reload, which means that responding officers have fewer opportunities to stop the suspect while not being in the line of fire.

56. Conversely, a shooter armed with a handgun, or even a weapon without a large-capacity magazine, would not have been able to fire as many bullets in the same amount of time. They will need to reload more often, and it will take them longer to shoot. The lower magazine capacity and slower rate of fire provides officers more opportunities to respond and gives civilians more time to escape.

57. On July 4th, the mass shooting was violent, deadly, and traumatic. Seven people died and dozens more were seriously wounded. I and my fellow law enforcement officers were present in the area and took action immediately, but it was futile. The shooting stopped before officers, like myself, could locate the shooter, much less stop him.

58. Had the shooter continued shooting, I would have put my life on the line, like the other responding officers, to try and locate the shooter and stop further carnage.

59. There was an immediate police and medical response, and still it could not stop the death and destruction.

60. Based on my law enforcement experience, I believe that Highland Park should have the ability to ban assault weapons and large-capacity magazines for civilian use given the unique public safety risks they pose to the community.

61. Before and especially after the July 4th shooting in Highland Park, if I saw a civilian carrying an assault weapon, I would feel uncomfortable and think that the community was at risk.

I, Chris O'Neill, under penalty of perjury as set forth in 28 U.S.C. § 1746 declare that the foregoing is true and correct.

Date: January 19, 2023

*Chris O'Neill*
Chris O'Neill
Patrol Commander,
City of Highland Park Police Department