# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF HIGHLAND PARK, ILLINOIS, <br><br> Defendant. | No. 1:22-cv-04774 <br><br> Honorable Harry D. Leinenweber <br><br> Honorable Jeffrey T. Gilbert |

**BRIEF OF THE UNITED STATES CONFERENCE OF MAYORS AS AMICUS CURIAE IN SUPPORT OF DEFENDANT**

Jeffrey E. Stone (No. 6189590)
James P. Durkin (No. 6296298)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, Illinois 60606
(312) 984-2064
jstone@mwe.com
jdurkin@mwe.com

Mary B. McCord (*pro hac vice*)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
(202) 661-6607
mbm7@georgetown.edu

Ben Gifford (*pro hac vice*)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Amicus Curiae the United States Conference of Mayors*

**INTEREST OF AMICUS CURIAE**

The United States Conference of Mayors ("Conference") is the official non-partisan organization of the more than 1,400 United States cities with populations of 30,000 or more. Its members suffer a disproportionate share of gun violence in the United States and have a common interest in maintaining the flexibility to address this problem in the manner local officials determine to be most effective and appropriate.

**INTRODUCTION**

State and local governments have long been required—and empowered—to solve novel problems across a host of issue areas. These solutions both inure to the benefit of their own constituents and serve as templates for jurisdictions at all levels of government. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems" (internal quotation marks and citation omitted)). As the Conference is keenly aware, cities—and the officials who represent them—have historically stood at the forefront of responding to the societal issues that impact their communities. Local governments must have the ability to innovate to "deal with pressing social, economic, and environmental concerns."[1]

Few problems underscore the need for innovation like the increasing availability of assault-style weapons and high-capacity magazines. The Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), recognized this need and preserved a degree of flexibility for local governments to protect their constituents. *Bruen* reaffirmed the point articulated by the Court's earlier decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that our Nation has a "historical tradition of prohibiting the carrying of

---

[1] Bruce Katz & Jeremy Nowak, *The New Localism* viii (2017).

1

'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). In addition, States have had a tradition since the Founding of banning a range of weapons—from clubs and Bowie knives to multi-shot firearms and machine guns. *See* Def.'s Opp. 31–38.

The challenged ordinance fits comfortably within this tradition of regulation that *Bruen* endorsed. *Bruen* made clear that the Second Amendment is not "a regulatory straightjacket." 142 S. Ct. at 2133. Although a government defending a regulation of "Arms" must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2126,[2] it is required only to "identify a well-established and representative historical *analogue*, not a historical *twin*," *id.* at 2133. The Court acknowledged, moreover, that while certain "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. For that reason, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

This aspect of *Bruen* has particular significance to the more than 1,400 cities represented by the Conference, including the Nation's largest cities. Assault-style weapons and high-capacity magazines are the kind of "dramatic technological changes" that *Bruen* contemplated. And their widespread availability has led to "unprecedented societal concerns." Mass shootings, in particular, have caused communities across the nation to experience previously unknown forms of tragedy and terror. And political violence and domestic extremism have jeopardized citizens' safety and ability to participate in civic life. *Bruen* explicitly recognized that for cities to adapt to these "novel modern conditions," *id.* at 2134 (quoting *Heller v. D.C.*, 670 F.3d 1244,

---

[2] As the City has explained in its Opposition, assault-style weapons and high-capacity magazines are not "Arms" protected by the Second Amendment's text. *See* Def.'s Opp. 17–28, 41–45.

2

1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)), they must have latitude to fashion regulatory responses "to circumstances beyond those the Founders specifically anticipated," *id.* at 2132. As has historically been the case, *Bruen* preserves the rights of cities and other governmental entities to exercise legislative flexibility to address emerging technologies that threaten society. Without this latitude, our local governments will be paralyzed in the face of a growing epidemic of gun violence, and all our communities will suffer the harms.

## ARGUMENT

### I. The Rise of Mass Shootings Demands a Flexible Government Response

Mass shootings were essentially unknown for the first two centuries of this Nation's history. According to expert evidence introduced in recent cases challenging high-capacity magazine bans, the first mass shooting in America resulting in double-digit fatalities did not occur until 1949. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022); Supplemental Declaration of Louis Klarevas ¶ 10, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 10, 2022), ECF No. 118-6 ("Klarevas Decl."). This shooting was followed by a second similar incident in 1966, a third in 1975, and a fourth in 1982. *See* Klarevas Decl. ¶ 10. In other words, these tragedies were initially non-existent, and then they occurred roughly once a decade.

The frequency and intensity of these massacres plaguing our cities have increased by an order of magnitude. Whereas the first four mass shootings resulting in 10 or more deaths occurred over more than three decades, the same number of double-digit killings took place in the two-year period from 2021 to 2022 alone.[3] These included, within 10 days, the racially

---

[3] *See Mass Murders in 2022*, Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-murders?year=2022; *Mass Murders in 2021*, Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-murders?year=2021.

motivated killing of 10 Black victims at Tops Friendly Markets in Buffalo, New York, and the murder of 19 children and two teachers at Robb Elementary School in Uvalde, Texas.[4]  And these are just the most fatal incidents; when all mass shootings are accounted for, they now occur nearly *twice a day*, and they killed over 1,200 people during the same two-year period.[5]  Days before the filing of this brief, another double-digit mass shooting occurred in Monterey Park, California, so far killing 11 people celebrating the Lunar New Year.[6]

Mass shootings inflict unique and devastating harms on victims and their communities. In addition to the incalculable costs of lost lives, survivors of gun violence "face a long ordeal of pain and medical care that collectively costs patients, hospitals, and governments billions of dollars each year."[7]  These include not only initial medical payments, but also ongoing expenses to manage physical and psychological pain, and the costs of "diminished quality of life for victims and their families."[8]  They also include decreased educational attainment in children exposed to gun violence, increased expenditures on school security, and depressed business and housing price growth in local economies.[9]  Survivors of school shootings in particular suffer

---

[4] *See A Partial List of Mass Shootings in the United States in 2022*, N.Y. Times (Jan. 24, 2023), https://www.nytimes.com/article/mass-shootings-2022.html.
[5] *See Past Summary Ledgers*, Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls (647 mass shootings in 2022, 690 in 2021, and 610 in 2020).  Mass shootings here are defined as when "four or more people are shot or killed in a single incident, not including the shooter." *General Methodology*, Gun Violence Archive, https://www.gunviolencearchive.org/methodology.
[6] *See* Morgan Winsor et al., *Monterey Park Mass Shooting Updates*, ABC News (Jan. 24, 2023), https://abcnews.go.com/US/live-updates/monterey-park-mass-shooting/?id=96603692.
[7] Patrick Boyle, *The Cost of Surviving Gun Violence: Who Pays?*, AAMC (Oct. 18, 2022), https://www.aamc.org/news-insights/cost-surviving-gun-violence-who-pays.
[8] *Id.*
[9] *See* Joint Econ. Comm. Democrats, The Economic Toll of Gun Violence 1, https://www.jec.senate.gov/public/_cache/files/69fcc319-b3c9-46ff-b5a6-8666576075fe/the-economic-toll-of-gun-violence-final.pdf.

long-term economic consequences, including reduced employment and earnings.[10] When the losses borne by survivors, families, communities, employers, and taxpayers are taken together, gun violence costs the U.S. $557 billion annually, or about 2.6% of gross domestic product.[11] And these costs are most acute in mass shootings.[12]

For those living in cities—which are densely populated and provide target-rich environments—mass shootings are particularly dangerous. The Conference knows this all too well. Just last month, the Conference sent a letter to Senators Schumer and McConnell urging the Senate to pass gun safety legislation that would have banned assault weapons and expanded background checks.[13] The letter was written on behalf of mayors of cities that experienced a mass shooting in 2022. Despite that limitation on signatories, the letter was signed by nearly *70 mayors*.

Mass shootings are also particularly likely to involve assault-style weapons or high-capacity magazines. "A study of mass shooting incidents between 1981 and 2017 found that assault rifles accounted for 86 percent of the 501 fatalities reported in 44 mass shooting incidents."[14] According to the expert evidence cited above, "*100 percent* of mass shootings

---

[10] *See* Kai Ryssdal & Maria Hollenhorst, *How School Shootings Shape Survivors' Economic Lives*, Marketplace (May 26, 2022), https://www.marketplace.org/2022/05/26/how-school-shootings-shape-survivors-economic-lives/.

[11] *See The Economic Cost of Gun Violence*, Everytown Research & Policy (July 19, 2022), https://everytownresearch.org/report/the-economic-cost-of-gun-violence/.

[12] *See* Boyle, *supra* note 7 ("Injuries from mass shootings are especially severe and costly."); *see also* Zara Abrams, *Stress of Mass Shootings Causing Cascade of Collective Traumas*, Am. Psych. Assoc. (Sept. 1, 2022), https://www.apa.org/monitor/2022/09/news-mass-shootings-collective-traumas.

[13] *See* Letter from U.S. Conf. Mayors to Charles Schumer, Majority Leader, U.S. Senate, and Mitch McConnell, Republican Leader, U.S. Senate (Dec. 5, 2022), https://www.usmayors.org/wp-content/uploads/2022/12/USCM-FINAL-Mayors-Gun-Safety-Letter-to-Senate-120522.pdf.

[14] *Assault Weapons and High-Capacity Magazines*, Everytown Research & Policy (Mar. 18, 2022), https://everytownresearch.org/report/assault-weapons-and-high-capacity-magazines/.

resulting in more than 14 deaths involved [large-capacity magazines] holding more than 10 bullets." Klarevas Decl. ¶ 13 (emphasis added); *see Oregon Firearms Fed'n*, 2022 WL 17454829, at *11. Furthermore, according to a study submitted by a different expert, in "all mass shooting events resulting in four or more fatalities through 2019 where the magazine capacity was known, sixty percent involved large-capacity magazines." *Id.* (citing Supplemental Declaration of Lucy P. Allen ¶ 26, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 10, 2022), ECF No. 118-1). And perhaps most striking, "[b]etween 2009 and 2020 in the US, the 10 mass shooting incidents with the most casualties *all* involved the use of a firearm equipped with a high-capacity magazine, an assault weapon, or both."[15]

The Conference and its members are painfully aware of why assault-style weapons and high-capacity magazines are popular with mass shooters: they are designed to be incredibly effective at maiming and killing their targets. "[A]ssault weapons are generally designed to fire rounds at a greater rate than other firearms," which "enable[s] a shooter to fire more rounds over a short period."[16] Each assault weapon "round has up to four times the muzzle velocity of a handgun round" and "inflicts greater damage to the human body."[17] And while "[b]ullets from weapons such as handguns typically pierce straight through a target, . . . weapons such as the AR-15s used in many mass shootings[] can liquefy organs."[18] As a result, "[s]hootings where assault weapons were used resulted in nearly six times as many people shot, more than twice as many people killed, and nearly 22 times as many people wounded per incident on average."[19]

---

[15] *Id.* (emphasis added).
[16] *Id.*
[17] *Id.*
[18] Emma Bowman, *This Is How Handguns and Assault Weapons Affect the Human Body*, NPR (June 6, 2022), https://www.npr.org/2022/06/06/1103177032/gun-violence-mass-shootings-assault-weapons-victims.
[19] *Assault Weapons and High-Capacity Magazines*, *supra* note 14.

High-capacity magazines also turn other weapons into formidable killing machines. For example, a Glock 19—the semiautomatic pistol used by a Tucson, Arizona, gunman in 2011 to shoot U.S. Rep. Gabrielle Giffords and nearly 20 other people, killing six—can be outfitted with an extended magazine that allows the shooter to fire off 33 shots in 15 seconds without having to reload.[20] Handguns with high-capacity magazines are also more easily concealable than assault-style weapons, which explains their popularity among mass shooters. "Most mass shootings—81 percent—involved the use of at least one handgun, and . . . [a]t least 17 shooters used only a handgun with a high-capacity magazine."[21] The cities represented by the Conference's members have first-hand experience: Dylann Roof used a handgun to kill nine people at the Emanuel AME Church in Charleston, South Carolina; Robert Bowers used three handguns and an assault-style rifle to kill 11 at the Tree of Life synagogue in Pittsburgh, Pennsylvania; and Omar Mateen used a handgun and an assault-style rifle to kill 49 at the Pulse nightclub in Orlando, Florida.[22] Recognizing the lethality and terror inflicted by these readily available weapons in the United States, foreign terrorist organizations have repeatedly urged their adherents to take advantage of such easy access to commit terrorist attacks.[23] The threat has been a reality for mayors in

---

[20] *See* Lane DeGregory, *Glock 19: Quick, Light, Tough*, Tampa Bay Times (Jan. 14, 2011), https://www.tampabay.com/archive/2011/01/14/glock-19-quick-light-tough/.
[21] *Mass Shootings in America*, Everytown Research & Policy (Nov. 21, 2020), https://everytownresearch.org/maps/mass-shootings-in-america/.
[22] *See* Emily Shapiro, *Key Moments in Charleston Church Shooting Case as Dylann Roof Pleads Guilty to State Charges*, ABC News (Apr. 10, 2017), https://abcnews.go.com/US/key-moments-charleston-church-shooting-case-dylann-roof/story?id=46701033; Reuters Staff, *Suspect in Pittsburgh Synagogue Massacre Faces More Charges*, Reuters (Jan. 29, 2019), https://www.reuters.com/article/us-pennsylvania-shooting/suspect-in-pittsburgh-synagogue-massacre-faces-more-charges-idUSKCN1PN2HH; Bart Jansen, *Weapons Gunman Used in Orlando Shooting Are High-Capacity, Common*, USA Today (June 14, 2016), https://www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/.
[23] *See* Adam Taylor, *The Islamic State Likes America's 'Dumb' Gun Laws, Defector Says*, Wash.

7

Orlando, Florida; San Bernardino, California; and Chattanooga, Tennessee, among others.[24]

First responders—most of whom work for the cities that the Conference's members represent—are no match for the firepower that mass shooters now deploy. As Highland Park notes in its Opposition, half of the City's Police Department was at the parade, but by the time the officers reached the center of the shooting, it had already stopped. *See* Def.'s Opp. at 7–9. Even if they had had time to confront the shooter, they would have been at grave risk given that they were not wearing rifle-rated ballistic vests. *See id.* at 9. Officers present at other shootings have been less lucky: in 2016, a sniper killed five Dallas police officers and wounded nine other officers and civilians.[25] And at the Buffalo shooting last year, an armed security guard died while trying to stop the assailant, who was wielding a high-powered rifle and body armor.[26]

There are proven solutions that jurisdictions have adopted, such as the ordinance challenged in this case, that can save lives by restricting exactly those weapons and accessories that mass shooters are most likely to use. At the federal level, "[m]ass-shooting related

---

Post (Aug. 4, 2016), https://www.washingtonpost.com/news/worldviews/wp/2016/08/04/the-islamic-state-likes-americas-dumb-gun-laws-defector-says/; Nick Miroff, *ISIS Fighter with American Accent Urges Supporters to Take Advantage of U.S. Gun Laws*, Wash. Post (Dec. 27, 2017), https://www.washingtonpost.com/world/national-security/isis-fighter-with-american-accent-urges-supporters-to-take-advantage-of-us-gun-laws/2017/12/27/5ffc664a-eb2d-11e7-b698-91d4e35920a3_story.html.

[24] *See* Ralph Ellis at al., *Orlando Shooting: 49 Killed, Shooter Pledged ISIS Allegiance*, CNN (June 13, 2016), https://www.cnn.com/2016/06/12/us/orlando-nightclub-shooting/index.html; Faith Karimi et al., *San Bernardino Shooters 'Supporters' of ISIS, Terror Group Says*, CNN (Dec. 5, 2015), https://www.cnn.com/2015/12/05/us/san-bernardino-shooting/index.html; Kristina Sgueglia, *Chattanooga Shootings 'Inspired' by Terrorists, FBI Chief Says*, CNN (Dec. 16, 2015), https://www.cnn.com/2015/12/16/us/chattanooga-shooting-terrorist-inspiration/index.html.

[25] *See* Manny Fernandez et al., *Five Dallas Officers Were Killed as Payback, Police Chief Says*, N.Y. Times (July 8, 2016), https://www.nytimes.com/2016/07/09/us/dallas-police-shooting.html.

[26] *See* Maki Becker, *Tops Security Guard Hailed as a Hero: 'Aaron Died Saving Lives'*, Buff. News (May 25, 2022), https://buffalonews.com/news/local/tops-security-guard-hailed-as-a-hero-aaron-died-saving-lives/article_6f0cdce4-db8a-11ec-929d-cbfc89e928b1.html.

8

homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004."[27] At the state level, "the rate of high-fatality mass shootings per capita was 2.3 times higher in states without [a large-capacity magazine] ban" than it was in states with such a ban.[28] And at the local level, cities like New York have seen success with the implementation of assault-weapons bans, among other measures.[29]

The success of these bans demonstrates the need for the kind of regulatory flexibility that *Bruen* contemplated. As the Conference and its partners have previously explained, "cities have adopted a range of approaches to confront the particular threats of gun violence that their communities face," and "[t]his range puts in sharp focus 'the theory and utility of our federalism as the States perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear.'"[30] This flexibility is particularly critical where cities face "novel" and "unprecedented societal concerns" like those posed by the problem of mass shootings. *Bruen*, 142 S. Ct. at 2132, 2134 (internal quotation marks and citation omitted). In addressing this problem, "data from cities and their varying approaches to municipal firearms regulation . . . show that cities need flexibility to craft locally tailored solutions to the particular threats and costs of gun violence that their residents face."[31]

Plaintiffs argue repeatedly that assault-style weapons and high-capacity magazines

---

[27] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994– 2004 Federal Assault Weapons Ban*, 86 J. Trauma & Acute Care Surgery 11, 12 (2019).
[28] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 AJPH 1754, 1758 (2019).
[29] *See* Brief of *Amici Curiae* Major American Cities, the United States Conference of Mayors, and Legal Community Against Violence in Support of Petitioners at 10–11, *D.C. v. Heller*, 554 U.S. 570 (2008) (No. 07-290).
[30] *Id.* at 11 (quoting *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring)) (alterations omitted).
[31] *Id.* at 12.

9

cannot be regulated because they are "in common use" today. *See, e.g.*, Pls.' Mot. 1, 3, 8, 10, 13–20. This is wrong factually and legally. First, Plaintiffs overstate how common these weapons and accessories are, both because they confuse the number *in circulation* with the number *used for lawful purposes*, and because even their inflated numbers fail to show a frequency of usage comparable to that of single-shot firearms at the Founding. *See* Def.'s Opp. 17–21, 43–44. Second, Plaintiffs' argument runs headlong into *Bruen*'s admonition that "dramatic technological changes may require a more nuanced approach" to firearms regulation. 142 S. Ct. at 2132. *Bruen* recognized a tradition going back to the Founding of governments regulating "dangerous and unusual weapons," *id.* at 2128 (quoting *Heller*, 554 U.S. at 627), as those technologies emerged. Highland Park's ordinance fits within that tradition. Furthermore, plaintiffs' argument is illogical and proves too much. As Judge Easterbrook explained in his opinion upholding Highland Park's ordinance when it was challenged less than a decade ago, "[d]uring Prohibition the Thompson submachine gun (the 'Tommy gun') was all too common in Chicago, but that popularity didn't give it a constitutional immunity." *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015). To the contrary, "relying on how common a weapon is at the time of litigation would be circular," because it would imply that "the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Id.* at 409. By plaintiffs' logic, if a jurisdiction does not act immediately to ban a novel and dangerous weapon, thus permitting that weapon to enter into common use, then the jurisdiction could *never* ban the weapon. This time-sensitive approach to regulation finds no basis in the Constitution and is inconsistent with prudent governance.

If cities lose the flexibility to devise regulatory responses to new and dangerous threats, mayors and other local officials will be hamstrung in their ability to ensure public safety, while

10

being left to manage the fallout of mass shootings when they inevitably occur. Mass shootings place substantial demands on cities' resources beyond the incalculable human toll that they exact. These resources are necessarily diverted from "essential public goods like education, workforce development, and . . . building healthier, safer, more sustainable communities."[32] A ruling in favor of Plaintiffs would impair the ability of the Conference's members not only to protect their communities, but also to govern the cities for which they are responsible.

## II. Regulatory Flexibility Is Necessary to Address Increases in Political Violence

In addition to the unprecedented problem of mass shootings, the Nation has seen a startling surge in political and ideologically motivated violence. "From death threats against previously anonymous bureaucrats and public-health officials to a plot to kidnap Michigan's governor and the 6 January 2021 attack on the U.S. Capitol, acts of political violence in the United States have skyrocketed in the last five years."[33] This recent increase in political violence has myriad causes, but one of the most prominent is the rise of domestic extremists that harbor anti-government sentiment.[34] Some of these extremists are disparate individuals who "self-radicalize via online engagement."[35] Others coalesce in paramilitary groups or militant social movements that espouse conspiratorial, white supremacist, and misogynistic views.[36] All are a

---

[32] Thoughts and Prayers Are Not Enough: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs., 117th Cong. 1 (2022) (written testimony of Sarah Burd-Sharps, Senior Dir. Rsch., Everytown for Gun Safety Support Fund), https://docs.house.gov/meetings/BA/BA09/20220719/115032/HHRG-117-BA09-Wstate-Burd-SharpsS-20220719.pdf.
[33] See Rachel Kleinfeld, *The Rise of Political Violence in the United States*, 32 J. Democracy 160, 160 (2021).
[34] See Alexander Mallin & Luke Barr, *Domestic Violent Extremism 'Growing Public Safety and National Security Threat,' DOJ Says*, ABC News (Feb. 26, 2021), https://abcnews.go.com/Politics/domestic-violent-extremism-growing-public-safety-national-security/story?id=76140671.
[35] See Kleinfeld, *supra* note 33, at 160.
[36] See Alejandro J. Beutel & Daryl Johnson, Newsline Inst., The Three Percenters: A Look

danger to our communities, and they demand nuanced policy responses from our civic leaders.

Political violence poses a threat to all Americans, regardless of where they reside: in addition to the direct losses that flow from violent acts, "political violence, *by design*, . . . creates harm and imposes costs on society well beyond the violent incident itself."[37] Researchers have concluded that "political violence deteriorates the functioning of government[] and its consequent ability to support the populace in three ways: (1) by deteriorating government systems necessary for daily living; (2) by weakening the public sector; and (3) by destroying democratic processes."[38] The United States has experienced this deterioration in recent years: according to the 2021 Fragile States Index, which ranks countries based on their level of stability, the United States deteriorated more in the prior year than any other nation, in part because of increased political polarization and attendant violence.[39]

While political violence affects us all, the burden is heavy for local governments. A recent report from the Office of the Director of National Intelligence found that militant violent extremists "typically target[] law enforcement and government personnel and facilities."[40] These

---

Inside an Anti-Government Militia 3 (2021), https://newlinesinstitute.org/wp-content/uploads/20210225-Three-Percenter-PR-NISAP-rev051021.pdf ("The U.S. far-right milieu is not monolithic. It can be divided into at least five sections: racist extremism, namely white nationalism/supremacy; anti-government extremism; nativist extremism; anti-abortion extremism; and male supremacy.").

[37] Andrew Blum, Democracy Fund, The Costs of Political Violence in the United States 11 (2021), https://democracyfund.org/wp-content/uploads/2021/02/2021_DF_CostsOfPoliticalViolence.pdf.

[38] Cindy A. Sousa, *Political Violence, Collective Functioning and Health: A Review of the Literature*, 29 Med. Conflict & Survival 169, 184 (2013).

[39] Fund for Peace, Fragile States Index Annual Report 2021, at 10, 14 (2021), https://fragilestatesindex.org/wp-content/uploads/2021/05/fsi2021-report.pdf.

[40] Off. Dir. Nat'l Intel., Domestic Violent Extremism Poses Heightened Threat in 2021, at 2 (2021), https://www.dni.gov/files/ODNI/documents/assessments/UnclassSummaryofDVEAssessment-17MAR21.pdf.

include police officers, election workers, and other local officials.[41] Cities have also seen a rise in extremist activity targeting marginalized groups. These include salient threats aimed at LGBTQ events,[42] and antisemitic marches by armed white supremacists,[43] but they also include less visible forms of violence, like increases in hate crimes against Blacks, Latinos, and Asians.[44]

The widespread availability of assault-style rifles and high-capacity magazines exacerbates the problem of political violence, particularly at public events where extremists increasingly show up visibly armed. According to a 2021 report, "at recent demonstrations, the presence of an armed person is correlated to more—not less—violence and destruction, and is a detriment to public safety and the right to organize, compared to demonstrations with unarmed participants."[45] To put numbers on it, "armed demonstrations are nearly six times as likely to turn violent or destructive compared to unarmed demonstrations."[46] Armed demonstrations are also more deadly: "A fatality was reported at approximately one out of every 2,963 demonstrations where no firearm was identified, compared to about one out of every 62

---

[41] *See, e.g.*, Cat Zakrzewski, *Election Workers Brace for a Torrent of Threats: 'I KNOW WHERE YOU SLEEP'*, Wash. Post (Nov. 8, 2022), https://www.washingtonpost.com/technology/2022/11/08/election-workers-online-threats/.

[42] *See, e.g.*, Odette Yousef, *31 Members of the White Nationalist Patriot Front Arrested near an Idaho Pride Event*, NPR (June 12, 2022), https://www.npr.org/2022/06/11/1104405804/patriot-front-white-supremacist-arrested-near-idaho-pride.

[43] *See, e.g.*, Adam Gabbatt, *'Jews Will Not Replace Us': Vice Film Lays Bare Horror of Neo-Nazis in America*, Guardian (Aug. 16, 2017), https://www.theguardian.com/us-news/2017/aug/16/charlottesville-neo-nazis-vice-news-hbo.

[44] *See* Brian Levin et al., Ctr. Stud. Hate & Extremism, Report to the Nation: 2020s—Dawn of a Decade of Rising Hate 2 (2022), https://www.csusb.edu/sites/default/files/2022-08/Report%20To%20The%20Nation8-4-22.pdf.

[45] Armed Conflict Location & Event Data Project & Everytown for Gun Safety, Armed Assembly: Guns, Demonstrations, and Political Violence in America 4 (2021), https://acleddata.com/acleddatanew/wp-content/uploads/2021/08/Report_Armed-Assembly_ACLED_Everytown_August2021.pdf.

[46] *Id.* at 2 (emphasis omitted).

demonstrations where there was a firearm identified."[47] And this increased violence is attributable not just to those who are armed, but also to *unarmed* individuals, indicating that "the presence of firearms at a demonstration can serve to escalate tensions in contentious contexts, *indirectly* contributing to a more dangerous environment."[48]

Even when armed protests do not turn violent, they deter citizens from exercising their rights. This is intuitive for local officials, who have dealt repeatedly with the chilling effect of armed protestors. In Sandpoint, Idaho, for example, a group of students organized a small protest against systemic racism.[49] According to the city's mayor, counter-protestors appeared "in full camo fatigues, with AR-15s, [and] multiple clips," and "the paramilitary and other armed citizens quickly overwhelmed" the students.[50] Consistent with this anecdote, a recent study "found that participants were far less likely to attend a protest, carry a sign, vocalize their views, or bring children to protests if they knew firearms would be present."[51] This was true regardless of participants' political ideology or whether they themselves owned a gun.[52] In addition, the presence of armed protestors on one ideological "side" can inspire a response from protestors on the other side, thereby increasing the chilling effect (and risk of violence) for all attendees.[53]

---

[47] *Id.* at 3.
[48] *Id.* at 4.
[49] *See, e.g.*, Kirk Siegler, *Are Paramilitary Extremists Being Normalized? Look To Idaho For Answers*, NPR (Oct. 17, 2020), https://www.npr.org/2020/10/17/924461164/are-paramilitary-extremists-being-normalized-look-to-idaho-for-answers.
[50] *Id.*
[51] Diana Palmer & Timothy Zick, *The Second Amendment Has Become a Threat to the First*, Atlantic (Oct. 27, 2021), https://www.theatlantic.com/ideas/archive/2021/10/second-amendment-first-amendment/620488/.
[52] *Id.*
[53] *See, e.g.*, Joey Palacios & Josh Peck, *Armed Protestors Gather Outside San Antonio's Aztec Theatre During Christmas-Themed Drag Show*, Tex. Pub. Radio (Dec. 14, 2022), https://www.tpr.org/news/2022-12-13/armed-protestors-expected-outside-san-antonios-aztec-theatre-during-christmas-themed-drag-show.

Nor are the stifling effects of guns limited to participation in peaceful protests. Recent years have seen a swell of armed activity in other centers of civil life. This includes the presence of armed individuals at polling places, vote-count centers, and school and county board meetings.[54] As in the case of peaceful protests, this armed activity deters citizens from exercising their freedom of speech and assembly, and it also deters them from engaging in other core democratic functions, such as exercising their right to vote and to petition their government.

## CONCLUSION

*Bruen* contemplated that state and local governments would retain the flexibility they need to address "dramatic technological changes" and "unprecedented societal concerns." 142 S. Ct. at 2132. Assault-style weapons and high-capacity magazines implicate both of these considerations. Highland Park's ordinance falls well within a historical tradition of regulating "dangerous and unusual weapons," *id.* at 2128 (quoting *Heller*, 554 U.S. at 627), which *Bruen* recognized, and which dates back to the Founding. Preserving this tradition is particularly important when it comes to assault-style weapons and high-capacity magazines, given how effective they are at maiming and killing, and how likely they are to chill participation in civic life.[55] The Conference urges the Court to bear in mind, in ruling on Plaintiffs' Motion, that local officials require certain regulatory tools if they are to stand a chance against the "novel modern conditions" they face. *Id.* at 2134 (internal quotation marks and citation omitted).

---

[54] *See, e.g.*, Jacob Knutson, *Election Officials: Armed "Vigilantes" Near Ballot Drop Box in Arizona*, Axios (Oct. 23, 2022), https://www.axios.com/2022/10/23/mesa-arizona-armed-vigilantes-ballot-drop-box; Danyelle Khmara & Clara Migoya, *Anti-Mask Protesters Storm Tucson School Board Meeting*, Ariz. Daily Star (Apr. 29, 2021), https://tucson.com/news/local/anti-mask-protesters-storm-tucson-school-board-meeting/article_02555ddc-a6e9-11eb-b809-170afdcf2ce6.html.

[55] *See* Mike McIntire, *At Protests, Guns Are Doing the Talking*, N.Y. Times (Dec. 6, 2022), https://www.nytimes.com/2022/11/26/us/guns-protests-open-carry.html.

| | |
|---|---|
| Dated: January 26, 2023 | Respectfully submitted, |
| Jeffrey E. Stone (No. 6189590)<br>James P. Durkin (No. 6296298)<br>MCDERMOTT WILL & EMERY LLP<br>444 West Lake Street<br>Chicago, Illinois 60606<br>(312) 984-2064<br>jstone@mwe.com<br>jdurkin@mwe.com | */s/ Mary B. McCord*<br>Mary B. McCord (*pro hac vice*)<br>INSTITUTE FOR CONSTITUTIONAL<br>ADVOCACY & PROTECTION<br>Georgetown University Law Center<br>600 New Jersey Avenue NW<br>Washington, DC 20001<br>(202) 661-6607<br>mbm7@georgetown.edu<br><br>Ben Gifford (*pro hac vice*)<br>INSTITUTE FOR CONSTITUTIONAL<br>ADVOCACY & PROTECTION<br>Georgetown University Law Center<br>PO Box 211178<br>Brooklyn, NY 11221<br>(202) 662-9835<br>bg720@georgetown.edu<br><br>*Attorneys for Amicus Curiae the United States Conference of Mayors* |