# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, | |
| Plaintiffs, | Case No. 22-cv-04774 |
| v. | Hon. Harry D. Leinenweber |
| CITY OF HIGHLAND PARK, ILLINOIS, | Hon. Jeffrey T. Gilbert |
| Defendant. | |

**BRIEF OF AMICUS CURIAE MARCH FOR OUR LIVES**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Amicus Curiae* March For Our Lives Foundation respectfully submits this brief in opposition to Plaintiffs' motion for a preliminary injunction.

## I.     INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* is March For Our Lives Foundation ("MFOL"), a non-profit organization of young people from across the country that seeks to promote civic engagement in support of sensible gun regulation and give voice to those who have been harmed by gun violence.  MFOL was formed after the 2018 mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida.  In the almost five years since, young people seeking to effect change have formed MFOL chapters across the country.

This nation's youth have come of age at a time when mass shootings in presumptively "safe" places – schools, places of worship, parades – are all too common.  Previous generations did not grow up confronting this epidemic.  Consequently, taking account of the voice and experiences of young people is vital to understanding the costs and benefits of measures taken to stop it – including laws regulating the very weapons that permit such tragedies to take place.  As

a platform for young people affected by gun violence, MFOL is uniquely positioned to provide the Court with this important perspective.

On July 4, 2022, Highland Park joined the long list of communities to suffer a mass shooting when a gunman wielding a semi-automatic assault rifle opened fire on the City's Fourth of July parade.  Marshalling its resources and experience, MFOL has reached out to survivors of this tragedy, young people and parents of young children who are grappling with the horrific violence they encountered that day and struggling to find comfort in what can be done about it. MFOL has conducted extensive interviews, and it has provided a means for these individuals to engage in the civic process and share their experiences.

Informed by these important insights, this brief provides a vital and unique perspective on a crucial question before the Court: what harm will result if Plaintiffs' motion is granted?  As set forth below, these Highland Park citizens derive substantial personal benefit from the fact that *their* community has chosen to preclude the possession and sale of assault weapons and high-capacity magazines, and they would suffer serious harm were enforcement of that law enjoined. MFOL respectfully submits this friend-of-the-Court brief to share with the Court its perspective as shaped by these citizens' stories, and to assist the Court in understanding the substantial harm that will result if it grants Plaintiffs' motion.

## II.    <u>BACKGROUND</u>

MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies. (Declaration of David Hogg at ¶ 2, attached as **Exhibit A**.)  On February 14, 2018, a gunman armed with an AR-15-style assault weapon murdered 17 people at Marjory Stoneman Douglas High School in Parkland, Florida.  (*Id.* at ¶ 3.)  Of the 17 killed, 14 were high school students.

2

(*Id.*)  MFOL formed in the wake of that tragedy, and it immediately began organizing the largest single day of protest against gun violence in the nation's history.  (*Id.*)  Five years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy for gun violence prevention.  (*Id.*)

MFOL has developed a nationwide network of thousands of young people in local, state, and regional chapters of MFOL, including in both Illinois and Highland Park.  (*Id.* at ¶ 4.)  In the nationwide effort to enact sensible gun regulation, MFOL serves as a platform for the indispensable voice of the younger generations, and it is a key resource for those who want to see an end to gun violence in this country.  (*Id.* at ¶ 5.)

## III.  <u>ARGUMENT</u>

To succeed on their motion for a preliminary injunction, Plaintiffs must establish, among other things, that the harm that would result were their motion denied would exceed the harm that would result were their motion granted.  *See American Hosp. Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593-94 (7th Cir. 1986); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (recognizing that the balance of harms and public interest factors "merge" when the opposing party is the government).  Here, if Plaintiffs' motion is granted, the resulting harm would be severe. MFOL respectfully submits for the Court's consideration one component of that harm, which, to be fairly and fully understood, requires an understanding of the experiences of 12 citizens of Highland Park, Illinois, on July 4, 2022.

**<u>Samantha (Sammi) Verhey, 35</u>**.  Sammi Verhey grew up in Highland Park, and, after moving away for a short time, returned with her husband, Max, and their four-year-old daughter and one-year-old son to raise their family there.  (Declaration of Sammi Verhey ("Verhey Decl.") at ¶¶ 3-5, attached as **Exhibit B**.)  Attending Highland Park's Fourth of July parade was one of her

3

childhood family traditions, and, with the parade having been suspended for the last two years due to the COVID pandemic, July 4, 2022 was her first opportunity to resume that family tradition with her own children. (*See id.* at ¶ 6.) Their son and daughter would participate in the children's "pre-parade" (Sammi spent weeks tailoring their costumes), and her parents, Kris and Wayne, would join them as well. (*See id.* at ¶ 7.)

**Abby Kisicki, 23**. Highland Park native Abby Kisicki has feared the possibility of encountering a mass shooting for as long as she can remember. (Declaration of Abby Kisicki ("Kisicki Decl.") at ¶ 3, attached as **Exhibit C**.) She and her twin sister, Carrie, attended Highland Park's Fourth of July parade as children, with their favorite spot by the train tracks where they would collect candy and chip clips from friendly local businesses. (*Id.* at ¶ 4.) On the morning of July 4, 2022, Abby did not particularly feel like going to the parade. (*Id.* at ¶ 5.) Ultimately, though, she decided to join her mother, Nancy, and her father, Mark, to take in the festivities. (*Id.*) Rather than settle in near the train tracks, they broke with their family tradition and found a place near the middle of Port Clinton Square. (*Id.*) The parade's vulnerability to a mass shooting crossed her mind, but that was not uncommon for her. (*Id.*)

**Shane Selig, 30**. Shane Selig grew up about 30 minutes south of Highland Park in Chicago, and he moved to Highland Park in March, 2021. (Declaration of Shane Selig ("Selig Decl.") at ¶ 2, attached as **Exhibit D**.) It is the first time he has lived somewhere where he has not felt compelled to keep his garage door closed and his doors locked. (*Id.* at ¶ 3.) Because his mother had lived in Highland Park before he did, Shane had relationships with the community before moving to town. (*Id.* at ¶ 2.) These included joining the City's volunteer Community Emergency Response Team ("CERT"), and volunteering as a CERT member at prior Highland Park Fourth of July parades. (*Id.*) He was on duty as a CERT member on July 4, 2022, his first activation in two

years.  (*Id.* at ¶ 6.)  Riding his bike to the parade that morning, Shane expected to assist in ways typical of his past experiences as a CERT member: controlling the crowd, handing out band-aids, and making sure children did not dart out in front of the parade line.  (*Id.*)

**Ashbey Beasley, 46**.  Ashbey Beasley moved to Highland Park in 2017, right after her 6-year-old son was born.  (Declaration of Ashbey Beasley ("Beasley Decl.") at ¶ 2, attached as **Exhibit E**.)  One of her favorite things about Highland Park is the community events, and she believes its Fourth of July parade is one of its best.  (*Id.* at ¶ 3.)  On July 4, 2022, though, she was having a hard time getting the rest of her family excited for the day.  (*Id.* at ¶ 4.)  Her husband would opt out, and her son was not interested.  (*Id.*)  Despite his protests, however, Ashbey ultimately insisted that her son accompany her to town, knowing that he would have his first opportunity to walk in the parade and pass out candy to his friends.  (*Id.*)  She was confident that he would love it.  (*Id.*)

**July 4, 2022 – 10:14 a.m.**

When Sammi first heard a rapid series of loud pops, she did not know what to make of it. (Ex. B (Verhey Decl.) at ¶ 10.)  She remembers thinking that fireworks in the middle of the day did not make sense.  (*Id.*)  Then she saw a look of horror on the face of a woman standing on the corner of Central Avenue and Second Street.  (*Id.*)  She immediately knew that there was grave danger, and she and her family had to get out.  (*Id.*)

Abby was just getting settled at the parade when she first heard a wave of loud pops.  (Ex. C (Kisicki Decl.) at ¶ 6.)  She assumed it was the sound of Navy reenactors firing blanks into the air, a feature of the parade in years past.  (*Id.*)  But then she heard a second wave of pops, and she saw people begin to run.  (*Id.* at ¶ 7.)  At that point for her, the world went silent.  (*Id.*)

Shane was riding his bike west on Central Avenue when he heard what he thought was a

5

car backfiring or a firecracker. (Ex. D (Selig Decl.) at ¶ 7.) Turning his bike around toward the noise, he saw someone fall to the ground in obvious distress. (*Id*.) He quickly abandoned his bike and started running in that direction. (*Id*.) As he got closer, he saw that the person was bleeding. (*Id*. at ¶ 8.) Then he saw that brain matter was coming out of the person's head. (*Id*.) Before he could process what was in front of him, he became conscious of more victims around him, the rapid loud pops continuing. (*Id*.)

Ashbey and her son were set to begin walking in the parade when she became confused by the sound of fireworks in the middle of the day. (Ex. E (Beasley Decl.) at ¶ 5.) Then she saw the entire high school football team begin to sprint toward her, in the opposite direction of the parade route. (*Id*.) And then she heard screaming. (*Id*.) She saw mothers and fathers pulling and holding young children, frantically running toward her. (*Id*.) She heard someone yell, "There's been a shooting!" (*Id*.) And she and her son began to run too. (*Id*.)

Struggling to get out from under the incessant pops and away from the frenzied crowd, Sammi had not only their two children to account for, but also her elderly parents. (Ex. B (Verhey Decl.) at ¶ 11.) Fortunately, their son was still in his stroller, and she began running with it as fast as she could. (*Id*.) Max grabbed their daughter's arm and followed, but they were outpacing Sammi's parents, and the gap between them quickly widened. (*Id*. at ¶¶ 11-12.)

Abby started to run as fast as she could. (Ex. C (Kisicki Decl.) at ¶ 8.) She remembers thinking, "I have to run," repeatedly as she sprinted through the throughway behind where she was sitting and past a pediatrician's office. (*Id*.) She tripped down some steps and scraped her knee, but she picked herself up and kept running. (*Id*.)

Shane was aware that the police were focused on finding the shooter, and the firefighters were struggling to get through the crowd. (Ex. D (Selig Decl.) at ¶ 9.) Then he realized that he

and the other CERT members were the only emergency response officials immediately available to assist people in need of medical attention. (*Id*.) He had been given a first-aid kit with three pieces of gauze in it. (*Id*.)

Ashbey's only thought now was getting home. (Ex. E (Beasley Decl.) at ¶ 6.) They lived nearby, but home was toward the shooting. (*Id*.) Running through the crowd with her son, they saw adult men falling to the ground, tripping in panic and fear. (*Id*.) They saw other adults sobbing hysterically, and they heard panicked voices yelling about the number of shooters, that the shooter had been caught, and that the shooter was coming. (*Id*.)

Sammi remembers a brief and welcome respite when the rapid pops suddenly stopped. (Ex. B (Verhey Decl.) at ¶ 13.) She immediately felt relief and was able to regain her focus, thinking she and her family were finally safe. (*Id*.) She started to double back to collect her mother and her father, and then the rapid pops resumed. (*Id*. at ¶ 14.) She later learned that the shooter had just emptied one 30-round magazine, pausing briefly to load another. (*Id*.)

Reaching First Street, Abby saw streams of people running, holding children's hands and pushing strollers. (Ex. C (Kisicki Decl.) at ¶ 9.) Most striking to her was that the crowd of fleeing, frightened people was full of people she knew – she saw friends, neighbors, and acquaintances, and they all looked shell-shocked or stricken. (*Id*.) As she turned down First Street, she realized that her mother and father had not kept up and were no longer with her. (*Id*. at ¶ 10.)

A man approached Shane with a huge red spot on his shirt – he had been shot. (Ex. D (Selig Decl.) at ¶ 10.) Shane pulled him down to the ground, and he did what he could to stop the bleeding with his bare hands, placing his fingers so deep into the wound that he could feel the man's heart. (*Id*.) To one side, another man had been shot in the leg, and Shane began cutting off clothing to use as a tourniquet to stop the bleeding. (*Id*.) The man's mother asked if her son's life

was at risk because her daughter had also been shot, and she was running between them.  (*Id.*) Shane began to administer CPR to yet another victim, and he remembers that a police officer held a riot shield over Shane's head in an effort to protect him from any further gunfire.  (*Id.* at ¶ 11.)

Ashbey could see that fear and panic was beginning to overcome her 6-year-old son.  (Ex. E (Beasley Decl.) at ¶ 7.)  He stopped running and laid himself out on the ground, and Ashbey heard him pleading not to die.  (*Id.*)  She crouched down and asked him over and over to get up and promised to keep him safe.  (*Id.*)  When her son finally did get up, he began to jump up and down yelling, "I don't want to die!"  (*Id.*)

By now, Max had run ahead of Sammi with their daughter, west on Central Avenue.  (Ex. B (Verhey Decl.) at ¶ 15.)  She saw them run into a gas station, and she followed with her son and her mother.  (*Id.*)  Leaving them with Max, Sammi ran back out to assist her father, who by then was just reaching the parking lot.  (*Id.*)  Sammi and her family would remain in the gas station for the next two hours, unsure whether sitting or fleeing was the safer option.  (*Id.* at ¶¶ 15-16.)

Running down First Street, Abby finally crouched down at the corner of First and Laurel Avenue to take a break.  (Ex. C (Kisicki Decl.) at ¶ 11.)  She was breathing hard, suddenly conscious that she had been running for her life.  (*Id.*)  At that point she found some close, family friends who brought her along with them to seek shelter.  (*Id.* at ¶ 12.)  Finally safe, she was able to reach her mother by phone and learned that her mother was no longer in harm's way, but her father was missing.  (*Id.*)

Shane found Jacki Lovi Sundheim.  (Ex. D (Selig Decl.) at ¶ 12.)  A bullet's entrance wound in her clavicle was small, but he found that the internal damage it caused was catastrophic. (*Id.*)  Finding a diaper bag that had been left behind, Shane quickly looked for something to use to stop the bleeding.  (*Id.*)  But as a firefighter handed him a stack of triage cards, Shane knew that

she could no longer be helped. (*Id*.) He had to stop other people, who Shane later learned were members of Ms. Sundheim's family, from continuing to provide care to her. (*Id*.)

When Ashbey and her son finally met Ashbey's husband and got into his car, she heard her son let out a gut-wrenching scream, and he collapsed in the back seat. (Ex. E (Beasley Decl.) at ¶ 8.) When they returned home, her son slammed the door and said, "I'm never going to a parade again!" (*Id*.) Ashbey saw her husband start to sob on the driveway. (*Id*.)

In less than 90 seconds, 83 shots were fired into the crowd from a semi-automatic assault rifle. (Opp. to Mot. for Preliminary Injunction (dkt. 45) at 27.) The shooter had to pause to reload his weapon only twice. (*Id*. at 1.) Seven people were killed, 48 more were injured. (*Id*. at 9.) Dozens of lives were irreparably harmed and changed forever.

### Aftermath

Sammi has remained on edge since July 4, particularly when at public gatherings. (Ex. B (Verhey Decl.) at ¶ 17.) Her four-year-old has suffered from severe separation anxiety and is in counseling. (*Id*.) Sammi prays that her 1-year-old was not traumatized, but realizes they will not know for some time. (*Id*.) She believes that the nature of the shooter's weapon enabled much of the devastation that was caused that day, and she takes great comfort in knowing that the people in her community have chosen to ban the sale and possession of such weapons in Highland Park. (*Id*. at ¶ 20.) The possibility that her city would be required to suspend enforcement of this ban – particularly now, and under these circumstances – is abhorrent to her. (*Id*.) It would cause her severe emotional and psychological distress, at a time when she already feels traumatized and struggles each day to feel safe. (*Id*.)

Abby frequently thinks of what she witnessed on July 4. (Ex. C (Kisicki Decl.) at ¶ 13.) Her father turned up safe and uninjured – she later learned that he had run back toward the shooting

when he realized that Abby was not with them, terrified that he would find her there. (*Id*. at ¶ 14.) But Abby often finds herself imagining alternative realities in which her parents had been fatally harmed. (*Id*. at ¶ 15.) She feels outrage at the scale and speed with which the shooter was able to indiscriminately take – to violate – so many innocent lives. (*Id*. at ¶ 19.) She is fiercely proud of her city's assault weapons ban, and would feel profound hurt, vulnerability, and loss if it were no longer enforced. (*Id*. at ¶ 20.) The fact that the ban has been in place for years, and it is only now, immediately after a mass shooting in her own community, that someone is seeking to prevent her community from enforcing it is particularly painful. (*Id*. at ¶ 21.)

Shane continues to experience episodes of profound sadness over the enormity of the event and the loss of life. (Ex. D (Selig Decl.) at ¶ 16.) He was alarmed to learn that the shooter lived near him, at the same cross streets. (*Id*. at ¶ 17.) And three months after the shooting, a doctor discovered a piece of a bullet in Shane's leg. (*Id*. at ¶ 19.) Shane does not want others to seek to obtain the same type of assault-style weapons that allowed the shooter to create what felt like a war zone in just seconds. (*Id*. at ¶ 25.) He saw dozens of people injured in the blink of an eye, immediately overwhelming any reasonable emergency medical response. (*Id*.) The injuries he saw the weapon cause, moreover, were not merely debilitating – they were catastrophic. (*Id*. at ¶¶ 11-12, 14.) Shane is proud that his community has seen fit to ban such weapons. (*Id*. at ¶ 24.) And, after what he and his city experienced on July 4, he would feel deeply troubled if the ban were no longer enforced. (*Id*.) He would feel less safe, as if the community were being forced to tempt fate and invite another tragedy, and he would feel distressed for the children and families of his community. (*Id*.)

Ashbey and her son have been deeply impacted by the trauma they experienced on July 4. (Ex. E (Beasley Decl.) at ¶ 9.) On one occasion, her son told Ashbey that his "head hurt because

it was so full of thoughts" and then immediately vomited. (*Id.*) Her son says he feels "really sad" and "angry" whenever he thinks about the parade, and Ashbey fears for her son's recovery from the trauma. (*Id.*) Ashbey herself is struggling, and she finds that she now is always scanning rooftops and looking for exits while out in public. (*Id.* at ¶ 10.) Ashbey takes comfort in the City's assault weapons ban, and she has discussed the significance of the law with her son. (*Id.* at ¶ 11.) Were enforcement of her community's law suspended, she would feel less safe, and suspension of the law now, of all times, would feel to her like a slap in the face. (*Id.*) Ashbey would be afraid to send her son to school without Highland Park's assault weapons ban in place, and her son has asked her every day whether people can have such weapons in Highland Park. (*Id.*) He says that if the ban were enjoined, he would "feel scared and have torture in my life again." (*Id.*)

*****

Sammi, Max, and their two children, Sammi's parents, Kris and Wayne, Abby and her parents, Nancy and Mark, Shane, Ashbey, and her son – 12 citizens of Highland Park who are sadly representative of a community that endured a horrific tragedy on July 4, 2022. As stated in the attached declarations, and as underscored by their stories, they each derive profound comfort from Highland Park's democratically enacted assault weapons ban and what it represents: a choice that *their* town has made to say that these weapons, capable of so quickly causing such devastation on so large a scale, have no place in their community.

Having now experienced the trauma of a mass shooting within their very town, the pain that would be caused were their community's collective will undone is all the more acute. As MFOL has found in other communities that have suffered through a mass shooting, survivors describe the distress of a potential encounter with an assault rifle as "terrorizing," as causing acute physical illness, as "tortuous." (*See* Ex. B (Verhey Decl.) at ¶ 20; Ex. D (Selig Decl.) at ¶ 25; Ex.

11

E (Beasley Decl.) at ¶ 11.)  It is no wonder, then, that survivors would experience discarding their community's stated preference on so consequential an issue as a painful, personal affront, a "slap in the face," hitting "very close to home."  (*See* Ex. B (Verhey Decl.) at ¶ 19; Ex. C (Kisicki Decl.) at ¶¶ 20-21; Ex. D (Selig Decl.) at ¶ 24; Ex. E (Beasley Decl.) at ¶ 11.)

Plaintiffs' motion asks the Court to force Highland Park to permit the sale and possession of assault weapons and high-capacity magazines within their small community while Plaintiffs attempt to prove that the law banning them is unconstitutional.  As set forth above, however, upending the status quo and the declarants' settled expectations in this manner and at this time would cause serious harm to each of them.  *See American Hosp. Supply*, 780 F.2d at 593 ("[a] district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken"); *see also Baird v. Bonta*, No. 2:19-cv-617, 2022 WL 17542432, at *8 (E.D. Cal. Dec. 7, 2022) (courts hesitate to issue preliminary injunctions where the costs of doing so mistakenly are "likely far-reaching, difficult to estimate, and potentially deadly").

Any claim of harm that might result from denying the extraordinary remedy Plaintiffs seek, by contrast, is belied by the fact that the law has been in place for a decade, and that rejecting Plaintiffs' motion merely maintains the status quo until the Court reaches a decision on the merits. Because that purported harm is plainly outweighed by the severe harm to the public interest that will result if Plaintiffs' motion is granted, the motion for preliminary injunction should be denied. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-33 (2008) (vacating preliminary injunction without addressing the merits and despite assuming that the movants would be irreparably harmed because the movants failed to show that "the balance of equities tip[ped] in [their] favor, and that an injunction [was] in the public interest").

IV.     **<u>CONCLUSION</u>**

For all of the foregoing reasons, MFOL respectfully submits that Plaintiffs' motion for a preliminary injunction should be denied.

Dated: January 26, 2023                    Respectfully submitted,

**MARCH FOR OUR LIVES FOUNDATION**


By:_____/s/  *Jordan E. Wilkow*_____
                    One of Their Attorneys

Caesar A. Tabet
Jordan E. Wilkow
Nikki R. Marcotte
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
(312) 762-9450
ctabet@tdrlaw.com
jwilkow@tdrlaw.com
nmarcotte@tdrlaw.com

Ciara Wren Malone
Legal Director
March for Our Lives
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

13

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, and SUSAN KAREN GOLDMAN,

Plaintiffs,

v.

CITY OF HIGHLAND PARK, ILLINOIS,

Defendant.

Case No. 22-cv-04774

Hon. Harry D. Leinenweber

**<u>DECLARATION OF DAVID HOGG</u>**

David Hogg, in accordance with the provisions of 28 U.S.C. § 1746, declares as follows:

1.      My name is David Hogg, I am over the age of 18, and I am a founding board member of March For Our Lives Foundation (MFOL).  I have personal knowledge of the facts set forth herein.

2.      MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies.

3.      On February 14, 2018, a gunman armed with an AR-15-style assault weapon murdered 17 people at Marjory Stoneman Douglas High School in Parkland, Florida.  Of the 17 killed, 14 were high school students. MFOL formed in the wake of that tragedy, and it immediately began organizing the largest single day of protest against gun violence in the nation's history. Five years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy for gun violence prevention.

4.      MFOL has developed a nationwide network of thousands of young people in

local, state, and regional chapters of MFOL, including in both Illinois and Highland Park.

5.      In the nationwide effort to enact sensible gun regulation, MFOL serves as a platform for the indispensable voice of the younger generations, and it is a key resource for those who want to see an end to gun violence in this country.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>01/25/2023</u>.

_____

DAVID HOGG

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, and SUSAN KAREN GOLDMAN,

        Plaintiffs,

     v.

CITY OF HIGHLAND PARK, ILLINOIS,

        Defendant.

Case No. 22-cv-04774

Hon. Harry D. Leinenweber

## DECLARATION OF SAMANTHA VERHEY

SAMANTHA VERHEY, in accordance with the provisions of 28 U.S.C. § 1746, declares as follows:

1.     My name is Samantha (Sammi) Verhey, and I am a citizen of Highland Park, Illinois. I have personal knowledge of the facts set forth herein.

2.     I am currently 35 years old.

3.     I spent most of my childhood in Highland Park, IL, and always regarded the town not only as a great place to grow up but a wonderful place to start a family. I always felt very supported by the community.

4.     I moved back to Highland Park in May 2020 when I was pregnant with my second child. My parents still live in my childhood home.

5.     I have a five-year-old daughter in pre-school, and a two-year-old son.

6.     On July 4, 2022, I could not wait to relive one of the highlights of my childhood—the Highland Park Fourth of July Parade—with my family for the first time since the pandemic.

7.      I spent weeks tailoring my daughter and son's costumes to walk in the kid parade before the actual parade began and spent the morning of July 4th negotiating with my daughter to wear red, white, and blue. We finally settled on a watermelon dress because I thought this was at least a somewhat-patriotic compromise, and we were running behind.

8.      After the kid parade, many families continued to walk down Sunset Route to get to the carnival, but for me, the parade is my favorite part of the day. I suggested to my husband that we should instead go back to the Main Square, where the bandstand is because it is much easier to get seats and to see the parade there, but he countered that we should circle back and go sit with my parents to watch the parade who were sitting on Central (right at 2nd St.) with friends they had spotted in the crowd.

9.      A few moments later, I would come to realize this trivial exchange with my husband housed the very line between life and death. The Main Square was massacred by the shooter and his AR-15, and my parents sat directly under the store the shooter had been on top of.

10.     I had never been that close to gunshots from a high-class rifle, so it took me a moment to decipher what I had just heard. Still surprised by the number of thoughts that can go through your brain in ten seconds, I ran through my checklist: "it's daylight, so it's not fireworks, it can't be ceremonial blanks because a parade wouldn't be stupid enough to do that in a society where everyone is so sensitive to gun violence, right?" I surveyed the scene and saw the horror in the face of a woman standing on the corner of Central and 2nd St., and immediately I knew that I needed to get myself and my family out right then and there.

11.     I had not only my baby and toddler to care for, but my elderly parents, who were also not capable of running amongst the chaotic crowds of people hoping to escape rapid gunfire and untimely deaths. Luckily, I had not yet had time to take my son out of his stroller while we

were settling into our parade seats. I began running as fast as I could with my son while my husband Max grabbed the arm of our daughter and dragged her along.

12. I knew I had to get my children to safety, but I could not bring myself to leave my parents behind. I tried to keep a short distance between me and my parents so they wouldn't get lost in the shuffle, but I lost my husband as he ran ahead with our daughter.

13. I remember experiencing a brief and welcome respite when the sound suddenly stopped. I stopped running because my dad had not made much ground and was still back where we had started fleeing. I felt an instantaneous relief and was able to regain focus, thinking that we were finally safe and that I would no longer have to face the fate of being a parent at the expense of losing my own.

14. I started to double back to collect my mother and father, but then the gunshots began raining again. I later learned that this gap was when the shooter had emptied one 30-round magazine and paused briefly to load another before he started shooting again.

15. I saw my husband and daughter run west on Central into a gas station so I followed and dropped off my elderly mother and my son with Max, and immediately ran back into danger for my dad who had only made it to the parking lot. We all stayed in the gas station for the next two hours.

16. I was not given an "all clear" announcement by the police. I did not know for sure whether I was safe in the gas station, and whether sitting or fleeing was the safer option. Ultimately, my family and I decided to make a run for it.

17. I am so thankful that my husband suggested we sit with my parents at the parade that day, but I know that we did not escape that parade untouched. My daughter sobbed uncontrollably that day, and to this day, suffers from severe separation anxiety. She forewent

3

Summer Camp to stay by me and my husband's side and seek psychological evaluations, and the days she was meant to spend in camp, my husband and I instead spent preparing her for school. I pray that my son is not traumatized by the event but I know that we won't discover this until he grows up. As for myself, Highland Park is different now. I have remained on edge since the shooting, particularly when at public gatherings. The parade I knew and loved as a young girl is now the site of the most traumatic thing I have ever experienced, the high school I spent my teenage years at is now the place I went the day after the parade to retrieve the toys my children had left behind, where the Red Cross set up camp to console the shattered community I had always known as safe and whole.

18.    I have not let what I went through be in vain. Following the event, I joined the same mothers I sought refuge with at the gas station at the March Forth march in Washington, D.C., went to the White House for meetings with policymakers, called the offices of Senators from my home advocating for gun safety regulations, and participated in a phone bank with March for Our Lives. I spend day in and day out engaged in activism but feel an overwhelming guilt as I have resettled into my life.

19.    I wish to tell the court that I think judges and anyone in a position of power who take on these roles that are so important to keeping people safe and cared for, not supporting bans on assault weapons goes directly in contrast to the promise that they made taking on these roles … if you have taken on this role, it is your sworn duty, and keeping assault weapons off the street is how to do that.

20.    If the assault weapons ban in Highland Park were struck down tomorrow, I would feel betrayed. It is something that has been proven effective before in the country and has been proven to save so many lives. In a community where a mass shooting has happened, it would be

4

an utter betrayal to strike the law down. You always want the government at the highest level to protect you, but politics often gets in the way of that. In my own state and own town, where we really do have a say in how the local government can protect our community, it hits so close to home. The nature of the shooter's weapon enabled much of the devastation that he caused that day. I take great comfort in knowing that the people in my community have chosen to ban the sale and possession of such weapons. The possibility that my city would be required to suspend enforcement of this ban – particularly now and under these circumstances – is abhorrent. It would cause me severe emotional and psychological distress at a time when I already feel traumatized and struggle each day to feel safe.

21.     If I saw an AR-15 in Highland Park, I would feel sick to my stomach, based on the reaction I had physically and mentally to seeing those types of weapons in movies or hearing percussive sounds like gunshots after the July 4th parade. My reaction is so visceral, I can't imagine seeing it in person, it would be much more of an aggressive response. My kids don't know the full extent of everything that took place that day, but as they grow up and realize what happened to them and what they went through, that would have a very traumatic effect.

22.     I was watching a documentary in a movie theater recently, and there was a scene with proud boys walking around with AR-15s in Michigan. I had to leave the theater because in my head that is what I thought I would see if I turned around at any given moment and saw the shooter with his guns that day. I can't imagine how it would be for everyone in Highland Park.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _11/21/2023_ .

5

SAMANTHA VERHEY

Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, and SUSAN KAREN GOLDMAN,

        Plaintiffs,

    v.

CITY OF HIGHLAND PARK, ILLINOIS,

        Defendant.

Case No. 22-cv-04774

Hon. Harry D. Leinenweber

## <u>DECLARATION OF ABBY KISICKI</u>

ABBY KISICKI, in accordance with the provisions of 28 U.S.C. § 1746, declares as follows:

1.    My name is Abby Kisicki, I grew up in Highland Park, Illinois and was a resident of Highland Park on July 4, 2022. I have personal knowledge of the facts set forth herein.

2.    I am currently 23 years old and currently live in Evanston, Illinois, a city between Highland Park and Chicago.

3.    I am a native of Highland Park and have feared the possibility of encountering a mass shooting for as long as I can remember. Even Highland Park before the shooting, which to me is a generally privileged Chicago suburb with an often overlooked amount of diversity, felt like a potential site of tragedy.

4.    My twin sister, Carrie, and I often attended Highland Park's Fourth of July parade as children. Our favorite spot was by the train tracks where we would collect candy and chip clips from friendly local businesses.

5.      On the morning of July 4, 2022, I did not particularly feel like going to the parade. Ultimately, though, I decided to join my mother Nancy and my father Mark, breaking with our family tradition of settling near the train tracks and instead taking a place near the middle of Port Clinton Square.  The parade's vulnerability to a mass shooting crossed my mind, but that was not uncommon for me.

6.      I was just getting settled at the parade when I first heard a wave of loud pops.  I assumed it was the sound of navy reenactors firing blanks into the air, a feature of the parade in years past.

7.      But then I heard a second wave of pops, and I saw people begin to run.  At that point for me, the world went silent.

8.      I started to run as fast as I could, at one point tripping down the steps and scraping my knee. I picked myself up and kept running.  I remember thinking, "I have to run," repeatedly as I sprinted through the throughway behind where I was sitting and past the pediatrician's office.

9.      I reached First Street and saw streams of people rushing along, holding hands with their children and pushing strollers. What I found most striking was the fact that the crowd of fleeing people was full of people I knew. I saw friends, neighbors, and acquaintances, and they all looked shell-shocked or stricken.

10.      As I turned down First Street, I realized that my mother and father had not kept up and were no longer with me.

11.      Running down First Street, I finally crouched down at the corner of First and Laurel Avenue to take a break. I was breathing hard and was suddenly conscious that I had been running for my life.

12.     At that point, I found some close family friends who brought me along with them to seek shelter. Finally safe, I was able to reach my mother by phone and learned that she was no longer in harm's way, but that my father was missing.

13.     I frequently think of what I witnessed on July 4.

14.     My father turned up safe and uninjured. I recall learning that he had run back toward the shooting when he realized that I was not with them, terrified that he would find me there.

15.     I often find myself imagining alternative realities in which my parents had been fatally harmed. A few weeks after the shooting, I saw a nightlight in the house that was turned off. My mother had turned it on every night, but she was gone for a work conference that day. I remember staring at the nightlight and imagining how I would feel if one of the bullets flying through the air had hit my mother that day, so she could never turn the nightlight on again.

16.     In my eyes, both my community and neighboring suburbs suffered an intense trauma that day. To me, my community has fundamentally changed because of the loss, and I think this change will linger long after national attention abates.

17.     I now advocate on behalf of sensible gun safety reforms, because I believe that no one should die like the individuals did in the Fourth of July parade.

18.     In my opinion, people should not die for the sake of others' alleged right to carry an assault weapon, a gun that I feel does not debilitate but rather shreds through people.

19.     I believe that I and my community have a right to be alive. I feel outrage at the scale and speed with which the shooter was able to indiscriminately take – to violate – so many innocent lives.

20.　　I am fiercely proud of my city's assault weapons ban, and would feel profound hurt, vulnerability, and loss if it were no longer enforced.

21.　　I find it particularly painful that the ban has been in place for years, and it is only now, immediately after a mass shooting in my own community, that someone is seeking to prevent my community from enforcing it.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___1/25/23____ .

ABBY KISICKI

Exhibit D

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-04774 |
| CITY OF HIGHLAND PARK, ILLINOIS, | Hon. Harry D. Leinenweber |
| Defendant. | |

**DECLARATION OF SHANE SELIG**

SHANE SELIG, in accordance with the provisions of 28 U.S.C. § 1746, declares as follows:

1. My name is Shane Selig, and I am a resident of Highland Park, Illinois. I have personal knowledge of the facts set forth herein.

2. I grew up about 30 minutes south of Highland Park in Chicago and officially moved to Highland Park in March of 2021. Because my mother moved to Highland Park before I did, I have had relationships with people there for years before I moved, including working with the local Community Emergency Response Team ("CERT") at Highland Park's July 4th parade about 2-3 times in the past.

3. Living in Highland Park was the first time I lived somewhere where I did not feel compelled to keep my garage door closed or my doors locked.

4. I joined CERT as a way to give back to the community. Although CERT members get first aid and first response training, it is not a professional position but a volunteer one. My day job is working as a technology manager at Capital One.

5.      Before the July 4, 2022 parade, the worst thing I had ever seen while volunteering with CERT were minor issues, such as looking for a child who had been separated from a parent and dealing with scraped knees. Typically, volunteering with CERT at the parade was a fun thing to do and a good way to give back to the community.

6.      On July 4, 2022, I was activated to work as a CERT volunteer for the parade. I rode my bike to the parade route, intending to do crowd control, hand out bandaids, and ensure no kids darted out in front of the parade line. My main job was to ride my bike up and down the parade line to assist with crowd control and supplement the police presence. This was to be my first CERT activation in two years.

7.      At the start of the parade, I was biking up and down the main street of the parade, riding west on Central Avenue, and looking to see if anyone needed any extra help, when I heard the sound of what I first thought at the time was either firecrackers or a car backfiring in the intersection I just biked through. I turned my bike around to head back towards the noise, but then saw someone to the ground in obvious distress and I abandoned my bike on the side of the road as I tried to make my way through the crowd of people running towards those who needed aid.

8.      I ran to the scene and approached the first victim I saw that day - a person bleeding with brain matter coming out of their head. It was at that point I realized something catastrophic was happening and began noticing others lying on the ground while the popping sound continued. Near to me another CERT volunteer was panicking, walking back and forth and repeating that it was just part of the parade. Before I could process everything that was happening, I saw more victims around me and heard the rapid loud pops.

9.     After seeing that first victim, I started thinking about "what's next" – I knew the police's sole job was to deal with the shooter, which they continued to do for hours, and I knew most of the fire department would have to fight their way back through the crowd of people to get to any victims as their protocol is to go with the ambulances. Therefore, I knew that myself and other CERT members were the only emergency response officials immediately available to assist people in need of medical attention. I had been given a first aid kit with only three pieces of gauze in it.

10.     I had been trained in mass casualty events before for CERT, but nothing really prepares you when you are going through something like this. The motto you hear in training is "do the greatest good for the greatest number." I couldn't help everyone that day, I had to make actual life and death decisions that day. I saw a person with brain matter coming out of their head; nothing prepares you for that. I had no mental capacity after that for anything but my training to kick in. I began helping the victims as I could. One of the first people I worked on ran up to me asking what was going on but had a huge red spot on his shirt – he had been shot. I pulled him down to the ground, and I had to stick my bare fingers into his chest to stop the bleeding. I could feel his heart beat next to my fingers. Another guy next to me was shot in the leg and I had to cut off clothing to tie off a tourniquet to stop the bleeding. While that was happening his mother was asking if his life was at risk because her daughter had also been shot, and she was running between them. There was a woman with shrapnel in her back who didn't want to go to the hospital because she couldn't afford it.

11.     At one point during the chaos immediately after the shootings, I was working on six injured people one-after-the-other – performing CPR, addressing catastrophic injuries, and constantly thinking "what's next." Taking care of three people basically simultaneously and six

people in nearly the same time period is far above the training provided for first responders. I didn't know where the shooting originated as the gunshots echoed, I did not have a bulletproof vest or a helmet in case the shooter continued shooting, but there was nothing else to do but to keep trying to save as many people as I could. At one point a police officer held a riot shield over my head as I was giving CPR to someone in case the shooting resumed.

12.     One of the victims I worked on was Jacki Sundheim. She had a small bullet entrance wound in her clavicle, but the internal damage was catastrophic. I searched through a diaper bag that was left behind for anything to stop the bleeding. As I was trying to help Jacki, a firefighter handed me a stack of triage cards and told me "this is a mass casualty event, make a call and tag it," referring to Jacki. Based on her condition, I tore off all but the black "deceased" tab and placed it on her body – indicating that she was either deceased or too catastrophically injured to save. I had to stop others from providing care to her, who I eventually learned were members of her family.  Tagging Jacki with the black tag was a decision that, though correct, still haunts me. I cannot get over how I could not do more for Jacki that day.

13.     I put black tags on other victims that day.

14.     I provided care to people that day who died, like Jacki; I provided care to three people with catastrophic injuries who survived, and I also helped other people who were experiencing less severe injuries, including shrapnel wounds, sprains, and panic attacks. At one point I spoke on the phone with a woman who ended up with someone else's child but couldn't find their parents. That woman took the child home, so they would be safe, and I later learned that both of the child's parents were killed in the shooting. I don't know the names of most of the people I helped that day or how they are doing now.

15.     After the active shooting ended and the injured were attended to, I went to a public fountain and took two baths in it trying to get as much blood off of me as possible. I ended up walking through parking garages and buildings looking for the shooter and other injured with a team of police officers. When I finally went home, I hugged my wife, took two more showers and threw out all of my clothes and the shoes I wore that day.

16.     Since that day I have experienced episodes of profound sadness over the enormity of that event and the loss of life. I still cannot truly fathom the enmity of that event, and I am waiting for the trauma of it to catch up. I will scan rooftops and look for darker presences that I can't quite see.

17.     I was later alarmed to learn that the shooter lived nearby, at our same cross streets.

18.     I went to Jacki's memorial and hundreds if not more people there. The memorial was so full of people that there was standing room only. Jacki was a leader in the community, had many friends, including some CERT leaders, and coordinated the bar and bat mitzvahs for many in the community. During the memorial I kept thinking about how I was the one who decided that she was dead and beyond help. I am also worried that in the future I might think more about what else I could have done for others, what other lives I could have saved but didn't.

19.     Three months after the shooting I discovered a piece of bullet shrapnel in my leg.

20.     The entire community is traumatized by the July 4th shooting. It is hard to quantify the exact damage that has been done because it is so much more than what they show you on television and it is only a few months after the shooting. It's more than seven dead, forty eight injured, thousands traumatized, and a community damaged in a way that is yet to be seen.

People are still hurting and scared. I wonder not if, but when a shooting like this will happen again. Will I survive the next time?

21.     It has been difficult to lean on others while trying to recover from this event. I have found solace in activism, leveraging connections, and letting people know that this is not normal.

22.     This was not my first experience with gun violence. When I was in college and an officer of my fraternity, a student who was expelled blamed my fraternity for his expulsion and sent us threatening messages, receipts of his purchases of AR-15s online, emails threatening to drive back to campus to kill us, videos of him shooting at printouts of our faces nailed to trees, and more. We went to the campus police, the city police, the local police where the student lived, even the FBI, and no one would do anything about it, saying nothing could be done until he stepped on campus or committed a crime. These authorities refused to trigger the red flag laws, saying the student was "having a rough time and lashing out." I can't believe how at every step of the way, everyone wanted to do nothing. There were so many chances for intervention, both during that time at college and right before the July 4th shooting, that weren't taken. People like that student and the Highland Park shooter shouldn't be allowed to fall through the cracks, especially when assault weapons have a uniquely terrible means of inflicting mass violence and terror.

23.     Assault weapon bans like the one in Highland Park are necessary. If the ban in Highland Park was struck down, I would not feel good about it. Until there can be thought-out systems in place to protect everyone including gun owners from gun violence, we should not create a system of free willing use and carrying of assault weapons in our community and in this country.

24.     I am proud that my community has seen fit to ban ARs. An AR would feel out of place in the community of Highland Park. And, after what I and my city experienced on July 4, I would feel deeply troubled if the ban were no longer enforced. I would feel less safe, as if the community were being forced to tempt fate and invite another tragedy, and I would feel distress for the children and families of our community.

25.     Highland Park is the first place that I ever lived where I would often forget to close my garage door. I've been to countries where people carry ARs because they are in proximity to war. I do not want others to seek to obtain the same type of assault-style weapons that allowed the shooter to create what felt like a war zone in just seconds.  I saw dozens of people injured in the blink of an eye, immediately overwhelming any reasonable emergency medical response. We should not be carrying assault weapons at a parade and not expect to witness an act of terrorism. Having ARs in Highland Park would feel like a form of terrorism, and reinforces a society where kids have to be scared of shooters and know where to hide in their classrooms.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on  Jan 25, 2023    .

_____

SHANE SELIG

# Exhibit E

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, | |
| Plaintiffs, | Case No. 22-cv-04774 |
| v. | Hon. Harry D. Leinenweber |
| CITY OF HIGHLAND PARK, ILLINOIS, | |
| Defendant. | |

## <u>DECLARATION OF ASHBEY BEASLEY</u>

ASHBEY BEASLEY, in accordance with the provisions of 28 U.S.C. § 1746, declares as follows:

1.      My name is Ashbey Beasley, and I am a resident of Highland Park, Illinois.  I have personal knowledge of the facts set forth herein.

2.      I moved to Highland Park about 6 years ago in 2017, right after my son was born. I moved partially to escape crime in Chicago. Growing up in New York in the 80s, gun violence always felt like a shadow; my parents would tell me to be aware, but it's a miracle I was never robbed at gunpoint. I love my home in Highland Park though. It is actually extremely diverse compared to the other Chicago suburbs, with a significant Latino and Jewish population, and I have been incredibly close with my neighbors. Before the July 4, 2022 shooting, we would all hang out together all the time, and me and my husband would sometimes just sit on chairs in our front lawn and have people come by and just chat.

3.      One of the best things about the Chicago suburbs are the community events, and at Highland Park, the 4th of July was always a *huge* deal. There's a children's pre-parade, the

parade, a festival in the local park afterwards, and tons of block parties thrown all throughout the town. One of my favorite things about Highland Park is the community events, like the July 4th parade, which is one of the best.

4. On the morning of July 4th, 2022, I was having a hard time getting the rest of my family excited for the day. My husband opted out of going, but despite my son's protests, I was determined to get him to go. It would be the first year that he would get to walk in the parade, and I knew that as soon as he would start to walk and get to pass out candy to his friends, he would absolutely love it. I was so excited for him.

5. As we were just beginning to walk in the parade, I was confused by what I thought was the sound of fireworks in the middle of the day, but chalked it up to overexcitement. Then I saw the entire local football team begin to run full-speed past us, in the opposite direction of the parade. It was completely surreal to see them running past, and it was like they were all running in slow motion. Then I heard the screaming. Mothers and fathers holding and pulling young children, dragging them and screaming, when someone yelled out from the crowd "There's been a shooting! People are dead!" My son and I then began to run, too.

6. My only thought was home, we lived less than a 2 minute drive away, but home was towards the shooting. Running through the crowd, we saw adults falling to the ground, tripping over the road in panic and fear. We were surrounded by adults sobbing hysterically and guttural screaming, with panicked voices yelling that there was one shooter, multiple shooters, that he had been caught, that he was coming.

7. Eventually, my son just gave up in fear, and laid himself out on the ground, begging not to die. Due to my panic, my initial reaction was to just yell at him to get up, but I crouched down, asking him over and over to get up and promising to keep him safe. When I

eventually was able to get him to stand, he began to jump up and down screaming "I don't want to die."

8.     Eventually, my husband was able to pick us up in his car. When we finally got into his car, our son let out this guttural gut wrenching scream. We have never heard him scream like that. Then he just collapsed. When we got home, he said "I'm never going to a parade again" and slammed the door, and my husband started sobbing on the driveway.

9.     My son and I have been deeply impacted by the trauma we experienced on July 4. He began to wear his clothes backwards and inside out to exert some kind of control over his life. He has had nightmares. Once, he said his "head hurt because it was so full of thoughts" and then projectile vomited. My son says he feels "really sad" and "angry" whenever he thinks about the parade, and I fear for his recovery from the trauma.

10.     My husband and I try to be strong for our son, but we are also struggling with what happened. To this day, whenever I am in a new store, or walking down a street, I am always looking for an exit and scanning rooftops.

11.     I take comfort in Highland Park's assault weapons ban, and have discussed the significance of the law with my son. Once, he was scared about the shooter coming back, and we assured him the shooter was in jail. But then he asked "what if there's another shooter?" Were enforcement of the law suspended, I would feel less safe. The suspension of the law now, of all times, would feel like a slap in the face. I would be afraid to send my son to school without Highland Park's assault weapons ban in place, and he has asked me every day whether people can have such weapons in Highland Park.  He says that if the ban were enjoined, he would "feel scared and have torture in my life again."

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on __1/24/23__ .

_____
ASHBEY BEASLEY