IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS and SUSAN KAREN GOLDMAN, *Plaintiffs*, v. CITY OF HIGHLAND PARK, ILLINOIS, *Defendant*. | No. 1:22-cv-04774 Honorable Harry D. Leinenweber Honorable Jeffrey T. Gilbert |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ................................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 2

ARGUMENT .................................................................................................................................. 3

        I.       Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ....................................................... 3

        II.      The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 .......... 5

        III.     This Court Should Reject Any Effort To Dismiss the City's Historical Analogues as "Outliers" or "Anomalous" ............................................................. 13

CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

*Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) .................................................................................................. 1

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) ............................................................................................................ 15

*Defense Distributed v. Bonta*,
  No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted by* 2022 WL
  15524983 (C.D. Cal. Oct. 24, 2022) ..................................................................................... 5

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................................................................... *passim*

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .................................................................................................... 6

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................................................ 6, 10

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ............................................................................................... 15

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ................................................................................................. 6

*Heller v. District of Columbia* (*Heller II*),
  670 F.3d 1244 (D.C. Cir. 2011) ..................................................................................... 11, 14

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) ...................................................................................................... 3, 4

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .............................................................................................. 4, 6, 9, 15

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ................................................................................................. 6

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ................................................................................................. *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
  No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022),
  *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023) ...................................................... 4, 5

## TABLE OF AUTHORITIES—Continued

*Or. Firearms Fed'n v. Brown*,
  No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) .......................................... 5, 12

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ................................................................................................. 2

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019),
  *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022) ................ 2

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020),
  *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020) ........................................................ 2

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ................................................................................................... 6

*United States v. Tilotta*,
  No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .............................................. 5

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998).............................. 8, 9

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*,
  No. 20-843 (U.S.) ................................................................................................ 10, 14

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) .............................................. 10, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021),
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ................................................. 9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ................................................................................................................................. 8

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021)............................................................................................................................ 10

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 370,000 in Illinois. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Highland Park Mayor Nancy Rotering and the mayors of 26 other cities and localities in Illinois are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Miller v. Smith*, No. 22-1482, Dkt. 42 (7th Cir. Oct. 13, 2022); *Antonyuk v. Nigrelli*, No. 22-908, Dkt. 193 (2d Cir. Jan. 17, 2023); *Teter v. Shikada*, No. 20-15948, Dkt. 76-2 (9th Cir. Sept. 26, 2022). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp.

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The City of Highland Park's ordinance prohibiting the manufacture, sale, transfer, acquisition, and possession of assault weapons and large-capacity magazines is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the City's Opposition to Motion for Preliminary Injunction, Dkt. 45 (Jan. 19, 2023) ("City Mem.").[2] Everytown submits this amicus brief to expand on three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that assault weapons and large-capacity magazines are protected "arms" within the meaning of the Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged ordinance implicates "unprecedented societal concerns or dramatic

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should deny Plaintiffs' motion for a preliminary injunction in its entirety for the reasons the City set out.

2

technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the City's robust historical record, we highlight that point in case the Court chooses to address it.

## ARGUMENT

I. **Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the City notes, *see* City Mem. at 15, Plaintiffs have the burden on the initial, textual inquiry. This is so for at least two reasons. First, *Bruen* itself makes clear that the burden is on plaintiffs on the textual inquiry, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their]

3

rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. To fall within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[3] *Bruen* further confirmed that the inquiry should focus on common use for the lawful purpose of self-defense.[4] As the City explains, *see, e.g.*, City Mem. at 17-21, 41-44, Plaintiffs have not carried this burden here, as to either assault weapons or large-capacity magazines.[5] That alone is enough to defeat Plaintiffs' motion. *See*

---

[3] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that the Second Amendment applies only weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned).

[4] *Bruen* did not spell out the textual inquiry with respect to "arms" in detail, because New York did not dispute either that the "people" in that case ("two ordinary, law-abiding, adult citizens") or the arms they sought to use ("handguns") fell within the Second Amendment's text. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)); *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

[5] As the City demonstrates, assault weapons and large-capacity magazines are also "dangerous and unusual weapons." *See* City Mem. at 21-28, 44-45.

4

*Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense"); *Or. Firearms Fed'n v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *9-12 (D. Or. Dec. 6, 2022) (making similar findings in denying motion for a temporary restraining order as to Oregon large-capacity magazine law).[6]

In sum, because Plaintiffs have failed to establish that the conduct in which they seek to engage is protected by the Second Amendment's text, they are not entitled to relief.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits, including the Seventh Circuit, reached that conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[7] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)

---

[6] With respect to Plaintiffs' challenge to the ordinance's prohibitions on the manufacture, sale, transfer, or acquisition of assault weapons and large-capacity magazines, the textual arguments here fall even further from the mark. *Cf. United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate

5

("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).[8]

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at

---

scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[8] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), is not to the contrary. There, the Seventh Circuit referred to 1791, but did not hold that 1791 is the only relevant time period for historical inquiry. Moreover, *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until the 1868 ratification of the Fourteenth Amendment (which is mentioned nowhere in the opinion). Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138. Accordingly, *Moore*'s observation has no remaining force after *Bruen*, whereas *Ezell*'s observation remains a faithful application of originalist principles, as well as being the one the Seventh Circuit followed in pre-*Bruen* Second Amendment cases.

2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the City's brief, this Court can uphold the challenged ordinance under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. *See* City Mem. at 28-41 (assault weapons), 45-46 (large-capacity magazines).[9] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state or local law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states or local governments under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state or local government, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government

---

[9] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the City's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See* City Mem. at 32-38, 45-46; *infra* pp. 12-13.

7

and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only

8

against the states, but also as to the federal government.[10] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of

---

[10] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

9

sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[11]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S.

---

[11] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[12] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period. That is precisely the situation in this case. As the City explains, *see, e.g.*, City Mem. at 4-6, the challenged ordinance was adopted primarily in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See Or. Firearms Fed'n*, 2022 WL 17454829, at *12-13 (similarly finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazines "implicate a dramatic change in firearms technology" and "also

---

[12] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the City correctly points to such history in its brief. *See* City Mem. at 31-33.

11

implicate unprecedented societal concerns" arising from mass shootings). A "more nuanced approach" to history is thus fully warranted.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the City's law. *See* City Mem. at 35-38, 45-46 (discussing late 19th-century- and early 20th-century laws regulating particularly dangerous weapons and weapon features soon after they emerged in the commercial market, including prohibitions and restrictions of multi-shot guns and automatic and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weapons and weapon features that demonstrably threaten public safety but have no legitimate use for self-defense, such as blunt weapons, trap guns, and Bowie knives); *see also, e.g.*, *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazine prohibitions are "consistent with the Nation's historical tradition of firearm regulation").[13] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the City's.

---

[13] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

12

### III. This Court Should Reject Any Effort To Dismiss the City's Historical Analogues as "Outliers" or "Anomalous"

Plaintiffs assert that what they refer to as "anomalous laws" from a "few" jurisdictions are insufficient to establish a historical tradition under *Bruen*. Plaintiffs' Motion for Preliminary Injunction ("Pl. Mot.") at 23.[14] Even if that assertion were correct, it is not implicated in this case, given the City's robust and extensive record of historical laws. *See* City Mem. at 28-41, 45-46. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[15] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee,

---

[14] Challengers in other recent Second Amendment cases have similarly sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers").

[15] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

13

13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[16] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[17]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of

---

[16] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* p. 15 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[17] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to manufacture, sell, transfer, acquire, or possess assault weapons or large-capacity magazines. In addition, Plaintiffs also appear to suggest (with a "*cf.*" citation) that then–D.C. Circuit Judge Kavanaugh's dissent in *Heller II* endorsed a rule that laws in six states are not enough to establish a history of regulation. *See* Pl. Mot. at 23. But that is not so (nor would it be controlling in any event). Then-Judge Kavanaugh was not referring to historical laws, but instead to the question whether "modern laws alone" could demonstrate constitutionality under the Second Amendment, and his reference to "six states" (in his own "*cf.*" citation) was in a parenthetical summary of a death-penalty case, not a case involving guns or the Second Amendment. *See Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting).

democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: January 26, 2023

Respectfully submitted,

William J. Taylor, Jr.
(*pro hac vice* application forthcoming)
EVERYTOWN LAW
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
(mailing address)
Phone: (646) 324-8124
Fax: (917) 410-6932
wtaylor@everytown.org

/s/ David A. Neiman
ROMANUCCI & BLANDIN, LLC
David A. Neiman
321 North Clark Street, Suite 900
Chicago, IL 60654
Phone: (312) 458-1000
Fax: (312) 458-1004
dneiman@rblaw.net

15