**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NATIONAL ASSOCIATION FOR GUN RIGHTS, and )
SUSAN KAREN GOLDMAN, )
                                      )
        Plaintiffs, )        Case No. 22-cv-04774
                                      )
v. )
                                        )
CITY OF HIGHLAND PARK, ILLINOIS, )
                                        )
        Defendant. )

**<u>REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

I.     Justice Thomas: Highland Park's Ordinance is Clearly Unconstitutional ...........1

II.    Like the Seventh Circuit, *Bevis* Failed to Apply *Heller's* Simple Rule..............1

III.   The City Tacitly Admits its Handgun Ban is Unconstitutional .........................2

IV.   The City's Central Premise is False.........................................................................3

      A.      *Heller* Rejected the City's Central Premise .............................................3

      B.      The Seventh Circuit Has Also Rejected the City's Central Premise .......5

V.     This Case is Very Simple.........................................................................................6

VI.   The Court Should Reject the City's Efforts to Move the *Heller/Bruen* Goalposts      ........................................................................................................8

      A.      The Founding Era is the Relevant Time Frame ......................................8

      B.      The Court Should Reject the City's Attempt to Ignore *Heller* and *Bruen* and Focus on the 20th Century ........................9

      C.      The City's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers .............................................................................11

      D.      The City's Focus on Mass Shootings Does Not Distinguish This Case from Heller .......................................................11

VII.   The City Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms.......................................................................................13

      A.      The Historical Record Has Not Changed Since *Heller* .........................13

      B.      The City's Expert Failed to Identify Historical Regulations Justifying the Ban ..............................................................13

           1.      Introduction.................................................................................13

           2.      Firearm Regulations....................................................................14

           3.      Knife Regulations .......................................................................15

           4.      Clubs and Trap Guns ..................................................................18

           5.      Summary .....................................................................................18

VIII.   The Banned Firearms Do Not Fall Within the Category of Weapons That Are Not Protected by the Second Amendment ......................20

i

| | | |
|---|---|---|
| | A. | The Banned Firearms are Not Dangerous and Unusual..........................20 |
| | B. | The City's "Weapons of War" Argument is Political Rhetoric, not a Serious Legal Analysis....................................................23 |
| IX. | | The City's Attempt to Support its Magazine Ban Fails......................................27 |
| | A. | The Banned Magazines are in Common Use...........................................27 |
| | B. | Magazines Are an Essential Component of a Firearm, not an "Accessory" ................................................................................28 |
| | C. | There is No Historic Tradition Supporting a Magazine Ban .................31 |
| X. | | The Court Should Reject the City's Efforts to Distort the *Heller/Bruen* Analysis .......................................................................................31 |
| | A. | The City Distorts the First Prong of the *Heller* Test...............................31 |
| | B. | The City Has Mangled the Common Use Inquiry ...................................33 |
| | | 1. Common Use is Not Based on Actual Use ...................................33 |
| | | 2. The City's Effort to Distort the Common Use Metric Fails ........35 |
| | | 3. The Banned Arms Are Useful for Lawful Purposes Such as Self-Defense .....................................................................37 |
| | | 4. The Court Should Reject the City's Attempt to Rewrite *Heller*.................................................................................38 |
| | | 5. "Unusual" Means "Not Common"................................................38 |
| | | 6. The *Heller* Test is Concerned with Common Use Today, Not Two Centuries Ago .....................................................................39 |
| XI. | | The Overwhelming Majority of the City's Response Does Not Address Any Matter Relevant to the *Heller/Bruen* Test..............................40 |
| | A. | The City's Means-End Argument is Simply Irrelevant ...........................40 |
| | B. | Constitutional Law is Not Grounded in Emotional Appeals ..................42 |
| | C. | The Availability Heuristic is not a Constitutional Doctrine ...................43 |
| XII. | | The Other Temporary Injunction Factors Are Met............................................44 |
| XIII. | | Conclusion .......................................................................................................45 |

TABLE OF AUTHORITIES

**CASES**                                                                 **Page**

*Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012).............................45

*Andrews v. State*, 50 Tenn. 165 (1871)...........................................................................16

*Arnold v. Kotek*, 370 Or. 716 (2023) ..............................................................................31

*Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106 (3d Cir. 2018) ........37

*Bevis v. City of Naperville*, Case No. 22-cv-4775 (N.D. Ill 2023) ..................................1-2

*Caetano v. Massachusetts*, 577 U.S. 411(2016) ...............................2, 21, 22, 31, 26, 38, 40

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................................9

*D.C. v. Heller*, 554 U.S. 570 (2008) ........................................................................*passim*

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...........................................31

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ........................................................31. 37

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ...........................................................31, 43

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................7, 8, 29, 44, 45

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015).........................1, 30, 34, 36, 43

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015)...................37, 38,43

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ........................5, 10, 13, 21, 22, 27, 39, 40, 42

*Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113
 (7th Cir. 2017)................................................................................................44

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ...............................................................36

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................28, 29

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ..........................................................26, 37, 43

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ............................................................44

*Luis v. United States*, 578 U.S. 5 (2016)........................................................................29

*Lynch v. Donnelly*, 465 U.S. 668 (1984)....................................................................9, 31

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)...............................................7, 9, 42

*McDonald v. State*, 102 S.W. 703 (Ark. 1907)..............................................................15

*McLaughlin v. United States*, 476 U.S. 16 (1986)........................................................21

iii

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021) .............. 4, 13, 21, 25, 26, 37, 44

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).........................................5

*Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117 (2011) ........................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)..................*passim*

*New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)........37

*Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022) .................29, 31

*Ocean State Tactical, LLC v. State of Rhode Island*,
 2022 WL 17721175 (D.R.I. 2022)................................................................29

*People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 ........................................8, 36

*Staples v. United States*, 511 U.S. 600 (1994) ...........................................21, 24, 26, 27

*United States v. Miller*, 307 U.S. 174 (1939)..............................................23, 24

*U.S. v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023)................................6, 7, 32

*U.S. v. Johnson*, 827 F. App'x 586 (7th Cir. 2020) ........................................21

*Virginia v. Moore*, 553 U.S. 164 (2008)........................................................9

*Wilson v. Cnty. of Cook*, 2012 IL 112026.....................................................8

**STATUTES**

*Militia Act of 1792*, 1 STAT. 271 (1792).........................................................19

*National Firearms Act* (48 Stat. 1236–40) ....................................................21

*U.S. Const*. amend. V ................................................................................25

**OTHER AUTHORITIES**

Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should
 Universities Have A Duty to Prevent Rampage Killings?*,
 60 Fla. L. Rev. 895 (2008)...........................................................................3

Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223 ...................................3, 12

Charles Alan Wright, et al, *Federal Practice and Procedure* (2d ed. 1995)..................45

Craig R. Whitney, *A Liberal's Case for the Second Amendment*,
 31 T.M. Cooley L. Rev. 15 (2014) ...............................................................3

David Kopel, *Bowie Knife Statutes* 1837-1899 .............................................17

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and ALB. L. REV. 849 (2015)...................................................................27

*Dictionary of the English Language* (4th ed.) (reprinted 1978) .....................................28

Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481 (2015) ........................................3

Lewis Carroll, *Through the Looking-Glass* (Signet Classic 2000).................................39

Louis Klarevas, *Rampage Nation* (2016)..........................................................43

Mark W. Smith, "*Not all History is Created Equal*": *In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022)..................................9

Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts*," 2022 Harv. J.L. & Pub. Pol'y Per Curiam  (2022)..........................................19

National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report* ......22

*A New and Complete Law Dictionary* ..............................................................28

*Merriam-Webster's Collegiate Dictionary* (10th ed.2001) ............................................2

*Modern Sporting Rifle Comprehensive Consumer Report NSSF* (July 14, 2022)...........28

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009).....................................21

*North-Carolina Gazette* .........................................................................19

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008).............................................................20

U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States, 2019*, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).........................4

William English, 2021 *National Firearms Survey: Updated Analysis*................... 27, 28, 36, 38

## I.      Justice Thomas: Highland Park's Ordinance is Clearly Unconstitutional

This is not a close case. Justice Thomas, the author of *Bruen*, has already concluded that Highland Park's Ordinance is clearly unconstitutional. In his dissent from denial of certiorari in *Friedman*,[1] Justice Thomas noted that under *Heller*, only those "weapons not typically possessed by law-abiding citizens for lawful purposes" are excluded from Second Amendment protection. *Id*. But the Seventh Circuit's "crabbed" reading of *Heller* "flouts" that simple rule. *Id*. Millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting." *Id*. "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id*. (emphasis added).

## II.     Like the Seventh Circuit, *Bevis* Failed to Apply *Heller's* Simple Rule

Three days ago, a division of this Court entered an order denying a preliminary injunction against the City of Naperville's gun control ordinance.[2] But nothing has changed since Justice Thomas wrote his opinion. Millions of American still own AR-style semiautomatic rifles, and under *Heller*, "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." Unfortunately, in *Bevis* the Court simply ignored this fact. Indeed, the Court did never addressed *Heller's* simple rule regarding bans on arms in common use (i.e., such bans are always unconstitutional). Instead, *Bevis* upheld the law because semi-automatic rifles are "particularly dangerous." Order, 30. This was clear error, because "the relative dangerousness of a weapon is **irrelevant** when the weapon belongs to a class of arms commonly used for lawful

---

[1] *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting).
[2] *See* Feb. 17, 2023 Order in *Bevis v. City of Naperville*, Case No. 22-cv-4775 (N.D. Ill 2023). The Court also refused to apply *Heller's* simple rule against the State of Illinois' categorial ban.

purposes …" *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring) (emphasis added).

*Bevis* also failed to abide by *Bruen's* clear holding. In *Bruen*, the Court held that *Heller* does "not support applying means-end scrutiny in the Second Amendment context." *Id.*, 142 S. Ct. at 2127. Unfortunately, in *Bevis* the Court smuggled means-ends scrutiny in through the back door when it concluded that the means employed by the government (banning arms) served a legitimate governmental end (decreasing the harms caused by those arms). Order, 26-30. In other words, the Court shoehorned the very interest-balancing inquiry rejected by *Bruen* into its analysis. This too was clear error. Since *Bevis* rests on at least two fundamental errors, it cannot support upholding Highland Park's arms ban in this case.

## III. The City Tacitly Admits its Handgun Ban is Unconstitutional

The first thing to notice about the City's Response is that it did not attempt to defend its blatantly unconstitutional handgun ban. Resp. 1-50 (no defense of handgun ban). The City admits that its Ordinance bans certain handguns.[3] Resp. 4. That ban extends to the home. *See* Resp. Ex. 1 (no exception for home). *Heller's* central holding is that banning handguns from the home violates the Second Amendment. *Id.*, 554 U.S. at 628–29.[4] It is one thing for the City to make arguments about the application of *Heller* to rifles, a matter *Heller* did not specifically decide. It would be altogether different for the City to have tried to defend its handgun ban in the very teeth of clearly binding Supreme Court precedent, and to its credit it did not attempt to do so. The City tacitly admits that its handgun ban is indefensible. Therefore, irrespective of

---

[3] The Ordinance uses the term "pistol," but the terms are synonymous. *Merriam-Webster's Collegiate Dictionary* 525 (10th ed.2001).
[4] Under *Bruen*, banning handguns from public carry is also unconstitutional. But this discussion focuses on *Heller* because the City's ban defies the Supreme Court regarding the very issue decided in that case.

anything else, at the very least, the City's handgun ban must immediately be declared unconstitutional and enjoined.

## IV.     The City's Central Premise is False

### A.      *Heller* Rejected the City's Central Premise

The Central Premise of the City's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of firearms that can "produce mass harm in a short time." Resp. 3, 17, 26. The City's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. This is easily demonstrated.

On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[5]  At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed thirty-two people, and wounded many others.[6] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho did not use an "assault rifle" to commit his crimes.[7] He used two semiautomatic handguns. *Id*.

*Helle*r was argued less than one year later on March 18, 2008,[8] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly

---

[5] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?,* 60 Fla. L. Rev. 895, 895–96 (2008).
[6] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[7] *Craig R. Whitney, A Liberal's Case for the Second Amendment, 31 T.M. Cooley L. Rev. 15, 19 (2014).*
[8] *Id*., 554 U.S. at 570.

3

aware that semiautomatic handguns could be used to "produce mass harm in a short time." Nevertheless, it struck D.C.'s ban as unconstitutional. In doing so, the Court wrote:

> **We are aware of the problem of handgun violence** in this country, and **we take seriously the concerns raised by the many _amici_ who believe that prohibition of handgun ownership is a solution**. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, [] But the enshrinement of constitutional rights necessarily **takes certain policy choices off the table. These include the absolute prohibition of handguns** held and used for self-defense in the home.

_Heller_, 554 U.S. at 636 (emphasis added).

The Virginia Tech shooter killed several times more people with his semi-automatic handguns than the Highland Park shooter killed with his semi-automatic rifle. Yet only months later the Supreme Court held that the very weapons used by the Virginia Tech shooter were protected by the Second Amendment. It follows that the City's Central Premise is false. The fact that a weapon can be used to "produce mass harm in a short time" does not disqualify it from Second Amendment protection.

The case for upholding Second Amendment rights is even more compelling here than in _Heller_. In _Heller_, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[9]  In contrast, as horrific as mass shootings are, they actually account for only a fraction of 1% of firearm homicides. Cramer Dec. ¶ 7. The City acknowledges that the weapons it bans are also possessed by millions of people. Resp. 17. The rights of those millions cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings.

---

[9] U.S. Dept. of Just., _Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States_, 2019, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).

Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

> [C]onsidering just the public safety rationale invoked by D.C., **semi-automatic handguns are more dangerous as a class** than semi-automatic rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'… So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. … [Heller erects a] serious hurdle … in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, **it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles**.

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)

(emphasis added).[10]

## B.    The Seventh Circuit Has Also Rejected the City's Central Premise

Seventh Circuit precedent is in accord with *Heller* in rejecting the City's Central Premise.

In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (Posner, J.), the Court ruled unconstitutional

an Illinois law that prohibited carrying ready-to-use firearms outside of a person's home. *Id*. 702

F.3d at 942. The Court reviewed the State's empirical evidence supporting its view that the

challenged statute would reduce gun violence. *Id*., 702 F.3d at 937-939. After reviewing this

evidence, the Court destroyed the City's Central Premise with the following observation:

> **Anyway the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts.** 554 U.S. at 636, 128 S.Ct. 2783. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

*Id*., 702 F.3d at 939 (emphasis added).

---

[10] Plaintiffs shall refer to Judge Kavanaugh's dissent in this case as "*Heller II*." Even though Judge Kavanaugh was in dissent, after *Bruen* his analysis almost certainly accurately reflects the law. Indeed, in *Bruen*, the Court cited Judge Kavanaught's dissent with approval multiple times. *See, id*., 142 S. Ct. at 2129, n.5, 2134, 2137,

Identical logic applies in this case. "If the mere possibility that [banning certain semi-automatic weapons would decrease the harm of mass shootings] sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in [Highland Park]." *Id.*

**V.      This Case is Very Simple**

The City and its *amici* have submitted over a thousand pages of material to the Court in an effort to make the issues in this case appear complex. They are not. As Justice Thomas observed in his *Friedman* dissent, this is a very simple case. The two-part *Heller/Bruen* test states:

> [T]he standard for applying the Second Amendment is as follows:
>
> [Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> [Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.*, 142 S. Ct. at 2129–30.

"*Bruen* makes clear that the first step is one based **solely** on the text of the Second Amendment to determine if it presumptively protects an individual's conduct – a presumption that the [government] can **then** rebut with history and tradition. *U.S. v. Harrison*, 2023 WL 1771138 *4 (W.D. Okla. 2023) (emphasis in original). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing certain bearable arms – "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126. It is just that simple. Plaintiffs have met their burden.

6

"Given that the Second Amendment presumptively protects [Plaintiffs'] conduct, the burden shifts to the [government] to demonstrate that [its absolute ban] is "consistent with the Nation's historical tradition of firearm regulation." *U.S. v. Harrison*, *supra*, *5. But under *Heller*, absolute bans of commonly held firearms are "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional.")

Therefore, it is impossible for the City to carry its burden under step two of the *Heller/Bruen* test. The reason for this is apparent from *Heller* itself – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131.

In this case, the City has also been unable to identify a regulation analogous to its absolute ban. This is unsurprising. After a no doubt exhaustive search, D.C. was unable to identify a single founding era analogue (far less a widespread American tradition) of banning any category of commonly held firearms. No one else has come close to doing so in the intervening 15 years, so there is no reason to expect Highland Park would be able to do so now. This is not to say that the City has not proposed analogues. But as discussed in more detail below, their search was no more successful than D.C.'s, and their proposals can be rejected for the same reason *Heller* rejected D.C.'s proposals – i.e, they do not "remotely burden the right of self-defense as much as [Highland Park's] absolute ban." *Heller*, 554 U.S. at 632.

7

In summary, the complete absence of regulations even remotely analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id*., 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in the words of the Seventh Circuit, "categorically unconstitutional." *Ezell, supra*. The Illinois Supreme Court is in accord. In *People v. Webb*, 2019 IL 122951, 131 N.E.3d 93, it held that such absolute bans are "necessarily" unconstitutional.[11] Therefore, this case, like *Heller*, is simple. The Ordinance cannot withstand constitutional scrutiny because the City cannot carry its burden under step two of the *Heller/Bruen* test. The Court's inquiry could end here.

**VI.    The Court Should Reject the City's Efforts to Move the *Heller/Bruen* Goalposts**

   **A.    The Founding Era is the Relevant Time Frame**

Though this is a simple case, the Court might nevertheless want to review the City's historical analysis. The first issue in a historical inquiry is to identify the relevant time period. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'" *Id*., 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id*., 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself,

---

[11] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id*., 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id*. (emphasis added). *But see*, *Wilson v. Cnty. of Cook*, 2012 IL 112026, ¶ 52 (declining to reach issue of whether "assault weapons" ban violated the Second Amendment).

because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). The Court need not resolve the issue of whether 1791 or 1868[12] is the proper timeframe, because, as in *Bruen*, "the lack of support for [the City's] law in either period makes it unnecessary to choose between them." *Id*., 142 S.Ct at 2163) (Barrett, J., concurring)

**B.** **The Court Should Reject the City's Attempt to Ignore *Heller* and *Bruen* and Focus on the 20th Century**

The City relies on the declaration of Robert J. Spitzer for its analysis of historical arms regulations. Resp., Ex. 8. Spitzer knows as well as anyone that the historical record has not changed since *Heller*. Indeed, he candidly admits that there were "few" restrictions on firearms in the Founding Era. Spitzer Dec. ¶ 81. Therefore, he attempts to divert the analysis from that era to the 20th century, to which the vast majority of his declaration is devoted (pages 5-37; paragraphs 12-59). He attempts to justify focusing on the 20th century instead of the founding era on the ground that conditions have changed since 1791 (as if that would have been news to the *Heller* Court). Spitzer Dec. ¶ 8.

---

[12] *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id*., 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*., 142 S.Ct. at 2137 (citations omitted). The founding era is key. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at bit.ly/3Xwtgze (last visited Feb. 16, 2023). This is evident for at least two reasons. First, in *McDonald*, the Court held that the Second Amendment bears the same meaning as applied against the federal government as it does against the states. *Id*., 561 U.S. at 765. Second, the Supreme Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g*., *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

The thrust of the City's argument appears to be that even if there is no founding era precedent analogous to its ban, it may instead point to 20th century precedent because the arms it bans are the product of "advances in weapons technology [that] have created new weapons with dangerous new capabilities [whose] presence created new social problems, [which have] prompted a legislative response, including bans on possession." Resp. 29. But the City's argument wilts in *Heller's* glare. The modern handguns at issue in *Heller* were the product of exactly the same sort of technological innovation. Those handguns produced the same social problems. Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and held the ban was unconstitutional.

The flaw in the City's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era (not from the 20th century) evinces a comparable tradition of regulation with the purpose of controlling the social problem identified by the City. *Id.* 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the City cannot point to a single founding-era law (far less a national tradition) that prohibited mere possession of an entire class of commonly held firearms. As Judge Kavanagh stated in *Heller II* with respect to D.C.'s ban of semi-automatic rifles, the historical facts are substantially the same as in *Heller* and therefore the result should be the same as well. *Id.*, 670 F.3d at 1287.

10

**C.   The City's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers**

Even if the City were able to identify a handful of isolated examples and outliers, that would not carry its burden. "[T]he burden falls on [the City] to show that [its regulation] is consistent with this **Nation's** historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The issue is whether a widespread and enduring tradition of regulation existed, and a few isolated regulations do not establish such a tradition. The "bare existence" of "localized restrictions" is insufficient to counter an American tradition." *Id.*, 142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

**D.   The City's Focus on Mass Shootings Does Not Distinguish This Case from *Heller***

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. *Bruen*, 142 S. Ct. at 2131. In *Heller*, D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the social problem D.C. identified, i.e. handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of the founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

The City has identified a subset of firearms violence, i.e., mass shootings, as the social problem it seeks to address with its arms ban. But the City's focus on mass shootings does not distinguish this case from *Heller*, because, once again, D.C. could have made an identical

11

argument in *Heller*. In fact, D.C. **did** make an identical argument in *Heller*. D.C. included a section in its brief in which it described the "harms posed by handguns" it was seeking to address. Brief of Petitioners, *D.C. v. Heller*, 49-55. One of the harms was the use of semi-automatic handguns in mass shootings. *Id.*, at 53 (citing the Virginia Tech shooting as an example). Thus, D.C. specifically identified mass shootings as one of the social problems it was seeking to address. But the mass shooting problem D.C. identified did not change the result in *Heller*. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its firearms ban. There is no such tradition and the law was declared unconstitutional.

In this case, the City seems to believe that if it is able to identify an unprecedented societal concern (i.e., mass shootings), it need not identify a founding era analogue that is "relevantly similar" to its Ordinance. This is not true. Under *Bruen*, a court must determine whether the Ordinance imposes a comparable burden as that imposed by a historical analogue from the founding era. *Id.*, 142 S. Ct. at 2132–33. The Court did note that when a regulation implicates unprecedented societal concerns or dramatic technological changes, the search for historical analogies may be more "nuanced." *Id.* But it never suggested that in those cases, the search for founding era analogues may be abandoned altogether. Even in these cases, the government is required to identify a relevantly similar tradition justifying its regulation. Heller distinguishes between categorical bans and other types of regulations. The former is simple; the latter may be more nuanced. As discussed above, this case is straightforward and simple. It is not in the "nuanced" category. But even if that were not the case, the City would still be required to show founding era regulations that are "relevantly similar" to its absolute ban. It has not.

12

**VII.    The City Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms**

**A.    The Historical Record Has Not Changed Since *Heller***

The City's experts have submitted hundreds of pages of historical information for the Court's review. The City apparently expects us to believe that while in *Heller* there was zero historical justification for a categorial ban of commonly held arms, there are now literally hundreds of historical arms regulations analogous to its identical ban. Of course, there is not, and the City has not identified anything in the historical record that even remotely suggests that *Heller's* conclusion should be reconsidered. then-Judge Kavanaugh stated in *Heller II*, semi-automatic rifles "have not traditionally been banned and are in common use today, and are thus protected under *Heller*." *Heller II*, 670 F.3d at 1287; see also *Bonta*, 542 F. Supp. 3d at 1024 ("a ban on modern rifles has no historical pedigree.").[13]

**B.    The City's Expert Failed to Identify Historical Regulations Justifying the Ban**

**1.    Introduction**

Most of the Spitzer declaration (pages 5-37; paragraphs 12-59) is a section entitled "Regulation History of Fully Automatic and Semi-Automatic Firearms (Early Twentieth Century)." This analysis ignores the Supreme Court's holding in *Bruen*. New York advanced 20th century analogues to support its case. The Court simply ignored them as irrelevant, because that evidence did "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. The Court should follow *Bruen* and ignore Spitzer's 20th century evidence.

---

[13] *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), vacated and remanded on other grounds, 2022 WL 3095986 (9th Cir. 2022). Plaintiffs will refer to this opinion as "*Bonta*."

The section contained in paragraphs 60-85 of the Spitzer Declaration is entitled "Historical Hardware Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns in the Eighteenth and Nineteenth Centuries." None of the regulations cited by Spitzer support the City's case. Indeed, Spitzer all but gives away the store when he states: "firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution were few." Spitzer Dec. ¶ 81 (internal citation and quotation marks omitted). Spitzer points to laws that increased penalties for burglaries if the offender were armed. Spitzer Dec. ¶ 60. But to count as a historical analogue, a regulation must be "relevantly similar" to the law in question. *Bruen*, 142 S. Ct. at 2132. A sentence enhancer for a burglary is not "relevantly similar" to a categorial ban of a commonly held arm. Spitzer points to laws prohibiting discharge near populated areas. *Id*. These are regulations on use of firearms that are comparable to many similar laws in place today, all of which are perfectly constitutional. Those regulations are not analogous to the City's ban. Spitzer asserts that four states prohibited public carry of arms. *Id*. n. 126. Spitzer misrepresents all four statutes, because none of them banned peacefully carrying firearms. Cramer Dec. ¶¶ 43-47. But even if he were correct, a regulation of carry is a use regulation, not a categorical ban, and therefore not relevantly similar to the City's Ordinance.

## 2. Firearm Regulations

Incredibly, in his 54-page declaration, Spitzer devoted only a *single paragraph* to founding era firearms regulations. Spitzer Dec. ¶ 81. He mentions without discussing laws that regulated public carry. *Id*. The point of this is unclear, because the whole point of *Bruen* is that a total ban on public carry is unconstitutional. If a historical ban on public carry does not even justify a ban on public carry, how could it justify an absolute ban on possession? He mentions laws banning concealed carry. *Id*. Again, the point is unclear. No one disputes that the City can

14

regulate concealed carry, because *Heller* recognized that founding era precedent supported concealed carry laws. *Id.*, 570 U.S. at 626. But obviously that fact did not rescue D.C.'s categorical ban. Finally, Spitzer mentions laws that would today fall under the category of "menacing." *Id.* Again, no one disputes that a law prohibiting menacing with a deadly weapon is constitutional. But such a law is not remotely analogous to a total ban.

### 3. Knife Regulations

Unable to find any historical firearms regulations even remotely as restrictive as the Highland Park Ordinance, Spitzer turns to regulations of other weapons, starting with Bowie knives. Spitzer states that "15 states effectively banned the possession of Bowie knives outright …" Spitzer Dec. ¶ 69. This is simply false. Indeed, it is outrageously false. In support of his assertion, Spitzer refers the reader to Exhibit H, where he has listed 15 states under his column entitled "No Carry." Exhibit 1 attached hereto is a detailed review of those regulations. The discussion in the following paragraphs is a summary of that analysis. In short, none of the laws supports the City's argument.

Spitzer misrepresents the Arkansas law. Far from banning possession as Spitzer says, the law expressly permits it. Spitzer omitted a key part of the statute in his quotation. The omitted part states that nothing in its provisions shall be "construed as to prohibit any person from carrying any weapon when … upon his own premises." *See McDonald v. State*, 102 S.W. 703, 703 (Ark. 1907).

Among the "states" Spitzer says banned possession of these arms are the *Kingdom* of Hawaii (i.e., before it was even a territory, much less a state) and the cities (not states) of Boise (pop. 1,899), Joplin (pop. 29,902), Nebraska City (pop. 6,050), Provo, Utah (pop. 3,432) and

15

Nashville (pop. 25,865). (*See* Ex. 1 for population figures). Regulations in a monarchy and a handful of small towns and cities obviously do not establish a national tradition.

The Arizona,[14] Oklahoma,[15] and Texas[16] statutes Spitzer cites were specifically rejected as Second Amendment analogues in *Bruen*. Laws from the Territory of Hawaii (second example different from the law from the kingdom), West Virginia, and Missouri are from the 20th century and thus not relevant. The Colorado and Indiana laws applied only to concealed carry, not possession. The Louisiana and Tennessee laws were sensitive place regulations, not bans. The Missouri statute was a licensing law, not a ban. The New York law prohibited illegal conduct only (i.e., carrying or possessing "with intent" to use against another). It did not ban any weapon.

The Arizona, Hawaiian (second example), Idaho, and Oklahoma laws were territorial laws. In addition to not being analogous to the City's ban, these laws are irrelevant to the constitutional analysis. *Bruen* stated: "[W]e will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption …" *Id.*, 142 S.Ct. at 2155.

Spitzer suggests that laws regulating carry are the same as laws banning possession. Spitzer Dec. ¶ 69. This is obviously wrong as a matter of logic. Carrying an arm in public is not the same as possessing it in private. It is also wrong as a matter of history. As the Arkansas law discussed above, lawmakers did not consider carry to be the same as possession. Judges distinguished the two as well. In *Andrews v. State*, 50 Tenn. 165, 185-86 (1871), the Tennessee Supreme Court rejected equating carry and possession The Court held it would be

---

[14] *Bruen*, 142 S. Ct. at 2154.
[15] *Id.*
[16] *Id.*, 142 S.Ct. at 2153.

unconstitutional to prevent a citizen from ordinary possession and use of an arm on his own premises, but the same citizen is subject to regulation when he carries the same arm among other people.

In summary, not a single one of the 15 laws Spitzer says is analogous to a ban supports the Highland Park Ordinance at all. At best, the City has established a founding era tradition of prohibiting concealed carry. But concealed carry regulations are not analogous to a categorial ban on possession. Otherwise, *Heller* would have gone the other way, because the Heller Court recognized that founding era precedent supported concealed carry laws. *Id.*, 570 U.S. at 626.

Law professor David Kopel, whose work was cited favorably in *Bruen,* reviewed Spitzer's work on this issue and came to the same conclusion. See David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited Feb. 10, 2023). After an exhaustive review of all nineteenth century state and territorial statutes, Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, **no state prohibited possession of Bowie knives**." *Id.* (emphasis added). Kopel concluded that the history of Bowie knife law is no stronger in creating historical precedents for banning common firearms or magazines than that which was examined in *Heller* and *Bruen*. *Id.*

The City's focus on knives actually cuts dramatically against it. The City's own expert, Randolph Roth does not claim that mass killings were unknown in the founding era. Rather, he states that they were "rare." Roth Dec. ¶ 41. And he cites as an example the 1782 Gnadenhutten massacre in Ohio in which 96 Moravian Christians were killed with blade weapons.. *Id.*, at n. 95. If the Founders were aware of a problem and could have adopted a regulation analogous to the City's regulation to address it but did not, the City's regulation is unconstitutional. *Id.*, 142 S. Ct.

at 2131. The founders were aware of the problem of mass killings were blade weapons. They did not adopt any absolute ban on possession of blade weapons. Thus, the City's ban is unconstitutional.

### 4. Clubs and Trap Guns

Spitzer states that various types of clubs and other blunt weapons were regulated in American history. Spitzer Dec. ¶ 72. Though he admits that most were anti-carry laws, which also generally encompassed pistols and knives. *Id*. If by "most" he means "all," he is correct. Spitzer does not state that any of the laws he listed banned possession as opposed to unlawful use of these weapons.

Spitzer's final category is "Trap guns" and "spring guns," which were devices rigged to fire without the presence of a person. Spitzer Dec. ¶ 82. But Spitzer's chart cites only one founding-era restriction on the setting of "trap guns." Spitzer Dec. Ex. B. (referring to 1763-1775 N.J. Laws 346, ch. 539, § 10). It was not until the late 19th century that such restrictions appeared elsewhere. *Id*. More importantly, these laws did not ban any class of arms. Rather, they regulated the manner of using them.[17] That is, they banned setting loaded, unattended guns to prevent unintended discharges. "Trap gun" restrictions were necessary because setting loaded, unattended guns to discharge automatically imposes an incredibly specific threat to life that is entirely unrelated to violent crime. Because early American "trap gun" laws are not comparable to Highland Park's ban, either in terms of the type of burden they imposed or the government's justification for that burden, they are not constitutionally relevant analogues.

### 5. Summary

---

[17] To this day Illinois' statute bans spring guns as an unlawful **use** of weapons. *See* 720 Ill. Comp. Stat. 5/24-1(a)(5).

18

As noted above, there is nothing one can say about Highland Park's categorical ban that one could not also say about D.C.'s categorical ban. Thus, the Court's conclusion in *Heller* applies to this case as well:  None of the historical laws identified by the City "remotely burden[s] the right of self-defense as much as an absolute ban on [semi-automatic rifles.] *Id*. 554 U.S. at 632. The plain fact of the matter is that the Founders would never have tolerated a categorical arms ban. We can know this because the Founders never did impose any gun ban as a solution to a societal problem, no matter how serious. Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts,"* 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 8 (2022). Bans on the possession of commonly held firearms are a strictly 20th and 21st century phenomenon. *Id*. So, the City's historical burden is impossible to meet, because such bans have no basis whatsoever in the early history of the republic. *Id*.

Indeed, far from banning arms in the founding era, there were laws **requiring** people to be armed with particular kinds of weapons. *Id*. For example, the Militia Act of 1792, 1 STAT. 271 (1792), required every men between eighteen and forty-five years of age to be enrolled in the militia. Those men were required to provide themselves, at their own expense, very specific firearms, ammunition, and equipment. Thus, the laws at the Founding prescribed the firearms citizens **had to have**, not those they **could not have**. *Smith, supra*.

The Founding generation's solution for mass killings was not to deprive ordinary citizens of weapons needed for defense, but for armed citizens to have an active role in preventing, or minimizing the harm caused by, such killings. *Id*. The *North-Carolina Gazette* published an account of an incident in which "a Demoniac being left in a Room, in which were 18 loaded Muskets," shot three men and wounded another with a sword, "upon which the People present,

19

without further Ceremony, shot him dead." Quoted in Stephen P. Halbrook, *The Founders'*
*Second Amendment: Origins of the Right to Bear Arms*, 105 (2008), citing *North Carolina*
*Gazette* (Newbern), July 7, 1775 at 3, col. 1. Halbrook concludes: "For the Founders, the right of
the subject to be armed for defense of self and the community was necessary to suppress such
tragedies – they never imagined a world in which they would be disarmed for the supposed
benefit of preventing access to weapons by madmen." *Id*.

Passing a law that deprived citizens of commonly held arms would have been
unthinkable to the Founders. That is why the City's task of identifying such a founding era law is
hopeless. There is no historical analogue to the City's arms ban, and for that reason it is
unconstitutional. The remainder of this brief discusses various errors and distortions in the City's
brief, but the Court could end its analysis here as well.

## VIII.  The Banned Firearms Do Not Fall Within the Category of Weapons That Are Not Protected by the Second Amendment

The City's effort to fit the banned arms into a constitutionally unprotected category fails.
*Heller* stated "dangerous and unusual" weapons may be subjected to a categorical ban. *Id*., 554
U.S. at 627. Sophisticated military arms that are "highly unusual in society at large" are a sub-
category of dangerous and unusual weapons. *Id*. The City argues that it may ban commonly held
semi-automatic rifles because they are dangerous weapons of war. This argument is meritless.

### A.  The Banned Firearms are Not Dangerous and Unusual

The City argues that it may ban semi-automatic weapons because they are more
dangerous than machineguns. Resp. 24. Apparently, the City's logic is that since fully automatic
machineguns may be banned under *Heller*, semi-automatic weapons (which it says are more
dangerous) may be banned as well. This is false.

20

Are semi-automatic weapons dangerous? Of course, they are. All firearms are dangerous.[18] Are semi-automatic weapons more dangerous than machineguns as the City contends? In *Staples v. United States*, 511 U.S. 600 (1994), the Court indicated that the answer to that question is "no." *See id*. at 612 (semi-automatic rifles "traditionally have been widely accepted as lawful possessions."). But even if the City is right and everyone else has been wrong about this issue since 1934,[19] it does not matter for purposes of the *Heller* test, because "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. … If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).

The City misapprehends the issue. The banned rifles are perfectly legal to build, buy, and own under federal law and the laws of 42 states. Resp. 1, 41.[20] There are probably more rifles such as those banned by the City in circulation than there are Ford F-150 pickup trucks. *Bonta*, 542 F. Supp. 3d at 1022. In 2018, 909,330 Ford F-150s were sold; twice as many rifles of this type were sold the same year. *Id*. The AR-15 in particular, the quintessential arm banned by the City, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287, and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold, at approximately

---

[18] *U.S. v. Johnson*, 827 F. App'x 586, 591 (7th Cir. 2020), *citing McLaughlin v. United States*, 476 U.S. 16, 17-18 (1986).

[19] Congress passed the National Firearms Act (48 Stat. 1236–40) in 1934. It heavily regulated automatic weapons as a class but not semi-automatic weapons.

[20] The City acknowledges that the weapons are banned in only eight states (and therefore not banned in 42 states) and that the federal ban expired nearly 20 years ago. Spitzer Dec. ¶ 11.

20% of all firearm sales, behind only semiautomatic handguns. See National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023). The City admits at least 24 million are held by Americans. Resp. 17.[21]

Because the semi-automatic weapons banned by the City are not unusual, they cannot be both dangerous and unusual. It follows that, as Justice Alito wrote, their relative dangerousness is irrelevant because they belong to a class of arms commonly used for lawful purposes.[22] Thus, the City's argument about whether these weapons are more dangerous than machineguns misses the point, because while the rifles are obviously dangerous, they are not both dangerous and unusual.

Finally, the City's argument proves too much. If semi-automatic weapons may be banned as such merely because they are excessively dangerous, *Heller* would have been decided the other way. As then-Judge Kavanaugh noted in *Heller II*, "the Supreme Court held that handguns – the vast majority of which today are semi-automatic – are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is **no meaningful or persuasive constitutional distinction** between semi-automatic handguns and semi-automatic rifles." *Id.*, 670 F.3d at 1269. "It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected." *Id*. The reason there is no meaningful constitutional distinction is "that semi-automatic **rifles** fire at the same general rate as semi-automatic **handguns**." *Id.*, at 1289.[23] *See also, Bonta*, 542 F. Supp. 3d at

---

[21] *See also* Mot. 13-18 for an extensive discussion of this issue.
[22] *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).
[23] Judge Kavanaugh was undoubtedly correct. Indeed, as comparing the Highland Park shooting with the Virginia Tech shooting shows, semi-automatic handguns can sometimes be more dangerous than semi-automatic rifles.

22

1061 (same). In summary, the City's effort to cast the most popular rifle in America as "dangerous **and** unusual" fails because it is manifestly not unusual.

### B. The City's "Weapons of War" Argument is Political Rhetoric, not a Serious Legal Analysis

Citing *Heller*, the City asserts in somewhat breathless prose that it can ban "weapons of war!" Resp. 22. But, again, the City misapprehends *Heller* because it held no such thing. In *Heller*, the Court examined the issue of the types of weapons that are protected by the Second Amendment. The City latches onto a snippet from the Court's extended discussion of this issue and announces that "weapons of modern warfare" may be banned. Resp. 22. Two passages from *Heller* show that the City's interpretation is the opposite of what the Court held. First, the Court stated:

> We may as well consider at this point … what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on **machineguns** (not challenged in *Miller*) might be unconstitutional, **machineguns being useful in warfare in 1939**. We think that *Miller's* 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. … We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes …

*Id*., 554 U.S. at 624-25 (emphasis added). Expanding on this passage from *Miller*, the Court stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' [citations omitted]

23

It may be objected that if weapons that are most useful in military service – M–16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require **sophisticated arms that are highly unusual in society at large**. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. 570, 627–28 (emphasis added).

Both of these passages are extended discussions of *Miller* in which the Court clarified "what types of weapons *Miller* permits." In both passages, the Court distinguishes between two categories of weapons, the first of which is not protected by the Second Amendment and the second of which is. In the first passage, the Court refers to: (1) "[O]rdinary military equipment" (which includes "machineguns"); and (2) Arms supplied by men called for militia service. The Court noted that this second category consists of arms in common use for lawful purposes. In the second passage, the Court refers to these same categories using slightly different terms: (1) "[W]eapons that are most useful in military service." This phrase means the same thing as "ordinary military equipment" in *Miller*. The Court cites three examples of this type of weapon (machineguns like the M-16,[24] bombers, and tanks). (2) Arms supplied by men called for militia service. Again, this category has the same "weapons in common use" meaning set forth in *Miller*.

One thing is clear from these passages. Weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. What do militia

---

[24] *See Staples v. United States*, 511 U.S. 600, 603 (1994) (stating that the M-16 rifle is a military machinegun).

members do with those weapons when they bring them to militia service? They fight wars.[25] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons in common use brought for militia service for fighting wars are protected by the Second Amendment, and (2) all weapons useful for fighting wars are not protected by the Second Amendment. If the Court were to adopt the City's argument, this is the nonsensical result it would have to reach. This is not the law. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016).

The City's error lies in distorting the language Justice Scalia used. The City asserts Justice Scalia said that "weapons of modern warfare" may be banned. He said no such thing. He said that "weapons that are most useful for military service" may be banned. The two phrases do not mean the same thing, and the difference is important. In the very passage cited by the City, Justice Scalia clarified that by "weapons that are most useful for military service" he meant "sophisticated arms that are highly unusual in society at large" such as machineguns, bombers and tanks that are wielded by a nation-state's standing army. He contrasted such "sophisticated" and "highly unusual arms" with arms brought by men for militia service that were "'in common use at the time' for lawful purposes."[26]

---

[25] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").
[26] *See Bonta* 542 F. Supp. 3d at 1014–15 (The banned rifles are not "bazookas, howitzers, or machineguns" solely useful for military purposes; they are ordinary, popular, rifles.).

In summary, when he used the phrase "weapons that are most useful for military service," Justice Scalia did not, as the City asserts, mean all weapons useful in warfare. Rather, he used the phrase to contrast specialized weapons employed by a standing army (not protected by the Second Amendment) with weapons in common use by law abiding-citizens for lawful purposes (protected by the Second Amendment). At the end of the day, Justice Scalia was simply stating the "common use" formulation in different terms.[27]

It is easily demonstrated that *Heller* did not hold that any weapon used in a war may be banned. From 1911 to 1986, the United States Army issued Colt M1911 pistols to its soldiers. Passameneck Dec. ¶ 3. After 1986 the Army issued Beretta Model 92 pistols to its soldiers. *Id*., ¶ 4. The Colt M1911 was used by soldiers in war (World War I, World War II, Korea, Vietnam, etc.). *Id*., ¶ 3. The Beretta Model 92 was also used by solders in war (the Gulf War, Iraq, Afghanistan, etc.). *Id*., ¶ 4. Colt and Beretta have all along sold identical models of these semi-automatic handguns in the civilian market, and they are widely possessed by civilians. *Id*., ¶¶ 3-5. The possession of these handguns is protected under *Heller*. Thus, certain "weapons of war" are indeed protected by the Second Amendment if the weapons are of a type that is widely possessed by law-abiding citizens for lawful purposes. *Id*.

Finally, in its argument, the City focuses on the military's M-16 machine gun (Resp. 22) and argues there is no practical difference between that weapon and semi-automatic weapons like the AR-15, and therefore the latter may be banned like the former. But this argument is precluded by *Staples v. United States*, 511 U.S. 600 (1994). In that case the Court held that the

---

[27] In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*abrogated* by Bruen), Judge Traxler made this same point. He wrote that just calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens." *Id*., 849 F.3d at156 (Traxler, J., dissenting).

distinction between the fully automatic M-16 and semi-automatic weapons such as the AR-15 is legally significant. *Accord, Bonta*, 542 F. Supp. 3d at 1056–57 (same). The Court stated that it is not lawful for a civilian to possess a machine gun like an M-16, and it contrasted that with semi-automatic weapons (like the AR-15 at issue in that case) which "**traditionally have been widely accepted as lawful possessions**." *Id*., 511 U.S. at 612 (emphasis added). The AR-15 is the quintessential semi-automatic rifle that the City seeks to ban. Yet as the Supreme Court noted in *Staples*, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. *Heller II*, 670 F.3d at 1288. Thus, even if the AR-15 were useful for warfare as the City says (a debatable question, since the City has not introduced a single example anywhere in the world of a national army that uses the AR-15), it is nevertheless protected by the Second Amendment because it is exactly the sort of arm "in common use at the time" contemplated by *Heller*.

## IX. The City's Attempt to Support its Magazine Ban Fails

### A. The Banned Magazines are in Common Use

The Banned Magazines are in common use. In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis (*hereinafter, "English"), 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners. *Id*. According to the survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned. English, 20. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more

than ten rounds. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Jan 30, 2023). The City does not attempt to refute Plaintiffs' evidence regarding these numbers. Thus, the City has conceded that Americans own over a 100 million magazines like the ones it has banned.

### B. Magazines Are an Essential Component of a Firearm, not an "Accessory"

The City attempts to define an entire class of arms out of existence. Resp. 41. But the City's effort to define its problem away fails, because even it is forced to admit that magazines are critical components of semi-automatic firearms. The City asserts that firearm magazines are mere "accessories" and not arms. But whether magazines are arms is not decided by the City's linguistic fiat. Rather, the issue is whether they fit within the 18th century meaning of the word "arms." The meaning of that word in the 18th century is no different from the meaning today. *Heller*, 554 U.S. at 581. *Heller* noted that the 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). *Id*. And the Court quoted Timothy Cunningham's important 1771 legal dictionary which defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary. *Id*.

Consider an 18th century musket. The lead ball the musket fired is not, standing alone, an arm, but it is essential to the functioning of a musket. Thus, the lead ball is a "thing that a man …

takes into his hands to … strike another." Thus, it would be absurd to argue that the Founders would have interpreted the Second Amendment to protect muskets but not the ammunition necessary to make them function. That is why in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), the Court, while recognizing the Second Amendment does not explicitly protect ammunition, noted that "without bullets, the right to bear arms would be meaningless." *Id*. at 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (same). Justice Thomas, the author of *Bruen*, cited both *Jackson* and *Ezell* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that constitutional rights implicitly protect those closely related items necessary to their exercise. *Id*., 578 U.S. at 26-27 (Thomas J., concurring).

Thus, the issue is whether magazines are needed to make the core right "effective." *Ezell*, 651 F.3d at 704. In other words, is a magazine necessary for a semi-automatic firearm to function? It is. A magazine is not a mere box in which ammunition is stored. Passamaneck Dec. ¶ 7. Instead, rounds of ammunition are held in the magazine under spring tension. *Id*. When a round is fired, the spring pushes another cartridge up to be pushed into the chamber, so that it can be fired with the next pull of the trigger. *Id*. If there is no magazine pushing rounds into the action one by one, there is no ability to fire a subsequent round merely by a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*. Thus, without magazines, semi-automatic firearms would not exist. *Id*. In other words, magazines are necessary for the operation of a semi-automatic firearm. Passamaneck Dec. ¶ 7.

The City does not actually dispute this. It concedes that some sized magazine is necessary. Resp. 43. And of course, it is, as even the case cited by the City recognizes. *See*

29

*Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, *9 (D. Or. 2022) ("magazines in general **are necessary** to the use of firearms for self-defense").[28]

The City's confusion regarding this issue results from confusing the first step of the *Heller/Bruen* test (text) with the second step (history). Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the City cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the City can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed below, it cannot make such a demonstration).

In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic rifle effective. Therefore, magazines, in general, constitute bearable arms that are prima facia protected by the Second Amendment under prong one (text) of the *Heller/Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history) of that test.

That issue is easily resolved under *Heller's* "common use" analysis. The City does not dispute that American citizens hold over 150 million such magazines. Instead, it resorts to the "plaintiffs have access to other arms" canard specifically rejected by *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban the possession of [some arms] so long as the possession of other [other arms]… is allowed." *Id.*, 554 U.S. at 629. Justice Thomas specifically

---

[28] Another recent case rests on the dubious proposition that a "a firearm can fire bullets without a detachable magazine." *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. 2022). Yes, muskets and other single shot firearms can fire one shot at a time without a magazine. But no one contends that the Second Amendment does not extend to multi-shot semi-automatic firearms. And for semi-automatic firearms, that multi-shot capacity is achieved with magazines. *Ocean State* essentially holds that the State could outlaw semi-automatic firearms, which is obviously inconsistent with *Heller*.

rejected the City's argument in the context of this very Ordinance. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting). The City also argues that those 150 million magazines are not "commonly used" because smaller magazines are available. This is a *non sequitur*. The City cannot reasonably dispute that the Banned Magazines are arms that are commonly used for lawful purposes. Therefore, a categorical ban of the magazines is "necessarily" unconstitutional.[29]

### C. There is No Historic Tradition Supporting a Magazine Ban

Plaintiffs demonstrated there is no historic tradition in this Nation supporting the City's magazine ban. Motion 21-25. *See also Duncan III*, 366 F.Supp.3d at 1149-53 ("History shows … restrictions on the possession of firearm magazines of any size have no historical pedigree."); *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history). In response, the City cites *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022), a case in which the Court upheld a magazine ban. In that case, the Court made the same error the City has made in its brief when it failed to recognize the overwhelming evidence that such magazines are in common use. *Id*. *9. That case is also irrelevant, because the Oregon law in question was later enjoined in a state court proceeding as an unreasonable restriction on the right to keep and bear arms under state law.[30]

### X. The Court Should Reject the City's Efforts to Distort the *Heller/Bruen* Analysis

---

[29] The City also argues that the Banned Magazines are "manifestly dangerous." Resp. 44. This is false as a factual matter, but more importantly it is irrelevant as a legal matter. Again, the "relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes," *Caetano*, 577 U.S. at 418 (Alito, J. concurring). 150 million certainly qualifies as commonly used.
[30] *See Arnold v. Kotek*, 370 Or. 716, 719 (2023).

31

### A.    The City Distorts the First Prong of the *Heller* Test

The City quotes the *Heller/Bruen* test properly. Resp. 14-15. But it becomes muddled when it tries to apply the first prong (plain text). The City goes astray when it asserts that in the *Heller* test the term "Arms" refers only to weapons that are in common use and excludes dangerous and unusual weapons. Resp. 14. That is not correct. Under *Heller* "the Second Amendment extends, prima facie, to **all** instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132 (emphasis added). Wait a second. Didn't *Heller* expressly say that dangerous and unusual weapons are not protected? Yes, but it reached this issue under the "history" prong, not the "text" prong. That is why the phrase "prima facie" in the quoted passage is important. Under the text prong "all" bearable arms (including dangerous and unusual arms) are **presumptively** protected. *Bruen*, 142 S. Ct. at 2116. Under the history prong, that presumption has been rebutted with respect to "dangerous and unusual" arms.

In other words, when an individual establishes that her regulated conduct involves possessing any instrument that constitutes a bearable arm, she has established a prima facie case that "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2116. The government can rebut that presumption by establishing that its "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* One way the government can do that is by showing the firearm is dangerous and unusual, because a prohibition of such arms "is fairly supported" by "historical tradition." *Heller*, 554 U.S. at 627. Thus, while all bearable arms are prima facie protected, history is used to determine which modern arms are actually protected, *Bruen*, 142 S. Ct. at 2132, and dangerous and unusual weapons are not.

This is not an academic point. The City is pushing its skewed interpretation of the first prong of the *Heller* test in an attempt to shift its burden onto Plaintiffs. In *U.S. v. Harrison*, 2023

WL 1771138 (W.D. Okla. 2023), the Court rejected a similar tactic, holding that the government's "approach shoehorns the government's historical-tradition burden onto *Bruen's* initial presumption, a presumption based simply on the Second Amendment's plain text." *Id.*, *4.

The City gives its illegitimate burden-shifting strategy away when it asserts that Plaintiffs have not carried "their burden" of showing that the banned arms are in common use and not dangerous and unusual. Resp. 16. This is manifestly wrong because Plaintiffs do not have to prove either of these things to meet their burden. Again, Plaintiffs' burden is only to show that the Second Amendment's plain text applies to their conduct. *Bruen.*, 142 S. Ct. at 2129–30. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms. *Id.*, 142 S. Ct. at 2132. The Ordinance bans a class of bearable arms that Plaintiffs have or desire to have. Therefore, "the Constitution presumptively protects [Plaintiffs'] conduct." *Id.* They have met their burden under the first prong of the *Heller/Bruen* test. The burden now shifts to the City to justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.*

The Court might reasonably ask why, if this is so, Plaintiffs have submitted so much evidence regarding the "common use" issue if they are not required to do so to meet their burden. The answer is that while Plaintiffs are not required to submit evidence of common use, they may submit such evidence to shortcut, as it were, the resolution of the second prong. As discussed in detail above (*See* Section V), an absolute ban of a commonly used firearm is "categorically" or "necessarily" unconstitutional. That means that if Plaintiffs do show that the banned arms are in common use (which they have), the City cannot meet its burden under the historical tradition test and the Ordinance is "necessarily" unconstitutional.

### B.     The City Has Mangled the Common Use Inquiry

33

### 1.    Common Use is Not Based on Actual Use

The City concedes there are over 24 million firearms of the type it has banned. Resp. 17, 19.[31] Unable to rebut the overwhelming evidence that the arms it has banned are "typically possessed for lawful purposes," the City retreats to yet another specious argument. According to the City, an arm is not protected unless it is in fact frequently **actually** used for self-defense. Resp. 17. The City's interpretation flies in the face of *Heller's* plain language, as Justice Thomas has already recognized. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting). In discussing Highland Park's Ordinance, Justice Thomas wrote that Americans own these arms "for lawful purposes like self-defense." *Id*. Justice Thomas reached this conclusion, as in *Heller*, based on the bare fact that millions of Americans have chosen to acquire the arms. *Id*. Neither Justice Scalia in *Heller* nor Justice Thomas in *Friedman* required a study regarding "actual use" to support their conclusions.

Moreover, in *Heller* the Supreme Court did not focus on "use" in isolation. The Court held that the Second Amendment conferred an individual right to **keep** and bear arms. *Id.*, 554 U.S. at 595 (emphasis added). The Court held that "keep arms" means "possessing arms." *Id.*, 554 U.S. at 583. And the Court held that banning "the most preferred firearm in the nation to **keep** and use for protection of one's home and family [fails] constitutional muster." *Id.*, 554 U.S. at 628–29 (cleaned up; emphasis added). The conjunctive is important. If the City's interpretation of *Heller* were correct, the word "keep" in that sentence would be superfluous. It is not. *Heller* held that the Second Amendment protects both the right to possess (i.e., keep) arms

---

[31] It invites the Court to speculate about how many of these might be held by criminals. *Id*. But speculation is not evidence. The City has produced no actual evidence to show that overwhelming majority of these firearms are not owned by law-abiding citizens for lawful purposes.

and the right to use those arms should the occasion arise. To be constitutionally protected, it is enough that the arms in question are commonly possessed for self-defense and other lawful purposes.

Nowhere in *Heller* did the Court suggest that it is necessary to show that a weapon's actual use in self-defense meets some threshold the City has not identified. *Heller* simply listed some of the reasons why Americans "may prefer" handguns; for example, a defender can dial a phone with one hand while holding the gun with the other hand. *Id.*, 554 U.S. at 629. *Heller* offered no data about defensive handgun use – such as whether anyone has ever actually dialed a phone with one hand while holding a handgun in the other. Instead, *Heller* concluded: "**Whatever the reason**, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id.* (emphasis added).

In *Bruen*, the Court picked up where *Heller* left off. The Court stated that the Second Amendment protects the right to "**possess** and carry weapons **in case of** confrontation." *Bruen*, 142 S. Ct. at 2134 (internal citations and quotation marks omitted; emphasis added). The right encompasses the right to be "**armed and ready** for offensive or defensive action in a case of conflict with another person." *Id.* (internal citations and quotation marks omitted; emphasis added). The right thus encompasses the right to "'keep' firearms … at the ready for self-defense … **beyond moments of actual confrontation**." *Id.*

## 2. The City's Effort to Distort the Common Use Metric Fails

Next, the City makes the astounding argument that 24 million firearms is not enough to show common use. Resp. 19-20. The City argues that the absolute number of firearms is irrelevant and the important metric is the proportion of people in the population as a whole who own such firearms. *Id.* The City then argues that since "only" 6.4 million of 333 million

35

Americans own firearms like those it has banned, those firearms are not in common use. *Id*. The City's argument fails as a matter of fact because 30.2% of gun owners, about 24.6 million **people**, have owned an AR-15 or similarly styled rifle. English, 33. It also fails as a matter of law. Nothing in *Heller* suggests that ownership as a percentage of the population is the relevant metric. The common use inquiry is based on bare numbers, not comparisons. In *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting), Justice Thomas noted that millions of Americans own AR-style rifles. *Id*. That bare fact, standing alone, was sufficient to establish common use. *Id*.

Justice Alito's concurrence in *Caetano* is also instructive on this point as well. He wrote that in determining whether the arms at issue (i.e., stun guns and Tasers) are commonly used, the relevant statistic is that over **200,000** Tasers and stun guns have been sold to private citizens who may lawfully possess them in 45 States. *Id*., 577 U.S. at 420 (internal citations and quotation marks omitted; emphasis added). And while stun guns are less popular than handguns, Massachusetts' categorical ban of such weapons violates the Second Amendment. *Id*. If this were not the case, a State would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense, *Id*., and all other arms are less commonly used. If approximately 200,000 arms in 45 states meets the "commonly used" threshold, surely tens of millions of arms in 41 states meets it as well.

Following *Caetano*, the Illinois Supreme Court held the same thing with respect to stun guns. See *People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 (stun gun ban "necessarily" unconstitutional). Other courts are in accord as well. *See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction

counting); *Duncan IV*, 970 F.3d 1133, 1147 (9th Cir. 2020)[32] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen* (2022) (Traxler, J. dissenting) (consensus among courts is that the test is an "objective and largely statistical inquiry"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen* ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'"). In summary, "hundreds of thousands" of a particular arm are sufficient to establish common use. It follows that "over 24 million" is far more than enough.

### 3. The Banned Arms Are Useful for Lawful Purposes Such as Self-Defense

The City asserts that the banned arms are not useful for self-defense. Resp. 47. This argument fails because the Second Amendment protects a personal right to keep arms for all lawful purposes, not only self-defense. *Friedman*, 784 F.3d at 412–13 (Manion, J., dissenting). The argument is also precluded by the majority opinion in *Friedman* (abrogated on other grounds by *Bruen*). There, the Court specifically held that "assault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers [and] Householders too frightened or infirm to aim carefully may be able to

---

[32] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

wield them more effectively than the pistols." *Id.*, 784 F.3d at 411. Thus, even the case relied upon by the City supports Plaintiffs with respect to its holding that has not been abrogated by *Bruen*. Moreover, the assertion is not true as a factual matter as Plaintiffs demonstrated in their Motion. Mot. 17. Of the 25.3 million Americans who have defended themselves with a firearm, 13.1% (3.3 million) have used a rifle. English, 12, 15.

### 4.   The Court Should Reject the City's Attempt to Rewrite *Heller*

The City attempts to rewrite the *Heller* test. Resp. 21, n.8. In *Heller* the Supreme Court held that the Nation's historical tradition of firearms regulation supports banning weapons that are both "dangerous **and** unusual." *Heller*, 554 U.S. at 627 (emphasis added). Importantly, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. Justice Alito provided critical guidance regarding this issue in *Caetano v. Massachusetts*, 577 U.S. 411 (2016):

> **[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes**. *See Heller, supra*, at 627, 128 S.Ct. 2783 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons . . . 'in common use at the time'"). . . . If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.

*Id.*, 577 U.S. at 418 (Alito, J. concurring) (emphasis added).

An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual.  Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629. The City asserts that the Supreme Court got it all wrong and what it really meant to say was "dangerous **or** unusual." Resp. 21, n.8. Needless to say, the Court should resist the City's effort to rewrite binding precedent.

### 5.   "Unusual" Means "Not Common"

Next, the City employs the Humpty Dumpty gambit[33] when it asserts that when the *Heller* Court used the word "unusual" what it really meant was "unusually likely to cause public terror." Resp. 21. Again, the City's interpretation flies in the face of *Heller's* plain meaning. In discussing common use, the Court contrasted "unusual" with "common." *Id.*, 554 U.S. at 627. Thus, it used the word "unusual" in its ordinary sense of "not usual" or "not common." Nothing in the opinion even hints at the idea that the Court meant "unusually terrifying" when it used that word. The City cites no authority for its novel and specious reading of *Heller*. *See also Heller II*, 670 F.3d at 1272 ("dangerous and unusual weapons" are equivalent to those weapons not "in common use.").

### 6. The *Heller* Test is Concerned with Common Use Today, Not Two Centuries Ago

The City argues that "a modern weapon can be considered 'in common use' only if it is as commonly used as weapons that the Second Amendment protected at the time of the Founding." Resp. 18. The City cites no authority for this novel and specious reading of *Heller* either. That is not surprising because the argument is contrary to *Heller's* plain holding that banning "the most preferred firearm in the nation to keep and use for protection of one's home and family" is unconstitutional. *Id.*, 554 U.S. at 628–29. D.C.'s ban was unconstitutional because handguns are commonly used for self-defense today, not two centuries ago. *Heller* said nothing about comparing how commonly used a modern weapon is to how commonly used weapons were at the Founding. Moreover, it is obvious that the weapons at issue in *Heller* (modern handguns) were not in common use at the Founding, because they were not invented until over a

---

[33] *See* Lewis Carroll, *Through the Looking-Glass* 188 (Signet Classic 2000) ("'When I use a word,' Humpty Dumpty said . . . 'it means just what I choose it to mean – neither more nor less.'").

century or more later. Unsurprisingly, therefore, *Bruen* specifically rejected the argument the

City advances. It stated that Heller held that handguns are constitutionally protected because

whatever their status was "during the colonial period, they are indisputably in 'common use' for

self-defense **today**." *Id*., 142 S. Ct. at 2143. See also *Caetano v. Massachusetts*, 577 U.S. 411,

420 (2016), ( "the pertinent Second Amendment inquiry is whether [arms] are commonly

possessed by law-abiding citizens for lawful purposes **today**.") (Alito, J., concurring) (emphasis

in the original); and *Heller II,* 670 F.3d at 1287 ( "Semi-automatic rifles have not traditionally

been banned and are in common use **today**, and are thus protected under *Heller*.").

## XI.    The Overwhelming Majority of the City's Response Does Not Address Any Matter Relevant to the *Heller/Bruen* Test

### A.    The City's Means-End Argument is Simply Irrelevant

Instead of attempting to carry its burden under *Heller/Bruen*, the vast majority of the

City's brief consists of an elaborate means-end argument of the type specifically prohibited by

*Bruen*. For page after page, the City goes on trying to demonstrate that banning semi-automatic

firearms and certain magazines promotes the important governmental interest of public safety. In

other words, the City argues that the means it has employed (banning arms) serves a salutary end

(increasing public safety). This argument is astonishing. The City appears to be so devoted to its

discredited Central Premise (See Section IV), that it cannot grasp *Bruen's* clear holding. The

means-end argument it advances is precisely what the Supreme Court held a government may

not do to justify a firearms regulation. "To justify its regulation, the government **may not simply**

**posit that the regulation promotes an important interest**. Rather, the government must

demonstrate that the regulation is consistent with this Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Certainly, the City believes its

40

ordinance promotes an important governmental interest, but just as certainly, under *Bruen*, the City's belief is irrelevant to the constitutional analysis.

Perhaps anticipating that governments would push back or ignore its holding as the City has done here, *Bruen* emphasized its rejection of means-end scrutiny by repeating it over and over: *Heller* does "not support applying means-end scrutiny in the Second Amendment context." *Id.* "[*Heller*] did not invoke any means-end test." *Id.*, 142 S. Ct. at 2129. "[*Heller*] expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* (internal citations and quotation marks omitted). "[T]he Second Amendment does not permit – let alone require – judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." *Id.* (cleaned up). "We declined to engage in means-end scrutiny because the very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* (cleaned up). "We then concluded [that a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* "*Heller* specifically ruled out the intermediate-scrutiny test." *Id.* *Heller* "expressly rejected" the dissent's "'interest-balancing inquiry.'" *Id.* (internal quotation marks omitted).

It is impossible to come away from even a cursory reading of *Bruen* and not understand that means-end scrutiny is no longer allowed in Second Amendment cases. Yet, the City devoted most of its brief to a means-end argument. Plaintiffs are sorely tempted to get into the factual weeds with the City, because practically everything the City says in support of its means-end analysis is either flat out wrong or substantially distorted. But Plaintiffs will resist this

41

temptation, because almost the whole point of *Bruen* is that it is not "legitimate" for judges to make "empirical judgments" about the "costs and benefits of firearms restrictions." *Id.*, 142 S. Ct. at 2130, *quoting McDonald*, 561 U.S. at 790-91. There is, therefore, nothing to be gained by challenging the empirical predicate of the City's means-end analysis. That discussion – though it makes up the bulk of the City's brief – is simply irrelevant to the Court's resolution of this case. Accordingly, as difficult as it is, Plaintiffs will ignore the means-end red herring, and they hope the Court will ignore it as well.

### B.        Constitutional Law is Not Grounded in Emotional Appeals

Much of the material attached to the City's brief is in service of its raw emotional appeal to the Court. But none of that material is relevant to carrying the government's burden of justifying its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. That said, the City's argument is emotionally – if not legally – powerful. All of the law is on Plaintiffs' side and all of the emotion is on the City's side, so naturally, the City plays to its strength. The City has an advantage. Plaintiffs sound heartless and callous when they point out that the gut-wrenching stories the City recounts are legally irrelevant. The City's brief is a masterpiece of the rhetorical art of pathos (appeal to emotion). But as Justice Alito wrote in *Bruen*, this emotional appeal is not relevant to the issues before the Court. *Id.*, 142 S. Ct. 2111, 2157 (Alito, J., concurring).

This case is like *Heller II*, in which then-Judge Kavanaugh noted that "emotions run high on both sides of the policy issue because of the vital public safety interests at stake." *Id.*, 670 F.3d at 1295. Judge Kavanaugh wrote that he was "acutely aware" of the gun violence that plagued D.C. and, as a citizen, he shared the city's goal of reducing or eliminating the violence. *Id.* And while he respected the motivation behind the city's gun laws, a faithful application of

42

*Heller* precluded him from deferring to the city's ban on semi-automatic rifles. A judge's task, he said, is to apply the Constitution and the precedents of the Supreme Court, regardless of whether he or she personally agrees as a matter of first principles or policy. *Id.*, 670 F.3d at 1295-96. Judge VanDyke put the matter this way: "The emotional impact of these tragedies does all the work for the government [but] that is precisely where judges must cut through the emotion and do their job of holding the government to its … burden." *Duncan V*, 19 F.4th at 1168 (VanDyke, J., dissenting).

### C.    The Availability Heuristic is not a Constitutional Doctrine

In *Friedman*, Judge Easterbrook wrote that "[i]f it has no other effect, Highland Park's ordinance may increase the public's sense of safety. Mass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events. . . . If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Id.*, 784 F.3d at 412 (emphasis added). In other words, Judge Easterbrook relied on the availability heuristic[34] as a justification for upholding the ordinance.

This holding has been subjected to withering criticism. See *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting) ("If a broad ban on firearms can be upheld based on conjecture that the public might **feel** safer (while being no safer at all), then the Second Amendment guarantees nothing." (emphasis in original)); *Kolbe v. Hogan*, 813 F.3d 160, 182 (4th Cir. 2016), on *reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) (Traxler, J.) (abrogated by

---

[34] The "availability heuristic" is the psychological phenomenon where judgments are heavily biased by dramatic incidents.  Louis Klarevas, *Rampage Nation* 61 (2016). An example of the availability heuristic is the fact that many people are afraid to fly because airplanes have crashed, even though airplane crashes are exceedingly rare and airplane travel is very safe.

*Bruen*) (rejecting *Friedman* because under its "view, a significant restriction on a fundamental right might be justified by benefits that are quite literally imagined into existence."); and *Bonta*, 542 F. Supp. 3d at 1055 (*Friedman* upheld the ban because it was "good for the community psyche."). The City downplays the fact that the actual risk of the banned weapons being used by criminals is extremely low, Resp. 27. Instead, it attempts to justify its ban based on the perceived risk in the community. Resp. 17, 21. But *pace* Judge Easterbrook, it was never constitutionally licit to justify a burden on constitutional rights by appealing to the psychological distortions of risk assessment caused by the availability heuristic. *Bruen* makes clear that all means-end arguments are out of bounds, including this one.

## XII. The Other Temporary Injunction Factors Are Met

Finally, the City argues that Plaintiffs have not demonstrated the other preliminary injunction factors in addition to probable success on the merits. But Plaintiffs cited *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113 (7th Cir. 2017). In that case the Seventh Circuit held that in a constitutional case like this one, "the analysis begins and ends with the likelihood of success on the merits of the [that] claim." *Id*., 858 F.3d at 1116 (internal quotation omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (same).

Plaintiffs have necessarily shown the other factors by establishing probable success on the merits.  First, the City claims that Plaintiffs have not suffered irreparable injury because they have access to weapons that have not been banned. Resp. 47. This argument, again, runs headlong into *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban [certain firearms] so long as the possession of other firearms … is allowed." *Id*., 554 U.S. at 629. Moreover, the City's argument ignores Seventh Circuit precedent that is directly on point. In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), held that "[w]hen an alleged deprivation

44

of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.*, 651 F.3d at 699, *quoting* Charles Alan Wright, *et al*, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). The City suggests that no case has ever held that the presumption of irreparable harm applies in a Second Amendment case. Resp. 48. But that is exactly what *Ezell* held.

As for the "balance of harm" and "public interest" prongs, injunctions protecting constitutional freedoms "are always in the public interest." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). And if the moving party establishes a likelihood of success on the merits, the balance of harms favors granting preliminary injunctive relief. *Id*. In summary, as argued in the Motion, the probable success on the merits prong is determinative. If Plaintiffs have established their constitutional rights are violated by the Statutes, they have necessarily established the irreparable harm, public interest and balance of the harms prongs.

## XIII.  Conclusion

For the foregoing reasons, Plaintiffs respectfully renew their motion for entry of a preliminary injunction enjoining enforcement of the Ordinance against them.

Respectfully submitted this 20th day of February 2022.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com
Pro Hac Vice

Designated local counsel:
Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington