## DECLARATION OF CLAYTON E. CRAMER

I, Clayton E. Cramer, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1.       I have been asked to review the January 18, 2023, Declaration of Robert Spitzer and render a rebuttal opinion of the matters contained therein.

2.       This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.       I have been retained by the National Association for Gun Rights to render expert opinions in this case. I am being compensated at a rate of $75 per hour.

4.       My rebuttal of the Spitzer Declaration is attached as Exhibit 1.

5.       My CV is attached as Exhibit 2

Clayton E. Cramer
February 10, 2023

EXHIBIT A

## Table of Authorities

### Cases

Aymette v. State, 21 Tenn. (2 Humph.) 154, 158 (1840). ........................................... 50

Cockrum v. State, 24 Tex. 394, 403 (1859). ............................................................. 52

Nunn v. State, 1 Ga. 243, 250, 251 (1846). ............................................................. 51

State v. Buzzard, 4 Ark. 18, 36 (1842) (diss.). ......................................................... 50

State v. Huntly, 418, 420 (N.C. 1843). ..................................................................... 44

Stromberg v. California, 283 U.S. 359 (1931) ........................................................... 6

### Statutes

1 Laws of the Commonwealth of Massachusetts 36-7 (1807) .................................... 40

1927 Cal. Sess. Laws ch. 552 at 938 ....................................................................... 24

1933 Cal. Stat. 1169, ch. 465 ................................................................................. 10

1933 Haw. Sess. Laws Act 120 at 117 ..................................................................... 27

1933 Wash. Sess. Laws ch. 64 at 335 ...................................................................... 30

A Digest Of The General Statute Laws Of The State Of Texas: To Which Are Subjoined The
Repealed Laws Of The Republic And State Of Texas… Art. 610 (1859). ............................ 52

William Hening, 12 Statutes at Large ch. 21 at 278 (1823) ....................................... 37

### Other Authorities

5 Blackstone's Commentaries 144 (1803). .............................................................. 36

A Decade On, Childers Remembers Hostel Fire Tragedy, Brisbane [Australia] Times, Jun. 23,
2010 ..................................................................................................................... 54

A Family Slain, Kansas City Journal, Mar. 4, 1899, 1 ............................................... 54

A Modern Borgia, Nashville Union and American, Oct. 27, 1868, 1 .......................................... 54

Alex Johnson, A Short History of Vehicles Being Used as Deadly Weapons, NBC News, Jul. 15, 2016 ...................................................................................................................................... 54

Alison Gee, Who first said 'The pen is mightier than the sword'?, BBC, Jan. 9, 2015 ................. 3

All the World Admires Browning, (ad), Life, 4 (Sep. 27, 1954). .................................................. 35

Australian who rammed and killed six pedestrians jailed for life, Reuters, Feb. 21, 2019 .......... 54

Bonus Expeditionary Forces March on Washington, National Park Service .............................. 23

Browning Automatic Shotguns (ad), Outdoor America 83 (Aug. 1927). ..................................... 7

Candace Sutton, Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears, [U.K.] Daily Mail, Sep. 8, 2014 ............................................................................................ 54

Clayton E. Cramer, Lock, Stock, and Barrel: The Origins of American Gun Culture (2018). .... 33

Clayton E. Cramer, Mental Illness and the Second Amendment, 46 Conn. L.R. 4:1301 (2014). 53

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012) ....................................................................................................... 53

Colt: "The World's Right Arm" (ad), 14 Hardware World: Plumbing & Heating 19 (1919) ........ 8

Crack Flyer Jumps Track, [De Kalb, Illinois] Daily Chronicle, Mar. 17, 1941, 1 ...................... 54

David Mercer, Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people, Sky News, Sep. 5, 2022 ......................................................................... 54

Defendant's Opposition To Plaintiffs' Motion For Preliminary Injunction, Baird v. Becerra 10 (2021). .................................................................................................................................... 37

Donald L. Ware, Remington Army and Navy Revolvers: 1861-1888 xvii (2007). ..................... 34

Eric Fein, Weapons, Gear, and Uniforms of the Civil War 18-19 (2012). .................................. 34

Fate Saves Scores in Blast When Maniac's Plot Kills 43, [Washington, D.C.] Evening Star, May 19, 1927, 1 .................................................................................................................. 54

FBI, Crime in the United States, Expanded Homicide Data Table 1 ............................................ 3

FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf ....................................................................................................... 54

FBI, Oklahoma City Bombing ...................................................................................... 54

Five Battered With An Axe, [Keokuk, Ia.] Daily Gate City, Oct. 17, 1911, 1 ............................. 54

Freund & Bro. (ad), Cheyenne [Dakota Territory] Leader, May 16, 1868, 2 ............................... 32

Greg Botelho and Joe Sterling, FBI: Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill, CNN, ...................................................................................... 33

*How to Escape the Draft*, NEW YORK TIMES, https://archive.nytimes.com/www.nytimes.com/learning/general/onthisday/harp/0801.html ... 3

Ian McCullum, Mannlicher 1885 Semiauto Rifle, ForgottenWeapons.com, May 6, 2015 .......... 31

Jamelle Wells, Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop, ABC [Australia], May 12, 2014 .......................................................................... 54

James E. Severn, Colt Firearms: 1836-1954 267, 269 (1954). ................................................ 31

James H. Willbanks, Machine Guns: An Illustrated History of Their Impact 23 (2004). .............. 2

James Madison, Federalist 46 .................................................................................... 23

Japan marks 25 years since deadly Aum sarin attack on Tokyo subway, Japan Times, Mar. 20, 2020 ......................................................................................................... 54

Jason Van Rassel, Police officer's son charged in city's worst mass murder, Calgary [Alberta] Herald, Apr. 17, 2014 ............................................................................... 54

Jonathan Pearlman, Eight Children Murdered In Mass Stabbing In Australia, [U.K.] Telegraph, Dec. 19, 2014 ........................................................................................................... 54

Judith Cummings, Kin of Suspect Defiant and Contrite, *New York Times*, Dec. 11, 1987 .......... 54

Katherine McLean Brevard, The Story of Guns: How They Changed the World 34 (2010)......... 2

Lauren del Valle, Ray Sanchez and Eric Levenson, Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says, CNN, January 9, 2023............... 54

Lever action rifle speed loader DiY, https://youtu.be/F6gGA13AwME ...................................... 33

Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras, [Chicago, Ill.] The Day Book, Dec. 2, 1911, 1 ......................................................................................................... 54

Mass killing database: Revealing trends, details and anguish of every US event since 2006, USA Today, Jan. 27, 2023 ................................................................................................................ 3

Melissa Espana, Sam Charles, Ben Bradley, Sean Lewis, Andy Koval, Kelly Davis, Alleged Highland Park parade shooter charged with 7 counts of first-degree murder, WGN: Jul. 5, 2022 ..................................................................................................................................... 2

Metropolitan Museum of Art, Notable Acquisitions: 1983-1984 25 (1984). .............................. 33

Mystery of 30 Axe-Murders is Believed Near Its Solution, Albuquerque Morning Journal, Mar. 22, 1915, 1.............................................................................................................................. 54

Nathan Gorenstein, The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World 119 (2022). .................................................................... 31

National Firearms Act, Hearings Before The Committee On Ways And Means House Of Representatives, 73rd Cong.. 2nd sess. 13 (1934)........................................................................ 5

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings, October, 1989, 19............................................................. 1

Nice attack: Trial for Bastille Day massacre which killed 86 begins, BBC, Sep. 5, 2022 ........... 54

Our Martial Pistols, Antiques 220-3 (Nov. 1922) ........................................................................ 34

Our Twenty-Two Automatics, Hunter-Trader-Trapper 50 (Apr. 1919). ........................................ 7

Phil Luciano, 9-year-old arraigned on murder charges in deadly Goodfield arson fire, Peoria
Journal Star, Oct. 21, 2019 ..................................................................................................... 54

Public Mass Shootings in the United States: Selected Implications for Federal Public Health and
Safety Policy, Congressional Research Service 2 (2013) ........................................................ 3

Ralph Blumenthal, Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron;
Worst New York Fire Since 1911, New York Times, Mar. 26, 1990 ...................................... 54

Robert Foyle Hunwick, Why Does China Have So Many School Stabbings?, New Republic, Nov.
2, 2018 ................................................................................................................................... 54

Seven Detectives and Three Miners Dead, Seattle Star, Jul. 26, 1912, 1 ...................................... 54

Stephen P. Halbrook, 62 Tennessee Law Review 597, 601 (Spring, 1995) ................................... 4

The Colt Automatic Pistol, Arms and Explosives 144 (Sep. 1900) ................................................ 31

Toronto is the most recent of many deliberate attacks involving vehicles, USA Today, Apr. 23,
2018 ........................................................................................................................................ 54

Victory Colt (ad), Arms and the Man 140 (Nov. 1, 1919) ............................................................... 7

Winchester Repeating Rifles (ad), [Jackson, Miss.] Daily Clarion, Jul. 4, 1868, 1, ..................... 32

Winchester Repeating Rifles (ad), Wilmington [N.C.] Journal, Nov. 13, 1868, 1. ........................ 32

Winchester's Repeating Rifles (ad), Baton Rouge [La.] Tri-Weekly Gazette & Comet ............... 32

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North
Carolina, iii (1792) ................................................................................................................. 41

1. This Rebuttal Declaration to Prof. Spitzer demonstrates errors of fact, including misrepresentations of the statutes at the cited locations. Because these false and misrepresented statutes are so widespread, and some are at the Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," where they show up on Google searches, I have included images of the printed title pages and statutes.

## I. INTRODUCTION

2. The current effort to restrict semiautomatic rifles of an often military appearance and what defendants call Large Capacity Magazines (LCMs) started after a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment, ended his suffering by committing mass murder with an AK-47 pattern rifle. Tragically, he received a Social Security Disability check which enabled him to remain homeless while buying guns and ammunition. As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[1]

This is an especially painful paragraph for me. My smarter, older brother's spiral down into schizophrenia resulted in brushes with law but never with such a horrible ending. It was still a life wasted by California's confused and irrational mental health policy, one which spread across the country in the 1970s. Early news reports concerning the Highland Park mass murderer suggest that he might well have benefitted from treatment: "Police removed 16 knives, a dagger and a

---

[1] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

sword after a family member reported that [alleged murderer] was going to "kill everyone."[2]  Of course, mental health treatment costs money, unlike drawing chalk marks around bodies, postmortems, counseling for the survivors, and lawsuits defending laws passed in reaction to unimaginable horror.

3. At ¶13: "While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,": This is incorrect as to origin.   Puckle first demonstrated his gun to the British military in 1718.  "It could fire nine shots per minute at time when the standard musket could be loaded and fired only once or twice per minute."  Its failure to become widely manufactured was "because British gunsmiths at the time couldn't make the many complicated parts."[3]  "As rudimentary and clumsy as it seemed, Puckle's gun is a direct ancestor of the modern machine gun….  [A]t a public trial held in 1722, the gun was able to fire 63 shots in seven minutes in the midst of a driving rainstorm, an amazing feat for the period."[4]  At ¶36, Spitzer claims, "This weapon "never advanced beyond the prototype stage."  There seems to be question about that: "There is some evidence that the Duke of Montagu purchased two of the guns, using them to arm his expedition to colonize the West Indies, but there is no record that they were actually used."[5]

4. At ¶13 "[The Gatling Gun] and its successors were military weapons designed to be used in combat…"  During the New York City Draft Riots of 1863, mobs threatened abolitionist newspapers:

---

[2] Melissa Espana, Sam Charles, Ben Bradley, Sean Lewis, Andy Koval, Kelly Davis, *Alleged Highland Park parade shooter charged with 7 counts of first-degree murder*, WGN: Jul. 5, 2022, https://wgntv.com/news/highland-park-parade-shooting/charges-to-be-announced-in-highland-park-mass-shooting/, last accessed January 30, 2023.
[3] Katherine McLean Brevard, THE STORY OF GUNS: HOW THEY CHANGED THE WORLD 34 (2010).
[4] James H. Willbanks, MACHINE GUNS: AN ILLUSTRATED HISTORY OF THEIR IMPACT 23 (2004).
[5] Id.

> At Newspaper Row, across from City Hall, Henry Raymond, owner and editor of *The New York Times*, averted the rioters with Gatling guns, one of which he manned. The mob, instead, attacked the headquarters of abolitionist Horace Greeley's *New York Tribune* until forced to flee by the Brooklyn Police.[6]

It appears the New York Times editor was not completely persuaded of Edward Bulwer-Lytton's "The pen is mightier than the sword."[7]

5. Prof. Spitzer acknowledges at ¶15: "Guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally…" Also at ¶19: "Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few very sensational news reports of their criminal use received widespread and extensive attention in newspapers across the country."

6. This is much like today. The Northeastern University/USA Today mass murder database tracks every mass murder from 2006 to the present. "Semiautomatic handguns are far more common in mass killings than guns that are typically classified as assault weapons. According to Fox, handguns are easily concealable and some can be equipped with large-capacity magazines. In this database, the long guns category includes any gun larger than a handgun, including rifles and shotguns."[8]

7. Mass murders are a fraction of 1% of all U.S. murders[9] but they are click-bait for dying, legacy news organizations and therefore receive very high coverage. If they involve an "assault

---

[6] *How to Escape the Draft*, NEW YORK TIMES, https://archive.nytimes.com/www.nytimes.com/learning/general/onthisday/harp/0801.html, last accessed December 13, 2022.
[7] Alison Gee, Who first said 'The pen is mightier than the sword'?, BBC, Jan. 9, 2015.
[8] *Mass killing database: Revealing trends, details and anguish of every US event since 2006*, USA TODAY, Jan. 27, 2023.
[9] See *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, CONGRESSIONAL RESEARCH SERVICE 2 (2013) which identified "78 public mass shootings… since 1983" killing almost 550. By comparison, there were 12,253 murders (single or mass) in 2013 alone. FBI, Crime in the United States, Expanded Homicide Data Table 1, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_1_murder_victims_by_race_and_sex_2013.xls, last accessed January 28, 2023.

weapon," even more so. Media attention helps unstable people to identify what sort of weapon to use for maximum attention when they decide to go out in a blaze of infamy.

## II.     State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

8. This entire section of Spitzer's declaration is irrelevant because of the 1868 cut off date set in Bruen, but is worthy of examination for what it tells of us the accuracy of his work. In ¶ 21, Spitzer suggests that state machine-gun laws adopted "between 1925 and 1933" played some part in pushing Congress to pass the Mailing of Firearms Act of 1927 to "restrict the interstate shipment of guns." The Mailing of Firearms Act has a somewhat different origin, unrelated to machine guns.

> Senator John K. Shields, a Tennessee Democrat, introduced a bill in the United States Congress to prohibit the shipment of pistols through the mails and by common carrier in interstate commerce. Shields inserted into the record a report which supported his bill based on the following:
>
>> Can not we, the dominant race, upon whom depends the enforcement of the law, so enforce the law that we will prevent the colored people from preying upon each other? . . .
>>
>> Here we have laid bare the principal cause for the high murder rate in Memphis— the carrying by colored people of a concealed deadly weapon, most often a pistol. . . .
>>
>> It is unspeakable that there is public sentiment among the whites that negroes should not be disturbed in their carrying of concealed weapons. . . .[10]

9. Spitzer at ¶¶25-26 quotes approvingly Attorney General Cummings testimony before the Ways and Means Committee concerning the National Firearms Act (1934), but seems to have missed a revealing discussion between Cummings and members of the Committee:

> Mr. McCLINTIC. I would like to ask just one question. I am very much interested in this subject. What in your opinion would be the constitutionality of a provision added to this bill which would require registration, on the part of those who now own the type or class of weapons that are included in this bill?

---

[10] Stephen P. Halbrook, 62 TENNESSEE LAW REVIEW 597, 601 (Spring, 1995) quoting 65 Cong. Rec. 3945, 3946 (1924)

Attorney General CUMMINGS. We were afraid of that, sir.

Mr. MCCLINTIC. Afraid it would conflict with State laws?

Attorney General CUMMINGS. I am afraid it would be unconstitutional.[11]

The proponent of a machine gun regulatory law argued that requiring just *registration* was unconstitutional.  Imagine his reaction to the Highland Park ordinance!

10. A bit further into the discussion:

Mr. LEWIS. Now a very brief statement on this subject: Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various States; there is a legal theory upon which we prohibit the carrying of weapons — the smaller weapons.

Attorney General CUMMINGS. Of course we deal purely with concealable weapons. Machine guns, however, are not of that class.

Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

Mr. LEWIS. I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

Attorney General CUMMINGS. Oh, we do not attempt to escape it.  We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say "We will tax the machine gun" and when you say " the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.

Mr. LEWIS. In other words, it does not amount to prohibition, but allows of regulation.[12]

The Attorney General of the United States sought a law to deal with a very real problem, organized crime and the much less organized gangs such as John Dillinger and Bonnie & Clyde, and yet he thought the Constitution prohibited the national government from banning private ownership of machine guns!  Nor did Cummings disagree with Rep. Lewis' belief that the "right to carry arms" imposed some restriction.   If Rep. Lewis was not referring to the Second

---

[11] National Firearms Act, Hearings Before The Committee On Ways And Means House Of Representatives, 73rd Cong.. 2nd sess. 13 (1934).
[12] *Id.,* at 19.

Amendment, to what *was* he referring? Rep. Lewis' lack of understanding why the "right to carry arms" did not apply to the states reflects the Court's hesitant steps towards incorporation of the Bill of Rights to the states. Bruen has clearly incorporated those rights, and it is hard to see any amendments to the Constitution between 1868 and 1934, or from 1934 to today, that could change Attorney General Cummings concerns. By Spitzer's reasoning statutes such as California's red flag law overturned in Stromberg v. California (1931)[13] would still be valid, and Highland Park could ban symbols of Communism.

11. Spitzer at ¶26 observes that the "the original version of the bill [the National Firearms Act] proposed regulating both semi-automatic and fully automatic firearms." What Congress *passed* limited regulation to automatic weapons and short-barreled rifles and shotguns, suppressors, and a few other exotic weapons. (An NRA letter writing campaign to prevent regulation of semiautomatic weapons seems to have been the reason.) Automatic weapons are not within the ambit of the Highland Park ordinance.

12. Much of the rest of Spitzer's declaration regarding state laws is irrelevant because of the 1868 limiter set by Bruen, but I examine his citations to demonstrate that he is not an expert. In n. 42, he acknowledges that he has relied on Duke Law Center for Firearms Law, "Repository of Historical Gun Laws." This would be a fine *starting* point for research; looking up the cited statutes would show him how much of the data in that repository is either false or taken out of context.[14]

---

[13] Stromberg v. California, 283 U.S. 359 (1931).

[14] Example: 1821 Me. Laws 285, ch. 76, § 1 appears in Duke Center for Firearms Law at https://firearmslaw.duke.edu/laws/1821-me-laws-285-ch-76-%C2%A7-1/, last accessed January 28, 2023. Compare the text to https://archive.org/details/actsresolvespass179495mass/page/436/mode/2up which shows the actual pages. Page 436 begins in the middle of Chap. 68, "An Act to Enable Sheriffs, Deputy Sheriffs, & Constables, to Require Aid in the Execution of Their Respective Offices in Criminal Cases," and starts Chap. 69: "An Act for Recording Births and Deaths by the Clerks of Towns & Districts." There is no § 1 anywhere on that page.

13. Spitzer at ¶27 points to state regulation of semiautomatic firearms and cites a Florida ban on *hunting* with automatic guns. Hunting often involves regulations much more restrictive than private ownership and use. More importantly, the citation clearly distinguishes automatic guns from semiautomatic guns.

14. Spitzer at ¶26 claims that ten states plus D.C. restricted semi-automatic weapons. But buried in n. 34, he acknowledges "The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons." This ambiguity might reflect that advertising of the 1920s still used "automatic" to refer to semi-automatic guns.[15] "Automatic" was sometimes a careless way to convey the more precise word "autoloader."[16] Even today, some older shooters will slip into the older terminology to describe semi-automatic handguns (*e.g.*, "Colt automatic").

15. Spitzer at ¶28 points to state regulation of semiautomatic firearms as an argument for the constitutionality of Highland Park's ordinance. He also claims, "By that time [the 1920s], gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices." But at *least* as early as 1919, Colt was advertising the "COLT AUTOMATIC PISTOL" with evidence of its success in the "Civilian Individual Pistol Match… Open to any civilian, any arm caliber .38 or larger permitted… Won by A.P. Lane with a .45 Colt Automatic Pistol."[17] A 1919 catalog from HARDWARE WORLD: PLUMBING & HEATING advertised: "Colt 'The World's

---

[15] *Browning Automatic Shotguns* (ad), OUTDOOR AMERICA 83 (Aug. 1927).
[16] *Our Twenty-Two Automatics*, HUNTER-TRADER-TRAPPER 50 (Apr. 1919).
[17] *Victory Colt* (ad), ARMS AND THE MAN 140 (Nov. 1, 1919).

Right Arm'… Colt Automatic Pistols and Colt Revolvers are being supplied to the trade as fast as possible."[18]

16. Spitzer at ¶30 lists states that adopted magazine capacity limits.  1933 Cal. Stat. 1169… ch. 465, §§ 1, 8."  The actual statute has no such limits.  It is a machine gun licensing law.

### STATUTES OF CALIFORNIA

PASSED AT THE

FIFTIETH SESSION OF THE LEGISLATURE

—

---

[18] *Colt: "The World's Right Arm"* (ad), 14 Hardware World: Plumbing & Heating 19 (1919).

## CHAPTER 450.

*An act to amend sections 1, 2, 3, 6, and 7 of an act entitled* Stats. 1927.
*"An act regulating the sale, offering for sale, possession or* p. 938,
*transportation of machine rifles, machine guns and sub-* amended
*machine guns, and providing a penalty for the violation
thereof," approved May 16, 1927.*

[Approved by the Governor May 20, 1933. In effect August 21, 1933.]

*The people of the State of California do enact as follows:*

SECTION 1.   Section 3 of the act cited in the title hereof is Stats. 1931.
hereby amended to read as follows:                             p 2205

Sec. 3.   It shall be lawful for the Superintendent of the Permits re
Division of Criminal Identification and Investigation of the machine guns
Department of Penology to issue permits for the possession
and transportation or possession or transportation of such
machine guns, upon a showing satisfactory to him that good
cause exists for the issuance thereof to the applicant for such
permit; provided, that no permit shall be issued to a person
who is under twenty-one years of age.

---

1170                 STATUTES OF CALIFORNIA              [Ch. 450

Stats 1931    SEC. 2.   Section 1 of said act is hereby amended to read as
p. 2205.   follows:

Possession       Section 1.   On and after the date upon which this act takes
or sale of   effect every person, firm or corporation, who within the State
machine
guns   of California sells, offers for sale, possesses or knowingly trans-
ports any firearms of the kind commonly known as a machine
gun, except as herein prescribed, is guilty of a public offense
and upon conviction thereof shall be punished by imprison-
ment in the State Prison not to exceed five years or by a fine
not to exceed five thousand dollars or by both such fine and
imprisonment.

Exceptions.       Provided, however, that nothing in this act contained shall
prohibit the sale to, purchase by, or possession of such firearms
by police departments and members thereof, sheriffs, and city
marshals, or the military or naval forces of this State or of
the United States for use in the discharge of their official
duties.

Stats 1927.   SEC. 3.   Section 2 of said act is hereby amended to read
p. 938.   as follows:

9

Stats 1927,
p. 938.

Machine
gun defined.

SEC. 3. Section 2 of said act is hereby amended to read as follows:

Sec. 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

Stats 1931,
p. 2203

Revocation
of permits

SEC. 4. Section 6 of said act is hereby amended to read as follows:

Sec. 6. Permits issued in accordance with this act may be revoked by the issuing authority at any time when it shall appear that the need for such firearms has ceased or that the holder of the permit has used such firearms for purposes other than those allowed by the permit or that the holder of the permit has not exercised great care in retaining custody of any weapons possessed under the permit.

Stats 1931,
p. 2203

Licenses
to sell

SEC. 5. Section 7 of said act is hereby amended to read as follows:

Sec. 7. The Superintendent of the Division of Criminal Identification and Investigation of the Department of Penology may also grant licenses in a form to be prescribed by him effective for not more than one year from the date of issuance, to permit the sale at the place specified in the license of such firearm subject to all of the following conditions, upon breach of any of which the license shall be revoked:

Conditions

1. Such business shall be carried on only in the place designated in the license.

2. Such license or a certified copy thereof must be displayed on the premises in a place where it may easily be read.

Ch. 451]                    FIFTIETH SESSION                    1171

3. No such firearm shall be delivered to any person not authorized to receive the same under the provisions of this act.

4. A complete record must be kept of sales made under the authority of the license, showing the name and address of the purchaser, the descriptions and serial numbers of the weapons purchased, the number and date of issue of the purchaser's permit, if any, and the signature of the purchaser or purchasing agent. This record shall be open to the inspection of any peace officer or other person designated by the Superintendent of the Bureau of Criminal Identification and Investigation.

<sub>—</sub>                                                                 19

§ 2 requires a firearm to be *both* a machine gun as well as fed by a magazine exceeding ten rounds to fall within ch. 450, sec. 2. If this law banned magazine-fed semiautomatics, why California's need to pass the Assault Weapons Control Act (1989)?

[19] 1933 Cal. Stat. 1169, ch. 465

17. "1927 Mass. Acts 413, 413-14;"

# ACTS

### AND

# RESOLVES

#### PASSED BY THE

# General Court of Massachusetts

##### IN THE YEAR

# 1927

###### TOGETHER WITH

RETURNS OF VOTES UPON CONSTITUTIONAL AMENDMENT
AND QUESTIONS SUBMITTED TO VOTERS, TABLES
SHOWING CHANGES IN THE STATUTES, ETC.

PUBLISHED BY THE
SECRETARY OF THE COMMONWEALTH



BOSTON
WRIGHT & POTTER PRINTING COMPANY
1927

vent the state treasurer from deducting at any time, from *Deduction of tax from money due from commonwealth.* any moneys which may be due from the commonwealth to the delinquent city or town, the whole or any part of said tax, with the interest accrued thereon, which shall remain unpaid.          *Approved April 27, 1927.*

---

AN ACT RELATIVE TO THE CHOICE OF A THIRD MEMBER OF THE STATE BOARD OF RETIREMENT.          *Chap.*325

*Whereas,* The deferred operation of this act would in *Emergency preamble.* part defeat its purpose, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted, etc., as follows:*

Chapter ten of the General Laws is hereby amended by *G. L. 10, § 18, amended.* striking out section eighteen and inserting in place thereof the following: — *Section 18.* There shall be a state board *State board of retirement, members, election.* of retirement serving in the department, consisting of three members, one of whom shall be the state treasurer, ex officio, who shall be chairman, a second member elected by the state retirement association established under section two of chapter thirty-two from among their number in such manner as the commissioner of insurance may determine, and a third member chosen by the other two. If the third member is not so chosen within thirty days after the election of the second, the governor shall appoint the third member for a term of three years. Upon the expiration of the term *Expirations and vacancies.* of office of an elected, chosen or appointed member or in case of a vacancy in either of said offices, his successor shall be elected, chosen or appointed as aforesaid for three years.          *Approved April 27, 1927.*

---

AN ACT RELATIVE TO MACHINE GUNS AND OTHER FIREARMS.          *Chap.*326

*Be it enacted, etc., as follows:*

SECTION 1. Chapter one hundred and forty of the *G. L. 140, § 121, etc., amended.* General Laws, as amended in section one hundred and twenty-one by section one of chapter four hundred and eighty-five of the acts of nineteen hundred and twenty-two, is hereby further amended by striking out said section one hundred and twenty-one and inserting in place thereof the following: — *Section 121.* In sections one hundred and *Definition of "firearms."* twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breech, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small *Definition of "machine gun."* arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action,

13

414        ACTS, 1927. — CHAP. 326.

shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty-one B. As used in this section and in sections one hundred and twenty-two to one hundred and thirty-one A, the words "purchase" and "sale" shall include exchange, the word "purchaser" shall include exchanger, and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense. Said sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, shall not apply to antique firearms incapable of use as firearms nor to sales of firearms at wholesale.

SECTION 2. Said chapter one hundred and forty, as amended in section one hundred and twenty-three by section four of said chapter four hundred and eighty-five, by section one of chapter two hundred and eighty-four of the acts of nineteen hundred and twenty-five and by section one of chapter three hundred and ninety-five of the acts of nineteen hundred and twenty-six, is hereby further amended by striking out said section one hundred and twenty-three and inserting in place thereof the following: — *Section 123.* The license shall be expressed to be and shall be subject to the following conditions: First, That the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be strictly adhered to. Second, That every licensee shall before delivery of a firearm make or cause to be made a true entry in a sales record book to be furnished by the licensing authorities and to be kept for that purpose, specifying the description of the firearm, the make, number, whether single barrel, magazine, revolver, pin, rim or central fire, whether sold, rented or leased, the date and hour of such delivery, and shall, before delivery as aforesaid, require the purchaser, renter or lessee personally to write in said sales record book his full name, sex, residence and occupation. The said book shall be open at all times to the inspection of the licensing authorities and of the police. Third, That the license or a copy thereof, certified by the recording officer of the licensing authorities or by the clerk of the town by which it is issued, shall be displayed on the premises in a position where it can easily be read. Fourth, That no firearms shall be displayed in any outer window of said premises or in any other place where they can readily be seen from the outside. Fifth, That the licensee shall, once a week, send a copy of the record of sales, rentals and leases made by him for the preceding seven days to the licensing authorities and to the commissioner of public safety. Sixth, That every firearm shall be delivered securely wrapped and fastened and shall be unloaded when delivered. Seventh, That no delivery of a pistol or revolver shall be made on the day of application for the purchase, rental or lease thereof, except to a person having a license to carry the

*(marginal notes:)* Words "purchase" and "sale" to include exchange, word "purchaser" to include exchanger, and verbs "sell" and "purchase" to include verb exchange. Sections not applicable to certain firearms. G. L. 140, § 123, etc., amended.

Conditions of license to sell, rent or lease certain firearms.

Chap. 326 defines machine gun as "which operates automatically after the first shot is fired." This is a machine gun. There is no specification of magazine capacity here.

18. At least a *few* of the citations are correct. "1927 Mich. Pub. Acts 887, 888" is an index:



The statute that Spitzer miscited is 1927 Mich. 669:



It prohibits sale or possession of "any machine gun or firearm which can be fired more than sixteen times without reloading…" Mich. Pub. Acts 1929, Act No. 206" revises the 1927 statute but retains the 16-round limit.[20]

19. "1933 Minn. Laws 231, 232":

---

[20] Mich. Pub. Acts 1929, Act No. 206.

# SESSION LAWS

OF THE

# STATE of MINNESOTA

PASSED DURING THE

## FORTY EIGHTH SESSION

OF THE

## STATE LEGISLATURE

AT THE SESSION COMMENCING
JANUARY 3, 1933

———

PUBLISHED BY
MIKE HOLM
SECRETARY OF STATE

---

corrected thereby, and shall be certified by the proper officers of the municipality as to authorization and by an engineer or surveyor as to correctness, and the signatures of such persons shall be acknowledged in like manner as a deed.

Such plat or plats when so certified and acknowledged may be filed in the office of the register of deeds and the declaration thereon may be recorded at length in a "Book of Plat Certificates"; and when so filed and recorded such plat or plats and declaration together with the record thereof shall be prima facie evidence in all matters shown or stated therein as to the lands covered thereby.

This act shall not apply to a city whose charter provides for official supervision of plats by municipal officers, commission or board.

Approved April 10, 1933.

———

CHAPTER 189—H. F. No. 166

*An act to amend Mason's Minnesota Statutes of 1927, Section 7456, relating to renewal of corporate existence.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Publication of notices of renewal of corporate existence.**—That Mason's Minnesota Statutes of 1927, Section 7456, be amended so as to read as follows:

"7456. No such resolution shall take effect until a duly certified copy thereof shall have been filed, recorded, and published in the same manner as its original certificate. *Provided, that in the case of a co-operative association, it shall not be necessary to publish said resolution.*"

Approved April 10, 1933.

———

CHAPTER 190—H. F. No. 189

*An act making it unlawful to use, own, possess, sell, control or transport a "machine gun", as hereinafter defined, and providing a penalty for the violation thereof.*

---

17

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Definitions.**—(a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of this Act.

(b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accomodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act.

(c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the name shall be a machine gun within the provisions of this Act.

Sec. 2. **Application.**—This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted of or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not useable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or preserving peace, while said person so summoned is engaged in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota.

Sec. 3. **Machine guns prohibited.**—Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

Approved April 10, 1933.

---

CHAPTER 191—S. F. No. 336

*An act to amend Mason's Minnesota Statutes of 1927, Section 646 relating to claims against counties.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Claims against county—appeal.**—That Mason's Minnesota Statutes of 1927, Section 646, be amended to read as follows:

"646. When any claim against a county is disallowed by the board in whole or in part, a claimant may appeal from its decisions to the district court by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after *written notice mailed to said claimant by the county auditor showing the disallowance of said claim* and giving security for costs, to be approved by the auditor, who shall forthwith notify the county attorney thereof. When any claim against a county shall be allowed in whole or in part by such board, no order shall be issued in payment of the same, or any part thereof until after fifteen days from date of the decision; and the county attorney may, on behalf and in the name of such county, appeal from such decision to the district court, by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after date of the decision appealed from; or any seven taxpayers of the county may in their own names appeal from such decision, to the district court by causing a written notice of appeal stating the grounds thereof to be filed in the office of the auditor within fifteen days after the date of the decision appealed from, and giving to the claimant security for his costs and disbursements to be approved by a judge of the district court; and thereafter no order shall be issued in payment of any such claim until a certified copy of the judgment of the court shall be filed in the office of the auditor. Upon the filing of such notice of appeal, the court shall acquire jurisdiction of the parties and of the subject matter, and may compel a return to be made as in the case of an appeal from a judgment of a justice of the peace.

Approved April 10, 1933.

This law defines machine guns to include "any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges." The phrase "capable of loading" seems to mean semiautomatic firearms. However, this only includes semiautomatic firearms if "said firearm shall have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers thereof, or by the addition of any other device capable of increasing the magazine capacity thereof…"[21] Any gun that came with a factory LCM would be outside this definition of machine gun. It seems arguable that a larger magazine that could be used with a firearm without modification of that arm would qualify. It is *not* a magazine size limit.

20. "1933 Ohio Laws 189":

---

[21] Minn. Sess. Laws (1933), ch. 190 at 231-3.



Machine gun includes "any firearm which shoots more than eighteen shots semi-automatically." It includes a definition of semi-automatically that conforms to the current definition.

21. "1927 R.I. Pub. Laws 256":

20

ACTS AND RESOLVES

PASSED BY THE

GENERAL ASSEMBLY

OF THE

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS

AT THE

JANUARY SESSION, A. D. 1927

STATE OF RHODE ISLAND, ETC.
OFFICE OF THE SECRETARY OF STATE, 1927

PAWTUCKET, R. I.
THE AUTO PRESS, PRINTERS
1927

256     JANUARY SESSION, 1927—CHAPTER 1052.

CHAPTER 1052.

H 779 A
Approved
April 22, 1927.

AN ACT TO REGULATE THE POSSESSION OF FIREARMS.

*It is enacted by the General Assembly as follows:*

Certain words
and phrases,
how construed.

SECTION 1. When used in this act the following words and phrases shall be construed as follows:

"Pistol."

"Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only.

"Machine gun."

"Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

"Firearm."

"Firearm" shall include any machine gun or pistol.

"Person."

"Person" shall include firm, association or corporation.

"Licensing authorities."

"Licensing authorities" shall mean the board of police commissioners of a city or town where such board has been instituted, the chief of police or superintendent of police of other cities and towns having a regular organized police force, and in towns where there is no chief of police or superintendent of police it shall mean the town clerk who may issue licenses upon the recommendation of the town sergeant;

"Crime of violence."

"Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering.

"Sell."

"Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly."

"Purchase."

"Purchasing."

Machine gun includes semi-automatic guns which shoot more than twelve shots without reloading.

21

22. I was unable to verify "1933 S.D. Sess. Laws 245." I do notice that, assuming the version on p. 28 of Spitzer's declaration is accurate, that the law *seems* to include semiautomatic firearms but the definition is defective.

> § 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device.

Any firearm that fires even two shots by a single trigger pull is an automatic weapon, not a semiautomatic weapon.

23. The same problem applies here. Assuming the version on Spitzer, p. 30 is accurate it seems to include semiautomatic firearms but the definition is defective.

> § 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading.

Any firearm that fires even two shots by a single trigger pull is an automatic weapon, not a semiautomatic weapon. This is a seven-round limit. More interesting is that like the nearly identical South Dakota statue § 3 only prohibits machine gun possession "for offensive or aggressive purpose" and § 4 defines *that* so narrowly that a citizen possessing a machine gun in one's home or business was not unlawful. This is not really a magazine limit except for a rare set of conditions.

24. "47 Stat. 650, 650, 652 (District of Columbia)" points to a magazine limit (12) and applies it to both automatic and semiautomatic weapons. Interestingly, Congress passed it as part of a comprehensive gun law July 8, 1932.[22]

---

[22] 47 Stat. 650, 652

The Bonus Expeditionary Force was at that time encamped in the District of Columbia requesting early Congressional payment of a bonus to veterans. (The Depression was a desperate time for many Americans.) Congress passed this gun law 20 days before the government first sent police to clear out the encampment, then called out the Army to restore order. Several protesters died.

As the Washington Daily News observed: "If the Army must be called out to make war on unarmed citizens, this is no longer America."[23] Madison's warning in *Federalist* 46[24].about the importance of an armed citizenry as a bulwark against an oppressive national government seems quite apropos.

25. Many of the statutes Spitzer cites at n. 40 are hunting statutes, which have always been restrictive to protect wild game, and are not general prohibitions on magazine capacity:

> Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

Magazine capacity limits while hunting do not apply at home or on a shooting range.

26. Spitzer at ¶30 claims "four states restricted all guns that could receive any type of ammo feeding mechanism or round feeding device and fire them continuously in a fully automatic

---

[23] *Bonus Expeditionary Forces March on Washington*, National Park Service, https://www.nps.gov/articles/bonus-expeditionary-forces-march-on-washington.htm, last accessed January 31, 2023.

[24] James Madison, FEDERALIST 46. Madison sought to alleviate the fears of those worried the new Constitution might give a president with inappropriate ambitions the power to enforce his will by military force. "Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands,…"

manner (California, Hawaii, Missouri, and Washington State)." True, but irrelevant to magazine size, and irrelevant to Highland Park's ordinance.

27. Spitzer cites 1927 Cal. Stat. 938; it is another machine gun ban and *not* a magazine limit. "The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically *and* continuously loaded ammunition of any caliber in which the ammunition is fed to such a gun from or by means of clips, disks, drums, belts or other separable mechanical devices." [emphasis added]

## STATUTES OF CALIFORNIA
### PASSED AT THE
### FORTY-SEVENTH SESSION OF THE LEGISLATURE

CHAPTER 552.

*An act to prohibit the possession of machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device, and providing a penalty for violation thereof.*

[Approved by the Governor May 16, 1927. In effect July 29, 1927.]

*The people of the State of California do enact as follows:*

Possession of machine guns.

SECTION 1. On and after the date upon which this act takes effect every person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment.

*Provided, however,* that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

"Machine gun" defined.

SEC. 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

25

---

[25] 1927 Cal. Sess. Laws ch. 552 at 938.

28. Spitzer cites "1933 Haw. Sess. Laws 117" which defines pistol and revolver and in Section 15-A licenses ownership, possession, sale, offering for sale or transport of "any firearm of the kind commonly known as a 'machine gun' or any shell, cartridge, or bomb containing or capable of emitting tear gas or any noxious gas."

# LAWS

### OF THE

## TERRITORY OF HAWAII

#### PASSED BY THE

## SEVENTEENTH LEGISLATURE

---

## REGULAR SESSION
## 1933

---

Commenced on Wednesday, the Fifteenth Day of February,—
and on the Sixtieth Day, the Twenty-sixth Day of April, the
Regular Session was extended by Executive Order
issued by the Governor of the Territory of Hawaii,
Honorable Lawrence M. Judd,—and Ended on
Thursday, the First Day of June.

---

PUBLISHED BY AUTHORITY

---

HONOLULU, HAWAII
HONOLULU STAR-BULLETIN, LTD.
1933

---

## ACT 120

### [S. B. No. 221]

AN ACT TO AMEND ACT 206 OF THE SESSION LAWS OF 1927, BY
AMENDING SECTION 1 THEREOF AND BY ADDING THERETO A
NEW SECTION TO BE KNOWN AS SECTION 15-A REGULATING
THE SALE, TRANSFER AND POSSESSION OF CERTAIN FIRE-
ARMS, TEAR GAS AND AMMUNITION.

*Be it Enacted by the Legislature of the Territory of Hawaii:*

SECTION 1. Act 206 of the Session Laws of 1927 is hereby
amended by amending the first paragraph of Section 1 thereof to
read as follows:

"Section 1. Definitions. 'Pistol' or 'revolver' as used in this
Act means and includes any firearm of any shape whatsoever with
barrel less than twelve inches in length and capable of discharging
loaded ammunition or any noxious gas."

SECTION 2. Said Act 206 of the Session Laws of 1927 is hereby
further amended by adding a new section to be known as Section
15-A to read as follows:

"Section 15-A. Machine gun and tear gas. Except as permitted
under the provisions of this Act, no person, firm or corporation
shall own, possess, sell, offer for sale or transport any firearm of
the kind commonly known as a 'machine gun' or any shell, car-
tridge or bomb containing or capable of emitting tear gas or any
other noxious gas.

"Provided, however, that nothing in this Act contained shall
prohibit the sale to, purchase by, or possession of such firearms by
any city and county, county, territorial, or federal officer where
such firearms are required for professional use in the discharge of
his duties, nor to the transportation of such firearms for or on
behalf of police departments and members thereof, sheriffs, or the

26

TRANSFER OF FIREARMS, TEAR GAS, ETC.   [ACT 120
HIGHWAYS AND IMPROVEMENT DISTRICT
118         ASSESSMENTS IN CITY AND COUNTY.   [ACT 121

military or naval forces of this Territory or of the United States;
and
    "Provided, further, that nothing in this Act shall prohibit police
departments and members thereof, sheriffs, or the military or naval
forces of the Territory or of the United States from possessing
or transporting such shells, cartridges, or bombs for professional
use in the discharge of their duties.
    "The term 'shell, cartridge, or bomb', as used in this Act shall
be construed to apply to and include all shells, cartridges, or bombs
capable of being discharged or exploded through or by the use of
percussion caps, fuses, electricity, or otherwise, when such dis-
charge or explosion will cause or permit the release or emission of
tear gases.  The term 'machine gun' as used in this Act shall be
construed to apply to and include machine rifles, machine guns and
submachine guns capable of automatically and continuously dis-
charging loaded ammunition of any caliber in which the ammuni-
tion is fed to such guns from or by means of clips, disks, drums,
belts or other separable mechanical device."
    SECTION 3.   This Act shall take effect upon its approval.

    Approved this 27th day of April, A. D. 1933.

            LAWRENCE M. JUDD,
        Governor of the Territory of Hawaii.        26

There are no magazine capacity limits.

29. "1929 Mo. Laws 170" uses nearly identical language to 1927 Cal. Stat. 938; there are no magazine limits, only a restriction on machine guns.

---

26 1933 Haw. Sess. Laws Act 120 at 117.



170                    CRIMINAL PROCEDURE

[H. B. 498.]

**CRIMES AND PUNISHMENT: Prohibiting the Sale Delivery,
Transportation, Possession or Control of Machine Rifles,
Machine Guns and Sub-machine Guns, and Providing
Penalty for Violation of Law.**

AN ACT to prohibit the sale, delivery, transportation, possession or control of machine
rifles, machine guns and sub-machine guns capable of automatically and continuously
discharging loaded ammunition of any caliber in which the ammunition is fed to such
guns from or by means of clips, disks, drums, belts or other separable mechanical devices
and providing a penalty for violation thereof.

| SECTION | SECTION |
| --- | --- |
| 1. Unlawful to sell, deliver, transport or have in possession any machine gun. | 2. The term "machine gun" defined. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

**Section 1. Unlawful to sell, transport or
possession any machine gun.**—It shall be unlawful for any person
to sell, deliver, transport, or have in actual possession or control
any machine gun, or assist in, or cause the same to be done.
Any person who violates this act shall be guilty of a felony and
punished by imprisonment in the state penitentiary not less than
two (2) nor more than thirty (30) years, or by a fine not to exceed
five thousand dollars, or by both such fine and imprisonment.
Provided, that nothing in this act shall prohibit the sale, de-
livery, or transportation to police departments or members
thereof, sheriffs, city marshals or the military or naval forces
of this state or of the United States, or the possession and trans-
portation of such machine guns, for official use by the above
named officers and military and naval forces in the discharge of
their duties.

**Sec. 2. The term "machine gun" defined.**—The term
"machine gun" as used in this act shall be construed to apply
to and include all firearms known as machine rifles, machine
guns or sub-machine guns capable of discharging automatically
and continuously loaded ammunition of any caliber in which the
ammunition is fed to such gun from or by means of clips, disks,
drums, belts or other separable mechanical device.

Approved June 1, 1929.

30. "Wash. 1933 Sess. Laws 335" is similar to 1927 Cal. Stat. 938 but with the additional

limitation that it can be "fired therefrom at the rate of five or more shots per second."  I certainly

cannot fire five shots per second from any semiautomatic rifle that I own. This would be 300 rounds per minute, which is automatic weapons speed.

# SESSION LAWS

OF THE

# STATE OF WASHINGTON

TWENTY-THIRD SESSION

Convened January 9, Adjourned March 9

## 1933

Compiled in Chapters
Under the Direction of ERNEST N. HUTCHINSON, Secretary of State,
and Including Five Acts Passed by the People Under the
Initiative Provision of the State Constitution
at the General Election, Held
on November 8, 1932.

Marginal Notes and Index

BY

G. W. HAMILTON

Attorney General

PUBLISHED BY AUTHORITY

CH. 64.]     SESSION LAWS, 1933.     335

## CHAPTER 64.
[S. B. 222.]

MACHINE GUNS.

AN ACT relating to machine guns, regulating the manufacture, possession, sale of machine guns and parts, and providing penalty for the violation thereof, and declaring an emergency.

*Be it enacted by the Legislature of the State of Washington:*

SECTION 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: *Provided, however,* That such limitation shall not apply to any peace officer in the discharge of official duty, or to any officer or member of the armed forces of the United States or the State of Washington. [*margin: Machine guns banned.*] [*margin: Officers.*]

SEC. 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second. [*margin: Definition.*]

SEC. 3. Any person violating any of the provisions of this act shall be guilty of a felony. [*margin: Violation, felony.*]

SEC. 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Wash- [*margin: Declared contraband.*]

```
336                    SESSION LAWS, 1933.         [CH. 65.
Seizure.    ington, to seize said machine gun, or parts thereof,
            wherever and whenever found.
Effective im-    Sec. 5.  This act is necessary for the immediate
mediately.  preservation of the public health and safety, and
            shall take effect immediately.
                 Passed the Senate February 10, 1933.
                 Passed the House February 23, 1933.
                 Approved by the Governor March 6, 1933.
                                                           27
```

31. Spitzer lists 1934 Va. Acts ch. 137 which does indeed define a machine gun to include semi-automatic weapons that can fire more than sixteen shots, but according to Spitzer's p. 31, possession was not illegal unless "for offensive or aggressive purpose."[28] The presumption of such was narrowly drawn, like South Dakota's nearly identical law to allow U.S. citizens to possess such weapons at home in one's business.

## III.    The History of Pre-Twentieth Century Firearms Technologies

32. Spitzer's history of pre-Twentieth Century firearms technology is contradictory and tendentious, often ignoring his own sources' caveats.  He makes much of the lack of commercial success of many early multishot guns, even while admitting that they were immediate predecessors of guns that *were* successes.  At ¶40:

> The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations. But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer. *Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work,* but the actual weapons produced by Volcanic were few, flawed, and experimental, dubbed "radical defects" by Winchester himself. [emphasis added]

At ¶41:

> Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . .  generally attributed to be the first semi-automatic rifle." Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."

---

[27] 1933 Wash. Sess. Laws ch. 64 at 335.
[28]

Yet his source for this claim tells us it was:

> doomed to fail despite Mannlicher's formidable design talents, simply because the cartridge he based it on was the M1877 11mm Austrian black powder round used in the Werndl rifles. Self-loading weapons would not become truly practical in any form until the invention of smokeless powder, which drastically reduced the amount of fouling and residue from each shot.[29]

33. Even having ignored this important explanation for Mannlicher's failure Spitzer claims: "The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military." However, "the first semi-automatic pistol to prove reliable, effective, accurate, and commercially successful—sort of—was invented by Hugo Borchardt… that appeared on the market in 1893."[30] The Belgian gun manufacturer FN licensed John Browning's .32 caliber semiautomatic pistol design, specifically as a civilian self-defense weapon in 1897.[31] A .38 caliber version was reviewed in 1900:

> A certain number of these pistols are on sale in this country, but no final arrangements seem to have been made for handling them in a wholesale way. Probably those on the market have been specially imported from the States or the Continent. Possibly in a short period the Colt Company will be able to regularize the position, so that one may know where to obtain the pistol in a wholesale way from regularly appointed agents.[32]

34. This version was marketed by Colt as "their 'Sporting Model' of 1900." While sold in the commercial market, the U.S. Army and Navy ordered somewhere around 200 combined. Other civilian semiautomatic pistols, included the .38 caliber Pocket Model, the .32 caliber Pocket Model, introduced in 1903, and the .380 Pocket Model and .25 caliber in 1908.[33] (Pocket Model clearly shows Colt intended these for the civilian market.)

35. Spitzer's discussion of semiautomatic firearms development misses the most important question: were repeating firearms available in the period before 1868, the year that Bruen makes

---

[29] Ian McCullum, *Mannlicher 1885 Semiauto Rifle*, ForgottenWeapons.com, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/, last accessed January 30, 2023.
[30] Nathan Gorenstein, THE GUNS OF JOHN MOSES BROWNING: THE REMARKABLE STORY OF THE INVENTOR WHOSE FIREARMS CHANGED THE WORLD 119 (2022).
[31] Id., at 104.
[32] *The Colt Automatic Pistol*, ARMS AND EXPLOSIVES 144 (Sep. 1900).
[33] James E. Severn, COLT FIREARMS: 1836-1954 267, 269 (1954).

clear is one of the limiting dates on interpreting the Second Amendment as incorporated against the states?  As even Spitzer admits at ¶45, Winchester's repeating rifle was "patented in 1860." He attempts to back himself out of this logical contradiction by asserting that the Winchester 1873 "was designed for sale to the Government as a military arm."  While this well might be true for the Model 1873, advertising for the Winchester Repeating Rifle appears throughout the U.S. between 1865 and 1868: "Winchester Repeating Rifles Firing Two Shots a Second As a Repeater,"[34] "Sole Agents for the Whole West for the Celebrated Winchester's Patent Repeating Rifles and Carbines, Firing two shots a second, as a Repeater,… They can be fired Eighteen times in Succession, Without re-loading," offered for sale at $50 for the 18-shot rifle and $40 for the 13-shot carbine;[35] "Winchester Repeating Rifles, Firing Two Shots a Second as a Repeate [*sic*];[36] "Winchester Repeating Rifles,"[37] Some of these advertisements are by gun retailers, some appear to be placed by Winchester seeking dealers.

36. Also at ¶45, Spitzer distinguishes the multishot firearms of the pre-1868 period from modern firearms by, "the Winchester was not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot. And when the gun was emptied, it had to be manually reloaded, one round at a time."  This is a distinction without a difference.  That lever action is among the easiest and simplest mechanisms imaginable; yes, more work than just pulling the trigger again, but I doubt any mass murderer would refuse to use one, or even find that it slowed him down much.  (The Navy Yard mass

---

[34] *Winchester's Repeating Rifles* (ad), BATON ROUGE [LA.] TRI-WEEKLY GAZETTE & COMET, Mar. 10, 1868, 4, May 19, 1868, 4 and May 21, 1868, 4.
[35] *Freund & Bro.* (ad), CHEYENNE [DAKOTA TERRITORY] LEADER, May 16, 1868, 2, Jun. 4, 1868, 3, Aug. 5, 1868, 3, Apr. 23, 1868, 2, Apr. 6, 1868, 2.
[36] *Winchester Repeating Rifles* (ad), [Jackson, Miss.] DAILY CLARION, Jul. 4, 1868, 1, Jul. 1, 1868, 2.
[37] *Winchester Repeating Rifles* (ad), WILMINGTON [N.C.] JOURNAL, Nov. 13, 1868, 1.

murderer used a pump-action Remington 870 shotgun to murder 12.[38]  A pump-action shotgun is no slower than a lever action rifle to fire and reload.)  Two shots per second is 120 shots per minute, well above the rate most shooters can expect to accurately fire an AR-15.  Even the supposed disadvantage of not being magazine-fed is less a limitation than it first appears; there are lever action speed loaders.[39]

37.  Arguing that multishot firearms had gone from impractical to commercially unsuccessful, this distinction makes little sense.  In 1868, Congress would have known that high-capacity rifles existed and could fire at least two rounds per second, not dramatically slower than modern semiautomatic firearms.  If they thought this was a reason to rein in the guarantees to be incorporated through the Fourteenth Amendment, they had full capacity to make this distinction.

38. At ¶44: Spitzer claims "The government, in fact, dismissed such firearms as mere 'novelties.'"  His citation is to Pamela Haag's THE GUNNING OF AMERICA (2016), a book so full of factual errors, out of context quotes, citations to non-existent pages in published books, and tendentious reasoning that I wrote an entire book documenting its mistakes.[40]  Reliance on such sources may explain *some* of Spitzer's many factual errors.  "Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, 'Colt's revolver was a sideshow through most of the war…'"  Why, then, is there a Model 1860 U.S. Army revolver in the Metropolitan Museum of Art's Notable Acquisitions catalog?[41]  What explains several pages in a 1922 ANTIQUES magazine of Colt

---

[38] Greg Botelho and Joe Sterling, *FBI: Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill*, CNN, https://www.cnn.com/2013/09/25/us/washington-navy-yard-investigation/index.html, last accessed February 3, 2023.
[39] *Lever action rifle speed loader DiY*, https://youtu.be/F6gGA13AwME, last accessed February 2, 2023.
[40] Clayton E. Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018).
[41] Metropolitan Museum of Art, NOTABLE ACQUISITIONS: 1983-1984 25 (1984).

revolvers, as well as copies of the Colt, purchased by the Army and Navy during the Civil War?[42] "Shortly into the Civil War, the Ordnance Department gave Colt their first order for the 1860 army models, later they received contracts for the same revolvers and eventually delivered over one hundred thousand before losing the contract."[43] Pictures of the Colt Model 1851 Navy Revolver, Model 1861 Revolver, 1860 Army Revolver can be found in works describing Civil War equipment.[44]

39. At ¶55, Spitzer tells us:

> An article in Outdoor Life belied the claim that assault weapons are limited only to firearms that fire fully automatically. That article urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, fullauto, or in three-round bursts.

It is unclear what point Spitzer is trying to make. OUTDOOR LIFE is asserting that assault weapons can fire "fullauto, or in three-round bursts." These would make such weapons machine guns under the National Firearms Act of 1968. Highland Park's ordinance is therefore irrelevant. Perhaps Spitzer does not understand the current laws regulating weapons that can fire "fullauto, or in three-round bursts"?

40. Spitzer at ¶57 asserts that describing magazines that hold more than ten rounds as LCMs is a generally accepted definition. In ¶58-¶59, he points to previous laws, federal and state, that have used this definition. While this is technically true, it is tautological; gun prohibitionists started using this definition in 1989; therefore it is *true*. It is equally valid to observe that the pro-gun side has eschewed the term "assault weapon" for several years in favor of the less emotionally charged and technically more accurate "modern sporting rifle." If all that we need is frequent use

---

[42] *Our Martial Pistols*, ANTIQUES 220-3 (Nov. 1922).
[43] Donald L. Ware, REMINGTON ARMY AND NAVY REVOLVERS: 1861-1888 xvii (2007).
[44] Eric Fein, WEAPONS, GEAR, AND UNIFORMS OF THE CIVIL WAR 18-19 (2012).

of the term to make it generally accepted then "modern sporting rifle" (MSR) is just as valid as using the term LCM. Because firearm magazines larger than ten rounds have been standard equipment in commercially sold pistols, such as the Browning Hi-Power, since at least 1954[45], it is hard to call a standard capacity magazine large, except in some relative sense. Compared to a three-round magazine, a five round magazine could be characterized as an LCM.

## IV. Historical Hardware Restrictions On Knives, Blunt Weapons, Pistols, and Trap Guns in the Eighteenth and Nineteenth Centuries

41. At ¶60, Spitzer attempts to draw parallels between various colonial and Early Republic laws and the Highland Park ordinance. "For example, from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed." The Highland Park ordinance does not require any criminal act as a predicate for criminalization of possession or sale. If Highland Park wished to increase penalties for crimes committed while armed with an Modern Sporting Rifle or a magazine exceeding one round, this would be a fair analogy and would be unobjectionable.

42. "At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge of firearms near populated areas." I would be surprised if existing Illinois statute does not already deal with this safety issue with firearms of any type.

43. "At least four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized public arms carrying." Such laws are irrelevant to the Highland Park ordinance which has no provisions concerning arms carrying. Examining the citation shows a host of errors. "1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays." According to Blackstone, affray is

---

[45] *All the World Admires Browning*, (ad), Life, 4 (Sep. 27, 1954).

the "the fighting of two or more persons in some public place, to the terror of his majesty's subjects."[46]  Arms do not seem to be required to commit affray; fighting, brawling, or quarreling *is* required.  Worse, while I could not find the 1786 Virginia session laws, I was able to find ch. 21 in Hening's STATUTES AT LARGE:

CHAP. 21

An act for giving further time to officers, soldiers, sailors, and marines, to settle their arrears of pay and depreciation, with the auditor of public accounts.



---

[46] 5 BLACKSTONE'S COMMENTARIES 144 (1803).



It appears that Spitzer meant 1786 Va. 334, at ch. 49, which is the Statute of Northampton (1328). The Bruen decision, rejected the relevance of the Statute of Northampton as being a limitation on the wearing of armor, not arms.[48]

44. The California Attorney General made this same incorrect citation to "1786 Va. Laws 33, ch. 21,"as evidence of widespread bans on carrying of arms in Baird v. Becerra (2021).[49]

45. Spitzer cites "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof." This statute prohibits "if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."

---

[47] William Hening, 12 STATUTES AT LARGE ch. 21 at 278 (1823).
[48] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S.Ct. 2111, 2140 (2022).
[49] Defendant's Opposition To Plaintiffs' Motion For Preliminary Injunction, Baird v. Becerra 10 (2021).

THE

# L A W S

OF THE

## Commonwealth of Massachusetts,

FROM

NOVEMBER 28, 1780...TO FEBRUARY 28, 1807.

WITH THE

*CONSTITUTIONS OF THE UNITED STATES OF AMERICA,*
*AND OF THE COMMONWEALTH, PREFIXED.*

IN THREE VOLUMES.

TO WHICH IS ADDED, AT THE END OF THE SECOND VOLUME,

## AN APPENDIX,

CONTAINING ACTS AND CLAUSES OF ACTS, FROM THE LAWS OF THE
LATE COLONY, PROVINCE AND STATE OF MASSACHUSETTS,
WHICH EITHER ARE UNREVISED OR RESPECT
THE TITLE OF REAL ESTATE.

### Published by Order of the General Court.

VOLUME I.

BOSTON:

*PRINTED BY J. T. BUCKINGHAM,*

FOR THOMAS & ANDREWS AND MANNING & LORING.

JUNE, 1807.

### An ACT to prevent Routs, Riots, and tumultuous Affemblies, and the evil Confequences thereof.

**Preamble.**

WHEREAS the provifion already made by law for the preventing routs, riots, and tumultuous affemblies and the evil confequences thereof has been found infufficient :

SECT. 1. *Be it therefore enacted by the Senate and Houfe of Reprefentatives, in General Court affembled, and by the authority of the fame,* That from and after the publication of this Act, if any perfons to the number of twelve, or more, being armed with clubs, or other weapons ; or if any number of perfons, confifting of thirty or more, fhall be unlawfully, routoufly, riotoufly, or tumultuoufly affembled, any Juftice of the Peace, Sheriff or Deputy-Sheriff of the county, or Conftable of the town, fhall, among the rioters, or as near to them as he can fafely come, command filence while proclamation is making, and fhall openly make proclamation in thefe or the like words :

**Proclamation to be made among rioters.**

**Form.**

#### COMMONWEALTH OF MASSACHUSETTS.

BY virtue of an Act of this Commonwealth, made and paffed in the year of our LORD One thoufand feven hundred and eighty-fix, entitled, " An Act for fuppreffing routs, riots and tumultuous affemblies and the evil confequences thereof," I am directed to charge and command, and I do accordingly charge and command all perfons, being here affembled, immediately to difperfe themfelves, and peaceably to depart to their habitations, or to their lawful bufinefs, upon the pains inflicted by the faid Act.

#### GOD fave the COMMONWEALTH

**If the perfons affembled do not difperfe, officers empowered, &c.**

And if fuch perfons, affembled as aforefaid, fhall not difperfe themfelves within one hour after proclamation made, or attempted to be made, as aforefaid, it fhall be lawful for every fuch officer to command fufficient aid, and he fhall feize fuch perfons, who fhall be had before a Juftice of the Peace ; and the aforefaid Juftice of the Peace, Sheriff or Deputy-Sheriff is hereby further empowered to require the aid of a fufficient number of perfons in arms, if any of the perfons affembled as aforefaid fhall appear armed : And if any fuch perfon or perfons fhall be killed or wounded by reafon of his or their refifting the perfons endeavouring to difperfe or feize them, the faid Juftice, Sheriff, Deputy-Sheriff, Conftable and their affiftants, fhall be indemnified and held guiltlefs.

**Penalty for refufing to affift the Sheriff or other officer.**

SECT. 2. *And be it further enacted,* That if any perfon being commanded by fuch Juftice, Sheriff, Deputy-Sheriff or Conftable, as aforefaid, fhall refufe or neglect to afford the affiftance required, and fhall be convicted thereof upon the oath of either of the faid officers fo commanding or other legal evidence, he fhall forfeit and pay a fum not lefs than *Forty Shillings,*

> TAXES.  Nov. 8, An. 1786.  347
>
> *Shillings*, nor exceeding *Ten Pounds*, to be recovered by indictment or presentment before the Supreme Judicial Court or any Court of General Sessions of the Peace, according to the aggravation of the offence; to be paid into the publick treasury for the use of the Commonwealth.
>
> SECT. 3.  *And be it further enacted*, That all persons who, for the space of one hour after proclamation made or attempted to be made, as aforesaid, shall unlawfully, routously, riotously and tumultuously continue together, or shall wilfully let or hinder any such officer, who shall be known or shall openly declare himself to be such, from making the said proclamation, shall forfeit all their lands, tenements, goods and chattels to this Commonwealth, or such part thereof as shall be adjudged by the Justices, before whom such offence shall be tried, to be applied towards the support of the government of this Commonwealth; and shall be whipped thirty-nine stripes on the naked back at the publick whipping-post, and suffer imprisonment for a term not exceeding twelve months nor less than six months; and once every three months during the said imprisonment receive the same number of stripes on the naked back at the publick whipping-post as aforesaid. And if any such person or persons, so riotously assembled, shall demolish or pull down, or begin to demolish or pull down, any dwelling-house or other house or parcel thereof; any house built for publick uses; any barn, mill, malt-house, store-house, shop or ship, he or they shall suffer the same pains and penalties as are before provided in this Act.
>
> *Provided always*, That where there shall appear any circumstances to mitigate or alleviate any of the offences against this Act in the judgment of the Court, before which such offence shall be tried, it shall and may be lawful for the Justices of such Court to abate the whole of the punishment of whipping, or such part thereof as they shall judge proper; any thing in this Act to the contrary notwithstanding.
>
> SECT. 4.  *And be it further enacted*, That this Act shall be read at the opening of every Court of General Sessions of the Peace by the Clerk of the said Court, and at the anniversary meeting of each town within this Commonwealth by the Town-Clerk thereof in *March* or *April* annually: And no person shall be prosecuted for any offence contrary to this Act, unless prosecution be commenced within twelve months after the offence committed.
>
> [This Act passed *October* 28, 1786.]
>
> 50

The predicate conditions demonstrate that the individual carrying of arms in a peaceful, non-riotous manner was not a crime.  And again, Duke Center for Firearms Law is spreading this false claim.[51]

46. "Francois Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, 60-61 (Newbern 1792)" is not, despite an almost session law format, a North Carolina statute at all.  The North Carolina Legislature tasked

---

[50] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 36-7 (1807).
[51] https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/, last accessed January 31, 2023.

Martin to sift through all *existing* British statutes that might have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[52]

 

Martin included the Statute of Northampton (1328):

[52] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).

[ 88 ]

### C H A P.  VIII.

*Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

### C H A P.  XIV.

*None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his household, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by finding of setters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

---

Statutes made at Northampton, tribus Septimanis Pascha, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

### C H A P.  I.

*A Confirmation of the Great Charter and the Charter of the Forest.*

[Unnecessary to be inserted.]

### C H A P.  III.

*No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's



42



Curiously, when the North Carolina Supreme Court decided State v. Huntly (N.C. 1843), a case which charged the defendant under the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here."[53] One might expect that if this statute had been adopted legislatively, as Spitzer claims, that it might have merited mention.

---

[53] State v. Huntly, 418, 420 (N.C. 1843).

47. Spitzer's last source in n. 126 purported to ban public carry: "Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710". This was hard to find. There are multiple copies online, but even when cataloged as volume 1, they all turn out to be volume 2. The only print copy in the U.S., perhaps anywhere, is at UC Berkeley Law Library.







This law intended to suppress "wandering, idle and disorderly persons." It seems to be aimed at "persons who have no apparent means of subsistence, or neglect applying themselves to some honest calling for the support of themselves and families…" Section 6 at 710 is not a ban on carrying of arms but a strange hybrid of language from the Statute of Northampton and a surety bond for good behavior. Failure to provide such a bond, or continuing to "publicly ride or go

45

armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon" was the crime. Carrying done in a way not "to the terror of the people" was not unlawful.[54]

Curiously, this law is not referenced in any of the knife law cases later in the 19th century and I believe that I have figured out why. It appears to have been substantially revised *without* section 6 in 1811:

# LAWS

*Onny C. Armstrong's*

OF THE

# STATE OF TENNESSEE,

INCLUDING THOSE OF

## NORTH CAROLINA

NOW IN FORCE IN THIS STATE.

FROM THE YEAR

1715 **TO THE YEAR 1820, INCLUSIVE.**

BY EDWARD SCOTT,

ONE OF THE JUDGES OF THE CIRCUIT COURTS OF LAW AND EQUITY.

## IN TWO VOLUMES.

### VOL. II.

*KNOXVILLE, TENN.*
PRINTED BY
*HEISKELL & BROWN.*

**1821.**

47



48. At ¶64, in defense of historical restrictions on fighting knives, Spitzer quotes Aymette v. State (Tenn. 1840) that such knives "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." But he seems to have missed the surrounding sentences where the Court explained that the right to keep and bear arms was protected so that citizens "may keep arms to protect the public liberty, to keep in awe those who are in power,

---

55 Judge Edward Scott, 2 LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820, INCLUSIVE 710 (1821).

and to maintain the supremacy of the laws and the constitution." (This is the revolutionary understanding of the Second Amendment, well-articulated in FEDERALIST *46*):

> so the *arms*, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war.[56]

Aymette was not exceptional in this understanding of the right to keep and bear arms as a revolutionary defense against an oppressive government:  Arkansas Supreme Court Justice Lacy echoed Patrick Henry's concerns about the division of "sword and purse" that were heard during the Virginia ratification debates:

> If the Legislature have the custody of the people's arms and the treasury of the State, what becomes of the separation and division of the political powers of the government?  Are not these powers united in the same body of magistracy?  And if this be the case, the balance of the Constitution is overthrown, and the State then possesses no real security for personal liberty.  It is no answer to this argument, to say that the people may abuse the privilege or right of keeping and bearing arms.  The Constitution thought and ordained it otherwise; and therefore it was deemed far safer to entrust the right to their own judgment and discretion, rather than to the will or ambition of the Legislature; and this right was excepted out of the general powers of the government, and declared inviolate.[57]

The repeated refrain that "assault weapons" are "weapons of war" would mean under Aymette's reasoning, the rifles and LCMs to be banned by Highland Park are protected arms (along with other military arms), even if fighting knives were not.

55. I am not done eviscerating[58] ¶64.  "Further, the court added that the state law existed 'to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . .'"  Is existing Illinois law insufficient to punish "wanton and unusual exhibition of arms" and criminal misuse of concealed weapons?

---

[56] Aymette v. State, 21 Tenn. (2 Humph.) 154, 158 (1840).
[57] State v. Buzzard, 4 Ark. 18, 36 (1842) (diss.).
[58] That word chosen *very* deliberately.

49. Spitzer ¶66 quotes Nunn v. State (Ga. 1846) upholding of a concealed carry ban and that the purpose of the law was "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." [emphasis in Nunn] But the rest of the Nunn decision seems to have gone over Spitzer's head:

> The language of the *second* amendment is broad enough to embrace both Federal and State governments—nor is there anything in its terms which restricts its meaning... Is this a right reserved to the *States* or to *themselves*? Is it not an unalienable right, which lies at the bottom of every free government? We do not believe that, because the people withheld this arbitrary power of disenfranchisement from Congress, they ever intended to confer it on the local legislatures. This right is too dear to be confided to a republican legislature.[59]…

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree; and all of this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta!* And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation! [emphasis in the original][60]

The evidence I found when researching concealed carry bans in Georgia revealed a severe public violence problem. Nonetheless, the Georgia Supreme Court delivered a powerful defense of the right to "keep and bear *arms* of every description."

50. Spitzer at ¶67 quotes the Texas Supreme Court's description of a Bowie knife as "an exceeding destructive weapon." The following sentences have a degree of panic that mirrors the current panic about "assault weapons" (and not without reason in either era):

> It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.[61]

---

[59] Nunn v. State, 1 Ga. 243, 250, 251 (1846).
[60] Id.
[61] Cockrum v. State, 24 Tex. 394, 403 (1859).

The Texas Supreme Court chose to uphold the enhanced sentence for criminal misuse by admitting: "The right to carry a bowie-knife for lawful defense is secured, and must be admitted."[62] Instead:

> May the State not say, through its law, to the citizen, "this right which you exercise, is very liable to be dangerous to the rights of others, you must school your mind to forbear the abuse of your right, by yielding to sudden passion; to secure this necessary schooling of your mind, an increased penalty must be affixed to the abuse of this right, so dangerous to others."[63]

Cockrum did not even deny the right to *carry* this weapon of "certain death." Cockrum is utterly contrary to Spitzer's claim in ¶68:

> All of these cases underscore the courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are permissibly treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.

51. ¶69 asserts that "In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name." and directs the reader to Exhibit C, titled Dangerous Weapon Restrictions. There he lists Bowie-knife bans, supposedly "by name." He lists Texas 1856, but as examination of Cockrum shows, and review of the statute in the 1859 digest of Texas statutes shows, this was not a ban on either concealed or open carry, but a sentence enhancement for manslaughters committed with a Bowie knife.

---

[62] Id.
[63] Cockrum v. State, 24 Tex. 394, 403 (1859).

GENERAL STATUTE LAWS

OF THE

STATE OF TEXAS:

TO WHICH ARE SUBJOINED

THE REPEALED LAWS OF THE REPUBLIC AND STATE OF TEXAS,

BY, THROUGH, OR UNDER WHICH RIGHTS HAVE ACCRUED;

ALSO,

THE COLONIZATION LAWS

OF

MEXICO, COAHUILA AND TEXAS, WHICH WERE IN FORCE BEFORE
THE DECLARATION OF INDEPENDENCE BY TEXAS.

PREPARED BY

WILLIAMSON S. OLDHAM AND GEORGE W. WHITE.

PUBLISHED BY AUTHORITY OF THE LEGISLATURE.

AUSTIN, TEXAS:
PRINTED BY JOHN MARSHALL & CO., AT THE STATE GAZETTE OFFICE.
1859.

Act of Aug. 28, 1856. Killing with bowie knife or dagger. — ART. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly.

Definition of. — ART. 611. A "bowie knife" or "dagger," as the terms are here and elsewhere used, means any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife.

64

## V. What Other Technologies Can Be Similarly Classified as "Beyond the Framers' Imagination"?

52. If you were tell Ben Franklin that freedom of the press would someday include presses that could prints thousands of pages per hour, would his reaction have been: "Assault newspapers! You could crush small newspapers like mine out of business. You could spread disinformation at thousands of pages per minute!" The Bill of Rights protects certain principles: the freedom to speak your mind, on a street corner haranguing a few neighbors, or a webpage from which you can annoy most of the world; freedom from arbitrary warrantless searches, in a colonial style house, a motor home, a car, or a phone line; the freedom to be armed for the unlikely but not unknown situation of a government that either actively persecutes minorities or simply ignores mob rule. Every right has its associated risks: child pornography; libel; slander; criminals escaping punishment by a meticulous protection of their rights to due process and privacy.

---

64 A DIGEST OF THE GENERAL STATUTE LAWS OF THE STATE OF TEXAS: TO WHICH ARE SUBJOINED THE REPEALED LAWS OF THE REPUBLIC AND STATE OF TEXAS... Art. 610 (1859).

## VI.    Summary

53. Professor Spitzer attempts to justify the Highland Park ordinance by pointing to "restrictions on fully automatic (most famously the Tommy gun) and semi-automatic firearms, with detachable ammunition feeding devices, both from the early twentieth century."  He fails. Automatic weapon restrictions are indeed present *after* the year Bruen sets for determining if a law or analogous restriction takes a particular arm out of Second Amendment protection.  Even the primary proponent of the National Firearms Act of 1934, U.S. Attorney General Cummings, admitted that they were using a tax scheme because they knew that a more direct regulatory measure was unconstitutional and he did not disagree with a Representative's reference to the right to keep and bear arms as the reason for this workaround.

54. Only a few of the statutes that he references restrict either semiautomatic arms or limit magazine capacity.  His miscitations and misrepresentations of these statutes seems a bit beyond random error.  Even the statutes that refer to ten round magazines are only *in conjunction* with a machine gun.  *All* are after 1868.

55. Repeating firearms were in commercial distribution by 1868.  The Congress made no attempt to limit the Second Amendments rights incorporated through the Fourteenth Amendment.

56. As I observed at the beginning, untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where the laws or policies made involuntary commitment impossible.[65]  Fix the root problem or mass murderers will use the weapons they have historically used in the United States:

---

[65] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) for how we got here.

arson,[66] vehicles,[67] explosives,[68] hammers,[69] axes,[70] poison,[71] aircraft,[72] and train derailments.[73] Or they might use the weapons mass murderers use in other nations: arson;[74] vehicles;[75] explosives,[76] sharp objects,[77] hammers;[78] poison gas.[79]

29. As long as we as a society focus on methods rather than causes, we are engaged in unneeded polarization while still not solving the problem.

---

[66] 3 Teamsters Charged in San Juan Hotel Fire," *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018 (97 dead); Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, NEW YORK TIMES, Mar. 26, 1990 (87 dead); Phil Luciano, *9-year-old arraigned on murder charges in deadly Goodfield arson fire*, PEORIA JOURNAL STAR, Oct. 21, 2019.

[67] Lauren del Valle, Ray Sanchez and Eric Levenson, *Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says*, CNN, January 9, 2023.

[68] FBI, *Oklahoma City Bombing*, https://www.fbi.gov/history/famous-cases/oklahoma-city-bombing, last accessed January 31, 2023 (168 dead); *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1; *Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras*, [Chicago, Ill.] THE DAY BOOK, Dec. 2, 1911, 1 (21 dead); *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1 (10 dead).

[69] *A Family Slain*, KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (5 dead).

[70] *Five Battered With An Axe*, [Keokuk, Ia.] DAILY GATE CITY, Oct. 17, 1911, 1 (5 dead); *Mystery of 30 Axe-Murders is Believed Near Its Solution*, ALBUQUERQUE MORNING JOURNAL, Mar. 22, 1915, 1 (police believed one man murdered 29 people in five families over three years).

[71] *A Modern Borgia*, NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (the maid murdered a family of seven).

[72] FBI, CRIME IN THE UNITED STATES: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf (3047 dead); Id., (184 dead); Id., (40 dead); Judith Cummings, *Kin of Suspect Defiant and Contrite*, *New York Times*, Dec. 11, 1987 (44 dead).

[73] *Crack Flyer Jumps Track*, [De Kalb, Illinois] DAILY CHRONICLE, Mar. 17, 1941, 1 (5 dead).

[74] *A Decade On, Childers Remembers Hostel Fire Tragedy*, BRISBANE [Australia] TIMES, Jun. 23, 2010 (15 dead); Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears*, [U.K.] DAILY MAIL, Sep. 8, 2014. (11 dead).

[75] *Toronto is the most recent of many deliberate attacks involving vehicles*, USA TODAY, Apr. 23, 2018 (10 dead in Toronto attack, 14 dead in Barcelona, Spain, 8 on London Bridge, 12 in Berlin, Germany) (10 dead); *Nice attack: Trial for Bastille Day massacre which killed 86 begins*, BBC, Sep. 5, 2022 (86 dead); *Australian who rammed and killed six pedestrians jailed for life*, REUTERS, Feb. 21, 2019 (6 dead); Alex Johnson, *A Short History of Vehicles Being Used as Deadly Weapons*, NBC News, Jul. 15, 2016 (8 dead).

[76] Andrew Higgins and Kimiko De Freytas-Tamura, *In Brussels Bombing Plot, a Trail of Dots Not Connected*, NEW YORK TIMES, March 26, 2016 (33 dead); Sylvia Hui, *Bomber's brother gets 55 years for Manchester concert attack*, Associated Press, Aug. 20, 2020 (22 dead)

[77] Jason Van Rassel, *Police officer's son charged in city's worst mass murder*, Calgary [Alberta] Herald, Apr. 17, 2014 (5 dead); Jonathan Pearlman, *Eight Children Murdered In Mass Stabbing In Australia*, [U.K.] Telegraph, Dec. 19, 2014 (8 dead); Robert Foyle Hunwick, *Why Does China Have So Many School Stabbings?*, New Republic, Nov. 2, 2018 (summarizing 14 knife mass murders in two incidents); David Mercer, *Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people*, SKY NEWS, Sep. 5, 2022 (10 dead).

[78] Jamelle Wells, *Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop*, ABC [Australia], May 12, 2014 (5 dead)

[79] *Japan marks 25 years since deadly Aum sarin attack on Tokyo subway*, Japan Times, Mar. 20, 2020 (14 dead).

EXHIBIT B

# Clayton E. Cramer

24408 Tombstone Ridge Ct.
Middleton, ID 83644
(208) 761-5916
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  |  |
|---|---|
|  | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize First Place, Undergraduate Division |
|---|---|

**TEACHING EXPERIENCE:**

Fall, 2017 – present
***Adjunct Faculty:*** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I, Historty iof the Fourteenth Amendment**.

Fall, 2014 – Spring, 2017
Recovering from stroke

Spring, 2010 – Spring, 2014
***Adjunct Faculty:*** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.

Fall, 2009 – Summer 2010
***Adjunct Faculty:*** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**.

Fall, 2003
***Adjunct Faculty:*** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**.

1996      ***Teaching Assistant***: Assisted Professor Peter Mellini in his course "Twentieth Century World." I graded quizzes, exams, and answered weekly written questions from students. I also prepared and lectured about the rise of totalitarianism in the period between the world wars.

**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241. Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

*"*Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester*, 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien*, 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.