**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, | No. 1:22-cv-04774 |
| Plaintiffs, | |
| v. | Honorable Harry D. Leinenweber |
| CITY OF HIGHLAND PARK, ILLINOIS, | Honorable Jeffrey T. Gilbert |
| Defendant. | |

**DEFENDANT CITY OF HIGHLAND PARK'S
SURREPLY IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................3

    I.    Plaintiffs Have Not Shown That They Are Likely to Succeed on the Merits. .............................................................................................................3

        A.    Plaintiffs Have Not Met Their Burden to Show That Assault Weapons Are "Arms" Protected by the Second Amendment. .....................3

            1.    Plaintiffs Distort the "Step One" Analysis Under *Bruen*. ...............4

            2.    Assault Weapons Are Not in "Common Use." ...............................5

            3.    Assault Weapons Are "Dangerous" and "Unusual." ....................10

            4.    The Assault Weapons Covered by Highland Park's Ordinance Are Wholly Unlike the Handguns at Issue in *Heller* and *Bruen*. ..................................................................13

        B.    Plaintiffs Fail to Rebut the Evidence Showing That Assault Weapons Bans Are Consistent with the Historical Tradition of Firearm Regulation. ...................................................................15

            1.    The Historical Record Shows a Tradition of Regulating Particularly Dangerous Weapons in Early America. .....................17

            2.    Late-19th- and Early-20th-Century Laws Confirm the Tradition of Regulating Particularly Dangerous Weapons and Are Relevant Under *Bruen*. ....................................................22

            3.    Highland Park's Ordinance Is Consistent with the Second Amendment. ................................................................24

        C.    Plaintiffs Have Not Met Their Burden to Show That Large-Capacity Magazines Are "Arms," and Have Failed to Rebut That Highland Park's Ban Is Consistent with the Second Amendment. ...........26

    II.    Plaintiffs Have Not Met Their Burden to Establish That They Will Suffer Any Irreparable Injury. ..........................................................................28

    III.    The Balance of the Equities and the Public Interest Strongly Favor Highland Park. ..............................................................................29

CONCLUSION ........................................................................................................................30

i

# **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
    471 F.3d 745 (7th Cir. 2006) ................................................16

*Bevis v. City of Naperville*,
    No. 22-cv-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ..................... *passim*

*Bolton v. Bryant*,
    71 F. Supp. 3d 802 (N.D. Ill. 2014) ..............................................30

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)....................................................... *passim*

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ......................................22, 28, 29

*Friedman v. City of Highland Park*,
    68 F. Supp. 3d 895 (N.D. Ill. 2014) ..............................................29

*Henderson v. Box*,
    947 F.3d 482 (7th Cir. 2020) ...................................................14

*McDonald v. City of Chicago*,
    561 U.S. 742 ...................................................................22

*Mistretta v. United States*,
    488 U.S. 361 (1989)............................................................23

*Nat'l Rifle Ass'n v. Bondi*,
    -- F.4th --, 2023 WL 2416683 (11th Cir. Mar. 9, 2023) .........................22

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
    No. 22-cv-1866, 2022 WL 17721175 (D.R.I. Dec. 14, 2022).........................26, 27

*Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 22-cv-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022)...........................26, 27

*People v. Harrison*,
    No. 4-21-0077, 2022 WL 736462 (Ill. App. Ct. Mar. 10, 2022) ..............9

*People v. Jackson*,
    No. 2-21-0186, 2022 WL 17176784 (Ill. App. Ct. Nov. 23, 2022)...........9

*Staples v. United States*,
    511 U.S. 600 (1994).................................................................................................11

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) .............................................................................26

*United States v. Harrison*,
    No. 22-cr-328, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023)..................................5

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ...............................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................29

**Other Authorities**

4 Sir William Blackstone, *Commentaries on the Laws of England* 149 (1789) ...........................10

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)...............................22

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*,
    97 Ind. L.J. 1439 (2022).........................................................................................22

## <u>INTRODUCTION</u>

Assault weapons are exceptionally dangerous guns that are unnecessary for, and rarely used for, self-defense. They are owned by a niche minority of less than 2% of Americans. They are disproportionately used in mass shootings and in assaults on law enforcement officers. Compared to ordinary handguns, they fire high-powered rounds more quickly, over longer distances, and cause more horrific injuries. And they are particularly deadly when paired with large-capacity magazines, a firearm accessory that is unnecessary for self-defense and has been used in nearly every mass shooting in the United States. Last year, these instruments—an assault weapon and several large-capacity magazines—were used to murder 7 people in Highland Park, and wound 48 more, in a mere 60–90 seconds.

No Supreme Court opinion—and no court of appeals—has ever struck down a government ban on assault weapons or large-capacity magazines. *See Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392, at *7 (N.D. Ill. Feb. 17, 2023) (collecting cases), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023). Most recently, in denying a request for a preliminary injunction in another case, Judge Kendall concluded that such restrictions are constitutional: "The history of firearm regulation [] establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)" that "pose an exceptional danger, more so than standard self-defense weapons such as handguns." *Id.* at *14. Plaintiffs here, disputing that ruling and the evidence and reasoning that support it, claim entitlement to a preliminary injunction against Highland Park's Ordinance. They do so only by badly distorting the Supreme Court's Second Amendment test for adjudicating firearms restrictions, and by ignoring our Nation's history of weapons regulation.

Plaintiffs misstate the Court's holdings about the original public meaning of the "Arms"

protected by the Second Amendment, the first step under *Bruen*, where Plaintiffs bear the burden. Neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), said that *all* bearable arms are covered by the Second Amendment. To the contrary, those decisions consulted history and concluded that certain bearable weapons fall outside the scope of the Second Amendment's protection: weapons not in common use, dangerous weapons, and unusual weapons. *Heller*, 554 U.S. at 626–27; *Bruen*, 142 S. Ct. at 2128, 2143. Instead of even attempting to carry their burden, Plaintiffs reject the test outright, refusing to consult history to inform how widespread ownership of weapons must be to count as "in common use" and what might make a weapon "dangerous" or "unusual." Plaintiffs' claim is thus likely to fail at the first step of *Bruen*, and this Court need go no further to deny the preliminary injunction.

Plaintiffs also cannot succeed at the second step of *Bruen*. They fail to rebut Highland Park's extensive evidence from distinguished academic and other experts showing a long history of legislative responses to the menace of weapons of increasing lethality when those weapons begin to enter the civilian market. Instead, Plaintiffs attempt to rewrite *Heller* and *Bruen*, arguing, in effect, that if handguns cannot be banned, then neither can assault weapons (or large-capacity magazines) because it is possible to kill large numbers of people with handguns, too. No doubt, this argument is "simple," as Plaintiffs repeatedly emphasize. It is simply wrong.

When Plaintiffs' misreadings of *Heller* and *Bruen* are combined with Plaintiffs' narrow view of history, the result is an absurd conclusion. Plaintiffs assert that *any* "bearable" weapon is protected by the Second Amendment, and that history provides no examples of laws that categorically banned weapons in 1791. The result, on their view, is that the Second Amendment precludes the banning of *any* bearable weapon. But that view must be wrong, because both *Heller*

2

and *Bruen* recognize that certain categories of bearable weapons, including M-16s, other machine guns, and short-barreled shotguns, may legitimately be banned by federal, state, and local governments. Unlike Plaintiffs, Highland Park has presented a way to apply the test articulated in *Heller* and *Bruen* that makes sense of *all* of our history, and that supports *both* the recognized right of individuals to possess handguns for self-defense *and* the recognized right of governments to regulate those weapons, including machine guns, that present special dangers to society.

Highland Park's Ordinance has been in place since 2013. There is no emergency or other reason to disrupt the status quo by enjoining enforcement of the Ordinance while this case is pending. As Highland Park's experts explain, the Ordinance allows Highland Park citizens an unlimited number of handguns, shotguns, and rifles that do not have the offensive, military-like characteristics of assault weapons, and there is thus no shortage of lawful weapons they can use for self-defense. And given the horrific facts about the July 4, 2022 mass shooting in Highland Park—which demonstrate in vivid detail the public suffering caused by assault weapons and large-capacity magazines and which Plaintiffs ignore—the balance of equities and public interest overwhelmingly favor Highland Park. Plaintiffs' request for a preliminary injunction therefore should be denied.

## ARGUMENT

### I. Plaintiffs Have Not Shown That They Are Likely to Succeed on the Merits.

#### A. Plaintiffs Have Not Met Their Burden to Show That Assault Weapons Are "Arms" Protected by the Second Amendment.

The first step of the *Bruen* inquiry asks whether the weapons at issue are "Arms" within the plain meaning of the Second Amendment. 142 S. Ct. at 2128, 2131–32. As *Heller* and *Bruen* explain, the plain meaning of "Arms" refers to "weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And "Arms" excludes "dangerous and unusual

3

weapons." *Id.* (quoting *Heller*, 554 U.S. at 627).

Highland Park's largely undisputed expert evidence shows that assault weapons are "dangerous and unusual," and are not "in common use." *See* Dkt. 45 ("Opp.") at 17–28. Less than 2% of Americans own one. Emergency room surgeons report that assault weapons cause horrific injuries, qualitatively different from other firearm injuries. These guns are disproportionately used in mass shootings, and in the murder of police officers in the line of duty. They release high-energy projectiles—and have a collection of other distinctive features— that make them uniquely dangerous offensive weapons, fit for military combat. They are expressly advertised as such by their manufacturers. And, due to their rarity in society and dangerous offensive power, they create terror when brandished in public. *See id.*

In response, Plaintiffs distort *Heller* and *Bruen*. They run from the history that the Supreme Court has deemed critical. And they cite evidence that is neither relevant nor reliable. None of their evidence shows that the right to an assault weapon is protected by the Second Amendment.

### 1. Plaintiffs Distort the "Step One" Analysis Under *Bruen*.

Plaintiffs' reply fundamentally misstates the step-one analysis. Plaintiffs contend that the Second Amendment covers *any* "bearable" arm, full stop. Dkt. 81 ("Reply") at 6, 32. And they assert that the "common use" and "dangerous and unusual" inquiries are not part of the step-one test at all. *Id.*

Plaintiffs' position is squarely contradicted by what the Supreme Court said in *Heller* and *Bruen*. *Heller* explained that the "common use" and "dangerous and unusual" rules limit "the sorts of weapons protected"—that is, they define the scope of protected "Arms." 554 U.S. at 627; *see also id.* at 623 (the right "extends only to certain types of weapons"). And *Bruen* expressly addressed these issues as part of its *step one* analysis, regarding whether the Second Amendment's plain text presumptively protected the plaintiffs' conduct. 142 S. Ct. at 2134–35.

After finishing its discussion of these issues, it then moved to the second step of the inquiry, where—by contrast—"the burden falls on respondents." *Id.* at 2135. Plaintiffs' contrary approach cannot be squared with *Bruen*.

*United States v. Harrison*, No. 22-cr-328, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (cited in Reply 6–7), does not and cannot change *Bruen* and *Heller*. *Harrison* dealt with a federal statute that criminalizes the possession of "*any* firearm or ammunition" (including a handgun, the type of gun at issue in that case) by users of controlled substances, including marijuana. *Id.* at *1–2, *16 (emphasis added). Nothing in *Harrison* changes what *Bruen* explained: *restrictions* on the underlying right to bear "Arms" are analyzed under step two of *Bruen*, based on whether there is a historical tradition of analogous prohibitions, while the scope of "Arms" is analyzed at step one. In other words, *Harrison*'s discussion of restrictions on a law covering *all* firearms does not inform how the Supreme Court has instructed courts to determine which *types* of firearms the Second Amendment protects.

Plaintiffs bear the burden at step one, and they have not carried it. But regardless of how the burden is allocated, Plaintiffs cannot prevail. The evidence affirmatively shows that assault weapons are not "in common use," and that they are both "dangerous" and "unusual."

### 2.    Assault Weapons Are Not in "Common Use."

The plain meaning of the Second Amendment protects only weapons that are "in 'common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Assault weapons are not "in common use," as that phrase is properly understood under *Bruen* and *Heller*. Plaintiffs ignore, because they must, *both* components of the test. Assault weapons are not "common" throughout the nation, and are especially rarely "used" for self-defense.

**Extent of assault weapon ownership/possession.** Starting with the record, less than 2% of the current American population, and at most only 5% of American households, possess an

assault weapon. Dkt. 45-6, Klarevas Decl. ¶ 27; Opp. 19. And Plaintiffs' own evidence indicates that assault weapons are not evenly distributed among the 2% of the population that possesses them. Their evidence suggests that at least ***11 million*** AR-15-style rifles—i.e., an estimated 45% of all such rifles in circulation—are concentrated in the hands of ***less than 0.5%*** of the estimated 81 million gun owners in America. *See* Ex. 24, Klarevas Rebuttal Decl. ¶¶ 10–11. Put simply, a very small number of Americans possess a disproportionately large number of assault weapons. This is the very definition of a niche item. And it is the opposite of an item in common use like handguns today or muskets at the time of the Founding.

To the extent Plaintiffs even try to rebut these facts, the effort is meager. Plaintiffs do not directly challenge Highland Park's evidence, described in a declaration from Dr. Louis Klarevas, regarding the percentage of Americans (less than 2%) who currently own an assault weapon. *See* Dkt. 45-6, Klarevas Decl. ¶ 27. Indeed, that figure comes from the same National Shooting Sports Foundation ("NSSF") data that Plaintiffs use in their own briefing. *See, e.g.*, Dkt. 7 at 15; Dkt. 7-3 (declaration of NSSF's former Director of Research and Market Development). Instead, Plaintiffs point to an unpublished paper by William English, which states that 30% of gun owners have owned an AR-15-style weapon *at some point*. *See* Reply 36 (citing William English, *2021 National Firearms Survey: Updated Analysis*, at *33 (last revised on SSRN Sept. 28, 2022)). This is unhelpful on its face. Plaintiffs offer no reason to even consider in the Second Amendment analysis how many people have *ever* owned a certain type of weapon. In any event, because just under 25% of Americans own a firearm at all (81 million out of 333 million people total, *see* Dkt. 45-6, Klarevas Decl. ¶ 27), even the English paper suggests that only 7.5% (that is, 30% of 25%) of the American population owns an assault weapon, and it does not even try to inform the question what percentage of households possess an assault weapon.

Ultimately, this Court can simply disregard the English survey results because they are unreliable. As Dr. Klarevas explains, the English paper does not meet the standards in the field for reliance on its reported results. Ex. 24, Klarevas Rebuttal Decl. ¶¶ 8–13. English has not made his survey data available to the public. In fact, he has not even published the complete survey questions themselves—a "serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR)." *Id.* ¶ 9. Because of these and other methodological problems apparent from the face of his paper, English's survey "cannot be deemed reliable." *Id.* ¶ 13.

Turning to the legal question of what counts as "common," Plaintiffs offer almost nothing. Surprisingly, given their emphasis on the Founding era as a source of authority, they ignore what was "common" in the Founding era.[1] That is unprincipled opportunism, and ignores Supreme Court precedent: Plaintiffs appeal to history when they think it suits them, and abandon it when it does not. As Highland Park showed, 50% to 60% of households owned the "common" weapons of the Founding era—muskets and fowling pieces. Dkt. 45-7, Roth Decl. ¶ 15. Notably, that corresponds to the widespread modern ownership of handguns; approximately 50% of the weapons in circulation among civilians are handguns. Dkt. 45-6, Klarevas Decl. ¶ 28. As *Heller* held, handguns are the "quintessential" weapons chosen for self-defense in the home in modern times, 554 U.S. at 629, as muskets and fowling pieces were the common weapons of the Founding era. Assault weapons are in an obviously different category.

---

[1] In support of their anti-historical approach, Plaintiffs repeatedly cite non-binding statements by two justices in different, pre-*Bruen* cases—a *dissent* from denial of certiorari by Justice Thomas, and a concurrence by Justice Alito joined only by Justice Thomas—to argue that these define the Supreme Court's interpretation of the Second Amendment. *See, e.g.*, Reply 35–36. Obviously, the law is not made by Justices in separate opinions. Plaintiffs also cite a series of pre-*Bruen* circuit cases that did not use a historical approach, *id.* at 36–37, and were thus overruled by the Supreme Court precisely because they gave insufficient weight and attention to history.

Plaintiffs do not dispute Highland Park's data regarding Founding-era firearm ownership. They claim it is irrelevant. Why? Because there are more assault weapons in circulation today than Ford F-150s. Were the matter not so weighty, this would be laughable. Plaintiffs offer no authority or rationale for their choice of comparator. They seem to believe that if there are more assault weapons than anything a judge might think is "familiar" in some sense, then assault weapons must be "common" within the meaning of the Second Amendment. That is not the law, and it is not even a serious attempt at stating a legal test.

**Use of assault weapons for self-defense.** Plaintiffs contend that the law does not require them to show "use" at all. *See, e.g.*, Reply 34 ("Common Use is Not Based on Actual Use"). That position is flat wrong. The textual question is *which* "Arms" can be kept and borne. And *Heller* and *Bruen* explain that the "Arms" covered by the Second Amendment's text are those "in common *use* at the time." *Heller*, 554 U.S. at 624 (emphasis added). This makes sense. The Second Amendment is not an idle right to stockpile curiosities. It protects the rights of law-abiding citizens to "*use* [weapons] for the core lawful purpose of self-defense." *Id.* at 630 (emphasis added). It therefore protects the right to both "keep and bear" the "Arms" that are *actually* commonly used for such purposes.

Nonetheless, Plaintiffs contend that assault weapons are commonly used for self-defense. At the outset, they attempt to move the goalpost by claiming that assault weapons are "useful" for self-defense. Reply 37–38. In theory, *any* weapon could be *useful* for self-defense. Yet no one reasonably believes that civilians have a constitutional right to possess, for example, a shoulder-mounted grenade launcher. Once again, the relevant test is actual use, not whether a particular firearm could be "useful."

In any event, Plaintiffs ignore Highland Park's overwhelming evidence from firearms

8

experts that assault weapons are not necessary or particularly suitable for self-defense. *See* Dkt. 45-3, Andrew Decl. ¶¶ 58–61; Dkt. 45-4, Busse Decl. ¶¶ 16–23; Ex. 23, Busse Rebuttal Decl. ¶ 4. As Highland Park's experts have explained, none of the features that make a firearm an "assault weapon" under the Highland Park Ordinance are necessary for self-defense. *See* Ex. 23, Busse Rebuttal Decl. ¶¶ 5–23; Ex. 26, Yurgealitis Rebuttal Decl. ¶ 18. On the contrary, they are designed for offensive, military applications in combat situations, and produce more force and damage than necessary in a civilian self-defense situation. *See* Ex. 23, Busse Rebuttal Decl. ¶ 4; Ex. 26, Yurgealitis Rebuttal Decl. ¶¶ 38–48. This evidence matches common sense, as these guns were designed for military use, have the same features as the M-16 on the military's preferred mode (semi-automatic), and are one quick "fix" away from being identical to the M-16 in fully automatic mode.[2] Tellingly, Plaintiffs have not identified a *single* instance in which anyone in Highland Park, or elsewhere in Illinois, lawfully used an assault weapon for self-defense. Indeed, Illinois courts have rejected the use of assault weapons as legitimate acts of self-defense. *See, e.g.*, *People v. Harrison*, No. 4-21-0077, 2022 WL 736462, at ¶ 74 (Ill. App. Ct. Mar. 10, 2022) (shooter who used AR-15 failed to show lawful self-defense); *People v. Jackson*, No. 2-21-0186, 2022 WL 17176784, at ¶¶ 82–88 (Ill. App. Ct. Nov. 23, 2022) (same).

The only purported "evidence" that Plaintiffs offer in response is the English paper's assertion that 13.1% of Americans who have defended themselves with a firearm used a "rifle." Reply 38. Again, this is useless on its face. Many rifles are not banned by the Ordinance (the Ordinance does not even ban all semi-automatic rifles), *see* Ex. 23, Busse Rebuttal Decl. ¶¶ 21– 22, so this statistic does not inform how many *assault weapons*, as defined in the Ordinance, are

---

[2] *See Bevis*, 2023 WL 2077392, at *15 ("Assault rifles can also be easily converted to increase their lethality and mimic military-grade machine guns. Some of these 'fixes' are as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15.") (quotation marks omitted).

actually used for self-defense. And, as noted above, the English survey is unreliable and so cannot rebut Highland Park's evidence. Ex. 24, Klarevas Rebuttal Decl. ¶¶ 8–13.

### 3. Assault Weapons Are "Dangerous" and "Unusual."

The plain meaning of the Second Amendment also excludes weapons that are "dangerous and unusual." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). The original public meaning of this phrase includes weapons that were particularly likely to disrupt the public peace. That is the lesson of Blackstone, as cited by *Bruen* and *Heller*. *See* 4 Sir William Blackstone, *Commentaries on the Laws of England* 149 (1789); *Bruen*, 142 S. Ct. at 2177–78; *Heller*, 554 U.S. at 626–27. It is also the conclusion that Judge Kendall reached. *See Bevis*, 2023 WL 2077392, at *10–11. And Plaintiffs do not dispute Highland Park's evidence that assault weapons are particularly likely to disrupt the public peace—they are highly dangerous, and they inspire unusual terror in members of the public. *See* Opp. 21–28. These same features make assault weapons virtually indistinguishable from those weapons "most useful in military service—M-16 rifles and the like," which, as *Heller* explains, can be banned. 554 U.S. at 627; *see also* Opp. 24 (M-16 rifles are like AR-15-style weapons except that M-16s can also be used on fully automatic mode, although the Army recommends the use of the gun on semi-automatic mode as the more lethal one).[3]

Plaintiffs concede that *some* dangerous and unusual weapons can be banned. *See, e.g.*, Reply 20, 24. They also largely admit—as they must—that the assault weapons banned by Highland Park's Ordinance are extremely dangerous. *Id.* at 22. Plaintiffs simply argue that these

---

[3] Plaintiffs attempt to argue that because the military sometimes uses handguns, the comparison with military weapons cannot justify a ban. Reply 26. But Highland Park is not arguing that any weapon can be banned merely because the military sometimes uses it. Rather, the point is that assault weapons can be banned because they are just like *a particular type* of weapon used by the military (the M-16), which the Supreme Court has said can be banned. Opp. 22.

weapons are not "unusual," contending that "unusual" means nothing more than "not common." *Id.* at 38–39. Even if that were right, Highland Park would prevail for the reasons described in the prior section—assault weapons are not "common." But Plaintiffs are wrong.

Plaintiffs ignore the sources that *Heller* cites—which show that, historically, "unusual" in this context meant unusually dangerous and thus unusually likely to inspire public terror. *See* 554 U.S. at 627 (citing Blackstone and other treatises); *see also* Opp. 21. They also argue that stun guns are not "unusual." *See* Reply 36. But stun guns are obviously distinguishable; their mere presence does not create fear of lethal violence or inspire public terror. In civilian life, by contrast, assault weapons are "dangerous and unusual" in the historical sense of those words.[4]

Plaintiffs assert that the *only* kinds of "dangerous and unusual" weapons that can be banned are fully automatic guns, citing *Staples v. United States*, 511 U.S. 600 (1994). *See* Reply 21, 26–27. But *Staples* is inapposite. It was a criminal case interpreting a statute to determine whether a jury instruction understated the *mens rea* requirement. *Staples*, 511 U.S. at 604. It was not a Second Amendment case; it pre-dated both *Heller* and *Bruen*; and it conducted no analysis of whether assault weapons are "in common use" or "dangerous and unusual" within the historical meaning of the Second Amendment—it did not even mention the Second Amendment. *See id.* at 612. Furthermore, the undisputed facts here show that the semi-automatic weapons banned by Highland Park's Ordinance are *more* lethal and *more* dangerous than many weapons used in fully automatic mode. *See* Opp. 21–25. If machine guns and other guns in fully automatic mode can be banned because they are so dangerous, then surely guns that are *more* lethal and *more* dangerous can also be banned.

---

[4] Plaintiffs do not dispute that the historical sources that *Heller* cited show that they used the phrase "dangerous *or* unusual," not "dangerous *and* unusual." Opp. 21 n.8.

Finally, Plaintiffs argue that AR-15-style weapons are no more dangerous than handguns. They claim (without evidence) that assault weapons and handguns fire at the same rate, and that handguns have sometimes been used in mass shootings. Reply 22.[5] To the extent Plaintiffs are saying that semi-automatic handguns paired with large-capacity magazines in the right setting can be used to kill a disturbingly high number of people, Highland Park agrees—though Highland Park fails to see how that informs the question whether assault weapons are especially dangerous compared to handguns. And to the extent Plaintiffs are suggesting that assault weapons and handguns are equally dangerous, the record refutes them. Assault weapons have a collection of distinctive features that make them vastly more lethal—for example, they have a higher muzzle velocity, shoot higher-energy rounds (and thus are far more likely to penetrate barriers and thus harm bystanders far from the shooting site), are more accurate from extremely long distances, and are equipped with features that allow the shooter to shoot rounds more quickly. Opp. 21–25; *see also, e.g.*, Dkt. 45-3, Andrew Decl. ¶¶ 25–34; Dkt. 45-4, Busse Decl. ¶¶ 24–25; Dkt. 45-5, Hargarten Decl. ¶¶ 26–29; Dkt. 45-7, Roth Decl. ¶¶ 49–57; Dkt. 45-8, Schreiber Decl. ¶ 38; Ex. 26, Yurgealitis Rebuttal Decl. ¶¶ 38–43. Rounds from these weapons tear apart human bodies—emergency room doctors report seeing wounds "markedly different" from those caused by other guns, including handguns. Opp. 23 (quoting Dkt. 45-12, McKenzie Decl. ¶¶ 11, 14); *see also id.* at 27; Dkt. 45-3, Andrew Decl. ¶¶ 26–34, 43; Dkt. 45-5, Hargarten Decl. ¶¶ 31–35; Dkt. 45-8, Schreiber Decl. ¶¶ 32–41. And, bearing this out, statistics show that

---

[5] Plaintiffs focus on the mass shooting at Virginia Tech University (Reply 3), but that example shows nothing about the relative lethality of assault weapons and handguns—especially given unique circumstances that contributed to the fatality rate of that shooting and were wholly independent from the shooter's choice of firearm: the shooter had trapped students in a classroom building and chained the door shut so that no one could leave while he shot them. *See, e.g.*, *Virginia Tech Shooting Leaves 33 Dead*, N.Y. Times (Apr. 16, 2007), *available at* https://www.nytimes.com/2007/04/16/us/16cnd-shooting.html (last accessed Mar. 1, 2023).

mass shootings involving an assault weapon are substantially more deadly than mass shootings involving a handgun. Opp. 25–26; Dkt. 45-6, Klarevas Decl. ¶¶ 12–22.

The unique dangers posed by assault weapons are not limited to mass shootings. As Judge Kendall found, the evidence reveals "a grim picture for police killings and gang activity. About 20 percent of officers were killed with assault weapons from 1998 to 2001 and again from 2016 to 2017." *Bevis*, 2023 WL 2077392, at *15. In addition, "just under 45 percent of all gang members own an assault rifle …, and gang members are seven times more likely to use the weapons in the commission of a crime." *Id.* This is one of the reasons why, as former ATF Senior Special Agent Jim Yurgealitis explains, Congress enacted the federal assault weapons ban in 1994. Ex. 26, Yurgealitis Rebuttal Decl. ¶ 32. This justification, among others, still holds true today, as Judge Kendall found. *See id.* ¶¶ 29–35; *accord Bevis*, 2023 WL 2077392, at *15 ("assault weapons are used disproportionately in mass shootings, police killings, and gang activity").

Plaintiffs do not, and could not, dispute any of this evidence. Even if it were Highland Park's burden, it has established that assault weapons are dangerous and unusual. But this is Plaintiffs' burden, and they present no evidence on the point—a fatal flaw that means they cannot meet step one of *Bruen*, especially at this preliminary stage.

### 4. The Assault Weapons Covered by Highland Park's Ordinance Are Wholly Unlike the Handguns at Issue in *Heller* and *Bruen*.

Unable to dispute the facts, Plaintiffs argue that *Heller*'s invalidation of a total ban on *handguns* resolves this case. Reply 2–5. Contrary to Plaintiffs' suggestion, it is obvious that the Highland Park Ordinance does not categorically ban all "handguns." Plaintiffs nevertheless assert that the Ordinance amounts to a categorical "handgun ban," and is therefore barred by *Heller*. Reply 2–3. This argument is meritless for at least two reasons.

13

To begin, the pistols that Highland Park's Ordinance covers are not the "handguns" discussed in *Heller*. The only "handguns" prohibited by the Highland Park Ordinance are specific semi-automatic pistols, like an Uzi and TEC-9 and others with similar characteristics (i.e., semi-automatic pistols that have the capacity to accept a detachable magazine *and* at least one other enumerated feature, such as a folding stock, barrel shroud, or muzzle break). Dkt. 45-2, Ordinance at 2, 4. These are not the traditional handguns that the Supreme Court called "the quintessential self-defense weapon" in *Heller*. 554 U.S. at 629. On the contrary, they are a narrow set of semi-automatic pistols with features that make them especially lethal and particularly attractive to mass shooters, gangs, and criminals who assault law enforcement personnel. Ex. 26, Yurgealitis Rebuttal Decl. ¶¶ 18–26, 29–35. A huge variety of handguns, including semi-automatic handguns without these especially lethal features, remain perfectly legal in Highland Park. *See* Ex. 23, Busse Rebuttal Decl. ¶¶ 4–8; Ex. 26, Yurgealitis Rebuttal Decl. ¶¶ 17–18. This is made immediately clear by comparing photos of the many semi-automatic pistols not prohibited by the Ordinance, *see* Ex. 23, Busse Rebuttal Decl. at 4–5 (Fig. A), with photos of the Uzi, TEC-9, and other prohibited semi-automatic pistols, *see id.*, Attachment A at 22–25. The narrowly targeted semi-automatic pistol provisions of the Highland Park Ordinance do not come close to the kind of total ban on handguns that *Heller* rejected. *See* 554 U.S. at 628–29.

More fundamentally, Highland Park's law as it relates to "pistols" is not at issue in this litigation, and certainly not in the preliminary injunction proceedings. To demonstrate harm, Plaintiffs have offered only a declaration from Susan Goldman, who asserts that she owns only an AR-15. *See* Dkt. 7-1, Goldman Decl. ¶ 3. Ms. Goldman has never asserted that she owns or wishes to acquire a Uzi, a TEC-9, or any other gun covered by the pistol provisions of Highland

14

Park's Ordinance. A preliminary injunction directed to those provisions would therefore provide no relief to her. *Cf. Henderson v. Box*, 947 F.3d 482, 487 (7th Cir. 2020) (injunctive relief "must not be broader than the legal justification for its entry").

In sum, this Court can and should conclude that Plaintiffs are unlikely to succeed on the merits at step one of *Bruen*, where they have the burden. It need go no further.

**B.    Plaintiffs Fail to Rebut the Evidence Showing That Assault Weapons Bans Are Consistent with the Historical Tradition of Firearm Regulation.**

The second step of the *Bruen* framework asks whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. This inquiry searches for a "historical *analogue*, not a historical *twin*." *Id.* at 2133. *Bruen* recognizes that "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and that a "nuanced approach" is required. *Id.* at 2132. It therefore asks for a tradition of *analogous* regulations—regulations that impose comparable burdens on self-defense, and are comparably justified. *Id.* at 2133.

Highland Park's Ordinance is amply supported by history. Judge Kendall concluded, in *Bevis*, that "[t]he history of firearm regulation … establishes that governments enjoy the ability to regulate highly dangerous arms," which "pose an exceptional danger, more so than standard self-defense weapons." 2023 WL 2077392, at *10–14. And Highland Park's historical evidence shows a robust tradition of regulating particular *types* of weapons that are not necessary for self-defense and impose distinctive public dangers. *See* Opp. 28–41.

In response, Plaintiffs' reply commits the very errors that *Bruen* warned against. Plaintiffs argue that Highland Park's Ordinance can be supported only if there were "categorical bans" on weapons in 1791. Reply 13–14. That would be the search for a historical twin. It

15

ignores *Bruen*'s teaching that the "regulatory challenges" of 1791 are not identical to the regulatory challenges of today. 142 S. Ct. at 2132. And it would transform the Second Amendment into a "regulatory straightjacket." *Id.* at 2133.

One straightforward way to show that Plaintiffs' argument is wrong stems from their acknowledgement that weapons like machine guns and bazookas can be banned. *See, e.g.*, Reply 25 & n.26. If Plaintiffs were right that there were no categorical weapon bans in the Founding era, and that the existence of such a ban is required to uphold a modern categorical ban, then bans on machine guns, bazookas, and *any* bearable weapon (on Plaintiffs' view of *Bruen* step one) would be invalid. In their own words, it would be "impossible" for Highland Park to defend a categorical ban on *any* weapon. Reply 7. They thus propose the "regulatory straightjacket" that *Bruen* warned against. 142 S. Ct. at 2133.

Highland Park offers a faithful application of *Bruen*. What justifies the undisputedly constitutional bans on machine guns and the like is that such weapons are especially dangerous and are clearly distinguishable from traditional self-defense weapons like handguns. So too with assault weapons, as the evidentiary record in this case shows. That the Founding era did not include more categorical bans does not render today's bans unconstitutional.

Plaintiffs' historical analysis is just as unsound as their doctrinal analysis. They criticize a small subset of the historical examples that Highland Park provided. *See* Reply 14–18. Each of their criticisms is misplaced, as Professor Robert Spitzer explains.[6] *See generally* Ex. 25, Spitzer

---

[6] Plaintiffs offer a declaration from a historical "expert," Clayton Cramer, but Cramer's opinions are clearly inadmissible under Federal Rule of Evidence 702 and the Court should therefore disregard his declaration. *See, e.g.*, *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (affirming denial of preliminary injunction motion and exclusion of expert testimony under Rule 702). Plaintiffs themselves largely disregard Cramer's declaration—they cite it only twice in their briefing. *See* Reply 4, 14. Cramer, a software engineer for the Idaho Department of Correction who is a part-time adjunct faculty member at the College of

Rebuttal Decl. ¶¶ 6–29. But they also fail to undermine—or even address—what matters: the principle that emerges from the Nation's history of firearms regulation, and how that principle applies to *this* regulation. *See, e.g.*, *id.* ¶¶ 5–7, 10. The historical record shows that there is a robust national tradition in which American jurisdictions have responded to changes in firearms technology by regulating particular *types* of especially dangerous weapons beyond the standard self-defense weapons. *See* Opp. 28–38.

Here, in 2013, Highland Park enacted its Ordinance based on factual findings that assault weapons pose unusual dangers to the community and are not necessary for self-defense. *See* Opp. 40–41. Its law is not an outlier. Similar laws have been enacted by jurisdictions covering 30% of the U.S. population, which share these judgments. Dkt. 45-6, Klarevas Decl. ¶ 34. Assault weapon regulations are a continuation of America's historical tradition of firearm regulation, applied to modern, unusually dangerous weapons.

**1.    The Historical Record Shows a Tradition of Regulating Particularly Dangerous Weapons in Early America.**

Plaintiffs' reply does nothing to undermine the well-documented historical tradition described in detail in Highland Park's opposition brief, supported by research from distinguished academics in attached declarations. As explained there, the weapons in the Founding era were very different from today's firearms. The musket—the most popular weapon of the era—could

---

Western Idaho, has never had his work reviewed or accepted by historians; the proffered C.V. does not disclose a single peer-reviewed publication. *See* Dkt. 81-1 at 61–66; *see also* https://cwi.edu/person/faculty/clayton-cramer (viewed Mar. 12, 2023). Moreover, his opinions are not based on reliable principles or methodology and cannot assist the trier of fact. In fact, in another recent Second Amendment case, Cramer admitted that his quantitative analysis was "clearly wrong" and he is not "quite as expert perhaps as [he] need[s] to be," testified that he would need to "lure" an actual "expert to assist [him] to verify the accuracy" of his opinions, and agreed that the court should be "reluctant" to accept the data he offered. *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-1815, Dkt. 126-6, Cramer Dep. Tr. at 87–88, 106, 165–66 (D. Or. Feb. 6, 2023).

fire a single shot; it required half a minute to reload, even by an experienced operator; it could not be kept loaded because the powder would corrode the mechanism; and it was not particularly reliable or accurate. Dkt. 45-7, Roth Decl. ¶¶ 15–16; *see also Bevis*, 2023 WL 2077392, at *10. Nonetheless, early American laws show a tradition of regulating the particularly dangerous *types* of weapons of that era, in ways that were commensurate with their specific societal dangers. *See* Opp. 31–35. States enacted public carry restrictions on particular types of weapons. And there were stringent regulations of Bowie knives—the dangerous new offensive weapons of the time, which were used in fights and duels. None of Plaintiffs' arguments about these weapons restrictions give any reason to doubt the tradition they show.

**Public carry restrictions.** First, Plaintiffs argue that laws restricting the public carrying of firearms and blunt weapons in early America are irrelevant because they did not amount to an "absolute ban on possession." Reply 14–15; *see also id.* at 18. But as explained above, *Heller* and *Bruen* reject the approach that would limit the analysis to a search for a "historical twin." *Bruen*, 142 S. Ct. at 2133. In fact, *Heller* itself contradicts Plaintiffs' argument by recognizing that the "historical tradition of prohibiting the *carrying*" of various firearms "fairly support[s]" limitations "on the right to *keep* and [not just] carry" weapons. 554 U.S. at 627 (emphases added).

The early American public carry restrictions are analogous to Highland Park's Ordinance in light of the two "metrics" that *Bruen* identified for the step-two inquiry: (1) those restrictions imposed some "burden on the right of armed self-defense" by restricting individuals' ability to possess firearms in public spaces, 142 S. Ct. at 2118; and (2) they were "justified" by the need to respond to a pressing societal problem, *id.*—namely, that certain weapons induced terror when carried in public. *See* Dkt. 45-9, Spitzer Decl. ¶ 81 & Ex. C. By comparison, the Highland Park Ordinance imposes **less** of a burden on the right of self-defense. The Ordinance imposes no limit

18

on Highland Park residents' ability to possess—and even to publicly carry—an unlimited number of firearms effective for self-defense that are not covered by the Ordinance. *See* Ex. 23, Busse Rebuttal Decl. ¶¶ 4–23. The justification for Highland Park's Ordinance is also analogous to the justification for these early public carry restrictions because it responds to the new societal problem that new weapons technology has created—namely, the unique dangers to the public posed by extraordinarily lethal weapons that substantially increase mass shooters' ability to kill large numbers of people in a short time. *See* Opp. 39–40; *see also* Dkt. 45-6, Klarevas Decl. ¶¶ 22–32.

Second, Plaintiffs criticize Professor Spitzer's examples of laws restricting the public carrying of firearms because, according to Plaintiffs, he cited only four such examples and "none of them banned peacefully carrying firearms." Reply 14. Plaintiffs are wrong on both points.

For starters, the four laws that Plaintiffs reference—from Virginia, Massachusetts, North Carolina, and Tennessee, *see id.* (citing Dkt. 81-1, Cramer Decl. ¶¶ 43–47)—not only banned but ***criminalized*** the peaceful public carrying of firearms. *See* Ex. 25, Spitzer Rebuttal Decl. ¶ 9 (collecting and discussing the text of these laws). Moreover, Professor Spitzer discussed many other public carry restrictions that Plaintiffs ignore—including laws from New Jersey (1686) and Massachusetts (1750), another from Virginia (1794), and others from ***43 states*** in the 1800s. Dkt. 45-9, Spitzer Decl. ¶ 81 & Ex. C. And the fact that there were more of these laws in the 1800s than there were in the 1700s in no way undermines the historical tradition of firearms restrictions that emerges. Instead, it supports that tradition. As explained in Judge Kendall's *Bevis* opinion and in the declarations supporting Highland Park's opposition, in the 1700s, "violent crime was at historic lows," and "[t]he pressing problem for minimizing violence in the colonies was not guns." *Bevis*, 2023 WL 2077392, at *10; *see also, e.g.*, Dkt. 45-7, Roth Decl. ¶¶ 14–18. But in the 1800s, firearms technology evolved, and interpersonal violence and gun carrying increased.

19

*See, e.g.*, Dkt. 45-7, Roth Decl. ¶¶ 19–34. As those social dangers increased, new firearms restrictions increased, too. *See id.*; Dkt. 45-9, Spitzer Decl. ¶ 81. Those trends confirm this Nation's long and continued tradition in which governments have appropriately responded to new social dangers from newly available firearms with new firearms laws. *See, e.g.*, Ex. 25, Spitzer Rebuttal Decl. ¶¶ 6–10.

Plaintiffs point to Founding-era laws that required certain persons to own firearms for militia service (*see* Reply 19), but nothing about those laws undermines Highland Park's argument.[7] As *Heller* explained, the guns that men in the Founding era were required to possess for militia service were the same guns they used for self-defense. 554 U.S. at 624–25. Today's issue—the societal problem from military-type guns that are much more lethal than traditional self-defense guns (handguns)—simply did not exist then.

**<u>Bowie knife regulations.</u>** Professor Spitzer's declaration presented more than 100 examples of historical laws that restricted Bowie knives or other long-bladed fighting knives. *See* Dkt. 45-9, Spitzer Decl. ¶¶ 61–71 and Exs. C, E, & H. Plaintiffs raise no issue with the vast majority of those examples. Instead, they focus on 22 of them, from 15 states total, and they accuse Professor Spitzer of "false[ly]" stating that those 22 laws "effectively banned the possession of Bowie knives." Reply 15. But as Professor Spitzer explained in his declaration, these laws had the effect of banning Bowie knives from public life by "banning both concealed carry and open carry." Dkt. 45-9, Spitzer Decl. ¶ 69; *see also* Ex. 25, Spitzer Rebuttal Decl. ¶ 11. Plaintiffs offer no basis to dispute that description. *See* Ex. 25, Spitzer Rebuttal Decl. ¶ 14

---

[7] These Founding-era laws do, however, undermine *Plaintiffs'* position at step one of *Bruen*. These laws underscore the kind of widespread ownership that was considered "common" in the Founding era. Precisely because the "common" weapons protected by the Second Amendment were the weapons used in militia service, these weapons had to be owned by a substantial fraction of the population—Founding-era laws *required* this.

(discussing each of these 22 laws).[8] And Plaintiffs' broader argument that such laws are
irrelevant because they do not amount to absolute bans on possession (*see, e.g.*, Reply 16) fails
for the same reason discussed above: the argument demands a "historical twin," yet *Bruen* makes
clear that the government need not point to a "twin." 142 S. Ct. at 2133.

Plaintiffs also contend that three laws (from Arizona, Oklahoma, and Texas) were already
"specifically rejected as Second Amendment analogues in *Bruen*." Reply 16. But that misreads
*Bruen*, which said only that those three laws did not outweigh the "overwhelming evidence of an
otherwise enduring American tradition permitting public carry of ***handguns***." 142 S. Ct. at 2154
(emphasis added). Those laws are relevant here not because of their restrictions on handguns, but
because of their restrictions on Bowie knives and other long-bladed fighting knives. *See, e.g.*,
Ex. 25, Spitzer Rebuttal Decl. ¶ 14. What *Bruen* said about them has no bearing here.

Plaintiffs also argue that some of these laws are irrelevant under *Bruen* because they
applied only to territories or cities. *See* Reply 15–16. But *Bruen* never held that local or territorial
laws are categorically irrelevant. It merely treated a handful of territorial laws at issue in that
case as "outliers" because those laws banned public carry of ***handguns*** and thus were in
"conflict with the Nation's earlier approach" to handgun regulation. 142 S. Ct. at 2154.

Finally, Plaintiffs claim that because the Founders were presumably aware of the dangers
posed by "blade weapons," but "did not adopt any absolute ban on possession of blade
weapons," Highland Park's Ordinance "is unconstitutional." Reply 18. That argument
mistakenly equates the absence of a law with the absence of power to enact that law. Nothing in
*Bruen* supports drawing such an inference from legislative silence—especially when the

---

[8] Many of Plaintiffs' assertions about these laws ignore other applicable statutory provisions and
are thus fatally flawed. *See* Ex. 25, Spitzer Rebuttal Decl. ¶ 14 (providing examples).

historical record provides an explanation: as Plaintiffs concede, violence from blade weapons was "rare" during the Founding era. Reply 17. Bowie knives were not invented until a few decades later, and only then did they become infamous and begin to proliferate. *See* Dkt. 45-9, Spitzer Decl. ¶¶ 61–63. After that, legislatures responded to this new weapons technology and the heightened social harms it posed by enacting dozens of laws restricting that technology. *See id.* ¶¶ 63–70; *Bevis*, 2023 WL 2077392, at *10–11 (collecting Bowie knife laws that were enacted after "the Bowie knife gained notoriety," in "the early 19th century"); *see also, e.g.*, Dkt. 45-7, Roth Decl. ¶¶ 25–26. Highland Park's Ordinance is a modern-day analogue to those laws.

        **2.**      **Late-19th- and Early-20th-Century Laws Confirm the Tradition of Regulating Particularly Dangerous Weapons and Are Relevant Under *Bruen*.**

        This tradition continued into the late 19th and early 20th centuries, as explained with extensive supporting evidence in Highland Park's opposition. Indeed, as weapons closer to modern weapons appeared, *regulations* closer to modern regulations appeared. *See* Opp. 35–39.

        Plaintiffs leave Highland Park's evidence on this point untouched. Their sole argument about many examples of historical firearms from the late 19th and early 20th centuries is that those periods are irrelevant under *Bruen*, and that the Court should therefore "ignore" them. *See, e.g.*, Reply 13. But *Bruen* did not hold that laws from those periods can be ignored. Instead, it confirmed that those laws are "critical" to the historical inquiry. *Bruen*, 142 S. Ct. at 2136.[9]

---

[9] Plaintiffs agree that the Court "need not resolve the issue of whether 1791 or 1868 is the proper timeframe" for the focus of the step-two inquiry. Reply 9 (footnote omitted). However, if the Court were to reach that issue, 1868 is the key focus because the law at issue in this case is a state or local, not federal, law. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. And "[w]hen the people adopted the Fourteenth Amendment," they "readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022) (draft cited in *Bruen*, 142 S. Ct. at 2138); *see also* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*, xiv, 223, 243 (1998) (also cited in *Bruen*). Thus, when a Second

As *Bruen* recognized, one "critical tool" of constitutional interpretation is historical evidence about "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" and beyond. *Id.* (quoting *Heller*, 554 U.S. at 605). Evidence of a "regular course of practice" over multiple periods of history can "liquidate" and "settle the meaning of disputed or indeterminate terms" in the Constitution. *Id.* (quotation marks and citations omitted). In other words, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic," post-ratification practice "should guide [the] interpretation of an ambiguous constitutional provision." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)); *see also, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 400–01 (1989) (examining 19th- and 20th-century "practice" as "additional evidence" of constitutional meaning).

To be sure, *Bruen* concluded that the late 19th- and 20th-century examples offered by the respondents in that case had "contradict[ed] earlier evidence." 142 S. Ct. at 2154 & n.28. When that happens, the earlier evidence controls. But here, Plaintiffs have not pointed to ***any*** earlier evidence that conflicts with the numerous 19th- and 20-century examples of legislatures enacting firearms laws in response to new social problems created by new weapons technologies. *Id.* at 2136–37; *see also, e.g.*, Ex. 25, Spitzer Rebuttal Decl. ¶¶ 7, 17.

In fact, Plaintiffs implicitly acknowledge that 20th-century examples exemplify our

---

Amendment claim concerns *a state or local law*, courts focus on "how the right was publicly understood when the Fourteenth Amendment was proposed and ratified"—that is, in 1868. *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *see also, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 768, 778 (considering the understanding of the "ratifiers of the Fourteenth Amendment" when examining "this Nation's history and tradition"); *Nat'l Rifle Ass'n v. Bondi*, -- F.4th --, 2023 WL 2416683, at *3–5 (11th Cir. Mar. 9, 2023) ("[T]he understanding of the Second Amendment right that ought to control … is the one shared by the people who adopted 'the Fourteenth Amendment.'").

Nation's tradition: they concede that machine guns and bazookas constitutionally can be banned, and thus that the 20th-century laws that banned them are fully consistent with the Second Amendment. *See* Reply 25, 27. Plaintiffs argue that AR-15-style weapons and other assault weapons should be treated differently from machine guns, because the former are semi-automatic instead of fully automatic. *Id.* at 26–27. But "automatic versus semi-automatic" is not the line the Supreme Court has drawn between weapons that cannot be banned (handguns) and those that can (e.g., short-barreled shotguns, machine guns, and Plaintiffs' examples of military-style weapons). And, as discussed above, no factual difference between the automatic and semi-automatic feature can justify treating machine guns and assault weapons differently. *See supra*, p. 11.

### 3. Highland Park's Ordinance Is Consistent with the Second Amendment.

Taken together, this Nation's history of weapons restrictions shows a settled tradition in which legislatures have responded to new societal dangers posed by newly available weapons technology with restrictions on that technology. *See* Ex. 25, Spitzer Rebuttal Decl. ¶¶ 6–10; *Bevis*, 2023 WL 2077392, at *14 ("The history of firearm regulation … establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories).").

Highland Park's Ordinance falls in line with this tradition: AR-15-style weapons did not begin to accumulate in the civilian market until after 2006, shortly after the federal assault weapon ban expired. *See* Opp. 39–40. By 2009, mass shootings had increased to unprecedentedly high rates. *Id.* at 40. Highland Park responded to this new weapons technology and increased danger by passing its Ordinance. *Id.* Plaintiffs dispute none of this in their reply.

Highland Park's Ordinance is also analogous to historically valid weapons regulations because the Ordinance leaves Highland Park residents fully able to defend themselves with numerous handguns and other weapons not covered by the Ordinance, Ex. 23, Busse Rebuttal

Decl. ¶¶ 4–23; Ex. 26, Yurgealitis Rebuttal Decl. ¶¶ 17–18, and therefore does not substantially

burden "the right of armed self-defense." *Bruen*, 142 S. Ct. at 2118 (explaining that this is a

"central consideration" when engaging in the "analogical inquiry" *Bruen* requires). In addition,

any burden that Highland Park's Ordinance places on self-defense is "comparably justified," *id.*,

because it responds to increased dangers to society—the increased rate of highly lethal mass

shootings—that emerged with the commercial availability of AR-15-style weapons. *See, e.g.*,

Opp. 39–40 (citing Dkt. 45-4, Busse Decl. ¶¶ 29–42 and Dkt. 45-6, Klarevas Decl. ¶¶ 19–23).

Plaintiffs respond that all of Highland Park's historical analysis should be swiftly rejected

because *Heller* struck down a ban on all handguns and, in their view, "[t]he modern handguns at

issue in *Heller* were the product of exactly the same sort of technological innovation" as AR-15-

style weapons and "produced the same social problems." Reply 10. But the evidence uniformly

shows otherwise. Unlike handguns, AR-15-style weapons descend from firearms designed

specifically for military purposes. Opp. 22; *see also* Dkt. 45-3, Andrew Decl. ¶¶ 25–35; Dkt. 45-

4, Busse Decl. ¶ 24; Dkt. 45-7, Roth Decl. ¶ 49. They are vastly more destructive than handguns.

Opp. 21–25; *see also, e.g.*, Dkt. 45-3, Andrew Decl. ¶¶ 25–34, 43; Dkt. 45-4, Busse Decl. ¶¶ 24–

25; Dkt. 45-5, Hargarten Decl. ¶¶ 26–35; Dkt. 45-7, Roth Decl. ¶¶ 49–57; Dkt. 45-8, Schreiber

Decl. ¶¶ 32–41; Dkt. 45-12, McKenzie Decl. ¶¶ 11–14. Their availability has dramatically

increased the frequency and lethality of mass shootings. Opp. 25–26; Dkt. 45-6, Klarevas Decl.

¶¶ 12–22. And unlike the law at issue in *Heller*, the Highland Park Ordinance does not in any

way encumber citizens' ability to possess numerous types of handguns that fall outside the scope

of the Ordinance, in whatever quantity they wish, for self-defense and other lawful purposes. *See*

Ex. 23, Busse Rebuttal Decl. ¶¶ 4–23. By arguing that AR-15s, which are virtually identical to

M-16s, are indistinguishable from handguns, Plaintiffs are simply denying reality.

25

### C. Plaintiffs Have Not Met Their Burden to Show That Large-Capacity Magazines Are "Arms," and Have Failed to Rebut That Highland Park's Ban Is Consistent with the Second Amendment.

Plaintiffs are also not likely to succeed on their challenge to the provisions of Highland Park's Ordinance that ban large-capacity magazines. Plaintiffs' reply confirms that they cannot meet their burden on *Bruen* step one. Large-capacity magazines are not "Arms" protected by the plain meaning of the Second Amendment, but rather *accessories*, as other courts have held. *Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022); *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-1866, 2022 WL 17721175, at *12–13 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

Plaintiffs, relying on cases that have held that a ban on *ammunition* would be tantamount to a ban on "Arms" because ammunition is necessary to operate arms, suggest the same is true of magazines for semi-automatic weapons. *See* Reply 28–29. But they concede that *large-capacity* magazines are not required. *Id.* In fact, Highland Park's unrebutted evidence establishes that *no* gun covered by Highland Park's Ordinance requires a large-capacity magazine in order to fire. Dkt. 45-4, Busse Decl. ¶ 23. A ban on large-capacity magazines is therefore nothing like a ban on ammunition, much less a ban on "Arms." Every single "Arm" covered by the Ordinance can be operated without one. *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers are a "firearm accessory" and thus are not "arms").

With respect to "common use," Plaintiffs cite the William English survey for statistics on the circulation of large-capacity magazines. Reply 27. But the statistics they cite are unreliable, in part because English has never released the survey questionnaire or the full survey results. Ex. 24, Klarevas Rebuttal Decl. ¶¶ 7–13. Moreover, publicly available data published in *Gun Digest* indicates that, before enactment of the 10-year federal ban on large-capacity magazines, at most only 7.2% of new firearm models were sold with factory-issue large-capacity magazines—a

26

small percentage that falls far short of showing that large-capacity magazines were "common." *Id.* ¶¶ 15–16 & Table 1. On top of that, Plaintiffs have no response to the evidence that—as other courts have recognized—the large-capacity magazines in circulation among the civilian population are not commonly used *for self-defense. See* Opp. 43–44; *see also Oregon Firearms Fed'n*, 2022 WL 1745829, at *9–11; *Ocean State Tactical*, 2022 WL 17721175, at *14–15.

Large-capacity magazines are also exceptionally dangerous. Other than their unsupported assertion that this is "false as a factual matter," Reply 31 n.29, Plaintiffs offer no response to Highland Park's evidence that large-capacity magazines make it easy to kill large numbers of people very quickly, and have been used in the overwhelming majority of mass shootings. *See* Dkt. 45-6, Klarevas Decl. ¶¶ 15–16; Ex. 24, Klarevas Rebuttal Decl. ¶¶ 24–28. Judge Kendall made the same finding. *See Bevis*, 2023 WL 2077392, at *15–16 (summarizing evidence from Klarevas and others, noting that "researchers examining almost thirty years of mass-shooting data determined that high-capacity magazines resulted in a 62 percent higher death toll," and concluding that "high-capacity magazines are particularly dangerous weapon accessories").

Finally, even if large-capacity magazines could be deemed "Arms," there is a long-standing historical tradition of regulating the *quantity* of ammunition that weapons can accept, which means Plaintiffs also lose at step two of *Bruen*. Highland Park's Ordinance covers magazines that can accept more than 10 rounds. Dkt. 45-2, Ordinance at 4. History shows a long tradition of similar regulations. *See* Opp. 45–46. Judge Kendall reached this conclusion, as have other courts. *See Bevis*, 2023 WL 2077392, at *12, *16 (regulation of large-capacity magazines "accords with history and tradition"); *Oregon Firearms Fed'n*, 2022 WL 1745829, at *12–14.

Plaintiffs offer little by way of response. They argue that ammunition quantity was not regulated in 1791, "despite multi-shot firearms having been in existence for some 200 years."

Reply 31. But Plaintiffs do not address Highland Park's evidence that these so-called "multi-shot" firearms were highly impractical, and owned in—at most—small numbers. *See* Dkt. 45-9, Spitzer Decl. ¶¶ 32–50. Once practical weapons capable of firing more than 10 rounds without reloading appeared, in the early 20th century, there was widespread regulation of ammunition capacity, including limits similar to the ones in Highland Park's Ordinance. *Id.* ¶¶ 29–31.

## II. Plaintiffs Have Not Met Their Burden to Establish That They Will Suffer Any Irreparable Injury.

Plaintiffs also have not demonstrated that they will suffer irreparable harm from Highland Park's Ordinance, particularly while this litigation proceeds. Instead, they continue to argue that under *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), a loss of Second Amendment rights is presumed to cause irreparable harm. Reply 44–45. Not so.

As the Seventh Circuit has cautioned, *Ezell* was decided "at a time when 'Second Amendment litigation [wa]s new,'" and the decision attempted to identify inquiries that would govern only in "'*some* Second Amendment cases.'" *Wilson v. Cook County*, 937 F.3d 1028, 1036 (7th Cir. 2019); *see also Bevis*, 2023 WL 2077392, at *16 ("[*Ezell*] stopped short of holding that injury in the Second Amendment context unquestionably constitutes irreparable harm.") (quotation marks omitted). But even if a presumption were to exist in some cases, it would apply at most only when a regulation burdens the "central component" of the Second Amendment: "the right to possess firearms *for protection*." *Ezell*, 651 F.3d at 699 (emphasis added). Any *Ezell* presumption thus does not apply here. As explained above, Highland Park's Ordinance does nothing to limit residents' ability to possess firearms that are commonly used for self-defense.

In addition, Plaintiffs have no answer to the point that "[p]resumptions can of course be rebutted." Opp. 48 (quotation marks omitted). When there is competing evidence on the issue, courts must weigh that evidence. *See, e.g.*, *id.* (collecting cases). So even if a presumption

applied, Highland Park has rebutted it with evidence that Goldman can use an unlimited number of effective firearms in self-defense. *See id.* at 47–48.

**III. The Balance of the Equities and the Public Interest Strongly Favor Highland Park.**

Plaintiffs refuse to engage with *any* of Highland Park's arguments about the third and fourth preliminary injunction factors. Instead, Plaintiffs accuse Highland Park of engaging in a means-end analysis grounded in "raw emotional appeal." Reply 40–44. And they argue that the preliminary injunction factors should collapse into an exclusive focus on the likelihood of success on the merits. *See id.* at 45. These objections are wrong.

Plaintiffs have moved for a preliminary injunction, which puts the burden on *them* to prove *each* preliminary injunction factor, including that the equities and public interest favor the extraordinary remedy they seek. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). *Bruen*, decided on a motion to dismiss, did not consider these preliminary injunction factors. And contrary to Plaintiffs' assertion, there is no binding precedent to support their view that the likelihood of success on the merits is the only factor that matters. Instead, courts inquire into *each* preliminary injunction factor, including in Second Amendment cases. *See, e.g.*, *Ezell*, 651 F.3d at 710–11. Plaintiffs' First Amendment case does not hold otherwise. *See* Reply 45 (citing *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012)).

So, under the applicable case law, the stories from the Highland Park mass shooting are highly relevant to Highland Park's "strong interest" in continuing to protect the public from the acute risks posed by assault weapons and large-capacity magazines. *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908–09 (N.D. Ill. 2014), *aff'd*, 784 F.3d 406 (7th Cir. 2015). And Highland Park's Ordinance irrefutably furthers that strong interest.

Only two months before this lawsuit was filed, a single shooter, wielding an AR-15-style assault weapon with multiple 30-round cartridges, killed 7 people and injured 48 others during a

shooting rampage that lasted a mere 60–90 seconds. *See* Opp. 7–11. It *is* relevant that, despite the on-the-scene presence of half of Highland Park's police force and nearly all of Highland Park's fire department, first responders were helpless to prevent the horrific harm—or the shooter's escape—because the weapon the shooter used allowed him to cause this massacre in such a short time. *Id.* It *is* relevant that the shooter inflicted "wartime injuries" with his AR-15-style assault weapon, killing Stephen Straus, Nicolas Toledo-Zaragoza, Eduardo Uvaldo, Katherine Goldstein, Jacki Sundheim, Kevin McCarthy, and Irina McCarthy, severing the spinal cord and shredding the esophagus of eight-year-old Cooper Roberts, and seriously injuring dozens of other July 4th paradegoers. *Id.* at 9–11; *see also* Dkt. 45-10, N. Rotering Decl. ¶¶ 20–33. And it *is* relevant that community members continue to suffer from the physical wounds and trauma of that day. Opp. 11. The July 4th mass shooting is but one example of the devastating harms that these uniquely lethal weapons are capable of producing.

Plaintiffs cannot erase the carnage that occurred on July 4, 2022. That devastation goes directly to Highland Park's interest in protecting the community and the balancing of the equities. The massacre on July 4th demonstrates the reality of the unmitigable risk that assault weapons and large-capacity magazines pose to law enforcement and civilians. And Plaintiffs have not and cannot show that an interest in possessing assault weapons and magazines containing more than 10 rounds can support a judicial override of the legislative judgments made by Highland Park. The "costs of a wrong decision" are simply too "substantial" to permit the extraordinary relief they seek. *Bolton v. Bryant*, 71 F. Supp. 3d 802, 818 (N.D. Ill. 2014).

## **CONCLUSION**

For these reasons and those explained in Highland Park's opposition brief, the Court should deny Plaintiffs' Motion for Preliminary Injunction (Dkt. 7).

Dated: March 13, 2023                    Respectfully submitted,

                                         */s/ David H. Hoffman*
                                         David H. Hoffman (No. 6229441)
                                         Robert N. Hochman (No. 6244222)
                                         Neil H. Conrad (No. 6321947)
                                         Caroline A. Wong (No. 6324863)
                                         Paul J. Rogerson (*pro hac vice*)
                                         Claire G. Lee (No. 6339280)
                                         SIDLEY AUSTIN LLP
                                         One South Dearborn
                                         Chicago, IL 60603
                                         Telephone: (312) 853-7000
                                         Facsimile: (312) 853-7036
                                         david.hoffman@sidley.com
                                         rhochman@sidley.com
                                         nconrad@sidley.com
                                         caroline.wong@sidley.com
                                         progerson@sidley.com
                                         claire.lee@sidley.com

                                         Steven M. Elrod (No. 6183239)
                                         Hart M. Passman (No. 6287062)
                                         ELROD FRIEDMAN LLP
                                         325 N. LaSalle St.
                                         Suite 450
                                         Chicago, IL 60654
                                         Telephone: (312) 528-5200
                                         steven.elrod@elrodfriedman.com
                                         hart.passman@elrodfriedman.com

                                         Douglas N. Letter (*pro hac vice* application
                                         forthcoming)
                                         Erin Davis (*pro hac vice*)
                                         Philip Bangle (*pro hac vice* application
                                         forthcoming)
                                         Shira Lauren Feldman (*pro hac vice*)
                                         BRADY
                                         840 First Street NE, Suite 400
                                         Washington, DC 20002
                                         Telephone: (202) 370-8100
                                         dletter@bradyunited.org
                                         edavis@bradyunited.org
                                         pbangle@bradyunited.org

31

sfeldman@bradyunited.org

*Attorneys for Defendant City of Highland Park, Illinois*