# EXHIBIT 25

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and SUSAN KAREN GOLDMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF HIGHLAND PARK, ILLINOIS, <br><br> Defendant. | No. 1:22-cv-04774 <br><br> Honorable Harry D. Leinenweber <br><br> Honorable Jeffrey T. Gilbert |

**REBUTTAL DECLARATION OF ROBERT J. SPITZER**

## REBUTTAL DECLARATION OF ROBERT J. SPITZER

I, Robert J. Spitzer, declare under penalty of perjury that the following is true and correct:

1.      I previously submitted an expert declaration in this case (my "Declaration") to provide an opinion on the history of firearms restrictions, including those enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semi-automatic firearms, and ammunition feeding devices, and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

2.      My background and qualifications are set forth in my Declaration, and a copy of my curriculum vitae is attached as Exhibit A thereto.

3.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

4.      I have been retained by the City of Highland Park, Illinois, and I have been asked to review and respond to certain portions of the following three documents, which were filed in this case on February 20, 2023: (i) Reply in Support of Motion for Preliminary Injunction, Document No. 81 (hereafter "Reply"); (ii) Exhibit 1: Rebuttal of Spitzer Exhibit H, Document No. 81-3 (hereafter "Exhibit 1"); and (iii) Declaration of Clayton E. Cramer, Document No. 81-1 (hereafter "Cramer Declaration").

5.      The Reply, Exhibit 1, and the Cramer Declaration attempt to make various criticisms regarding my Declaration. However, as I explain below, those materials make a series of errors regarding my Declaration, and they offer no information to blunt, contradict, or undermine the opinions and information I set forth in my Declaration, including the information I set forth to demonstrate that a specific relationship existed between the development of new weapons technologies, their spread into society, and subsequent regulation by the government as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence.

## I.   FIREARMS RESTRICTIONS IN EARLY AMERICA

6.      Page 9 of the Reply says: "he [Spitzer] candidly admits that there were 'few' restrictions on firearms in the Founding Era. Spitzer Dec. ¶ 81." First, that is a mischaracterization of my Declaration. In the cited paragraph, I instead wrote that there were few firearms restrictions from the end of the 1600s through the eve of the Revolution.[1] That is not the same as the Founding period, which extends through the Revolution and includes the period of the adoption of the modern Constitution in 1789 and the Bill of Rights in 1791, during which time more firearms restrictions were enacted. In addition, as the relevant paragraph of my Declaration explained, I was quoting historian Randolph Roth, who notes that "firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution" were few because "homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur."[2] My overarching argument in my Declaration is that there is a tradition across American history in which governments enacted new weapons restrictions when various weapons entered civil society and were used in ways that threatened public safety or were tied to harm or criminality. Because gun-related homicides were few from the end of the 1600s through the eve of the Revolution, as Roth makes clear, governments in this period did not need to enact the same firearms restrictions that later generations enacted. That history supports the tradition I identify and discuss in my Declaration.

7.      Page 9 of the Reply also says: "he [Spitzer] attempts to divert the analysis from [the Founding] era to the 20th century, to which the vast majority of his declaration is devoted (pages 5-37; paragraphs 12-59)." I address the regulation of fully automatic and semi-automatic firearms, and ammunition feeding devices in the early 20th century, on pages 5-22 of my Declaration, not pages 5-37. (The Reply repeats the citation error on page 13.) Pages 23-33 of my Declaration are devoted to, as the section heading says, "The History of Pre-Twentieth

---

[1] Spitzer Decl. ¶ 81.

[2] Spitzer Decl. ¶ 81.

Century Firearms Technologies."[3] Moreover, my discussion of the 20th century is not a "diversion." The examples I discuss of regulation of fully automatic and semi-automatic firearms, and ammunition feeding devices in the early 20th century, are relevant because they are illustrative examples of a tradition, tracing back to early America, in which new weapons technologies were developed and spread into society, and in which governments subsequently regulated that technology to protect the public from harm and to dampen weapons-related criminality and violence. Other laws that I discuss from the late 19th and 20th centuries, which the Reply and Exhibit 1 criticize on similar grounds, are relevant to my analysis for these same reasons.

8.      Pages 14-15 of the Reply attempt to minimize the significance of anti-carry weapons laws. While these represent only one type of law enacted to combat the harmful consequences of weapons carrying by civilians, these laws were a bulwark enacted at a time (mostly in the 19th century) when the still-developing American state possessed an under-developed police power and fewer regulatory tools. The notion that various harmful and dangerous weapons were not ubiquitously "banned" in this time period fails to appreciate that such a mechanism was a practical impossibility at the time. This lesson applies with particular force to regulated items such as fighting knives and various types of clubs, as these were very simple to make, compared to firearms. Carry restrictions—no less sensible in the 19th century than now—were a feasible and logical policy tool suited to the time and place.

9.      Page 14 of the Reply states: "Spitzer asserts that four states prohibited public carry of arms. *Id.* n. 126. Spitzer misrepresents all four statutes, because none of them banned peacefully carrying firearms." This is incorrect. I did not misrepresent anything. Instead, the Reply has mischaracterized what I wrote, by replacing my word "criminalized" with the word "prohibited." In the sentence to which this portion of the Reply refers (in paragraph 60 of my

_____

[3] Spitzer Decl. ¶¶ 35–50 (emphasis added).

Declaration), I wrote: "At least four states (Virginia, Massachusetts, North Carolina, Tennessee) *criminalized* public arms carrying"[4] (emphasis added), which is what these laws did:

- The Virginia law (1786) provided that no man was to "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison. . . ."

- The Massachusetts law (1786) provided: "if any persons to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultously assembled, any Justice of the Peace, Sheriff or Deputy-Sheriff of the county, or constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall openly make proclamations in these or the like words. … and if such persons, assembled as aforesaid, shall not disperse themselves within one hour after proclamation made, or attempted to be made, as aforesaid, it shall be lawful for every such officer to command sufficient aid, and he shall seize such persons, …"

- The North Carolina law (1792) provided: "no man great nor small" "with force and arms" shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor i[n] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. …"

- The Tennessee law (1801) provided: "if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail …"

These examples, and the other firearm restrictions I present in my Declaration, are consistent

with and therefore support the tradition I describe, in which enactment of weapons restrictions

---

[4] Spitzer Decl. ¶ 60 & n.126 (citing 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6).

"occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use."[5] For example, relevant to the examples I discuss in paragraph 60 of my Declaration, homicide rates increased substantially after the Revolution, and governments responded to that increase in part with laws that restricted public carrying of firearms.[6] Other laws that I present elsewhere in my Declaration support this tradition for similar reasons (including, for example, the anti-club and trap gun laws discussed at page 18 of the Reply).

10.     Elsewhere the Reply appears to acknowledge that the firearms restrictions I cite from the Founding era support this tradition. Specifically, at Page 17, the Reply says: "At best, the City has established a founding era tradition of prohibiting concealed carry." In fact, my Declaration lays out a plethora (both in number and variety) of laws that curtailed multiple categories of dangerous weapons, far beyond concealed carry, through a variety of regulatory means. In addition to weapons carry restrictions (both concealed and open), there were criminal penalty enhancements, taxes and restrictions related to sale, laws against weapons brandishing and display, and weapons restrictions related to named groups. In toto, these laws spanned all the states, hundreds of years, and hundreds of laws. They and the other laws I cite in my Declaration (including, for example, regulations of clubs and trap guns) support the opinions I set forth, even though those laws do not necessarily use categorical prohibitions on firearms possession as their regulatory means. The cited laws support the tradition I describe in which firearms regulations are enacted when new technologies "circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address."[7]

---

[5] Spitzer Decl. ¶ 60.

[6] Spitzer Decl. ¶¶ 60, 81.

[7] Spitzer Decl. ¶ 33.

## II.  BOWIE KNIFE REGULATIONS

11.     Page 15 of the Reply says: "Spitzer states that '15 states effectively banned the possession of Bowie knives outright …' Spitzer Dec. ¶ 69. This is simply false. Indeed, it is outrageously false." There is nothing false or outrageous here. My full sentence stated: "15 states effectively banned the possession of Bowie knives outright (by banning both concealed carry and open carry). . . ."[8] In other words, my sentence says that these laws "***effectively*** banned" (i.e., in effect banned) the possession of Bowie knives, which I then define as "banning both concealed and open carry," as this means that Bowie knives could not leave the house[9] (with the exception that some laws allowed Bowie knives to be taken "upon a journey"[10]). Further, the Reply fails to note that restrictions on Bowie and similar long-bladed fighting knives not only barred carrying them, but also utilized an array of other policy tools against them (see below).

12.     Page 16 of the Reply states: "Spitzer suggests that laws regulating carry are the same as laws banning possession. Spitzer Dec. ¶ 69." That mischaracterizes my Declaration. My Declaration, both in the cited paragraph and in Exhibit H, distinguishes between the different regulatory means by which various laws restricted Bowie knives and other long-bladed fighting knives. Then, in the cited paragraph of my Declaration, I described the overlapping objectives that various weapons restrictions advanced, whether they regulated carry, banned possession, or used some other regulatory means to restrict weapons: "The desirability and utility of such restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also

---

[8] Spitzer Decl. ¶ 69.

[9] Spitzer Decl. ¶ 69 (emphasis added).

[10] *See, e.g.*, Josiah Gould, A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly (1837) (cited in Spitzer Decl., Exhibit E at 7) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.").

discouraging the settlement of private grievances and disputes in public through weapons-fueled violence."[11]

13.     Page 17 of the Reply quotes an online article written by David Kopel, and states with approval: "Kopel concluded: 'As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, no state prohibited possession of Bowie knives.'" But Kopel undercounts the numbers of restrictions on Bowie knifes and other long-bladed fighting knives. By the close of the 19th century, over 40 states had anti-Bowie knife laws, and the remaining states generally had anti-fighting knife laws that would have been understood to include Bowie knives (for example, South Dakota had a law barring carry of "any sharp or dangerous weapon"[12]). And Kopel's added comment that "no state prohibited possession" (quoted in the Reply at page 17) understates the extensive and varied regulations enacted against Bowie knives. I detailed those regulations in my Declaration.[13]

14.     Next, the Reply and Exhibit 1 attempt to criticize my discussion of certain Bowie knife or long-bladed knife regulations. In all, Exhibit 1 raises questions about 22 laws I cite from 15 states. However, Exhibit 1 does not raise any legitimate factual dispute about these laws or the restrictions they imposed. Instead, most of these questions argumentatively quibble about whether the cited statutes are or are not appropriate for consideration in the light of *Bruen*.[14] These 22 laws represent only a fraction of the more than 100 laws I presented in my Declaration

---

[11] Spitzer Decl. ¶ 69.

[12] S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), § 471 (cited in Spitzer Decl., Exhibit E at 75–76) ("Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.").

[13] *See* Spitzer Decl. ¶¶ 61–71 & Exhibits C, E, and H.

[14] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

that regulated Bowie knives and other similar knives, and an even smaller percentage (roughly 9 percent) of the list of over 240 laws presented in my Declaration involving all manner of weapons regulation spanning all the states and over three centuries. In any event, the criticisms of these 22 laws do not contradict or undermine the opinions set forth in my Declaration, including for the following reasons:

- **State 1, Arizona 1889:** Exhibit 1 (at page 1) says that the Court in *Bruen* "specifically ruled that this statute is irrelevant." That is inaccurate. *Bruen* said only that this law did not outweigh the "overwhelming evidence of an otherwise enduring American tradition permitting public carry of **handguns**."[15] I am citing this law for its restrictions on Bowie knives and other weapons, not handguns. In addition, notably, Exhibit 1 does not raise any question regarding the two other Arizona laws regulating Bowie knives that I present in my Declaration (enacted in 1893 and 1901).[16]

- **State 2, Arkansas 1881:** Exhibit 1 (at pages 1–2) says that "Spitzer flat out misrepresents this law when he states that it 'banned the possession of Bowie knives outright.' Spitzer Dec. ¶69. In his exhibit he deleted a key portion of the statute. When that portion is added back in, the statute expressly states the exact opposite of what Spitzer represented." (See also Reply, p. 15.) No part of this is correct. As noted above, my full sentence stated: "15 states **effectively** banned the possession of Bowie knives outright (by banning both concealed carry and open carry). . . ." (emphasis added).[17] In other words, my sentence says that these laws "**effectively** banned" (i.e., in effect banned) possession, which I then define as banning both concealed and open carry, as this meant that Bowie knives could not leave the house (again, with the

---

[15] *Bruen*, 142 S. Ct. at 2154 (emphasis added).

[16] *See* Spitzer Decl., Exhibit H; *see also* Spitzer Decl., Exhibit E at 6.

[17] Spitzer Decl. ¶ 69.

exception that they could be taken "upon a journey" as Exhibit 1 notes). Exhibit 1 simply omits that language from my sentence. Further, I did not "delete a key portion of the statute." The source from which I obtained the text of the law (the Duke Center for Firearms Law Repository of Historical Gun Laws[18]) contained only that portion of the text that I reprinted. Finally, the additional text from the statute that Exhibit 1 provides (at page 2) does not state "the exact opposite" of my comment about it. The added text simply demonstrates my point by noting that the weapons in question were confined to one's home.

- **State 3, Colorado 1881:** Exhibit 1 (at page 3) argues that this law is not relevant because it prohibited concealed carry of arms but did not regulate open carry. However, this law, like others I cite, supports the opinions in my Declaration, even though it does not prohibit open carry as its regulatory means. Such laws are consistent with and exemplify the tradition I describe, in which weapons regulations were enacted when new weapons technologies "circulate[d] sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address."[19]

- **State 4, Hawaii 1852 and 1913:** Exhibit 1 does not raise any criticism about my inclusion of these laws in my Declaration, except to argue that these laws are not relevant under *Bruen* because they pre-date the time when Hawaii became a state.

- **State 5, Idaho 1879:** Exhibit 1 (at page 5) argues that this law is not relevant because it prohibited only concealed carry and not open carry. Again, however, such concealed carry restrictions support and are consistent with my opinions, for the reasons I explained in the bullet point above with regard to the 1881 Colorado law.

---

[18] https://firearmslaw.duke.edu/repository/search-the-repository/.

[19] Spitzer Decl. ¶ 33.

- **State 6, Indiana 1859:** Exhibit 1 (at page 5) says that this law is not relevant because it "prohibits carrying concealed and carrying with the 'intent or avowed purpose of 'injuring' another."[20] In addition, however, this law also prohibited open carry in the circumstances it describes. It supports and is consistent with my opinions for the reasons I explained in bullet points above regarding concealed carry restrictions.

- **State 7, Louisiana 1870:** Exhibit 1 (at page 5) says that this law is not relevant because it "regulated carry of arms only in certain designated places and even then only once every two years (i.e., during election and registration)." However, Exhibit 1 ignores that my Declaration also discussed another law, enacted in Louisiana in 1855, which prohibited ***all*** concealed carry of Bowie knives and other dangerous weapons.[21]

- **State 8, Missouri 1917 and 1923:** Exhibit 1 (at pages 6–7) says that these laws are not relevant because one "regulated carry of arms only in certain designated places" and the other "forbids only the carrying of arms while in a vehicle of any type that was carrying liquor." That is not accurate. In addition to restricting the carry of arms in certain designated places, the 1917 law provides: "If any person shall ***carry concealed*** upon or about his person a dangerous or deadly weapon of any kind or description … he shall be deemed guilty of a misdemeanor" (emphasis added),

---

[20] The full relevant text of the Indiana law provides: "Every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars." 1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefore, § 1 (cited in Spitzer Decl., Exhibit E at 27).

[21] Louisiana 1855 law, 1855 La. L. Chap. 120, Sec. 115, p. 148 (cited in Spitzer Decl., Exhibit E at 33) ("[W]hoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution …").

regardless of place, and the 1917 law contains a list that expressly includes Bowie knives as an example of a "deadly weapon."[22]

- **State 9, Nebraska 1872:** Exhibit 1 does not raise any criticism about my inclusion of this law in my Declaration, except to argue that it is not relevant under *Bruen* because of when and where it was enacted.

- **State 10, New York 1885:** Exhibit 1 (at page 8) says that this law is not relevant because it only "prohibits a person from carrying or possessing an arm 'with the intent to [] use' the arm against another." However, Exhibit 1 ignores other language in this law, which provided: "The ***possession***, by any person other than a public officer, of any of the weapons specified in the last section, ***concealed or furtively carried*** on the person, ***is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same*** in violation of that section" (emphasis added).[23] In other words, this law effectively banned all concealed carry, not just concealed carry with intent to use against another, because it treated concealed or "furtive" carry as presumptive evidence of such intent.

- **State 11, Oklahoma 1890 and 1891:** Exhibit 1 (at pages 8–9) says that the Court in *Bruen* "specifically considered" the 1891 law and "held that it is irrelevant." That is inaccurate. The *Bruen* decision said only that this law did not outweigh the "overwhelming evidence of an otherwise enduring American tradition permitting public carry of ***handguns***."[24] I am citing this law for its restrictions on Bowie knives and other weapons, not handguns. Exhibit 1 also says that these statutes are irrelevant because they prohibited only public carry, not private possession. For the same

---

[22] Joplin Code of 1917, Art. 67, § 1201 (cited in Spitzer Decl., Exhibit E at 47).

[23] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885), § 410 (cited in Spitzer Decl., Exhibit E at 61).

[24] *Bruen*, 142 S. Ct. at 2154 (emphasis added).

reasons I have explained now in several bullet points above, such laws are consistent with and illustrate the tradition I describe, in which weapons regulations were enacted when new weapons technologies "circulate[d] sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address."[25]

- **State 12, Tennessee 1869, 1881, and 1893:** Exhibit 1 (at pages 9–11) criticizes my presentation of these three laws on grounds similar to those that I have already addressed herein. Notably, however, Exhibit 1 raises no question regarding any of the four other laws from Tennessee that restricted Bowie knives or other similar knives that I presented in my Declaration (enacted in 1838, 1856, 1863, and 1867.)[26]

- **State 13, Texas 1871:** Exhibit 1 (at page 11) says that the Court in *Bruen* specifically rejected this statute as an "outlier." However, *Bruen* characterized this law as an outlier solely to the extent it prohibited carrying of handguns.[27] I cite this law not for its restrictions on handguns, but for its restrictions on Bowie knives and other weapons.[28]

- **State 14, Utah 1877:** Exhibit 1 (at page 12) does not raise any criticism about my inclusion of this law in my Declaration, except to argue that it is not relevant under *Bruen* because of when and where it was enacted.

---

[25] Spitzer Decl. ¶ 33.

[26] *See* Spitzer Decl., Exhibit H; *see also* Spitzer Decl., Exhibit E at 76–78.

[27] *See Bruen*, 142 S. Ct. at 2153.

[28] *See* 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons (cited in Spitzer Decl., Exhibit E at 80) ("[A]ny person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense … shall be guilty of a misdemeanor …").

- **State 15, West Virginia 1882, 1891, and 1925:** Exhibit 1 (at pages 12–13) criticizes my presentation of these three laws on grounds similar to those that I have already addressed herein. However, Exhibit 1 raises no question regarding the fourth law from West Virginia that restricted Bowie knives or other similar knives, which I presented in my Declaration (enacted in 1870).[29]

## III. RESPONSE TO THE CRAMER DECLARATION

15.     Clayton Cramer's Declaration fails as a "rebuttal" of my Declaration. Most importantly, Cramer does not address or say anything to undermine my overarching argument in my Declaration, which is that there is a tradition across American history in which governments enacted new weapons restrictions when various weapons entered civil society and were used in ways that threatened public safety or were tied to harm or criminality. Rather than address that central point, Cramer repeats or amplifies information I present without contradicting it, embarks on some tangents, inserts some non sequiturs, and commits a parade of errors in the course of attempting to criticize my citations to a small subset of the hundreds of laws I present in my Declaration. I will address some instances of Cramer's non sequiturs and errors in this section. While Cramer claims that I commit "errors" and "misrepresentations," he manages to find none.

16.     For example, on page 2, ¶¶ 3-4, the Cramer Declaration notes that the Puckle gun had been invented by 1718, and that the Gatling gun was used against rioters; those facts are true. I noted the same fact about the Puckle gun in my Declaration,[30] and, with regard to the Gatling gun, my Declaration simply said that it was a military weapon developed and designed to

---

[29] *See* Spitzer Decl., Exhibit H; *see also* Spitzer Decl., Exhibit E at 90.

[30] Spitzer Decl. ¶ 36 ("[A]n early multi-shot gun, the 'the Puckle Gun,' [was] patent in 1719 in London by James Puckle …").

be used in combat, which it was.[31] Cramer does not dispute or refute these points. It is unclear why he discusses the Puckle gun and the Gatling gun at all.

17.     On page 4, ¶ 8, the Cramer Declaration begins by asserting that all examples of 20th-century laws that I present in my Declaration are "irrelevant because of the 1868 cut off date set in Bruen." As I have noted above, however, the examples I discuss of 20th-century regulations of firearms and ammunition feeding devices are relevant because they are illustrative examples of a tradition, tracing back to early America, in which new weapons technologies were developed and spread into society, and in which governments subsequently regulated that technology to protect the public from harm and to dampen weapons-related criminality and violence. Again, Cramer does not address or say anything to dispute the existence of that long-standing tradition.

18.     The same paragraph of the Cramer Declaration then says: "Spitzer suggests that state machine-gun laws adopted 'between 1925 and 1933' played some part in pushing Congress to pass the Mailing of Firearms Act of 1927 to 'restrict the interstate shipment of guns.' The Mailing of Firearms Act has a somewhat different origin, unrelated to machine guns." On this point, Cramer is correct; so am I. The controversy over machine guns was not the basis for introducing what eventually became the 1927 law, but the explosive criminological and political concern over machine guns did prod enactment of the law in Congress, where it had languished.[32] Cramer does not refute that.

19.     On pages 5-6, ¶ 10, the Cramer Declaration presents excerpted congressional testimony from 1934 from Attorney General Homer Cummings, who was concerned about how to construct what became the 1934 federal gun law (it utilized the federal power to tax as the enforcement mechanism). The excerpt includes a question from Rep. Lewis to Cummings that

---

[31] Spitzer Decl. ¶ 13.

[32] Alexander DeConde, *Gun Violence in America* (Boston: Northeastern University Press, 2001), 122-27.

made a passing reference to "the right to carry arms." But a full reading of the over 160 pages of hearings on this legislation demonstrates that the Second Amendment was not a significant concern at the hearings. Cramer then interprets Cummings' response as expressing the view that "the Constitution prohibited the national government from banning private ownership of machine guns." But even if that interpretation were correct, this single comment from an individual during congressional hearings does not change or undermine my analysis or conclusions. Congress later proceeded to pass the 1934 National Firearms Act. In addition, the constitutionality of the 1934 National Firearms Act was later challenged as a violation of the Second Amendment, but a unanimous Supreme Court rejected that challenge and upheld the law in 1939 in *U.S. v. Miller*.[33]

20.     On page 7, ¶ 13, the Cramer Declaration discusses one of the approximately 100 laws that I present in Exhibit B of my Declaration, and notes that the law (enacted in Florida in 1913) prohibited hunting with automatic firearms. I noted the same point in my Declaration.[34] It is unclear why Cramer discusses this law.

21.     At Page 7, ¶ 14, the Cramer Declaration states: "Spitzer at ¶26 claims that ten states plus D.C. restricted semi-automatic weapons." I do not; Cramer misquotes me. The subject matter he references is in ¶ 27 of my Declaration, not ¶ 26 (which deals with a 1932 D.C. law). Here is my sentence from that paragraph: "during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons."[35]

22.     At Page 8, ¶ 16, the Cramer Declaration says: "Spitzer at ¶30 lists states that adopted magazine capacity limits. 1933 Cal. Stat. 1169…ch. 465, §§ 1, 8. The actual statute has no such limits. It is a machine gun licensing law." The actual statute does indeed include a

---

[33] *See U.S. v. Miller*, 307 U.S. 174 (1939).

[34] Spitzer Decl. ¶ 27 n.35 & Exhibit B.

[35] Spitzer Decl. ¶ 27.

magazine limit—of no more than 10 rounds, as I said in my Declaration. In fact, these actual words appear in Cramer's own reprint of the California law (on page 10 of his Declaration in very small print). Here is the full text of the Section:

> § 3: The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having *a capacity greater than ten cartridges*.[36] [emphasis added]

23.     At page 22, ¶¶ 22-23, the Cramer Declaration asserts that a South Dakota 1933 law and a Virginia 1934 law (which Cramer quotes in ¶ 23 without citing) are "not really magazine limit[s] except for a rare set of conditions." Cramer's assertions are incorrect. The South Dakota 1933 law defined "machine gun" to include weapons "from which *more than five shots or bullets* may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device" (emphasis added).[37] The Virginia 1934 law defined "machine gun" to include weapons "from which *more than seven shots or bullets* may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which *more that sixteen shots or bullets* may be rapidly, automatically, semi-automatically or otherwise discharged without reloading" (emphases added).[38] Those clearly are magazine limits, and Cramer does not explain any basis for his assertion that they applied only in "a rare set of conditions." Both laws prohibited use for *any* "offensive or aggressive purpose" and even listed

---

[36] https://firearmslaw.duke.edu/laws/1933-cal-stat-1169/

[37] 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, § 1 (cited in Spitzer Decl., Exhibit D at 28).

[38] 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, § 1 (cited in Spitzer Decl., Exhibit D at 30).

circumstances in which "an offensive or aggressive purpose" was to be presumed, which included *any* circumstances in which a person was in possession of a machine gun outside of the person's "bona fide permanent residence or business occupancy."[39]

24.    At pages 23-24, ¶ 26, after agreeing that four state laws I list (a California 1927 law, and laws from Hawaii, Missouri, and Washington State, discussed in my Declaration[40] and also part of my Table 1) did in fact restrict all guns that could receive any type of ammo feeding mechanism or round feeding device, the Cramer Declaration then says that this is "irrelevant to magazine size." Obviously, however, since these laws barred ***any*** magazines or other feeding devices of any capacity whatsoever, they are highly and self-evidently relevant. In ¶ 27 he again references the 1927 California law, saying it is "another machine gun ban and not a magazine limit." Cramer's assertion misunderstands that a law can be both a machine gun ban and a limit on ammunition magazines and like devices; the two overlap. For example, as I explained in my Declaration, the 1927 California law "prohibited the possession of any 'machine gun'"—and it also limited ammunition magazines by defining the term "machine gun" by reference to a certain type of ammunition feeding device.[41] He shows the same confusion in ¶¶ 28-30 of his Declaration, where he raises the same off-point objection about the Hawaii, Missouri, and Washington State laws, and in ¶¶ 17 and 19, where he does the same with regard to laws from Massachusetts and Minnesota.[42]

---

[39] 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, §§ 3-4; 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 3-4.

[40] Spitzer Decl. ¶ 30.

[41] Spitzer Decl. ¶ 31 (quoting 1927 Cal. Stat. 938).

[42] Cramer's claim about the Minnesota law (at pages 16-19, ¶ 19 of his Declaration) is also incorrect for another reason. He claims that the law is not "a magazine size limit," but a limit on modified semi-automatic firearms. Section 1(a) of the law, however, defines a machine gun as "[a]ny firearm capable of loading or firing automatically [a semi-automatic or automatic weapon], the magazine of which is *capable of holding more than twelve cartridges*" (emphasis added)—a definition that obviously is tied to magazine size. Only Section 1(b) of the law defines

18

25.     At page 30, ¶ 32, the Cramer Declaration says, "Spitzer's history of pre-Twentieth Century firearms technology is contradictory and tendentious, often ignoring his own sources' caveats." Yet Cramer provides no evidence to support this claim. For example, he takes issue with some of my accounts of early multi-shot firearms like those produced by the Volcanic Arms company and the Mannlicher rifle. Yet he concedes my very point: that these were experimental, produced in relatively few numbers, and were commercially unsuccessful. I say that true semi-automatic weapons became feasible and available around "the beginning of the twentieth century."[43] Cramer then proceeds at ¶¶ 33 and 34 to discuss a semi-automatic pistol that first appeared on the market in 1893, another by John Browning "licensed in 1897," another version that appeared in 1900, and others in 1903 and 1908. All of this supports what I write in my Declaration about the development of such weapons occurring around the start of the 20th century.

26.     At pages 31-34, ¶¶ 35-38, the Cramer Declaration recites information about a number of multi-shot weapons that existed roughly from the time of the Civil War on, but the examples he cites (which I also cite[44]) conform to the main argument of my Declaration. As I explained, it is true that such weapons existed—but they were mostly experimental, or were produced in very small numbers, or were commercially unsuccessful for most of the nineteenth century. Because they did not circulate widely in civilian life, they did not raise the public policy, public safety, and criminological problems that arose when some of these weapons eventually did begin to circulate widely. That is when governments responded with the gun laws

---

a machine gun to include a semi-automatic or automatic weapon that has "been changed, altered or modified to increase the magazine capacity from the original design." *Se* 1933 Minn. Laws 231-33 (cited in Spitzer Decl., Exhibit D at 14-15).

[43] Spitzer Decl. ¶ 41.

[44] *See, e.g.*, Spitzer Decl. ¶¶ 44–47 (discussing the Winchester rifle and other multi-shot firearms in the 19th century).

that I have presented. To say that these weapons simply existed in the world is insufficient to demonstrate anything about gun policy in America.

27.     At pages 35-48, ¶¶ 43-47, the Cramer Declaration discusses several early laws I examine from the late 1700s and early 1800s, noting that a Virginia 1786 law and a North Carolina 1792 law contained wording very similar to the British Statute of Northampton (1328).[45] Because *Bruen* treated the old British law as inconclusive for its analysis, Cramer claims that these early U.S. laws are irrelevant. But that conclusion does not follow; they are different laws. Cramer seems to have only now realized that these early U.S. laws were based on earlier British law, which was true of much of early American law—the U.S. had been a colony of Britain, after all. And in fact, these states did borrow from the language of earlier British law but also adapted, adopted, and approved it as their own law at the time, making it relevant to this analysis of early American laws.

28.     At pages 48-51, ¶¶ 48, 49, 55, 50 (Cramer's paragraphs are numbered out of order), the Cramer Declaration says nothing to dispute my analysis of the 1840 Tennessee case of *Aymette v. State*, which I discuss because of what the court said about Bowie knives in upholding the conviction of a man who violated a state law that criminalized the concealed carrying of these and other weapons, and in emphasizing the threat to public safety these knives posed. The same is true of my discussion of the Georgia case, *Nunn v. State*, and the Texas case of *Cockrum v. State*. In other words, I discuss these cases because they each upheld a restriction or penalty on the carrying or use of Bowie knives, and because they address the dangerous nature of those knives.[46] Cramer does not dispute those points.

---

[45] Within this paragraph range, Cramer also characterizes a 1786 Massachusetts law as "demonstrat[ing] that the individual carrying of arms in a peaceful, non-riotous manner was not a crime." Cramer Decl. ¶ 45. His characterization of this 1786 Massachusetts law is inaccurate, for the reasons I have explained above in my discussion of page 14 of the Reply.

[46] *See* Spitzer Decl. ¶¶ 64, 66–68.

29.     At page 51, ¶ 51, Cramer references my Exhibit C, titled "Dangerous Weapons Restrictions," whereupon Cramer erroneously says that I claimed in my Exhibit C that an 1856 Texas Bowie knife law was a Bowie knife "ban." In Cramer's words: "this was not a ban on either concealed or open carry, but a sentence enhancement for manslaughters committed with a Bowie knife." But I did not say it was a "ban" law, because it was not. My discussion of the *Cockrum* case describes the Texas law correctly as a sentence enhancement law pertaining to Bowie knives.[47]

## IV.   FURTHER ITEMS

30.     Finally, although Cramer does not say anything about page 31, ¶ 47 of my Declaration, or about any of the laws or other matters I reference therein, I wish to clarify a point in that paragraph. In particular, on page 31, ¶ 47 of my Declaration, I wrote this: "In addition, in the late 1800s and early 1900s at least a half-dozen states barred possession of such weapons outright, regardless of other circumstances.[48]" The sentence (including footnote) should instead say this, to correctly reflect the number of applicable cited laws:

"In addition, in the late 1800s and early 1900s several states barred possession of such weapons outright, regardless of other circumstances.[49]"

---

[47] Spitzer Decl. ¶ 67.

[48] 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695; Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1883 Kan. Sess. Laws 159, §§ 1-2; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1931 N.Y. Laws 1033, ch. 435, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1923 S.C. Acts 221. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

[49] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-

## V.  CONCLUSION

31.     Cramer says (at page 6, ¶ 12) that he writes in order "to demonstrate that he [Spitzer] is not an expert." He fails to make that case in any respect against me. On the contrary, Cramer's Declaration is riddled with errors, as I have detailed above. And neither the Cramer Declaration, nor the Reply or Exhibit 1, says anything to undermine my overarching conclusion in my Declaration, which is that there is a tradition across American history in which governments enacted new weapons restrictions when various new weapons technologies entered civil society and were used in ways that threatened public safety or were tied to harm or criminality.

---

207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _March 13, 2023_____, at Williamsburg, Virginia.

_/s/Robert J. Spitzer_____
Robert J. Spitzer