# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, and SUSAN KAREN GOLDMAN,

> Plaintiffs,

> v.

CITY OF HIGHLAND PARK, ILLINOIS,

> Defendant.

No. 1:22-cv-04774

Honorable Harry D. Leinenweber

Honorable Jeffrey T. Gilbert

## <u>DECLARATION OF JAMES YURGEALITIS</u>

## DECLARATION OF JAMES YURGEALITIS

I, James Yurgealitis, declare under penalty of perjury that the following is true and correct:

1.      This declaration is based on my personal knowledge and experience, and if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

2.      All opinions contained herein are made pursuant to a reasonable degree of professional certainty. My curriculum vitae, which is attached as **Exhibit A**, documents my educational and professional experience in detail.

3.      I am currently self-employed as a Legal and Forensic Consultant where I provide firearms and related technical and public policy consulting, forensic case reviews, and testing and training services to corporations, legal counsel, and the public sector.

4.      Previously, I served as a Federal Law Enforcement Officer for 26 years. From 1986 until 1990 I was a Special Agent with the Bureau of Diplomatic Security in the United States Department of State. Then, from 1990 until December 2012, I served as a Special Agent with the Bureau of Alcohol, Tobacco Firearms & Explosives (ATF) in the United States Department of Justice.

5.      When I retired from ATF, I was a Senior Special Agent and a Program Manager at the ATF National Laboratory Center. For nine years, I was responsible for all ATF firearms and forensic firearms related training and research at the National Laboratory Center. I directed ATF's Forensic Training Programs, oversaw all forensic firearms-related research, supervised 52 instructors and administrative personnel, and maintained liaison with commercial firearms and ammunitions manufacturers.

1

6.     I graduated from the Federal Law Enforcement Training Center, the Criminal Investigator Training Program, the Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program. I also conducted regular training for local, state, and federal law enforcement agencies, domestically and abroad, regarding firearms classification, operability, and firearms statutes.

7.     I have been granted regular access to a number of firearms reference collections, including the ATF National Reference Collection (10,000+ firearms) as well as the Liege Proofhouse (1,000+ ammunition cartridges), Springfield Armory National Historical Site Firearms Collection (10,000+ firearms), Smithsonian Institution Firearms Reference Collection (4,000+ firearms), Wetechnische Studiensammlung des BWB (Federal Defense Procurement Bureau Museum in Germany) (10,000+ firearms). I have also toured numerous firearms and ammunition manufacturers' facilities in the United States and overseas.

8.     I maintain a personal library of firearms- and ammunition-related books, printed material, documents, and periodicals, attend local and national tradeshows, and maintain contact with other recognized experts in the field.

9.     Over the course of my career, I have been recognized, and testified, as an expert witness in numerous local, state, and federal courts.

10.     I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher University in Rochester, New York.

11.     In the past four years, I have served as an expert in *Herrera v. Raoul*, Case No. 1:23-cv-00532 (N.D. Ill.), *Harrel v. Raoul*, Case No. 3:23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, Case No. 3:23-cv-192-SPM (S.D. Ill.); *Barnett v. Raoul*, 3:23-cv-209-SPM (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, Case No. 3:23-cv-215-SPM (S.D. Ill.);

2

*Viramontes v. Cook County*, Case No. 1:21-cv-04595 (N.D. Ill.); *Gates v. Polis*, Case No. 1:22-cv-01866 (D. Colo.); *Nat'l Ass'n for Gun Rights v. Lopez*, Case No. 1:22-cv-404-DKW-RT (D. Haw.); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Security*, Case No. 1:22-cv-00951-RGA; *Capen v. Healey*, Case No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Fed'n v. Brown*, Case No. 2:22-cv-01815-IM (D. Or.); and *Joseph v. Brown*, Case No. 22-cv-41008 (Circuit Court of Harney County, Oregon). **Exhibit B** contains a listing of the cases that I have recently served as an expert witness or consultant in.

12. I am being compensated for my research, opinions, preparation, and testimony at the rate of $400/hour.

13. I have reviewed the complaint filed in this case, *National Association for Gun Rights v. City of Highland Park, Illinois*, Case No. 1:22-cv-04774 (N.D. Ill.), and Highland Park Ordinance No. 68-13, codified at Highland Park Code § 136.001 (the "Highland Park Ordinance").

14. I have been asked by counsel for Defendant the City of Highland Park, Illinois ("Highland Park") to address certain statements made in Plaintiffs' Reply In Support of Motion for Preliminary Injunction (Dkt. 81) concerning the necessity and suitability of assault weapons and large-capacity magazines ("LCMs"), as defined by the Highland Park Ordinance, for civilian self-defense.

## REBUTTAL OPINIONS

15. Based on my experience, and my training and research regarding the conception, design, history, and purpose of assault weapons, the characteristics of assault weapons as described in the Highland Park Ordinance are ill-suited for civilian self-defense. In fact, the

prohibited characteristics make the weapons more suitable for offensive assaults that pose a serious risk to the public and to law enforcement officers.

16.     Based on my training, experience, and knowledge, I would not recommend an assault weapon for home or self-defense. Home defense and self-defense rarely, if ever, involve lengthy shootouts at long ranges. The range and performance characteristics of assault weapons increase the risk of bystander injury and building material destruction.

## I.     Features of Assault Weapons in the Highland Park Ordinance

17.     The Highland Park Ordinance does not ban all firearms, all semi-automatic firearms, or even all firearms chambered to fire .223/556 mm (AR-platform) or 7.62x39 mm (AK-platform) caliber ammunition.

18.     Instead, the Highland Park Ordinance prohibits a number of enumerated firearms and features with obvious military (*i.e.*, non-sporting) heritage, certain weapons based on magazine features, and shotguns with revolving cylinders. The features delineated in the Highland Park Ordinance are direct descendants from those on military firearms. These features are not necessary for civilian self-defense; firearms without these features are permitted under the Highland Park Ordinance, and these lawful alternatives are widely available to civilian customers and provide effective means for civilian self-defense.

19.     **Pistol grip without a stock attached** (semiautomatic rifles and semiautomatic shotguns): A semiautomatic rifle or semiautomatic shotgun that includes a pistol grip (without a shoulder stock) increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator).

4

20.     **Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand** (semiautomatic rifles, semiautomatic pistols, and semiautomatic shotguns): Protruding foregrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb, thus increasing the hit probability of successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK-based rifles; however, it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the U.S. Military of the same that foregrips for semi-automatic rifles became more widespread. A foregrip on a pistol is regulated under the National Firearms Act and subject to more restrictive controls to include registration in a national database.

21.     **Folding, telescoping, or thumbhole stock** (semiautomatic rifles, semiautomatic pistols, and semiautomatic shotguns): Folding and/or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder. However, a firearm does not need an adjustable stock to operate. Folding stocks were added to the M-1 carbine in World War II for paratrooper use. More recent variants of the U.S. Military's M-16 (M-4 Carbine) have incorporated telescoping stocks as a standard feature. Thumbhole stocks have historically been utilized on some firearms for sport and target shooting; however, during the time the Federal Assault Weapons Ban was in effect (1994-2004), a number of AK-style firearms (amongst others) were equipped with thumbhole stocks to circumvent the ban's prohibition on pistol grips.

22.     **Shroud attached to the barrel, or that partially or completely encircles the barrel** (semiautomatic rifles and semiautomatic pistols): Historically, barrel shrouds were a

5

feature of military rifles produced and adopted at the beginning of the 20th Century. The U.S. Model 1903 Springfield Rifle (standard issue for U.S. Forces in WWI) incorporated a wooden barrel shroud. The M1 "Garand" Rifle utilized by the U.S. Military during WWII incorporated a traditional wooden stock and a wooden handguard which covered the top 2/3rds of the barrel. Barrel shrouds encircle and protect the end of the barrel, keeping the barrel safe from damage caused by collision with objects and providing the operator with a second grip without being burned. In a modern gas-operated semiautomatic military rifle, it serves to protect the gas tube/piston mechanism from inadvertent damage. It also provides additional grip space for the operator to steady and control the rifle during rapid, repeat firing without risking being burned by a hot barrel.

23. **Muzzle brake or muzzle compensator** (semiautomatic rifles and semiautomatic pistols): These are devices attached to the muzzle of a firearm barrel which directionally deviate a portion of the gasses escaping (from the muzzle) to counteract the recoil of the firearm. Many firearms have a tendency to "climb" when fired rapidly due to the effects of recoil on the operator and the firearm itself. Counteracting muzzle climb allows the operator to rapidly and effectively fire follow-up shots into the intended target or acquire additional targets.

24. The Highland Park Ordinance also prohibits certain magazine features.

25. **The capacity to accept a detachable magazine at some location outside of the pistol grip** (semiautomatic pistols): The placement of a detachable magazine outside of the pistol grip is a feature not common to sporting pistols and can trace its origin to military pistols. The Bergman Military Model 1897 (or No. 5) featured a detachable magazine outside the pistol grip. Further evolution of this design can be found in the Mauser C-96 or "Broomhandle" pistols, which were manufactured with fixed internal as well as detachable magazines forward of the

6

pistol grip. Modern firearms recently or currently manufactured in this configuration are either semiautomatic pistol variants of submachinegun designs (HK SP89, Czech Scorpion, TEC-9, etc.) or pistols based upon AR and AK receivers. The magazine placement provides a second grip, which can increase stability and allow more controlled rapid fire.

26.     **Fixed magazine capacity in excess of five rounds** (semiautomatic shotguns) **or ten rounds** (semiautomatic rifle or semiautomatic pistol): This feature prohibits large-capacity fixed magazines. A fixed magazine capable of holding more than 5 rounds of ammunition for a semiautomatic shotgun or 10 rounds for a semiautomatic rifle or semiautomatic pistol is not necessary to operate a firearm as designed. All firearms are capable of functioning with compliant capacities. Generally speaking, modern semiautomatic rifles that are designed, manufactured, and marketed as "hunting rifles" traditionally have a fixed magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has a fixed magazine capacity of four (4) rounds. Similarly, many modern semiautomatic shotguns that are designed, manufactured, and marketed as "hunting shotguns" have a fixed magazine capacity of less than 5 rounds, including, for example, the Remington Model 1100, which has a fixed magazine capacity of four (4) rounds. Notably, most shotguns comply with state hunting laws that restrict shotguns to no more than 5 rounds.

27.     **An ability to accept a detachable magazine** (semiautomatic shotgun): Detachable magazines allow shooters to replace an empty or depleted magazine with a fresh magazine to resume firing quickly.

28.     Finally, the Highland Park Ordinance defines any **shotgun with a revolving cylinder** as an assault weapon. Shotguns with revolving cylinders are known as "street sweeper" shotguns, and are of a design that has not been accepted or issued for military or law

enforcement use by any nation or agency that I am aware of. In terms of legitimate sporting use for either hunting or target shooting or self-defense, I cannot conceive of it having any utility. Shotguns of this type have been classified as a "Destructive Device" by ATF and are subject to additional restrictions under the National Firearms Act of 1935.

29. For more than 30 years, these types of prohibited features—useful for offensive military applications in combat settings but not necessary for civilian self-defense—have been the subject of study and regulation.

30. For example, in 1989, an ATF working group formed under the President George H.W. Bush administration evaluated the importability of semiautomatic rifles and completed a report, which is attached as **Exhibit C**.[1] That working group determined that certain civilian semiautomatic rifles were generally semiautomatic versions of selective-fire military assault rifles.[2] As the working group explained, selective-fire military assault rifles can fire in fully automatic mode (AKA: a machinegun). By contrast, civilian semiautomatic assault rifles cannot fire in fully automatic mode, but they have the same "general characteristics which are common to the modern military assault rifle."[3]

31. These characteristics are associated with features that are designed for offensive, military applications. As the working group found, these characteristics and features carried over from the military assault rifle to the semiautomatic versions, and distinguished the semiautomatic

---

[1] *Report and Recommendation on the Importability of Certain Semiautomatic Rifles*, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms (July 6, 1989).

[2] *Id.* at 5–6.

[3] *Id.* at 6.

assault rifles from traditional sporting rifles.[4] The ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, and other identified characteristics were "military configurations."[5] As a result, the ATF working group determined that semiautomatic assault rifles were not "generally recognized as particularly suitable for or readily adaptable to sporting purposes."[6]

32.     In 1994, Congress enacted the Federal Assault Weapons Ban, creating criminal penalties for the manufacture, transfer, or possession of assault weapons and large-capacity magazines. In enacting the federal ban, Congress recognized the tragic threat posed by gangs, drug-traffickers, mentally deranged persons, and others armed with assault weapons.[7] Specifically, Congress noted that assault weapons had become the weapon of choice for gangs, and law enforcement faced a "rising level of lethality … from assault weapons on the street."[8]

33.     Congress, when drafting the 1994 Federal Assault Weapons Ban, incorporated the technical work of the 1989 ATF working group.[9] Congress recognized that "semiautomatic assault rifles … represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[10] Congress further

---

[4] *Id.*

[5] *Id.* at 6–7.

[6] *Id.* at 12.

[7] H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act (May 2, 1994) (attached as **Exhibit D**) at 12.

[8] *Id.* at 13–14.

[9] *Id.* at 17.

[10] *Id.*

recognized that these features serve "specific, combat-functional ends" that provide "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."[11]

34.    ATF organized two subsequent working groups in 1998 and 2011. The 1998 working group concurred with the conclusions of the 1989 study and added a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989."[12] The 2011 working group then considered the importability of certain shotguns, finding that features such as folding/telescoping/collapsible stock, shotgun magazines over 5 rounds, and forward pistol grips were most appropriate for military or law enforcement use and not sporting purposes.[13]

35.    As described above, the prohibited features serve military-style offensive purposes as opposed to traditional sporting or self-defense uses. And the ATF's concerns about the offensive nature of these firearms have certainly been borne out by their subsequent criminal use in mass shootings and assaults on law enforcement in the past decade.

## II.    Assault Weapons Are Ill-Suited for Self-Defense

36.    At numerous points throughout Plaintiffs' Reply in Support of Motion for a Preliminary Injunction, Plaintiffs allege that self-defense is one of the primary reasons for the

---

[11] *Id.* at 18–20.

[12] *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms (April 1998) (attached as **Exhibit E**) at 2.

[13] *ATF Study on the Importability of Certain Shotguns*, U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives (January 2011) (attached as **Exhibit F**), at iv, 9–13.

purchase of a firearm regulated by the Highland Park Ordinance. It is my opinion, based on my experience and training, that an AR, AK, or other banned assault weapon is a poor choice for self-defense.

37.     Due to my background as a Federal Law Enforcement Officer, training, and experience, I have been asked on numerous occasions over the past 35 years what firearm I would recommend for home or self-defense. In all of those years, I have never recommended any of the firearms prohibited by the Highland Park Ordinance as a self-defense or home defense weapon.

38.     Home defense and/or self-defense situations rarely, if ever, involve lengthy shootouts at distant ranges with extensive exchanges of gunfire. Many assault weapons banned under the Highland Park Ordinance were designed to be effective at battlefield ranges of up to 500 yards or more, and the typical muzzle velocity of a .223 caliber bullet is approximately 3,200 feet per second. When the .223 cartridge was designed for the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet.

39.     Projectiles travelling at velocities found in banned weapons also pose a serious risk of over-penetration in most home construction materials, such as gypsum board / sheet rock and typical 2x4 lumber, which also poses a serious risk of death or injury to innocent bystanders in adjoining rooms, apartments, attached dwellings, etc.

40.     In August 2014, the National Rifle Association's "American Rifleman" published an article by Stanton Wormley: "The AR-15 for Home Defense: Penetration Tests."[14] Wormley conducted penetration tests on nine different types of .223 / 5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board / sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls, all nine (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs placed three feet behind:

> "But just how much energy did the penetrating projectiles carry? All the loads, including the Glaser, exploded one-gallon water jugs placed 3 feet behind the wall sections."[15]

41.     The tests conducted by Wormley also included firing longitudinally through the wall sections, resulting in the penetration of three successive 2" thick 2x4 studs by a number of the projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with high velocity ammunition in a home defense scenario.

42.     The current U.S. Army issue .223 caliber ammunition is capable of penetrating 3/8" hardened steel at 350 yards.[16] Potential over-penetration in a confined environment is problematic in terms of risk to bystanders or family members outside the target location. Most jacketed commercially available .223 / 5.56mm ammunition has impressive penetration capabilities. Additionally, the (former) NATO issue M855 SS109 5.56mm is readily available

---

[14] Stanton Wormley, *The AR-15 for Home Defense: Penetration Tests*, American Rifleman (Aug. 5, 2014), https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/ (last accessed March 12, 2023).

[15] *Id.*

[16] Maj. John L. Plaster, *Testing The Army's M855A1 Standard Ball Cartridge* (May 21, 2014), https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/ (last accessed March 12, 2023).

for purchase by civilians. This ammunition was designed to penetrate up to 3mm of "soft" (*i.e.*, non-hardened) steel. This capability poses substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwelling units.

43.     Assault pistols are similarly a poor choice for home defense or personal protection. Many assault pistols enumerated in the Highland Park Ordinance require two hands to effectively aim and shoot. In a home defense situation, an individual may be required to use one hand to call 911 while attempting to operate a "two handed" firearm with one hand. Such a situation would also preclude the homeowner from utilizing their "non-gun hand" to pick up or guide a small child, elderly, or handicapped individual during such an event.

44.     Further, home defense and street/commercial robbery situations are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA-ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[17]

45.     Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 incidents provided by the NRA-ILA on their website from 1997 to 2001. He determined, from the information provided, that the average number of shots fired in a defensive scenario was 2.2.[18]

46.     Lucy Allen conducted a similar statistical analysis of the "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self-defense scenario was identical to that determined by Werner: 2.2

---

[17] *Armed Citizen*, National Rifle Association Institute for Legislative Action, https://www.nraila.org/gun-laws/armed-citizen/ (last accessed March 12, 2023).

[18] Claude Werner, *The Armed Citizen – A Five Year Analysis* (attached as **Exhibit G**), at 3.

13

shots. "According to this analysis of incidents in the NRA Armed Citizen database, it is extremely rare for a person, when using firearms in self-defense, to fire more than seventeen rounds. Out of 736 incidents, there were no incidents in which the defender was reported to have fired more than 17 bullets and only two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets. Defenders fired 2.2 shots on average."[19]

47.     These two independent analyses of information provided by the NRA, itself an organization which advocates and promotes use and availability of firearms for self-defense, showed that the average shots fired per self-defense incident had not changed over a 20-year period.

48.     Additionally, an abundance of ammunition is not a substitute for weapons familiarization and shot placement. Repeated practice and shooting with a chosen firearm will make someone a more effective deterrent should deadly force be required.

49.     If an individual asking for a self-defense weapon recommendation has a preference for shoulder weapons, I have recommended a pump-action 12- or 20-gauge shotgun (Remington 870, etc.) loaded with 00 Buckshot and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power and low probability of over-penetration (as compared to rifle caliber and velocity projectiles). The loading/chambering process itself is an audible deterrent—*i.e.*, the sound of someone loading a shotgun can be

---

[19] Declaration of Lucy P. Allen, *Del. State Sportsmen's Ass'n v. Del. Dep't of Homeland Security*, Case No. 1:22-cv-00951-RGA (D. Del.), Dkt. 38 at 5.

enough to scare off an intruder or attacker. Training and familiarization with this type of firearm is simple and straightforward.

50. For a handgun, my first inclination is to recommend an eight-shot revolver in .38 +P caliber/.357 Magnum (Similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets. As with my rationale for recommending a pump action shotgun, there is a low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easy for other family members to learn to operate, especially if they have less familiarity with firearms.

51. In terms of a carry handgun, I value concealability. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, we were issued a Sig Sauer P229 in .40 S&W caliber as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five-shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low-profile small semiautomatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine.

52. In sum, the types of firearms classified as assault weapons under the Highland Park Ordinance, specifically AR- and AK-type rifles, are descendants of military weapons

15

designed for use in combat. These features are not designed for, nor are they particularly suitable for, civilian self-defense. Hundreds of firearms—without these features—are permitted under the Highland Park Ordinance, and provide Highland Park citizens with more than effective means of self-defense.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2023 at _MANCHESTER, MD._

/s/ _James E. Yelito_

16

# EXHIBIT A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

---

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

CLEARANCES:  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

TEACHING EXPERIENCE:

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

LINKEDIN PROFILE AND ENDORSEMENTS:

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

REFERENCES:

Available upon request

## Professional Qualifications of James E. Yurgealitis
## Independent Legal, Public Policy and Forensic Consultant

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include published authors and recognized experts in the origin, identification and classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

Qualifications Of James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

Qualifications Of  James E. Yurgealitis contd.

I have been allowed regular access to the following reference collections:
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

I have toured the following museums:
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

Membership in Professional Organizations:

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)

# EXHIBIT B

<u>James E. Yurgealitis: Consulting Engagements 2013 – 2023</u>

(D) – Engaged by Defendant's Counsel

(P) – Engaged by Plaintiff's Counsel

(O) – Engaged by other entity

1. State of Maryland v. Smith, Linwood T, Circuit Court for Baltimore County, Maryland, Case No. 03-K-12-004002 (D) – Defendant's Private Counsel. Case review and consultation.

2. Freidman v. City of Highland Park, Illinois, United States District Court for the District of Illinois, Case No. 1:13-cv-9073 (D) – Defendant's Private Counsel acting as City Attorney. Report & Deposition.

3. Wilson v. County of Cook, Illinois, Illinois Supreme Court, Case No. 2012 IL 112026 (D) – Office of the State's Attorney for the Cook County, IL. Report & Deposition.

4. Fyock v. The City of Sunnyvale, California, United States District Court for the Northern District of California, Case No. 13-cv-05807 RMW (D) – City Solicitor. Declaration.

5. Wrenn v. District of Columbia, United States District Court for the District of Columbia, Civil Action Case No. 15-162 CKK (D) – U.S. Attorney's Office for the District of Columbia. Report & Deposition.

6. Mosaic Research Management, New York, New York, Confidential business assessment and projection (O) – Private consulting firm

7. Worman v. Healey, United States District Court for the District of Massachusetts, Case No. 1:17-cv-10107 (D) – Office of the Attorney General for the Commonwealth of Massachusetts. Report & Deposition.

8. Buckeye Firearms v. City of Cincinnati, Hamilton County, Ohio Court of Common Pleas, Case No. A1803098 (D) – Office of the City Attorney. Report & Deposition.

9. Powell v. The State of Illinois, United States District Court for the Northern District of Illinois, Case No. 18-cv-6675 (D) – Plaintiff's Private Counsel. Consultation.

10. Fletcher v. Century Arms, Circuit Court of the 15th Judicial District, in and for Palm Beach County, Florida, Case No. 502018CA009715 (P) – Plaintiff's Private Counsel. Case Review, Consultation & Deposition.

11. Pullman Arms v. Healey, United States District Court for the District of Massachusetts, Case No. 4:16-40136-TSH (D) - Office of the Attorney General for the Commonwealth of Massachusetts. Report.

Yurgealitis Consulting Engagements 2013 – 2023 contd.

12. United States v. Richard Cooke, United States District Court for the Western District of New York, Case No. 17-CR-0038 (D) – Office of the Federal Public Defender for the Western District of New York. Case review & consultation.

13. Long v. GAMO Outdoor U.S.A. Inc., District Court, Clark County Nevada, Case No. A-16-748401-C (P) – Plaintiff's Private Counsel. Test firing & consultation.

14. Viramontes v. Cook County, IL, United States District Court for the Northern District of Illinois, Case No. 1:21-CV-04595 (D) – Office of the District Attorney for Cook County, Illinois. Report & Deposition.

15. Arnold, Joseph et al., v. Kate Brown et al - Harney County, OR Circuit Court, Case No. 22CV41008 (D) – State of Oregon. Court Testimony.

16. Oregon Firearms Federation et al., v. Brown et al., United States Court for the District of Oregon, Pendleton Division, Case No. 2:22-cv-01815-IM (lead case), 3:22-cv-01859-IM (trailing case), 3:22-cv-01862-IM (trailing case), 3:22-cv-01869-IM (trailing case). (D) – State of Oregon. Declaration.

17. NAGR & Capen v. Healey, United States Court for the District of Massachusetts, Case No. 1:22-cv-11431-FDS (D) – Office of the Attorney General for the Commonwealth of Massachusetts. Declaration.

18. Delaware State Sportsmen's Ass'n et al v. Delaware Dep't of Homeland Security, United States District Court for the District of Delaware, Case No.  No. 1:22-cv-00951-RGA (Consolidated), (D) – Office of the Attorney General for the State of Delaware. Declaration.

19. NAGR v. Lopez, United States District Court for the District of Hawai'i, Case No. 1:22-cv-404-DKW-RT (D) – Office of the Attorney General for the State of Hawai'i. Declaration

20. Harrel et al. v. Raoul, United States District Court for the Southern District of Illinois, Case No. 23-141-SPM (D) – Office of the Attorney General for the State of Illinois. Declaration

21. Herrera v. Raoul et.al., United States District Court for the Northern District of Illinois, Case No. 1:23-cv-00532 (D) – Office of the District Attorney for Cook County, Illinois. In progress.

22. Gates et.al. v. Polis, United States District Court for the District of Colorado, Case No. 1:22-cv-01866 (D) – Colorado Department of Law. In progress.

23. Herrera v. Raoul et. al., United States District Court for the Northern District of Illinois, Case No. 1:23-cv-00532 (D) – Department of Law, City of Chicago, IL. In progress.

# EXHIBIT C



**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**WASHINGTON, D.C. 20226**

JUL 06 1989

MEMORANDUM T0:    Director

         FROM:    Associate Director (Compliance Operations)

   SUBJECT:    Report and Recommendation on the
                  Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

**REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP
ON THE IMPORTABILITY OF CERTAIN
SEMIAUTOMATIC RIFLES**

## SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

      a.   military appearance

      b.   large magazine capacity

      c.   semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

## BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

> The Secretary shall authorize a firearm. . .to be imported or
> brought into the United States . . if the firearm . .
>
> > (3) is of a type that does not fall within the definition
> > of a firearm as defined in section 5845(a) of the
> > Internal Revenue Code of 1954 and is generally
> > recognized as particularly suitable for or readily

> adaptable to sporting purposes, excluding surplus
> military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards ". . . are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition ". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in <u>Gilbert Equipment Company</u>, <u>Inc. v. Higgins</u>, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

<u>**ANALYSIS**</u>

A. <u>Defining the type of weapon under review</u>.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a <u>type</u> that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain <u>types</u> of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, <u>et seq.</u>) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a.  Ability to accept a detachable magazine. Virtually allmodern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b.  Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c.  Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of themiliitary weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d.  Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e.  Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f.  Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g.  Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h.  Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2.  Whether the weapon is a semiautomatic version of a machinegun.

The vast majority of modern military firearms are selective fire, _i.e._, they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3.  Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in Gilbert Equipment Company, Inc., v Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. Suitability.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle generally recognized as particularly suitable for or readily adaptable to the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.[22]

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

<u>CONCLUSIONS</u>

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

NOTES

1. Paul Wahl, ed., <u>Gun Trader's Guide</u>, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as <u>particularly</u> suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not <u>truly</u> suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

   Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

   > Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "

   > Mr. DODD. I would think so.

   > Mr. HANSEN. What about trap and skeet shooting?

   > Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.

   > Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"

   > Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.

   > Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

Page 13

Would all of these firearms be classified as weapons constituting a "sporting purpose?"

Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.

Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?

Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.

Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
I say that is true? (27461)

Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.

Mr. HANSEN. If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?

Mr. DODD. That would seem right to me ….. As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.…... I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3. Ken Warner, ed., <u>Gun Digest 1989</u>, (Northbrook, I1. 1988), pp. 293-300; William S. Jarrett, ed., <u>Shooter's Bible, No. 80</u>, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, <u>Small Arms of the World</u>, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., <u>Jane's Infantry Weapons</u>, <u>1987-88</u>, (New York 1987); Jack Lewis, ed., <u>The Gun Digest Book of Assault Weapons</u>, (Northbrook, I1. 1986).

4. Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," <u>Guns & Ammo</u>, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5. Daniel D. Musgrave and Thomas B.Nelson, <u>The World's Assault Rifles</u>, (Virginia, 1967), p. 1.

6. See generally, Angus Laidlaw, ed., <u>Paul Wahl's Big  Gun Catalog/1</u>, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

7.  Ibid.

8.  Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9.  See generally, Hogg; Musgave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10.  Ibid.

11.  Ibid.

12.  Ibid.

13.  Ibid.

14.  Ibid.

15.  Ibid.

16.  Ezell, p. 844; Dickey, p. 31.

17.  Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18.  Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19.  See, for example, Walter Rickell, "The Plinker's AK <u>GunsMagazine,</u> (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," <u>Guns & Ammo,</u> (January 1987), p. 37; John Lachuk, ".22 Erma Carbine, <u>Guns & Ammo,</u> (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," <u>Gun World,</u> (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," <u>Gun World,</u> (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," <u>Guns & Ammo,</u> (November 1985), p. 72.

20.  See note 2, colloquy between Senators Dodd and Hansen.

21.  Ibid.

22.  See generally, bibliography.

<u>BIBLIOGRAPHY</u>

"Armalite AR-180 Rifle," <u>American Rifleman</u>, (February 1981), 65-66.

"Beretta AR. 70 Rifle," <u>American Rifleman</u>, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," <u>Guns & Ammo</u>, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," <u>Guns & Ammo</u>, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," <u>Guns Magazine</u>, (September 1986), 37-39, 42,43, 57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," <u>Gun World</u>, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", <u>Gun World</u>, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," <u>The Gun Digest Book of Assault Weapons</u>, (1988), 188-195.

"Cooking and Heckling with H & K's HK94A3," <u>Gun World</u>, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," <u>Guns Magazine</u>, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," <u>American Rifleman</u>, (June 1985), 29-32, 65-67.

Ezell, Edward Clinton. <u>Small Arms of the World</u>. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," <u>American Rifleman</u>,(January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", <u>The Gun Digest Book of Assault Weapons</u>, (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," <u>Guns & Ammo</u>, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," <u>Gun World</u>, (September 1986), 40-41.

"Heckler & Koch 91," <u>American Rifleman</u>, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. <u>Janes' Infantry Weapons. 1987-1988</u>. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", <u>American Rifleman</u>, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " <u>Special Weapons and Tactics</u>, (July 1989), 42-46.

James, Garry. "Austrailian LlAlA Rifle," <u>Guns & Ammo</u>, (December 1987),

James, Garry. "Chinese AK-47 .223," <u>Guns & Ammo</u>, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," <u>Guns & Ammo</u>, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," <u>Guns & Ammo</u>, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," <u>American Rifleman</u>, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," <u>Guns & Ammo</u>, (August 1985), 64-66.

Jarrett, William S., ed. <u>Shooter's Bible. No. 80</u>. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," <u>Gun World</u>, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," <u>Gun World</u>, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," <u>Guns & Ammo</u>, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," <u>Guns & Ammo</u>, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. <u>Paul Wahl's Big Gun Catalog/l.</u> Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. <u>The Gun Digest Book of Assault Weapons</u>. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 76-81.

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986), 160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

"Valmet M78 Rifle," American Rifleman, (April 1988), 64-66

Wahl, Paul, ed. Gun Trader's Guide, 13th Edition, South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. Gun Digest 1989. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," Guns Magazine, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," Guns Magazine, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," Gun World, (September 1988), 28-30.

**NOTE:** This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles",** published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

# EXHIBIT D

| 103D CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPORT<br>103–489 |
|---|---|---|

# PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT

---

MAY 2, 1994.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. BROOKS, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## SUPPLEMENTAL AND DISSENTING VIEWS

[To accompany H.R. 4296]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4296) to make unlawful the transfer or possession of assault weapons, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

**SEC. 2. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMI-AUTOMATIC ASSAULT WEAPONS.**

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

79–006

2

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of such title is amended by adding at the end the following:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms, known as—

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

3

"(iii) a fixed magazine capacity in excess of 5 rounds; and
"(iv) an ability to accept a detachable magazine.".
(c) PENALTIES.—
(1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".
(2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".
(d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

SEC. 3. RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS.

(a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 2(a) of this Act, is amended by adding at the end the following:
"(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.
"(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.
"(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.
"(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.
"(5) As used in this subsection, the term 'form 4473' means—
"(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or
"(B) any other form which—
"(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and
"(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).".
(b) PENALTY.—Section 924(a) of such title is amended by adding at the end the following:
"(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.".

SEC. 4. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

(a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by sections 2 and 3 of this Act, is amended by adding at the end the following:
"(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.
"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.
"(3) This subsection shall not apply to—
"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;
"(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;
"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or
"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

4

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of such title, as amended by section 2(b) of this Act, is amended by adding at the end the following:

"(31) The term 'large capacity ammunition feeding device'—

"(A) means—

"(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

"(ii) any combination of parts from which a device described in clause (i) can be assembled; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) LARGE CAPACITY AMMUNITION FEEDING DEVICES TREATED AS FIREARMS.—Section 921(a)(3) of such title is amended in the first sentence by striking "or (D) any destructive device." and inserting "(D) any destructive device; or (E) any large capacity ammunition feeding device.".

(d) PENALTY.—Section 924(a)(1)(B) of such title, as amended by section 2(c) of this Act, is amended by striking "or (v)" and inserting "(v), or (x)".

(e) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of such title, as amended by section 2(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

SEC. 5. STUDY BY ATTORNEY GENERAL.

(a) STUDY.—The Attorney General shall investigate and study the effect of this Act and the amendments made by this Act, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

SEC. 6. EFFECTIVE DATE.

This Act and the amendments made by this Act—

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

SEC. 7. APPENDIX A TO SECTION 922 OF TITLE 18.

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

### "APPENDIX A

#### Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M-1 Carbine
Iver Johnson 50th Anniversary M-1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

#### Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30" Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions

5

E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles—Bolt Action**

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU-33/40 Carbine
Parker-Hale Model 81 Classic Rifle

6

Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sako Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel
Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage Model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter

7

Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

## Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

## Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

## Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle

8

Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR-7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL-22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM-321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM-452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60-J-ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Esproncedo IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT-22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU-KKW Training Rifle
Navy Arms TU-33/40 Carbine
Navy Arms TU-KKW Sniper Trainer
Norinco JW-27 Bolt-Action Rifle
Norinco JW-15 Bolt-Action Rifle
Remington 541-T
Remington 40-XR Rimfire Custom sporter
Remington 541-T HB Bolt-Action Rifle
Remington 581-S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

### Competition Rifles—Centerfire & Rimfire

Anschutz 64-MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle

9

Anschuts 1910 Super Match II
Anschuts 54.18MS Silhouette Rifle
Anschuts Super Match 54 Target Model 2013
Anschuts Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

**Shotguns—Autoloaders**

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning Bsa 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun
Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet
Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun

**10**

Remington 1100 LT-20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

### Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

### Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U
American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models
Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U

11

Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A./Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K-80 Sporting Clays O/U
Krieghoff K-80 Skeet Shotgun
Krieghoff K-80 International Skeet
Krieghoff K-80 Four-Barrel Skeet Set
Krieghoff K-80/RT Shotguns
Krieghoff K-80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM-6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

### Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side

12

Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

**Shotguns—Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel
Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.".

## Summary and Purpose

The purpose of this bill is to create criminal penalties for the manufacture, transfer, or possession of certain firearms within the category of firearms known as "semiautomatic assault weapons." It also creates such penalties for certain ammunition feeding devices, as well as any combination of parts from which such a device can be assembled.

In reporting legislation banning certain assault weapons last Congress, the Committee on the Judiciary said:

> The threat posed by criminals and mentally deranged individuals armed with semi-automatic assault weapons has been tragically widespread.[1]

Since then, the use of semiautomatic assault weapons by criminal gangs, drug-traffickers, and mentally deranged persons continues to grow.[2]

H.R. 4296 will restrict the availability of such weapons in the future. The bill protects the rights of persons who lawfully own such weapons on its date of enactment by a universal "grandfathering" clause and specifically exempts certain firearms traditionally used for hunting and other legitimate support. It contains no confiscation or registration provisions; however, it does establish record-keeping requirements for transfers involving grandfathered semiautomatic assault weapons. Such record-keeping is not required for transfers of grandfathered ammunition feeding devices

[1] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 202.
[2] See, e.g., Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 Firearms; Chief Sylvester Daughtry, President, International Association of Chiefs of Police; Mr. John Pitta, National Executive Director, Federal Law Enforcement Officers Association).

13

(or their component parts.) H.R. 4296 expires ("sunsets") on its own terms after 10 years.

## BACKGROUND

A series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society of proportion to their numbers:[3] As this Committee said in its report to the last Congress:

> The carnage inflicted on the American people be criminals and mentally deranged people armed with Rambo-style, semi-automatic assault weapons has been overwhelming and continuing. Police and law enforcement groups all over the nation have joined together to support legislation that would help keep these weapons out of the hands of criminals.[4]

Since then, evidence continues to mount that these semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder.

Use in Crimes. On April 25, 1994, the Director of the Federal Bureau of Alcohol, Tobacco and Firearms testified that the percentage of semiautomatic assault weapons among guns traced because of their use in crime is increasing:

> In 1990, 5.9 percent of firearms traced were assault weapons. In 1993, that percentage rose to 8.1 percent. Since Justice Department studies have shown that assault weapons make up only about 1 percent of the firearms in circulation, these percentages strongly suggest that they are proportionately more often used in crimes.[5]

Law enforcement officials confirm this statistical evidence in accounts of the rising level of lethality they face from assault weapons on the street. For example, the representative of a national police officers' organization testified:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and

---

[3] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994; Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991; Hearing on Semiautomatic Assault Weapons, Part II, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, July 25, 1991; Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5 and 6, 1989.

[4] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102-242, October 7, 1991, at 203.

[5] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. John Magaw, Director, Bureau of Alcohol, Tobacco and Firearms).

**14**

preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[6]

A representative of federal law enforcement officers testified that semiautomatic assault weapons "dramatically escalate the firepower or the user" and "have become the weapon of choice for drug runners, hate groups and the mentally unstable."[7]

> The TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals. Cities across the country confiscate more TEC–9s than any other assault pistol. The prototype for the TEC–9 was originally designed as a submachine gun for the South African government. Now it comes standard with an ammunition magazine holding 36 rounds of 9 mm cartridges. It also has a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire. To any real sportsman or collector, this firearm is a piece of junk, yet is very popular among criminals.[8]

The Secretary of Housing and Urban Development testified that criminal gangs in Chicago routinely use semiautomatic assault weapons to intimidate not only residents but also security guards, forcing the latter to remove metal detectors installed to detect weapons.[9]

Use in Mass Killings and Killings of Law Enforcement Officers. Public concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered.

On April 25, 1994, the Subcommittee on Crime and Criminal Justice heard testimony about several incidents representative of such killings.

On February 22, 1994, Los Angeles (CA) Police Department rookie officer Christy Lynn Hamilton was ambushed and killed by a

---

[6] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Tony Loizzo, executive vice president, National Association of Police Organizations). See also, Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal Order of Police) (assault weapons "pose a grave and immediate threat to the lives of those sworn to uphold our laws"); Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5, 1989 (Testimony of Daniel M. Hartnett, associate director, law enforcement, Bureau of Alcohol, Tobacco and Firearms) ("Fifteen years ago, police rarely encountered armed drug dealers. Today, firearms, especially certain types of semiautomatic weapons, are status symbols and tools of the trade for this country's most vicious criminals.")

[7] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[8] Hearing on H.R. 4296 and H.R. 3527, Public Safety and recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[9] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development).

15

drug-abusing teenager using a Colt AR–15. The round that killed Officer Hamilton penetrated a car door, skirted the armhole of her protective vest, and lodged in her chest. The teenager also killed his father, who had given him the gun, and took his own life as well. Officer Hamilton had been voted the most inspirational officer in her graduating class only weeks before her murder. Officer Hamilton's surviving brother testified about the impact of this murder.[10]

On December 7, 1993, a deranged gunman walked through a Long Island Railroad commuter train, shooting commuters. Six died and 19 were wounded. The gunman used a Ruger semiautomatic postol. Although the pistol itself would not be classified as an assault weapon under this bill, its 15 round ammunition magazine ("clip") would be banned. The gunman had several of these high capacity 15 round magazines and reloaded several times, firing between 30 to 50 rounds before he was overpowered while trying to reload yet again. The parents of one of the murdered victims, Amy Locicero Federici, testified about the impact of this murder.[11]

On February 28, 1993, 4 special agents of the Bureau of Alcohol, Tobacco and Firearms were killed and 15 were wounded while trying to serve federal search and arrest warrants at the Branch Davidian compound in Waco, Texas. The Branch Davidian arsenal included hundreds of assault weapons, including AR–15s, AK–47s, Street Sweepers, MAC10s and MAC–11s, along with extremely high capacity magazines (up to 260 rounds).[12]

Finally, on July 1, 1993, gunman Gian Luigi Ferri Killed 8 people and wounded 6 others in a San Francisco high rise office building. Ferri—who took his own life—used two TEC DC9 assault pistols with 50 round magazines, purchased from a gun dealer in Las Vegas, Nevada. Two witnesses, both of whom lost spouses in the slaughter, and one of whom was herself seriously injured, testified about this incident.[13]

Numerous other notorious incidents involving semiautomatic assault weapons have occurred. They include the January 25, 1993, slaying of 2 CIA employees and wounding of 3 others at McLean, VA, (AK–47), and the January 17, 1989 murder in a Stockton, CA, schoolyard of 5 small children, and wounding of 29 others (AK–47 and 75 round magazine, firing 106 rounds in less than 2 minutes).

Several witnesses who were victims themselves during such incidents testified in opposition to H.R. 4296/H.R. 3527, and in opposition to the banning of any semiautomatic assault weapons or ammunition feeding devices.

Dr. Suzanna Gratia witnessed the brutal murder, in Luby's cafeteria located in Killeen, Texas, of both of her parents who had just

[10] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ken Brondell, Jr.).

[11] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Jacob Locicero and Arlene Locicero).

[12] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[13] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Michelle Scully and Steve Sposato).

16

celebrated their 47 weeding anniversary. Just a few days before, she had removed her gun from her purse and left it in her car to comply with a Texas law which does not allow concealed carrying of a firearm. Dr. Gratia testified:

> I am mad at my legislators for legislating me out of a right to protect myself and my family. I would much rather be sitting in jail with a felony offense on my head and have my parents alive. As far as these so-called assault weapons, you say that they don't have any defense use. You tell that to the guy that I saw on a videotape of the Los Angeles riots standing on his rooftop protecting his property and his life from an entire mob with one of these so-called assault weapons. Tell me that he didn't have a legitimate self-defense use.[14]

Ms. Jacquie Miller was shot several times with a semiautomatic assault weapon and left for dead at her place of employment with the Standard Gravure Printing Company in Louisville, Kentucky, when a fellow employee went on a killing spree. Now permanently disabled, Ms. Miller testified:

> It completely enrages me that my tragedy is being used against me to deny me and all the law abiding citizens of this country to the right of the firearm of our choosing. I refuse in return to use my tragedy for retribution against innocent people just to make myself feel better for having this misfortune. Enforce the laws against criminals already on the books. After all, there are already over 20,000 of them.[15] More won't do a thing for crime control * * * You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it.
>
> This is America, not Lithuania or China. Our most cherished possession is our Constitution and Bill of Rights. Let's not sell those down the river or we could one day find ourselves in a boat without a paddle against the criminals who think we are easy pickings.[16]

Mr. Phillip Murphy used his lawfully-possessed Colt AR–15 H-BAR Sporter semiautomatic rifle—a gun which would be specifically banned by H.R. 4296—to capture one of Tucson, Arizona's most wanted criminals who was attempting to burglarize the home of Mr. Murphy's parents. The 19-year old criminal he captured was

---

[14] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on crime and Criminal Justice, April 25, 1994 (State of Dr. Suzanna Gratia, Copperas Cove, Texas)

[15] The Committee notes that, under the Gun Control Act of 1968 as amended in 1986, it is a Federal felony for a convicted felon to be in possession of any firearm, including an assault weapon, under 18 U.S.C. 922(g)(1). Violations carry up to five years imprisonment and a $250,000 fine. If a criminal—whether previously convicted or not—is carrying an assault weapon and is involved in a drug trafficking crime, that criminal is subject to a mandatory minimum of 5 years imprisonment and a $250,000 fine under 18 U.S.C. 924(c)(1). Any criminal who has three prior violent felony and/or serious drug offenses convictions and is in possession of a firearm is subject to a mandatory minimum of 15 years imprisonment and a $250,000 fine under 18 U.S.C. 924(e)(1).

[16] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ms. Jacquie Miller, Louisville, Kentucky).

17

a three-time loser with 34 prior convictions who was violating his third adult State parole for a knife assault. Mr. Murphy testified:

> I respectfully urge this Committee and the Congress of the United States to restrain themselves from forcing tens of millions of law-abiding Americans like me to choose between the law and their lives.[17]

The Characteristics of Military-Style Semiautomatic Assault Weapons. The question of what constitutes an assault weapon has been studied by the Congress and the executive branch as the role of these guns in criminal violence has grown.

A Bureau of Alcohol, Tobacco and Firearms working group formed under the Bush administration to consider banning foreign imports of such semiautomatic assault weapons conducted the most recent comprehensive study of military assault weapons and the civilian firearms that are modelled after them.[18] The working group formulated a definition of the civilian version, and a list of the assault weapon characteristics that distinguish them from sporting guns. That technical work has to a large extent been incorporated into H.R. 4296.[19]

The working group settled on the term "semiautomatic assault" for the civilian firearms at issue. That term distinguishes the civilian firearms from the fully automatic military weapons (machineguns)[20] after which they are modelled and often simply adapted by eliminating the automatic fire feature. The group determined that "semiautomatic assault rifles * * * represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[21]

The group elaborated on the nature of those characteristics as follows:

> The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK–47, is a weapon designed for killing or disabling the enemy and * * * has characteristics designed to accomplish this purpose.
>
> We found that the modern military assault rifle contains a variety of physical features and characteristics designed

---

[17] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Mr. Phillip Murphy, Tucson, Arizona).

[18] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989.

[19] The ultimate question of law upon which the working group was advising the Secretary of the Treasury was whether these import firearms met a "sporting purpose" test under 18 U.S.C. Code section 925(d). He held that they did not. Although that legal question is not directly posed by this bill, the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features.

[20] An automatic gun fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ("rounds" or "bullets") in its magazine (or "clip"). Automatic firearms are also known as machineguns. A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted. Manually operated guns require the shooter to manually operate a bolt, slide, pump, or lever action to extract the fired round and load a new round before pulling the trigger.

[21] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

18

for military applications which distinguishes it from tradi-
tional sporting rifles. These military features and charac-
teristics (other than selective fire) are carried over to the
semiautomatic versions of the original military rifle.[22]

The "selective fire" feature to which the working group referred
is the ability of the military versions to switch from fully automatic
to semiautomatic fire at the option of the user. Since Congress has
already banned certain civilian transfer or possession of machine-
guns,[23] the civilian models of these guns are produced with semi-
automatic fire capability only. However, testimony was received by
the Subcommittee on Crime and Criminal Justice that it is a rel-
atively simple task to convert[24] a semiautomatic weapon to auto-
matic fire[25] and that semiautomatic weapons can be fired at rates
of 300 to 500 rounds per minute, making them virtually indistin-
guishable in practical effect from machineguns.[26]

The 1989 Report's analysis of assault characteristics which dis-
tinguish such firearms from sporting guns was further explained
by an AFT representative at a 1991 hearing before the Subcommit-
tee on Crime and Criminal Justice:

We found that the banned rifles represented a distinc-
tive type of rifle characterized by certain military features
which differentiated them from the traditional sporting ri-
fles. These include the ability to accept large capacity de-
tachable magazines, bayonets, folding or telescoping
stocks, pistol grips, flash suppressors, bipods, grenade
launchers and night sights, and the fact that they are
semiautomatic versions of military machineguns.[27]

Proponents of these military style semiautomatic assault weap-
ons often dismiss these combat-designed features as merely "cos-
metic." The Subcommittee received testimony that, even if these
characteristics were merely "cosmetic" in effect, it is precisely those
cosmetics that contribute to their usefulness as tools of intimida-
tion by criminals.[28]

However, the expert evidence is that the features that character-
ize a semiautomatic weapon as an assault weapon are not merely
cosmetic, but do serve specific, combat-functional ends. By facilitat-

[22] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and
Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Ri-
fles," July, 1989, p. 6.
[23] 18 U.S. Code, section 922(o).
[24] The Committee notes that such conversion is a Federal felony that carries penalties of up
to 10 years imprisonment and a $250,000 fine under 26 U.S.C. 5861.
[25] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey
R. Stokes, National President, Fraternal order of Police).
[26] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey
R. Stokes, National President, Fraternal order of police).
[27] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard
Cook, Chief, Firearms Divisions, Bureau of Alcohol, Tobacco and Firearms) at 268.
[28] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms, Use Protec-
tion Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and
Criminal Justice, April 25, 1994 (Statements of Hon. Henry Cisneros, Secretary, Department of
Housing and Urban Development and John Pitta, National Executive Vice President, Federal
Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of
Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice,
June 12, 1991 (Statement of Paul J. McNulty, Principal Deputy Director, Office of Policy devel-
opment, Department of Justice) at 288.

**19**

ing the deadly "spray fire" of the weapon or enhancing its portability—a useful attribute in combat but one which serves to enhance the ability to conceal the gun in civilian life.[29]

High-capability magazine, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.[30] Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. As noted above, tests demonstrate that semiautomatic guns can be fired at very high rates of fire. In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities—from 3 to 5.

Because of the greater enhanced lethality—numbers of rounds that can be fired quickly without reloading—H.R. 4296 also contains a ban on ammunition magazines which hold more than 10 rounds, as well as any combination of parts from which such a magazine can be assembled.

Barrel shrouds also serve a combat-functional purpose.[31] Gun barrels become very hot when multiple rounds are fired through them quickly. The barrel shroud cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing.

Similar military combat purposes are served by flash suppressors (designed to help conceal the point of fire in night combat), bayonet mounts, grenade launchers, and pistol grips engrafted on long guns.[32]

The net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond

[29] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[30] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[31] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[32] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

20

that of other firearms in general, including other semiautomatic guns.[33]

### BRIEF EXPLANATION OF H.R. 4296

H.R. 4296 combines two approaches which have been followed in the past in legislation proposed to control semiautomatic assault weapons—the so-called "list" approach and the "characteristics" approach.

The bill does not ban any semiautomatic assault weapons nor large capacity ammunition feeding device (or component parts) otherwise lawfully possessed on the date of enactment. However, records must be kept by both the transferor and the transferee involved in any transfer of these weapons, but not of the feeding devices (or combination of parts).

The bill explicitly exempts all guns with other than semiautomatic actions—i.e., bolt, slide, pump, and lever actions. In addition, it specifically exempts by make and model 661 long guns most commonly used in hunting and recreational sports,[34] making clear that these semiautomatic assault weapons are not and cannot be subject to any ban.

Section 2(z) of the bill lists 19 specific semiautomatic assault weapons—such as the AK–47, M–10, TEC–9, Uzi, etc.—that are banned.[35] It also defines other assault weapons by specifically enumerating combat style characteristics and bans those semiautomatic assault weapons that have 2 or more of those characteristics.[36]

The bill makes clear that the list of exempted guns is not exclusive. The fact that a gun is not on the exempted list may not be construed to mean that it is banned. Thus, a gun that is not on the list of guns specifically banned by name would only be banned if it met the specific characteristics set out in the characteristics test. No gun may be removed from the exempted list.

H.R. 4296 also bans large capacity ammunition feeding devices—clips that accept more than 10 rounds of ammunition—as well as

---

[33] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown University Medical Center, Washington, DC); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[34] See H.R. 4296, Appendix A, for the list.

[35] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN-FAL/LAR; Galil; MAC 10, MAC 11–type; Steyr AUG; Street Sweeper, Striker 12; TEC–9; Uzi.

[36] While noting that its list is not all-inclusive, the Bureau of Alcohol, Tobacco, and Firearms has listed the following semi-automatic firearms that would be banned based on their general characteristics:

1. Semi-automatic Rifles: AA Arms AR9 semi-automatic rifle; AMT Lightning 25 rifle; Auto Ordnance Thompson Model 1927 carbines (finned barrel versions); Calico M100 carbine; Colt Sporter Rifle (all variations); Federal XC900 carbine; Federal XC450 carbine; Grendel R31 carbine; Iver Johnson M1 carbine (version w/collapsible stock and bayonet mount); Springfield MJA rifle.

2. Pistols: AA Arms AP9 pistol; Australian Automatic Arms pistol; Auto Ordnance Model 1927A5 pistol; American Arms Spectra pistol; Calico Model M950 pistol; Calico Model 110 pistol; All Claridge Hi-Tec pistol; D Max auto pistol; Grendel P–31 pistol; Heckler & Koch SP89 pistol; Wilkinson Linda pistol.

3. Shotguns: Benelli M1 Super 90 Defense shotgun; Benelli M3 Super 90 shotgun; Franchi LAW 12 shotgun; Franchi SPAS 12 shotgun; USAS 12 shotgun.

21

any combination of parts from which such a device can be assembled.

The bill exempts all semiautomatic assault weapons and large capacity ammunition feeding devices (as well as any combination of parts) that are lawfully possessed on date of enactment. Owners of such semiautomatic assault weapons need do nothing under the bill unless they wish to transfer the semiautomatic assault weapon.

H.R. 4296 differs significantly from previously-proposed legislation—it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns. Most significantly, the ban in the 1991 proposed bill gave the Bureau of Alcohol, Tobacco, and Firearms authority to ban any weapon which "embodies the same configuration" as the named list of guns. The current bill, H.R. 4296 does not contain any such general authority. Instead, it contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons.

## 102D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on semiautomatic assault weapons on June 12 and July 25, 1991. A ban on certain semiautomatic assault weapons was included as Subtitle A of Title XX in H.R. 3371, the Omnibus Crime Control Act of 1991. A ban on large capacity ammunition feeding devices was included in the same bill. The bill was reported out of the Judiciary Committee on October 7, 1991. The provisions dealing with semiautomatic assault weapons and large capacity ammunition feeding devices were struck by the House of Representatives by a vote of 247–177 on October 17, 1991.

## 103D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on H.R. 4296 and its predecessor, H.R. 3527, which ban semiautomatic assault weapons, on April 25, 1994. The Subcommittee reported favorably on an amendment in the nature of a substitute to H.R. 4296 on April 26, 1994, by a recorded vote of 8–5.

## COMMITTEE ACTION

The Committee on the Judiciary met on April 28, 1994 to consider H.R. 4296, as amended. Two amendments were adopted during the Committee's consideration.

An amendment was offered to provide that the absence of a firearm from the list of guns specifically exempted from the ban may not be construed as evidence that the semiautomatic assault weapon is banned, and that no gun may be removed from the exempt list so long as the Act is in effect. This amendment was adopted by voice vote.

An amendment was offered to delete a provision that barred from owning any firearms those persons convicted of violating the recordkeeping requirements relating to grandfathered weapons. This amendment was adopted by voice vote.

22

A reporting quorum being present, the Committee on the Judiciary, by a roll call vote of 20 to 15, ordered H.R. 4296, as amended, favorably reported to the House.

SECTION-BY-SECTION ANALYSIS

SECTION 1—SHORT TITLE

This section provides that the Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

SECTION 2—RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS

Subsection 2(a) makes it unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon (including any "copies or duplicates.")

The ban on transfer and possession does not apply to (1) weapons otherwise lawfully possessed on the date of enactment; (2) any of the firearms (or their replicas or duplicates) listed in Appendix A; (3) any manually operated (bolt, pump, slide, lever action), permanently inoperable, or antique firearms; (4) semiautomatic rifles that cannot accept a detachable magazine that holds more than 5 rounds; or, a semiautomatic shotgun that cannot hold more than 5 rounds in a fixed or detachable magazine.

The fact that a gun is not listed in Appendix A may not be construed to mean that it is banned. No gun listed in Appendix A may be removed from that exempted list so long as the Act is in effect.

Federal departments and agencies and those of States and their subdivisions are exempted. Law enforcement officers authorized to purchase firearms for official use are exempted, as are such officers presented with covered weapons upon retirement who are not otherwise prohibited from receiving such a weapon. Finally, weapons made, transferred, possessed, or imported for the purposes of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 2(b) defines semiautomatic assault weapons, both by name and by characteristics. It lists by name specific firearms, including "copies or duplicates" of such firearms.[37] Characteristics of covered semiautomatic rifles, pistols, and shotguns are defined by separate subsections applicable to each. In the case of rifles and pistols, in addition to being semiautomatic, a gun must be able to accept a detachable magazine and have at least 2 listed characteristics.

In the case of rifles, those characteristics are: (1) folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (5) a grenade launcher.

In the case of pistols, the characteristics are: (1) a magazine that attaches to the pistol outside of the pistol grip; (2) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (3) a barrel shroud that permits the

---

[37] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN–FAL/LAR; Galil; MAC 10, MAC 11-type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi

23

shooter to hold the firearm without being burned; (4) an unloaded manufactured weight of 50 ounces or more; and (5) a semiautomatic version of an automatic firearm.

In the case of shotguns, covered weapons must have at least 2 of the following four features: (1) a folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a fixed magazine capacity in excess of 5 rounds; and (4) an ability to accept a detachable magazine.

The section provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban on manufacture, transfer and possession. It also adds use of a semiautomatic assault weapon to the crimes covered by the mandatory minimum of 5 years under 18 USC Section 924(c)(1) for use in a federal crime of violence or drug trafficking crime.

Finally, the section requires that semiautomatic assault weapons manufactured after the date of enactment must clearly show the date on which the weapon was manufactured.

### SECTION 3—RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS

This section makes it unlawful to transfer a grandfathered semi-automatic assault weapon unless both the transferor and the transferee complete and retain a copy of federal form 4473 (or its successor). Within 90 days of enactment, the Secretary of the Treasury must issue regulations ensuring the availability of the form to owners of semiautomatic assault weapons. The Committee expects the Secretary to make such forms easily and readily available to such gun owners. The Committee further expects the Secretary to maintain the confidentiality of the requester and to ensure the destruction of any and all information pertaining to any request for such forms immediately upon complying with the request. The Committee does not expect the Secretary to release any such information to any other Department of the Federal, State or local Governments or to use the information in any way other than to comply with the requests for the form. The Committee would consider failure to comply with these expectations a very serious breach.

A person who knowingly violates the recordkeeping requirement shall be fined not more than $1,000, imprisoned for not more than 6 months or both.

### SECTION 4—BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES

Subsection 4(a) makes it unlawful for a person to transfer or possess a large capacity ammunition feeding device (which is defined to include any combination of parts from which such a device can be assembled.)

The ban on transfer and possession does not apply to (1) devices (or component parts) otherwise lawfully possessed on the date of enactment; (2) Federal departments and agencies and those of States and their subdivisions; (3) law enforcement officers authorized to purchase ammunition feeding devices for official use; devices transferred to such officers upon retirement who are not otherwise prohibited from receiving them; and (3) devices (or combination of parts) made, transferred, possessed, or imported for the pur-

24

pose of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 4(b) defines large capacity ammunition feeding device to mean a magazine, belt, drum, feed strip, or similar device that has a capacity of more than 10 rounds, or can be readily restored or converted to accept more than 10 rounds. It includes any combination of parts from which such a device can be assembled. It exempts an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

Subsection 4(c) adds large capacity ammunition feeding devices to the definition of "firearm" under 18 US Code section 921(a)(3).

Subsection 4(d) provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban.

Subsection 4(e) requires that large capacity ammunition feeding devices manufactured after the date of enactment be identified by a serial number that clearly shows the device was manufactured after the date or imported after the date of enactment, and such other identification as the Secretary of the Treasury may by regulation prescribe.

### SECTION 5—STUDY BY ATTORNEY GENERAL

This section requries the Attorney General to study and report to the Congress no later than 30 months after its enactment the effects of the Act, particularly with regard to its impact—if any—on violent and drug-trafficking crime.

The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment.

### SECTION 6—EFFECTIVE DATE

The Act and the amendment made by the Act take effect on the date of enactment and are repealed effective as of the date that is 10 years after that date.

### SECTION 7—APPENDIX A TO SECTION 922 OF TITLE 18

This section adds, as Appendix A, a list of firearms that are specifically exempted from the ban on semiautomatic assault weapons.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

25

NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 4296 will have no significant inflationary impact on prices and costs in the national economy.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 4296, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE.
*Washington, DC, May 2, 1994.*

Hon. JACK BROOKS,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, as ordered reported by the House Committee on the Judiciary on April 28, 1994. We estimate that enactment of the bill would result in costs to the federal government over the 1995–1999 period of less than $500,000 from appropriated amounts. In addition, we estimate that enactment of H.R. 4296 would lead to increases in receipts of less than $10 million a year from new criminal fines. Such receipts would be deposited in the Crime Victims Fund and spent in the following year. Because the bill could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill would not affect the budgets of state or local governments.

H.R. 4296 would ban the manufacture, transfer, and possession of certain semiautomatic assault weapons not lawfully possessed as of the date of the bill's enactment. The bill also would ban the transfer and possession of certain large-capacity ammunition feeding devices not lawfully possessed as of the date of enactment. In addition, H.R. 4296 would establish recordkeeping requirements for transfers of grandfathered weapons and would direct the Attorney General to conduct a study of the bill's impact. Finally, the bill would create new federal crimes and associated penalties—prison sentences and criminal fines—for violation of its provisions.

The new recordkeeping requirements and the impact study would increase costs to the Department of the Treasury and the Department of Justice, respectively, but we estimate that these costs would be less than $500,000 over the next several years from appropriated amounts. The imposition of new criminal fines in H.R. 4296 could cause governmental receipts to increase through greater

26

penalty collections. We estimate that any such increase would be less than $10 million annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER, *Director.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## CHAPTER 44 OF TITLE 18, UNITED STATES CODE

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 44—FIREARMS

### § 921. Definitions

(a) As used in this chapter—

(1) * * *

\*     \*     \*     \*     \*     \*     \*

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; [or (D) any destructive device.] *(D) any destructive device; or (E) any large capacity ammunition feeding device.* Such term does not include an antique firearm.

\*     \*     \*     \*     \*     \*     \*

*(30) The term "semiautomatic assault weapon" means—*

*(A) any of the firearms, or copies or duplicates of the firearms, known as—*

*(i) Norinco, Mitchell, and Poly Technologies Automat Kalashnikovs (all models);*

*(ii) Action Arms Israeli Military Industries UZI and Galil;*

*(iii) Beretta Ar70 (SC–70);*

*(iv) Colt AR–15;*

*(v) Fabrique National FN/FAL, FN/LAR, and FNC;*

*(vi) SWD M–10, M–11, M–11/9, and M–12;*

*(vii) Steyr AUG;*

*(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and*

*(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;*

*(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—*

*(i) a folding or telescoping stock;*

27

  *(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;*

  *(iii) a bayonet mount;*

  *(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and*

  *(v) a grenade launcher;*

 *(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—*

  *(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;*

  *(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;*

  *(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;*

  *(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and*

  *(v) a semiautomatic version of an automatic firearm; and*

 *(D) a semiautomatic shotgun that has at least 2 of—*

  *(i) a folding or telescoping stock;*

  *(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;*

  *(iii) a fixed magazine capacity in excess of 5 rounds; and*

  *(iv) an ability to accept a detachable magazine.*

*(31) The term "large capacity ammunition feeding device"—*

 *(A) means—*

  *(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and*

  *(ii) any combination of parts from which a device described in clause (i) can be assembled; but*

 *(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.*

## § 922. Unlawful acts

 *(a) It shall be unlawful—*

   *   \*   \*   \*   \*   \*   \*   \**

 *(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.*

 *(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.*

 *(3) Paragraph (1) shall not apply to—*

  *(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;*

  *(B) any firearm that—*

   *(i) is manually operated by bolt, pump, lever, or slide action;*

   *(ii) has been rendered permanently inoperable; or*

28

    *(iii) is an antique firearm;*

    *(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or*

    *(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.*

*The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.*

    *(4) Paragraph (1) shall not apply to—*

    *(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

    *(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;*

    *(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or*

    *(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

    *(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

    *(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

    *(3) If a person receives a semiautomatic assault weapon from any one other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.*

    *(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.*

    *(5) As used in this subsection, the term "form 4473" means—*

    *(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or*

    *(B) any other form which—*

        *(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and*

        *(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).*

29

*(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.*

*(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.*

*(3) This subsection shall not apply to—*

*(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

*(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;*

*(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or*

*(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

### APPENDIX A

#### *Centerfire Rifles—Autoloaders*

*Browning BAR Mark II Safari Semi-Auto Rifle*
*Browning BAR Mark II Safari Magnum Rifle*
*Browning High-Power Rifle*
*Heckler & Koch Model 300 Rifle*
*Iver Johnson M–1 Carbine*
*Iver Johnson 50th Anniversary M–1 Carbine*
*Marlin Model 9 Camp Carbine*
*Marlin Model 45 Carbine*
*Remington Nylon 66 Auto-Loading Rifle*
*Remington Model 7400 Auto Rifle*
*Remington Model 7400 Rifle*
*Remington Model 7400 Special Purpose Auto Rifle*
*Ruger Mini-14 Autoloading Rifle (w/o folding stock)*
*Ruger Mini Thirty Rifle*

#### *Centerfire Rifles—Lever & Slide*

*Browning Model 81 BLR Lever-Action Rifle*
*Browning Model 81 Long Action BLR*
*Browning Model 1886 Lever-Action Carbine*
*Browning Model 1886 High Grade Carbine*
*Cimarron 1860 Henry Replica*
*Cimarron 1866 Winchester Replicas*
*Cimarron 1873 Short Rifle*
*Cimarron 1873 Sporting Rifle*
*Cimarron 1873 30" Express Rifle*
*Dixie Engraved 1873 Rifle*
*E.M.F. 1866 Yellowboy Lever Actions*
*E.M.F. 1860 Henry Rifle*
*E.M.F. Model 73 Lever-Action Rifle*
*Marlin Model 336CS Lever-Action Carbine*
*Marlin Model 30AS Lever-Action Carbine*
*Marlin Model 444SS Lever-Action Sporter*
*Marlin Model 1894S Lever-Action Carbine*
*Marlin Model 1894CS Carbine*

30

Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rifle
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

### *Centerfire Rifles—Bolt Action*

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle

31

*KDF K15 American Bolt-Action Rifle*
*Krico Model 600 Bolt-Action Rifle*
*Krico Model 700 Bolt-Action Rifles*
*Mauser Model 66 Bolt-Action Rifle*
*Mauser Model 99 Bolt-Action Rifle*
*McMillan Signature Classic Sporter*
*McMillan Signature Super Varminter*
*McMillan Signature Alaskan*
*McMillan Signature Titanium Mountain Rifle*
*McMillan Classic Stainless Sporter*
*McMillan Talon Safari Rifle*
*McMillan Talon Sporter Rifle*
*Midland 1500S Survivor Rifle*
*Navy Arms TU–33/40 Carbine*
*Parker-Hale Model 81 Classic Rifle*
*Parker-Hale Model 81 Classic African Rifle*
*Parker-Hale Model 1000 Rifle*
*Parker-Hale Model 1100M African Magnum*
*Parker-Hale Model 1100 Lightweight Rifle*
*Parker-Hale Model 1200 Super Rifle*
*Parker-Hale Model 1200 Super Clip Rifle*
*Parker-Hale Model 1300C Scout Rifle*
*Parker-Hale Model 2100 Midland Rifle*
*Parker-Hale Model 2700 Lightweight Rifle*
*Parker-Hale Model 2800 Midland Rifle*
*Remington Model Seven Bolt-Action Rifle*
*Remington Model Seven Youth Rifle*
*Remington Model Seven Custom KS*
*Remington Model Seven Custom MS Rifle*
*Remington 700 ADL Bolt-Action Rifle*
*Remington 700 BDL Bolt-Action Rifle*
*Remington 700 BDL Varmint Special*
*Remington 700 BDL European Bolt-Action Rifle*
*Remington 700 Varmint Synthetic Rifle*
*Remington 700 BDL SS Rifle*
*Remington 700 Stainless Synthetic Rifle*
*Remington 700 MTRSS Rifle*
*Remington 700 BDL Left Hand*
*Remington 700 Camo Synthetic Rifle*
*Remington 700 Safari*
*Remington 700 Mountain Rifle*
*Remington 700 Custom KS Mountain Rifle*
*Remington 700 Classic Rifle*
*Ruger M77 Mark II Rifle*
*Ruger M77 Mark II Magnum Rifle*
*Ruger M77RL Ultra Light*
*Ruger M77 Mark II All-Weather Stainless Rifle*
*Ruger M77 RSI International Carbine*
*Ruger M77 Mark II Express Rifle*
*Ruger M77VT Target Rifle*
*Sako Hunter Rifle*
*Sako Fiberclass Sporter*
*Sako Safari Grade Bolt Action*
*Sako Hunter Left-Hand Rifle*
*Sako Classic Bolt Action*
*Sako Hunter LS Rifle*
*Sako Deluxe Lightweight*
*Sako Super Deluxe Sporter*
*Sako Mannlicher-Style Carbine*
*Sako Varmint Heavy Barrel*
*Sako TRG–S Bolt-Action Rifle*
*Sauer 90 Bolt-Action Rifle*
*Savage 110G Bolt-Action Rifle*
*Savage 110CY Youth/Ladies Rifle*
*Savage 110WLE One of One Thousand Limited Edition Rifle*
*Savage 110GXP3 Bolt-Action Rifle*
*Savage 110F Bolt-Action Rifle*
*Savage 110FXP3 Bolt-Action Rifle*

*Savage 110GV Varmint Rifle*
*Savage 112FV Varmint Rifle*
*Savage Model 112FVS Varmint Rifle*
*Savage Model 112BV Heavy Barrel Varmint Rifle*
*Savage 116FSS Bolt-Action Rifle*
*Savage Model 116FSK Kodiak Rifle*
*Savage 110FP Police Rifle*
*Steyr-Mannlicher Sporter Models SL, L, M, S, S/T*
*Steyr-Mannlicher Luxus Model L, M, S*
*Steyr-Mannlicher Model M Professional Rifle*
*Tikka Bolt-Action Rifle*
*Tikka Premium Grade Rifles*
*Tikka Varmint/Continental Rifle*
*Tikka Whitetail/Battue Rifle*
*Ultra Light Arms Model 20 Rifle*
*Ultra Light Arms Model 28, Model 40 Rifles*
*Voere VEC 91 Lightning Bolt-Action Rifle*
*Voere Model 2165 Bolt-Action Rifle*
*Voere Model 2155, 2150 Bolt-Action Rifles*
*Weatherby Mark V Deluxe Bolt-Action Rifle*
*Weatherby Lasermark V Rifle*
*Weatherby Mark V Crown Custom Rifles*
*Weatherby Mark V Sporter Rifle*
*Weatherby Mark V Safari Grade Custom Rifles*
*Weatherby Weathermark Rifle*
*Weatherby Weathermark Alaskan Rifle*
*Weatherby Classicmark No. 1 Rifle*
*Weatherby Weatherguard Alaskan Rifle*
*Weatherby Vanguard VGX Deluxe Rifle*
*Weatherby Vanguard Classic Rifle*
*Weatherby Vanguard Classic No. 1 Rifle*
*Weatherby Vanguard Weatherguard Rifle*
*Wichita Classic Rifle*
*Wichita Varmint Rifle*
*Winchester Model 70 Sporter*
*Winchester Model 70 Sporter WinTuff*
*Winchester Model 70 SM Sporter*
*Winchester Model 70 Stainless Rifle*
*Winchester Model 70 Varmint*
*Winchester Model 70 Synthetic Heavy Varmint Rifle*
*Winchester Model 70 DBM Rifle*
*Winchester Model 70 DBM-S Rifle*
*Winchester Model 70 Featherweight*
*Winchester Model 70 Featherweight WinTuff*
*Winchester Model 70 Featherweight Classic*
*Winchester Model 70 Lightweight Rifle*
*Winchester Ranger Rifle*
*Winchester Model 70 Super Express Magnum*
*Winchester Model 70 Super Grade*
*Winchester Model 70 Custom Sharpshooter*
*Winchester Model 70 Custom Sporting Sharpshooter Rifle*

### Centerfire Rifles—Single Shot

*Armsport 1866 Sharps Rifle, Carbine*
*Brown Model One Single Shot Rifle*
*Browning Model 1885 Single Shot Rifle*
*Dakota Single Shot Rifle*
*Desert Industries G-90 Single Shot Rifle*
*Harrington & Richardson Ultra Varmint Rifle*
*Model 1885 High Wall Rifle*
*Navy Arms Rolling Block Buffalo Rifle*
*Navy Arms #2 Creedmoor Rifle*
*Navy Arms Sharps Cavalry Carbine*
*Navy Arms Sharps Plains Rifle*
*New England Firearms Handi-Rifle*
*Red Willow Armory Ballard No. 5 Pacific*
*Red Willow Armory Ballard No. 1.5 Hunting Rifle*
*Red Willow Armory Ballard No. 8 Union Hill Rifle*

33

Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

### Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle

34

Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR-7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL-22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM-321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM-452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60-J-ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT-22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU-KKW Training Rifle
Navy Arms TU-33/40 Carbine
Navy Arms TU-KKW Sniper Trainer
Norinco JW-27 Bolt-Action Rifle
Norinco JW-15 Bolt-Action Rifle
Remington 541-T
Remington 40-XR Rimfire Custom Sporter
Remington 541-T HB Bolt-Action Rifle
Remington 581-S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

35

### Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

### Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun

36

*Browning Bsa 10 Stalker Auto Shotgun*
*Browning A–500R Auto Shotgun*
*Browning A–500G Auto Shotgun*
*Browning A–500G Sporting Clays*
*Browning Auto-5 Light 12 and 20*
*Browning Auto-5 Stalker*
*Browning Auto-5 Magnum 20*
*Browning Auto-5 Magnum 12*
*Churchill Turkey Automatic Shotgun*
*Cosmi Automatic Shotgun*
*Maverick Model 60 Auto Shotgun*
*Mossberg Model 5500 Shotgun*
*Mossberg Model 9200 Regal Semi-Auto Shotgun*
*Mossberg Model 9200 USST Auto Shotgun*
*Mossberg Model 9200 Camo Shotgun*
*Mossberg Model 6000 Auto Shotgun*
*Remington Model 1100 Shotgun*
*Remington 11–87 Premier Shotgun*
*Remington 11–87 Sporting Clays*
*Remington 11–87 Premier Skeet*
*Remington 11–87 Premier Trap*
*Remington 11–87 Special Purpose Magnum*
*Remington 11–87 SPS–T Camo Auto Shotgun*
*Remington 11–87 Special Purpose Deer Gun*
*Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun*
*Remington 11–87 SPS–Deer Shotgun*
*Remington 11–87 Special Purpose Synthetic Camo*
*Remington SP–10 Magnum-Camo Auto Shotgun*
*Remington SP–10 Magnum Auto Shotgun*
*Remington SP–10 Magnum Turkey Combo*
*Remington 1100 LT–20 Auto*
*Remington 1100 Special Field*
*Remington 1100 20-Gauge Deer Gun*
*Remington 1100 LT–20 Tournament Skeet*
*Winchester Model 1400 Semi-Auto Shotgun*

### *Shotguns—Slide Actions*

*Browning Model 42 Pump Shotgun*
*Browning BPS Pump Shotgun*
*Browning BPS Stalker Pump Shotgun*
*Browning BPS Pigeon Grade Pump Shotgun*
*Browning BPS Pump Shotgun (Ladies and Youth Model)*
*Browning BPS Game Gun Turkey Special*
*Browning BPS Game Gun Deer Special*
*Ithaca Model 87 Supreme Pump Shotgun*
*Ithaca Model 87 Deerslayer Shotgun*
*Ithaca Deerslayer II Rifled Shotgun*
*Ithaca Model 87 Turkey Gun*
*Ithaca Model 87 Deluxe Pump Shotgun*
*Magtech Model 586–VR Pump Shotgun*
*Maverick Models 88, 91 Pump Shotguns*
*Mossberg Model 500 Sporting Pump*
*Mossberg Model 500 Camo Pump*
*Mossberg Model 500 Muzzleloader Combo*
*Mossberg Model 500 Trophy Slugster*
*Mossberg Turkey Model 500 Pump*
*Mossberg Model 500 Bantam Pump*
*Mossberg Field Grade Model 835 Pump Shotgun*
*Mossberg Model 835 Regal Ulti-Mag Pump*
*Remington 870 Wingmaster*
*Remington 870 Special Purpose Deer Gun*
*Remington 870 SPS–BG-Camo Deer/Turkey Shotgun*
*Remington 870 SPS-Deer Shotgun*
*Remington 870 Marine Magnum*
*Remington 870 TC Trap*
*Remington 870 Special Purpose Synthetic Camo*
*Remington 870 Wingmaster Small Gauges*
*Remington 870 Express Rifle Sighted Deer Gun*

37

*Remington 879 SPS Special Purpose Magnum*
*Remington 870 SPS-T Camo Pump Shotgun*
*Remington 870 Special Field*
*Remington 870 Express Turkey*
*Remington 870 High Grades*
*Remington 870 Express*
*Remington Model 870 Express Youth Gun*
*Winchester Model 12 Pump Shotgun*
*Winchester Model 42 High Grade Shotgun*
*Winchester Model 1300 Walnut Pump*
*Winchester Model 1300 Slug Hunter Deer Gun*
*Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun*
*Winchester Model 1300 Turkey Gun*
*Winchester Model 1300 Ranger Pump Gun*

### Shotguns—Over/Unders

*American Arms/Franchi Falconet 2000 O/U*
*American Arms Silver I O/U*
*American Arms Silver II Shotgun*
*American Arms Silver Skeet O/U*
*American Arms/Franchi Sporting 2000 O/U*
*American Arms Silver Sporting O/U*
*American Arms Silver Trap O/U*
*American Arms WS/OU 12, TS/OU 12 Shotguns*
*American Arms WT/OU 10 Shotgun*
*Armsport 2700 O/U Goose Gun*
*Armsport 2700 Series O/U*
*Armsport 2900 Tri-Barrel Shotgun*
*Baby Bretton Over/Under Shotgun*
*Beretta Model 686 Ultralight O/U*
*Beretta ASE 90 Competition O/U Shotgun*
*Beretta Over/Under Field Shotguns*
*Beretta Onyx Hunter Sport O/U Shotgun*
*Beretta Model SO5, SO6, SO9 Shotguns*
*Beretta Sporting Clay Shotguns*
*Beretta 687EL Sporting O/U*
*Beretta 682 Super Sporting O/U*
*Beretta Series 682 Competition Over/Unders*
*Browning Citori O/U Shotgun*
*Browning Superlight Citori Over/Under*
*Browning Lightning Sporting Clays*
*Browning Micro Citori Lightning*
*Browning Citori Plus Trap Combo*
*Browning Citori Plus Trap Gun*
*Browning Citori O/U Skeet Models*
*Browning Citori O/U Trap Models*
*Browning Special Sporting Clays*
*Browning Citori GTI Sporting Clays*
*Browning 325 Sporting Clays*
*Centurion Over/Under Shotgun*
*Chapuis Over/Under Shotgun*
*Connecticut Valley Classics Classic Sporter O/U*
*Connecticut Valley Classics Classic Field Waterfowler*
*Charles Daly Field Grade O/U*
*Charles Daly Lux Over/Under*
*E.A.A./Sabatti Sporting Clays Pro-Gold O/U*
*E.A.A./Sabatti Falcon-Mon Over/Under*
*Kassnar Grade I O/U Shotgun*
*Krieghoff K-80 Sporting Clays O/U*
*Krieghoff K-80 Skeet Shotgun*
*Krieghoff K-80 International Skeet*
*Krieghoff K-80 Four-Barrel Skeet Set*
*Krieghoff K-80/RT Shotguns*
*Krieghoff K-80 O/U Trap Shotgun*
*Laurona Silhouette 300 Sporting Clays*
*Laurona Silhouette 300 Trap*
*Laurona Super Model Over/Unders*
*Ljutic LM-6 Deluxe O/U Shotgun*

38

*Marocchi Conquista Over/Under Shotgun*
*Marocchi Avanza O/U Shotgun*
*Merkel Model 200E O/U Shotgun*
*Merkel Model 200E Skeet, Trap Over/Unders*
*Merkel Model 203E, 303E Over/Under Shotguns*
*Perazzi Mirage Special Sporting O/U*
*Perazzi Mirage Special Four-Gauge Skeet*
*Perazzi Sporting Classic O/U*
*Perazzi MX7 Over/Under Shotguns*
*Perazzi Mirage Special Skeet Over/Under*
*Perazzi MX8/MX8 Special Trap, Skeet*
*Perazzi MX8/20 Over/Under Shotgun*
*Perazzi MX9 Single Over/Under Shotguns*
*Perazzi MX12 Hunting Over/Under*
*Perazzi MX28, MX410 Game O/U Shotguns*
*Perazzi MX20 Hunting Over/Under*
*Piotti Boss Over/Under Shotgun*
*Remington Peerless Over/Under Shotgun*
*Ruger Red Label O/U Shotgun*
*Ruger Sporting Clays O/U Shotgun*
*San Marco 12-Ga. Wildflower Shotgun*
*San Marco Field Special O/U Shotgun*
*San Marco 10-Ga. O/U Shotgun*
*SKB Model 505 Deluxe Over/Under Shotgun*
*SKB Model 685 Over/Under Shotgun*
*SKB Model 885 Over/Under Trap, Skeet, Sporting Clays*
*Stoeger/IGA Condor I O/U Shotgun*
*Stoeger/IGA ERA 2000 Over/Under Shotgun*
*Techni-Mec Model 610 Over/Under*
*Tikka Model 412S Field Grade Over/Under*
*Weatherby Athena Grade IV O/U Shotguns*
*Weatherby Athena Grade V Classic Field O/U*
*Weatherby Orion O/U Shotguns*
*Weatherby II, III Classic Field O/Us*
*Weatherby Orion II Classic Sporting Clays O/U*
*Weatherby Orion II Sporting Clays O/U*
*Winchester Model 1001 O/U Shotgun*
*Winchester Model 1001 Sporting Clays O/U*
*Pietro Zanoletti Model 2000 Field O/U*

### *Shotguns—Side by Sides*

*American Arms Brittany Shotgun*
*American Arms Gentry Double Shotgun*
*American Arms Derby Side-by-Side*
*American Arms Grulla #2 Double Shotgun*
*American Arms WS/SS 10*
*American Arms TS/SS 10 Double Shotgun*
*American Arms TS/SS 12 Side-by-Side*
*Arrieta Sidelock Double Shotguns*
*Armsport 1050 Series Double Shotguns*
*Arizaga Model 31 Double Shotgun*
*AYA Boxlock Shotguns*
*AYA Sidelock Double Shotguns*
*Beretta Model 452 Sidelock Shotgun*
*Beretta Side-by-Side Field Shotguns*
*Crucelegui Hermanos Model 150 Double*
*Chapuis Side-by-Side Shotgun*
*E.A.A./Sabatti Saba-Mon Double Shotgun*
*Charles Daly Model Dss Double*
*Ferlib Model F VII Double Shotgun*
*Auguste Francotte Boxlock Shotgun*
*Auguste Francotte Sidelock Shotgun*
*Garbi Model 100 Double*
*Garbi Model 101 Side-by-Side*
*Garbi Model 103A, B Side-by-Side*
*Garbi Model 200 Side-by-Side*
*Bill Hanus Birdgun Doubles*
*Hatfield Uplander Shotgun*

39

*Merkell Model 8, 47E Side-by-Side Shotguns*
*Merkel Model 47LSC Sporting Clays Double*
*Merkel Model 47S, 147S Side-by-Sides*
*Parker Reproductions Side-by-Side*
*Piotti King No. 1 Side-by-Side*
*Piotti Lunik Side-by-Side*
*Piotti King Extra Side-by-Side*
*Piotti Piuma Side-by-Side*
*Precision Sports Model 600 Series Doubles*
*Rizzini Boxlock Side-by-Side*
*Rizzini Sidelock Side-by-Side*
*Stoeger/IGA Uplander Side-by-Side Shotgun*
*Ugartechea 10-Ga. Magnum Shotgun*

**Shotguns—Bolt Actions & Single Shots**

*Armsport Single Barrel Shotgun*
*Browning BT–99 Competition Trap Special*
*Browning BT–99 Plus Trap Gun*
*Browning BT–99 Plus Micro*
*Browning Recoilless Trap Shotgun*
*Browning Micro Recoilless Trap Shotgun*
*Desert Industries Big Twenty Shotgun*
*Harrington & Richardson Topper Model 098*
*Harrington & Richardson Topper Classic Youth Shotgun*
*Harrington & Richardson N.W.T.F. Turkey Mag*
*Harrington & Richardson Topper Deluxe Model 098*
*Krieghoff KS–5 Trap Gun*
*Krieghoff KS–5 Special*
*Krieghoff K–80 Single Barrel Trap Gun*
*Ljutic Mono Gun Single Barrel*
*Ljutic LTX Super Deluxe Mono Gun*
*Ljutic Recoilless Space Gun Shotgun*
*Marlin Model 55 Goose Gun Bolt Action*
*New England Firearms Turkey and Goose Gun*
*New England Firearms N.W.T.F. Shotgun*
*New England Firearms Tracker Slug Gun*
*New England Firearms Standard Pardner*
*New England Firearms Survival Gun*
*Perazzi TM1 Special Single Trap*
*Remington 90–T Super Single Shotgun*
*Snake Charmer II Shotgun*
*Stoeger/IGA Reuna Single Barrel Shotgun*
*Thompson/Center TCR '87 Hunter Shotgun.*

## § 923. Licensing

(a) * * *

     \*     \*     \*     \*     \*     \*     \*

    (i) Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer. *The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured. A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.*

## § 924. Penalties

(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever—

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (k), [or (q) of section 922] *(r), (v), or (x) of section 922*;

\*　　\*　　\*　　\*　　\*　　\*　　\*

*(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, *or semiautomatic assault weapon*, to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

\*　　\*　　\*　　\*　　\*　　\*　　\*

## SUPPLEMENTAL VIEWS OF HON. DAN GLICKMAN

I supported this bill because it is a narrowly crafted bill focused on specific weapons that have no business being on our streets. It is aimed at rapid fire weapons that have the sole purpose of killing people, and it is aimed at weapons that are more suited for the battlefield than the target range.

I believe that violence in our nation is getting out of hand. It is devastating to read that a student killed a student with a semi-automatic weapon. But it is equally devastating to hear of students killing students with anyone. What we really need to focus on is why students are engaging in violence in the first place. For this reason, I think this legislation must be viewed as part of the effort to reduce crime—in conjunction with the comprehensive crime bill that increases penalties, calls for tougher sentencing, provides for more jails and police officers, and provides for prevention programs.

But we must not abrogate the Second Amendment rights that are provided for in the Constitution. We must be extremely careful that in this legislation and in any legislation in the future, that we are not taking away guns that truly are used for sports, hunting, or self-defense.

I don't believe that this bill is the first step in a long road to banning guns. However, some of my constituents have expressed their fear that the Congress is moving slowly toward banning all guns for all people. We must be absolutely clear that this narrowly crafted legislation is not that first step and is not just a precursor to further, broader federal gun control and federal gun bans. Sport shooters and hunters tell me that they don't want assault weapons on the streets and in the hands of gang members any more than anyone else. But what they don't want is for Congress to take the short step to saying that the hunting rifles are being used on the streets, and should be taken away. And then the handguns are being used on the streets and should be taken away.

I want to make sure that what we are doing has a purpose—that it gets at the weapons that are being used by gang members and others in killing sprees or other random violence. I want to be able to assure the hunters, sport shooters and folks who want to be prepared for self-defense that we're not going to turn around and tell these gun owners that their sporting guns are illegal. This is a good bill, but let's tread very carefully before going any further.

Finally, because I want to make sure that there is no mistake about which guns are banned and which are exempt, especially guns that will be developed in the future, I offered an amendment during Committee markup that was accepted by the Committee. This amendment clarifies that simply because a gun is not on the list of specifically exempted guns, does not mean that that firearm is banned. A firearm must meet the specific criteria set out in the

42

bill, or be specifically named as a banned gun before it can be
banned. In other words, the exempted gun list is not exhaustive.

Furthermore, my amendment makes clear that no gun may be
taken off the list of specifically exempted guns as long as the act
is in effect. In this way, it is absolutely clear that the intent of Con-
gress is that exempted guns remain exempted.

## DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., HON. GEORGE GEKAS, HON. LAMAR S. SMITH, HON. BILL McCOLLUM, HON. HOWARD COBLE, HON. STEVE SCHIFF, AND HON. BOB GOODLATTE

We strongly oppose H.R. 4296 which would ban a variety of guns. The primary problem with this bill is that it targets law abiding citizens. If this bill passes, simply possessing a shotgun or rifle could land you in jail. You don't have to shoot anybody. You don't have to threaten anyone, just leaving it in the hall closet is enough to land you in jail. Even if you use the gun for self-defense, you can go to jail.

It is already a federal crime for convicted criminals to possess these weapons, or any other gun for that matter. The laws aimed at these criminals should be fully enforced before we start going into the homes of law-abiding citizens and arresting them.

Another problem with this legislation is that simple, cosmetic changes to certain guns would turn those guns from being illegal to, all of a sudden being legal. For example, simply by removing a pistol grip, or a bayonet mount from a rifle saves the owner from going to jail, but leaves the gun's performance unaffected.

Finally, the problem of these guns has been greatly exaggerated. Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices. According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens. Therefore, we oppose H.R. 4296.

F. JAMES SENSENBRENNER, Jr.
GEORGE W. GEKAS.
LAMAR SMITH.
BILL McCOLLUM.
HOWARD COBLE.
STEVE SCHIFF.
BOB GOODLATTE.

(43)

## DISSENTING VIEWS OF HON. JACK BROOKS

I am strongly opposed to H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, because it misidentifies the causes of violent crime in the United States; diverts national priorities away from meaningful solutions to the problem of violent crime; punishes honest American gun owners who buy and use firearms for legitimate, lawful purposes such as, but not necessarily limited to, self-defense, target shooting, hunting, and firearms collection; fails to focus the punitive powers of government upon criminals. Most fundamentally, a prohibition on firearms violates the right of individual Americans to keep and bear arms, protected by the Second Amendment to the Constitution of the United States—a stark fact of constitutional life that the proponents of H.R. 4296 conveniently overlook in their zeal to abridge the rights of law-abiding citizens.

Reasons claimed to justify a prohibition on the firearms that would be affected by H.R. 4296 include the assertion that those particular firearms are used often in the commission of violent crimes. Data on the use of the firearms H.R. 4296 labels as "assault weapons" is not comprehensive, but such data as do exist consistently show that "assault weapons" are involved in a small percentage of violent crimes.

Most of the firearms labelled as "assault weapons" in H.R. 4296 are rifles—yet rifles are the general category of firearms used least often in the commission of violent crimes. The FBI Uniform Crime Reports, 1992, the most recent comprehensive data available, shows that rifles of any description are used in 3.1 percent of homicides, for example, while knives are used in 14.5 percent, fists and feet are used in 5 percent, and blunt objects are used in another 5 percent.

Professor Gary Kleck, of Florida State University, the 1993 recipient of the American Society of Criminology's Hindelang Award, estimates that one-half of 1 percent of violent crimes are committed with "assault weapons." University of Texas criminologist Sheldon Ekland-Olson estimates that one-quarter of rifle-related homicides may involve rifles chambered for military cartridges, which would include not only so-called "assault" type semi-automatic rifles, but non-semiautomatic rifles as well.

Since 1980, rifle-related homicides have declined by more than a third. According to the Metropolitan Police of Washington, D.C., the city which has the highest per capita rate of homicides of any major city in the United States, between 1980–1993 there occurred only 4 rifle-related homicides out of a total of more than 4,200 homicides in the period. The last rifle homicide during the period was recorded in 1984. Other data from D.C. police show that rifles are used in about one-tenth of 1 percent of robberies and assaults.

(44)

45

The California Department of Justice surveyed law enforcement agencies in the state in 1990, as the state's legislature addressed "assault weapon" ban legislation there. The California Department of Justice found that only 3.7 percent of the firearms that are used in homicides and assaults were "assault weapons," defined there to include even more firearms than are defined as "assault weapons" in H.R. 4296.

Connecticut State Police report that less than 2 percent of firearms seized by police in the state are "assault weapons"; the Massachusetts State Police report that "assault" type rifles were used in one-half of 1 percent of homicides between 19851991.

I believe the proponents of H.R. 4296 are in error in claiming that the Bureau of Alcohol, Tobacco and Firearms (BATF) has traced a large number of "assault weapons" to crime. This claim has been effectively contradicted by both the BATF itself and the Congressional Research Service's (CRS) report on the BATF firearms tracing system. The BATF has stated that it "does not always know if a firearm being traced has been used in a crime." For instance, sometimes a firearm is traced simply to determine the rightful owner after it is found by a law enforcement officer.

Each year, the BATF traces about 50,000 firearms, yet only about 1 percent of these traces relate to "assault weapons" that have been seized by police in the course of investigations of violent crimes. Most "assault weapons" traced relate not to violent crime but to property violations, such as stolen guns being traced so that they may be returned to their lawful owners, violations of the Gun Control Act, and other non-violent circumstances.

As noted by BATF and by CRS in its report to Congress entitled "Assault Weapons: Military-Style Semiautomatic Firearms Facts and Issues" (1992) that firearms traces are not intended to "trace guns to crime," that few "assault weapons" traced relative to violent crime investigations, and that available state and local law enforcement agency data shows relatively little use of "assault weapons" are used frequently in violent crimes.

"Assault weapons" function in the same manner as any other semi-automatic firearm. They fire once with each pull of the trigger, like most firearms. They use the same ammunition as other firearms, both semi-automatic and not. Therefore, "assault weapons" are useful for target shooting, self-defense, hunting, and other legitimate purposes, just as other firearms are.

H.R. 4296 would prohibit rifles that are commonly used for competitive shooting, such as the Springfield N1A and the Colt "AR-15."

Accessories found on some models of "assault weapons," such as folding stocks, flash suppressors, pistol grips, bayonet lugs, and detachable magazines may look menacing to persons unfamiliar with firearms, but there is absolutely no evidence that any of these accessories provide any advantage to a criminal. As has been demonstrated on many occasions, firearms which H.R. 4296 specifically exempts from its prohibition, firearms not equipped with those accessories, can be fired at the same rate, with the same accuracy, and with the same power as "assault weapons."

Time and again, supporters of H.R. 4296 have claimed that "assault weapons" can be "spray-fired from the hip"; but this is simply

46

not true. The firearms targeted in H.R. 4296 are not machineguns. Machineguns are restricted under the National Firearms Act of 1934. H.R. 4296's guns are semi-automatic, and fire only one shot at a time.

H.R. 4296's limitation on the capacity of ammunition feeding devices would do nothing to reduce the number of rounds available to a criminal. It has been demonstrated frequently that such devices can be switched in less than a second, so a criminal determined to have available a number of rounds greater than H.R. 4296 would permit in a single magazine would need only to possess additional smaller magazines. However, police have reportedly consistently that when criminals fire shots, they rarely discharge more than 2–5 rounds, well below the number of rounds H.R. 4296 would permit in a single magazine.

Most fundamentally, to impinge upon the constitutionally-protected rights of honest, law-abiding Americans on the basis of myth, misinformation, and newspaper headlines is a crime in and of itself. To protect against such a mockery of our Constitution and the infliction of such harm upon our citizens, I intend to oppose H.R. 4296 vigorously on the House floor in the hope that careful reflection will permit cooler heads and the light of reason to prevail.

○

# EXHIBIT E




# DEPARTMENT OF THE TREASURY STUDY ON THE SPORTING SUITABILITY OF MODIFIED SEMIAUTOMATIC ASSAULT RIFLES

## APRIL 1998

TABLE OF CONTENTS

Page

1. Executive Summary.................................................................. 1

2. Background......................................................................... 4

3. Defining the Type of Weapon Under Review........................... 16

4. Scope of "Sporting Purposes".............................................. 16

5. Method of Study................................................................. 19

6. Suitability for Sporting Purposes......................................... 21

7. Determination................................................................... 36

8. Exhibits:

   White House Memorandum: Importation of Modified Semiautomatic Assault-type Rifles

   Study Rifle Models

   Study Rifles

   ATF Form 4590, Factoring Criteria for Weapons

   Military Configuration

   Memorandum to File From First Meeting of Firearms Advisory Panel

   State Fish and Game Commission Review

9. Appendix: Summary of Externally Gathered Information

1

## EXECUTIVE SUMMARY

On November 14, 1997, the President and the Secretary of the Treasury ordered a review of the importation of certain modified versions of semiautomatic assault rifles into the United States.[1] The decision to conduct this review stemmed in part from concerns expressed by members of Congress and others that the rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable in a 1989 decision by the Bureau of Alcohol, Tobacco and Firearms (ATF). The decision also stemmed from the fact that nearly 10 years had passed since the last comprehensive review of the importation of rifles, and many new rifles had been developed during this time.

Under 18 U.S.C. section 925(d)(3), the Secretary shall approve applications for importation only when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test"). In 1989, ATF denied applications to import a series of semiautomatic versions of automatic-fire military assault rifles. When ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles. This distinctively military configuration served as the basis for ATF's finding that the rifles were not considered sporting rifles under the statute.

The military configuration identified by ATF incorporated eight physical features: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF took the position that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic rifle not importable.

Subsequent to the 1989 decision, certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features other than the ability to accept a detachable magazine. Significantly, most of these modified rifles not only still had the ability to accept a detachable magazine but, more specifically, still had the ability to accept a detachable large capacity magazine that

---

[1]  The President and the Secretary directed that all pending and future applications for importation of these rifles not be acted upon until completion of the review. They also ordered that outstanding permits for importation of the rifles be suspended for the duration of the review period. The existence of applications to import 1 million new rifles and outstanding permits for nearly 600,000 other rifles threatened to defeat the purpose of the expedited review unless the Department of the Treasury deferred action on additional applications and temporarily suspended the outstanding permits. (See exhibit 1 for a copy of the November 14, 1997, memorandum directing this review.)

The rifles that are the subject of this review are referred to in this report as "study rifles."

2

was originally designed and produced for the military assault rifles from which they were derived. These magazines are referred to in this report as "large capacity military magazines." Study rifles with the ability to accept such magazines are referred to in this report as "large capacity military magazine rifles," or "LCMM rifles." It appears that only one study rifle, the VEPR caliber .308 (an AK47 variant), is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found to meet the sporting purposes test. Accordingly, the study rifles were approved for import into the United States.

These modified rifles are the subject of the present review. Like the rifles banned in 1989, the study rifles are semiautomatic rifles based on AK47, FN-FAL, HK91 and 93, Uzi, and SIG SG550 military assault rifles. While there are at least 59 specific model designations of the study rifles, they all fall within the basic designs listed above. There are at least 39 models based on the AK47 design, 8 on the FN-FAL design, 7 on the HK91 and 93 designs, 3 on the Uzi design, and 2 on the SIG SG550 design (see exhibit 2 for a list of the models). Illustrations of some of the study rifles are included in exhibit 3 of this report.

This review takes another look at the entire matter to determine whether the modified rifles approved for importation since 1989 are generally recognized as particularly suitable for or readily adaptable to sporting purposes.[2] We have explored the statutory history of the sporting purposes test and prior administrative and judicial interpretations; reexamined the basic tenets of the 1989 decision; analyzed the physical features of the study rifles, as well as information from a wide variety of sources relating to the rifles' use and suitability for sporting purposes; and assessed changes in law that might have bearing on the treatment of the rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military configuration features identified in 1989, other than the ability to accept a detachable magazine. Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test. Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding

---

[2] The study was carried out by a working group composed of ATF and Treasury representatives. The working group's activities and findings were overseen by a steering committee composed of ATF and Treasury officials.

3

devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem. Specifically, Congress found that these magazines served "combat-functional ends" and were attractive to criminals because they "make it possible to fire a large number of rounds without reloading, then to reload quickly when those rounds are spent."[3] Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose. Accordingly, we found that the ability to accept such a magazine is a critical factor in the sporting purposes test, which must be given the same weight as the other military configuration features identified in 1989.

In addition, the information we collected on the use and suitability of LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes. Although our review of this information indicated that, with certain exceptions, the LCMM rifles sometimes are used for hunting, their actual use in hunting is limited. There are even some general restrictions and prohibitions on the use of semiautomatic rifles for hunting game. Similarly, although the LCMM rifles usually may be used, with certain exceptions, and sometimes are used for organized competitive target shooting, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use.

Furthermore, the information we gathered demonstrated that the LCMM rifles are attractive to certain criminals. We identified specific examples of the LCMM rifles' being used in violent crime and gun trafficking. In addition, we found some disturbing trends involving the LCMM rifles, including a rapid and continuing increase in crime gun trace requests after 1991 and a rapid "time to crime." Their ability to accept large capacity military magazines likely plays a role in their appeal to these criminals.

After weighing all the information collected, we found that the LCMM rifles are not generally recognized as particularly suitable for or readily adaptable to sporting purposes and are therefore not importable. However, this decision will in no way preclude the importation of true sporting firearms.

---

[3]    H. Rep. No. 103-489, at 18-19.

4

## BACKGROUND

### Importation of Firearms Under the Gun Control Act

The Gun Control Act of 1968 (GCA)[4] generally prohibits the importation of firearms into
the United States.[5]  However, the GCA creates four narrow categories of firearms that the
Secretary of the Treasury shall authorize for importation.  The category that is relevant to
this study is found at 18 U.S.C. section 925(d)(3).

> The Secretary shall authorize a firearm . . . to be imported or brought into the
> United States . . . if the firearm . . .
>
> > (3) is of a type that does not fall within the definition of a
> > firearm as defined in section 5845(a) of the Internal
> > Revenue Code of 1954 and **is generally recognized as
> > particularly suitable for or readily adaptable to sporting
> > purposes**, excluding surplus military firearms, except in any
> > case where the Secretary has not authorized the importation
> > of the firearm pursuant to this paragraph, it shall be
> > unlawful to import any frame, receiver, or barrel of such
> > firearm which would be prohibited if assembled.  (Emphasis
> > added)

This provision originally was enacted, in a slightly different form, by Title IV of the
Omnibus Crime Control and Safe Streets Act of 1968[6] and also was contained in Title I of
the GCA, which amended Title IV later that year.

The GCA was enacted in large part "to assist law enforcement authorities in the States and
their subdivisions in combating the increasing prevalence of crime in the
United States."  However, the Senate Report to the act also made clear that Congress did
not intend the GCA to place any undue or unnecessary restrictions or burdens on
responsible, law-abiding citizens with respect to acquiring, possessing, transporting, or
using firearms for lawful activities.[7]

---

[4]  Pub. L. No. 90-618.

[5]  18 U.S.C. section 922(l).

[6]  Pub. L. No. 90-351.

[7]  S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

5

Consistent with this general approach, legislative history indicates that Congress intended the importation standard provided in section 925(d)(3) to exclude military-type weapons from importation to prevent such weapons from being used in crime, while allowing the importation of high-quality sporting rifles. According to the Senate Report, section 925(d)(3) was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting."[8] The report goes on to explain that "[t]he importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which this title is designed to alleviate [crime]. Thus, the import provisions of this title seem entirely justified."[9] Indeed, during debate on the bill, Senator Dodd, the sponsor of the legislation, stated that "Title IV prohibits importation of arms which the Secretary determines are not suitable for . . . sport . . . . The entire intent of the importation section is to get those kinds of weapons that are used by criminals and have no sporting purpose."[10]

The Senate Report, however, also makes it clear that the importation standards "are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms."[11] (The rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.) Similarly, the report states that the importation prohibition "would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes."[12] The reference to recreational purposes is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting, because firearms particularly suitable for these purposes also can be used for other purposes such as recreational shooting.

During debate on the bill, there was discussion about the meaning of the term "sporting purposes." Senator Dodd stated:

> [h]ere again I would have to say that if a military weapon is used in a

---

[8]  S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

[9]  S. Rep. No. 1501, 90th Cong. 2d Sess. 24 (1968).

[10]  114 Cong. Rec. S 5556, 5582, 5585 (1968).

[11]  S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

[12]  S. Rep. No. 1501, 90th Cong. 2d. Sess. 22 (1968).

6

> special sporting event, it does not become a sporting weapon. It is a
> military weapon used in a special sporting event . . . . As I said previously
> the language says no firearms will be admitted into this country unless they
> are genuine sporting weapons.[13]

Legislative history also shows that the determination of a weapon's suitability for sporting
purposes is the direct responsibility of the Secretary of the Treasury. The Secretary was
given this discretion largely because Congress recognized that section 925(d)(3) was a
difficult provision to implement. Immediately after discussing the large role cheap
imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target
> without discriminating against sporting quality firearms, was a major
> reason why the Secretary of the Treasury has been given fairly broad
> discretion in defining and administering the import prohibition.[14]

Indeed, Congress granted this discretion to the Secretary even though some expressed
concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of
> the Treasury unusually broad discretion to decide whether a particular type
> of firearm is generally recognized as particularly suitable for, or readily
> adaptable to, sporting purposes. If this authority means anything, it
> permits Federal officials to differ with the judgment of sportsmen expressed
> through consumer preference in the marketplace . . . . [15]

Section 925(d)(3) provides that the Secretary shall authorize the importation of a firearm
if it is of a "type" that is generally recognized as particularly suitable for or readily
adaptable to sporting purposes. The legislative history also makes it clear that the
Secretary shall scrutinize types of firearms in exercising his authority under section 925(d).
Specifically, the Senate Report to the GCA states that section 925(d) "gives the

Secretary authority to permit the importation of ammunition and certain types of
firearms."[16]

---

[13]   114 Cong. Rec. 27461-462 (1968).

[14]   S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[15]   S. Rep. No. 1097, 90th Cong. 2d. Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and
Burdick). In Gun South, Inc. v. Brady, F.2d 858, 863 (11th Cir. 1989), the court, based on legislative
history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

[16]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

7

The Senate Report to the GCA also recommended that the Secretary establish a council that would provide him with guidance and assistance in determining which firearms meet the criteria for importation into the United States.[17] Accordingly, following the enactment of the GCA, the Secretary established the Firearms Evaluation Panel (FEP) (also known as the Firearms Advisory Panel) to provide guidelines for implementation of the "sporting purposes" test. This panel was composed of representatives from the military, the law enforcement community, and the firearms industry. At the initial meeting of the FEP, it was understood that the panel's role would be advisory only.[18] The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. ATF thereafter developed an evaluation sheet (ATF Form 4590) that was put into use for evaluating handguns pursuant to section 925(d)(3). (See exhibit 4.)

The FEP did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms, which Congress addressed separately, the rifles and shotguns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Therefore, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns.

1984 Application of the Sporting Purposes Test

The first time that ATF undertook a meaningful analysis of rifles or shotguns under the sporting purposes test was in 1984. At that time, ATF was faced with a new breed of imported shotgun, and it became clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to submit evidence of the weapon's sporting purposes, it provided information that the weapon was suitable for police/combat-style competitions. ATF determined that this type of competition did not constitute a sporting purpose

under the statute, and that the shotgun was not suitable for the traditional shotgun sports of hunting, and trap and skeet shooting.

---

[17] S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[18] Gilbert Equipment Co. v. Higgins, 709 F. Supp. 1071, 1083, n. 7 (S.D. Ala. 1989), aff'd without op., 894 F.2d 412 (11th Cir. 1990).

8

## 1986 Firearms Owners Protection Act

On May 19, 1986, Congress passed the Firearms Owners Protection Act,[19] which amended section 925(d)(3) to provide that the Secretary "shall" (instead of "may") authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for or readily adaptable to sporting purposes. The Senate Report to the law stated "it is anticipated that in the vast majority of cases, [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practices."[20] As the courts have found, "[r]egardless of the changes made [by the 1986 law], the firearm must meet the sporting purposes test and it remains the Secretary's obligation to determine whether specific firearms satisfy this test."[21]

## 1986 Application of the Sporting Purposes Test

In 1986, ATF again had to determine whether a shotgun met the sporting purposes test, when the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). Again, ATF refused to recognize police/combat-style competitions as a sporting purpose. After examining and testing the weapon, ATF determined its weight, size, bulk, designed magazine capacity, configuration, and other factors prevented it from being classified as particularly suitable for or readily adaptable to the traditional shotgun sports of hunting, and trap and skeet shooting. Accordingly, its importation was denied.

When this decision was challenged in Federal court, ATF argued, in part, that large magazine capacity and rapid reloading ability are military features. The court accepted this argument, finding "the overall appearance and design of the weapon (especially the detachable box magazine . . . ) is that of a combat weapon and not a sporting weapon."[22] In reaching this decision, the court was not persuaded by the importer's argument that box magazines can be lengthened or shortened depending on desired shell capacity.[23] The court also agreed with ATF's conclusion that police/combat-style competitions were not considered sporting purposes.

---

[19] Pub. L. No. 99-308.

[20] S. Rep. No. 98-583, 98th Cong. 1st Sess. 27 (1984).

[21] Gilbert Equipment Co., 709 F. Supp. at 1083.

[22] Id. at 1089.

[23] Id. at 1087, n. 20 and 1089.

9

## 1989 Report on the Importability of Semiautomatic Assault Rifles

In 1989, after five children were killed in a California schoolyard by a gunman with a semiautomatic copy of an AK47, ATF decided to reexamine whether certain semiautomatic assault-type rifles met the sporting purposes test. This decision was reached after consultation with the Director of the Office of National Drug Control Policy. In March and April 1989, ATF announced that it was suspending the importation of certain "assault-type rifles." For the purposes of this suspension, assault-type rifles were those rifles that generally met the following criteria: (1) military appearance; (2) large magazine capacity; and (3) semiautomatic version of a machinegun. An ATF working group was established to reevaluate the importability of these assault-type rifles. On July 6, 1989, the group issued its Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles (hereinafter 1989 report).

In the 1989 report, the working group first discussed whether the assault-type rifles under review fell within a "type" of firearm for the purposes of section 925(d)(3). The working group concluded that most of the assault-type rifles under review represented "a distinctive type of rifle [which it called the "semiautomatic assault rifle"] distinguished by certain general characteristics which are common to the modern military assault rifle."[24] The working group explained that the modern military assault rifle is a weapon designed for killing or disabling the enemy and has characteristics designed to accomplish this purpose. Moreover, it found that these characteristics distinguish modern military assault rifles from traditional sporting rifles.

The characteristics of the modern military assault rifle that the working group identified were as follows: (1) military configuration (which included: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights) (see exhibit 5 for a thorough discussion of each of these features); (2) ability to fire automatically (i.e., as a machinegun); and (3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[25] In regards to the ability to accept a detachable magazine, the working group explained that:

> [v]irtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable

---

[24] 1989 report at 6.

[25] 1989 report at 6.

10

> magazines are not limited to military firearms, most traditional
> semiautomatic sporting firearms, designed to accommodate a detachable
> magazine, have a relatively small magazine capacity.[26]

The working group emphasized that these characteristics had to be looked at as a whole to determine whether the overall configuration of each of the assault-type rifles under review placed the rifle fairly within the semiautomatic assault rifle type. The semiautomatic assault rifles shared all the above military assault rifle characteristics other than being machineguns.[27]

The working group also addressed the scope of the term "sporting purposes." It concluded that the term should be given a narrow interpretation that focuses on the traditional sports of hunting and organized competitive target shooting. The working group made this determination by looking to the statute, its legislative history, applicable case law, the work of the FEP, and prior interpretations by ATF. In addition, the working group found that the reference to sporting purposes was intended to stand in contrast to military and law enforcement applications. Consequently, it determined that police/combat-type competitions should not be treated as sporting activities.[28]

The working group then evaluated whether the semiautomatic assault rifle type of firearm is generally recognized as particularly suitable for or readily adaptable to traditional sporting applications. This examination took into account technical and marketing data, expert opinions, the recommended uses of the firearms, and information on the actual uses for which the weapons are employed in this country. The working group, however, did not consider criminal use as a factor in its analysis of the importability of this type of firearm.

After analyzing this information, the working group concluded that semiautomatic assault rifles are not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, the working group concluded that semi-automatic assault rifles should not be authorized for importation under section 925(d)(3). However, the working group found that some of the assault-type rifles under review (the Valmet Hunter and .22 rimfire caliber rifles), did not fall within the semiautomatic assault rifle type. In the case of the Valmet Hunter, the working group found that although it was based on the operating mechanism of the AK47 assault rifle, it had been substantially

---

[26]  1989 report at 6 (footnote omitted).

[27]  The semiautomatic assault rifles were semiautomatic versions of machineguns.

[28]  1989 report at 9-11.

11

changed so that it was similar to a traditional sporting rifle.[29] Specifically, it did not have any of the military configuration features identified by the working group, except for the ability to accept a detachable magazine.

Following the 1989 study, ATF took the position that a semiautomatic rifle with any of the eight military configuration features identified in the 1989 report, other than the ability to accept a detachable magazine, failed the sporting purposes test and, therefore, was not importable.

Gun South, Inc. v. Brady

Concurrent with its work on the 1989 report, ATF was involved in litigation with Gun South, Inc. (GSI). In October 1988 and February 1989, ATF had granted GSI permits to import AUG-SA rifles. As mentioned previously, in March and April of 1989, ATF imposed a temporary suspension on the importation of rifles being reviewed in the 1989 study, which included the AUG-SA rifle. GSI filed suit in Federal court, seeking to prohibit the Government from interfering with the delivery of firearms imported under permits issued prior to the temporary suspension.

The court of appeals found that the Government had the authority to suspend temporarily the importation of GSI's AUG-SA rifles because the GCA "impliedly authorizes" such action.[30] In addition, the court rejected GSI's contention that the suspension was arbitrary and capricious because the AUG-SA rifle had not physically changed, explaining the argument "places too much emphasis on the rifle's structure for determining whether a firearm falls within the sporting purpose exception. While the Bureau must consider the rifle's physical structure, the [GCA] requires the Bureau to equally consider the rifle's use."[31] In addition, the court found that ATF adequately had considered sufficient evidence before imposing the temporary suspension, citing evidence ATF had considered

demonstrating that semiautomatic assault-type rifles were being used with increasing frequency in crime.[32]

---

[29] This finding reflects the fact that the operating mechanism of the AK47 assault rifle is similar to the operating mechanism used in many traditional sporting rifles.

[30] Gun South, Inc. v. Brady, 877 F.2d 858 (11th Cir. 1989). The court of appeals issued its ruling just days before the 1989 report was issued. However, the report was complete before the ruling was issued.

[31] Id.

[32] Id.

12

Although GSI sued ATF on the temporary suspension of its import permits, once the 1989 report was issued, no one pursued a lawsuit challenging ATF's determination that the semiautomatic assault rifles banned from importation did not meet the sporting purposes test.[33]

Violent Crime Control and Law Enforcement Act of 1994

On September 13, 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994,[34] which made it unlawful, with certain exceptions, to manufacture, transfer, or possess semiautomatic assault weapons as defined by the statute.[35] The statute defined semiautomatic assault weapons to include 19 named models of firearms (or copies or duplicates of the firearms in any caliber);[36] semiauto-matic rifles that have the ability to accept detachable magazines and have at least two of five features specified in the law; semiautomatic pistols that have the ability to accept detachable magazines and have at least two of five features specified in the law; and semiautomatic shotguns that have at least two of four features specified in the law.[37] However, Congress

---

[33] After the 1989 report was issued, Mitchell Arms, Inc. asserted takings claims against the Government based upon the suspension and revocation of four permits allowing for the importation of semiautomatic assault rifles and ATF's temporary moratorium on import permits for other rifles. The court found for the Government, holding the injury complained of was not redressable as a taking because Mitchell Arms did not hold a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment. Mitchell Arms v. United States, 26 Cl. Ct. 1 (1992), aff'd, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994).

[34] Pub. L. No. 103-22. Title XI, Subtitle A of this act may be cited as the "Public Safety and Recreational Firearms Use Protection Act."

[35] 18 U.S.C. section 922(v).

[36] Chapter 18 U.S.C. section 921(a)(30)(A) states that the term "semiautomatic assault weapon" means "any of the firearms, or copies or duplicates of the firearms in any caliber, known as -," followed by a list of named firearms. Even though section 921(a)(3) defines "firearm" as used in chapter 18 to mean, in part, "the frame or receiver of any such weapon," the use of "firearm" in section 921(a)(30)(A) has not been interpreted to mean a frame or receiver of any of the named weapons, except when the frame or receiver actually is incorporated in one of the named weapons.

Any other interpretation would be contrary to Congress' intent in enacting the assault weapon ban. In the House Report to the assault weapon ban, Congress emphasized that the ban was to be interpreted narrowly. For example, the report explained that the present bill was more tightly focused than earlier drafts which gave ATF authority to ban any weapon which "embodies the same configuration" as the named list of guns in section 921(a)(30)(A); instead, the present bill "contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons [beyond the listed weapons]." H. Rep. 103-489 at 21.

[37] 18 U.S.C. section 921(a)(30).

13

exempted from the assault weapon ban any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition and any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.[38]

Although the 1994 law was not directly addressing the sporting purposes test in section 925(d)(3), section 925(d)(3) had a strong influence on the law's content. The technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law. The House Report to the 1994 law explained that although the legal question of whether semiautomatic assault weapons met section 925(d)(3)'s sporting purposes test "is not directly posed by [the 1994 law], the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features."[39]  As in the 1989 study, Congress focused on the external features of firearms, rather than on their semiautomatic operating mechanism.

The 1994 law also made it unlawful to possess and transfer large capacity ammunition feeding devices manufactured after September 13, 1994.[40] A large capacity ammunition feeding device was generally defined as a magazine, belt, drum, feed strip, or similar device that has the capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.[41]

Congress passed these provisions of the 1994 law in response to the use of semiautomatic assault weapons and large capacity ammunition feeding devices in crime. Congress had been presented with much evidence demonstrating that these weapons were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[42]  The House Report to the 1994 law recounts numerous crimes that had occurred involving semiautomatic assault weapons and large capacity magazines that were originally designed and produced for military assault rifles.[43]

---

[38]  18 U.S.C. sections 922(v)(3)(C)&(D).

[39]  H. Rep. No. 103-489, at 17, n. 19.

[40]  18 U.S.C. section 922(w).

[41]  18 U.S.C. section 921(a)(31).

[42]  H. Rep. No. 103-489, at 13.

[43]  H. Rep. No. 103-489, at 14-15.

14

In enacting the semiautomatic assault weapon and large capacity ammunition feeding device bans, Congress emphasized that it was not preventing the possession of sporting firearms. The House Report, for example, stated that the bill differed from earlier bills in that "it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns."[44] In addition, Congress specifically exempted 661 long guns from the assault weapon ban which are "most commonly used in hunting and recreational sports."[45]

Both the 1994 law and its legislative history demonstrate that Congress recognized that ammunition capacity is a factor in determining whether a firearm is a sporting firearm. For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. Moreover, the House Report specifically states that the ability to accept a large capacity magazine was a military configuration feature which was not "merely cosmetic," but "serve[d] specific, combat-functional ends."[46] The House Report also explains that, while "[m]ost of the weapons covered by the [ban] come equipped with magazines that hold 30 rounds [and can be replaced with magazines that hold 50 or even 100 rounds], . . . [i]n contrast, hunting rifles and shotguns typically have much smaller magazine capabilities-- from 3-5."[47]

Finally, it must be emphasized that the semiautomatic assault weapon ban of section 922(v) is distinct from the sporting purposes test governing imports of section 925(d)(3). Clearly, any weapon banned under section 922(v) cannot be imported into the United States because its possession in the United States would be illegal. However, it is possible that a weapon not defined as a semiautomatic assault weapon under section 922(v) still would not be importable under section 925(d)(3). In order to be importable, the firearm must be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes regardless of its categorization under section 922(v). The

Secretary's discretion under section 925(d)(3) remains intact for all weapons not banned by the 1994 statute.

The Present Review

Prior to the November 14, 1997, decision to conduct this review, certain members of

---

[44] H. Rep. No. 103-489, at 21.

[45] H. Rep. No. 103-489, at 20. None of these 661 guns are study rifles.

[46] H. Rep. No. 103-489, at 18.

[47] H. Rep. No. 103-489, at 19 (footnote omitted).

15

Congress strongly urged that it was necessary to review the manner in which the Treasury Department is applying the sporting purposes test to the study rifles, in order to ensure that the present practice is consistent with section 925(d)(3) and current patterns of gun use. The fact that it had been nearly 10 years since the last comprehensive review of the importation of rifles (with many new rifles being developed during this time) also contributed to the decision to conduct this review.

16

## DEFINING THE TYPE OF WEAPON UNDER REVIEW

Section 925 (d) (3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that meets the sporting purposes test. Given this statutory mandate, we had to determine whether the study rifles suspended from importation fell within one type of firearm. Our review of the study rifles demonstrated that all were derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found to be importable when certain military features were removed.

Within this group, we determined that virtually all of the study rifles shared another important feature: The ability to accept a detachable large capacity magazine (e.g., more than 10 rounds) that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi. (This is the only military configuration feature cited in the 1989 study that remains with any of the study rifles).

We determined that all of the study rifles that shared both of these characteristics fell within a type of firearm which, for the purposes of this report, we call "large capacity military magazine rifles" or "LCMM rifles." It appears that only one study rifle, the VEPR caliber .308--which is based on the AK47 design--does not fall within this type because it does not have the ability to accept a large capacity military magazine.

## SCOPE OF "SPORTING PURPOSES"

As in the 1989 study, we had to determine the scope of "sporting purposes" as used in section 925(d)(3). Looking to the statute, its legislative history, the work of the Firearms Evaluation Panel (see exhibit 6), and prior ATF interpretations, we determined sporting purposes should be given a narrow reading, incorporating only the traditional sports of hunting and organized competitive target shooting (rather than a broader interpretation that could include virtually any lawful activity or competition.)

In terms of the statute itself, the structure of the importation provisions suggests a somewhat narrow interpretation. Firearms are prohibited from importation (section 922(l)), with four specific exceptions (section 925(d)). A broad interpretation permitting a firearm to be imported because someone may wish to use it in some lawful shooting activity would render the general prohibition of section 922(l) meaningless.

Similarly, as discussed in the "Background" section, the legislative history of the GCA indicates that the term sporting purposes narrowly refers to the traditional sports of hunting and organized competitive target shooting. There is nothing in the history to indicate that it was intended to recognize every conceivable type of activity or competition that might employ a firearm.

17

In addition, the FEP specifically addressed the informal shooting activity of "plinking" (shooting at randomly selected targets such as bottles and cans) and determined that it was not a legitimate sporting purpose under the statute. The panel found that, "while many persons participate in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . . ." (See exhibit 6.)

Finally, the 1989 report determined that the term sporting purposes should be given a narrow reading incorporating the traditional rifle sports of hunting and organized competitive target shooting. In addition, the report determined that the statute's reference to sporting purposes was intended to stand in contrast with military and law enforcement applications. This is consistent with ATF's interpretation in the context of the Striker-12 shotgun and the USAS-12 shotgun. It is also supported by the court's decision in Gilbert Equipment Co. v. Higgins.

We received some comments urging us to find "practical shooting" is a sport for the purposes of section 925(d)(3).[48] Further, we received information showing that practical shooting is gaining in popularity in the United States and is governed by an organization that has sponsored national events since 1989. It also has an international organization.

While some may consider practical shooting a sport, by its very nature it is closer to police/combat-style competition and is not comparable to the more traditional types of sports, such as hunting and organized competitive target shooting. Therefore, we are not convinced that practical shooting does, in fact, constitute a sporting purpose under section 925(d)(3).[49] However, even if we were to assume for the sake of argument that practical shooting is a sport for the purposes of the statute, we still would have to decide whether a firearm that could be used in practical shooting meets the sporting purposes test. In other words, it still would need to be determined whether the firearm is of a type that is generally recognized as particularly suitable for or readily adaptable to practical shooting and other sporting purposes.[50] Moreover, the legislative history makes clear that the use of a military weapon in a practical shooting competition would not make that weapon

---

[48] Practical shooting involves moving, identifying, and engaging multiple targets and delivering a num ber of shots rapidly. In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, "no-shoots," steel reaction targets, movers, and others to challenge them.

[49] As noted earlier, ATF has taken the position that police/combat-style competitions do not constitute a "sporting purpose." This position was upheld in Gilbert Equipment Co., 709 F. Supp. at 1077.

[50] Our findings on the use and suitability of the LCMM rifles in practical shooting competitions are contained in the "Suitability for Sporting Purposes" section of this report.

18

sporting: "if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event."[51]  While none of the LCMM rifles are military weapons, they still retain the military feature of the ability to accept a large capacity military magazine.

---

[51]  114 Cong. Rec. 27461-462 (1968) (Sen. Dodd).

19

## METHOD OF STUDY

As explained in the "Executive Summary" section of this report, the purpose of this study is to review whether modified semiautomatic assault rifles are properly importable under 18 U.S.C. section 925(d)(3). More specifically, we reexamined the conclusions of the 1989 report as applied today to determine whether we are correct to allow importation of the study rifles that have been modified by having certain military features removed. To determine whether such rifles are generally recognized as particularly suitable for or readily adaptable to sporting purposes, the Secretary must consider both the physical features of the rifles and the actual uses of the rifles.[52] Because it appears that all of the study rifles that have been imported to date have the ability to accept a large capacity military magazine,[53] all of the information collected on the study rifles' physical features and actual uses applies only to the LCMM rifles.

**Physical features**:

The discussion of the LCMM rifles' physical features are contained in the "Suitability for Sporting Purposes" section of this report.

**Use**:

We collected relevant information on the use of the LCMM rifles. Although the 1989 study did not consider the criminal use of firearms in its importability analysis, legislative history demonstrates and the courts have found that criminal use is a factor that can be considered in determining whether a firearm meets the requirements of section 925(d)(3).[54] Accordingly, we decided to consider the criminal use of the LCMM rifles in the present analysis.

The term "generally recognized" in section 925(d)(3) indicates that the Secretary should base his evaluation of whether a firearm is of a type that is particularly suitable for or readily adaptable to sporting purposes, in part, on a "community standard" of the firearm's use.[55] The community standard "may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is generally recognized as particularly suitable for or readily adaptable to a sporting purpose."[56] Therefore, to assist the Secretary in determining whether the LCMM rifles presently are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes, we gathered information from the relevant "community." The relevant community was defined as persons and groups who are

---

[52]    Gun South, Inc., 877 F.2d at 866.

[53]    The VEPR caliber .308 discussed on page 16 has not yet been imported.

[54]    114 Cong. Rec. S 5556, 5582, 5585 (1968)("[t]he entire intent of the importation section [of the sporting purposes test] is to get those kinds of weapons that are used by criminals and have no sporting purposes") (Sen. Dodd); Gun South, Inc., 877 F.2d at 866.

[55]    Gun South, Inc., 877 F.2d at 866.

[56]    Id.

knowledgeable about the uses of these firearms or have relevant information about whether these firearms are particularly suitable for sporting purposes. We identified more than 2,000 persons or groups we believed would be able to provide relevant, factual information on these issues. The individuals and groups were selected to obtain a broad range of perspectives on the issues. We conducted surveys to obtain specific information from hunting guides, editors of hunting and shooting magazines, organized competitive shooting groups, State game commissions, and law enforcement agencies and organizations. Additionally, we asked industry members, trade associations, and various interest and information groups to provide relevant information.[57] A detailed presentation of the surveys and responses is included as an appendix to this report.

We also reviewed numerous advertisements and publications, both those submitted by the editors of hunting and shooting magazines and those collected internally, in our search for material discussing the uses of the LCMM rifles. Further, we collected importation data, tracing data, and case studies.[58]

Our findings on use are contained in the "Suitability for Sporting Purposes" section of this report.

---

[57] **Hunting guides**: Guides were asked about specific types of firearms used by their clients. The guides were an easily definable group, versus the entire universe of hunters. We obtained the names of the hunting guides surveyed from the States.

**Editors of hunting and shooting magazines**: Editors were surveyed to determine whether they recommended the LCMM rifles for hunting or organized competitive target shooting and whether they had written any articles on the subject. The list of editors we surveyed was obtained from a directory of firearms-related organizations.

**Organized competitive shooting groups**: Organized groups were asked whether they sponsored competitive events with high-power semiautomatic rifles and whether the LCMM rifles were allowed in those competitions. We felt it was significant to query those who are involved with organized events rather than unofficial activities with no specific rules or guidelines. As with the editors above, the list of groups was obtained from a directory of firearms-related organizations.

**State game commissions**: State officials were surveyed to determine whether the use of the LCMM rifles was prohibited or restricted for hunting in each State.

**Law enforcement agencies and organizations**: Specific national organizations and a sampling of 26 police departments across the country were contacted about their knowledge of the LCMM rifles' use in crime. The national organizations were surveyed with the intent that they would gather input from the wide range of law enforcement agencies that they represent or that they would have access to national studies on the subject.

**Industry members and trade associations**: These groups were included because of their knowledge on the issue.

**Interest and information groups**: These organizations were included because of their wide range of perspectives on the issue.

[58] To assist us with our review of the crime-related information we collected, we obtained the services of Garen J. Wintemute, MD, M.P.H. Director of the Violence Prevention Research Program, University of California, Davis, and Anthony A. Braga, Ph.D., J.F.K. School of Government, Harvard University.

21

## SUITABILITY FOR SPORTING PURPOSES

The next step in our review was to evaluate whether the LCMM rifles, as a type, are generally recognized as particularly suitable for or readily adaptable to hunting and organized competitive target shooting.[59]   The standard applied in making this determination is high.  It requires more than a showing that the LCMM rifles may be used or even are sometimes used for hunting and organized competitive target shooting; if this were the standard, the statute would be meaningless.  Rather, the standard requires a showing that the LCMM rifles are especially suitable for use in hunting and organized competitive target shooting.

As discussed in the "Method of Study" section, we considered both the physical features of the LCMM rifles and the actual uses of the LCMM rifles in making this determination.

Physical Features

**The ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.**

Although the LCMM rifles have been stripped of many of their military features, they all still have the ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 and 93, SIG SG550, or Uzi; in other words, they still have a feature that was designed for killing or disabling an enemy.  As the 1989 report explains:

> Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional

---

[59]   One commenter suggests that the Secretary has been improperly applying the "readily adaptable to sporting purposes" provision of the statute.  Historically, the Secretary has considered the "particularly suitable for or readily adaptable to" provisions as one standard.  The broader interpretation urged by the commenter would make the standard virtually unenforceable.  If the Secretary allowed the importation of a firearm which is readily adaptable to sporting purposes, without requiring it actually be adapted prior to importation, the Secretary would have no control over whether the adaptation actually would occur following the importation.

22

> semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[60]

Thus, the 1989 report found the ability to accept a detachable large capacity magazine originally designed and produced for a military assault rifle was a military, not a sporting, feature. Nevertheless, in 1989 it was decided that the ability to accept such a large capacity magazine, in the absence of other military configuration features, would not be viewed as disqualifying for the purposes of the sporting purposes test. However, several important developments, which are discussed below, have led us to reevaluate the weight that should be given to the ability to accept a detachable large capacity military magazine in the sporting purposes test.

Most significantly, we must reevaluate the significance of this military feature because of a major amendment that was made to the GCA since the 1989 report was issued. In 1994, as discussed in the "Background" section of this report, Congress passed a ban on large capacity ammunition feeding devices and semiautomatic assault weapons.[61] In enacting these bans, Congress made it clear that it was not preventing the possession of sporting firearms.[62] Although the 1994 law was not directly addressing the sporting purposes test, section 925(d)(3) had a strong influence on the law's content. As discussed previously, the technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.

Both the 1994 law and its legislative history demonstrate that Congress found that ammunition capacity is a factor in whether a firearm is a sporting firearm. For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. In other words, Congress found magazine capacity to be such an important factor that a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition will not be banned, even if it contains all five of the assault

---

[60]  1989 report at 6 (footnote omitted). This was not the first time that ATF considered magazine capacity to be a relevant factor in deciding whether a firearm met the sporting purposes test. See Gilbert Equipment Co., 709 F. Supp. at 1089 ("the overall appearance and design of the weapon (especially the detachable box magazine . . .) is that of a combat weapon and not a sporting weapon."

[61]  The ban on large capacity ammunition feeding devices does not include any such device manufactured on or before September 13, 1994. Accordingly, there are vast numbers of large capacity magazines originally designed and produced for military assault weapons that are legal to transfer and possess ("grandfathered" large capacity military magazines). Presently these grandfathered large capacity military magazines fit the LCMM rifles.

[62]  See, for example, H. Rep. No. 103-489, at 21.

23

weapon features listed in the law. Moreover, unlike the assault weapon ban in which a detachable magazine and at least two physical features are required to ban a rifle, a large capacity magazine in and of itself is banned.

In addition, the House Report specifically states that the ability to accept a large capacity magazine is a military configuration characteristic that is not "merely cosmetic," but "serve[s] specific, combat-functional ends."[63] The House Report also explains that large capacity magazines

> make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent. Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. . . . In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities--from 3-5.[64]

Congress specifically exempted 661 long guns from the assault weapon ban that are "most commonly used in hunting and recreational sports."[65] The vast majority of these long guns do not use large capacity magazines. Although a small number of the exempted long guns have the ability to accept large capacity magazines, only four of these exempted long guns were designed to accept large capacity military magazines.[66]

The 1994 law also demonstrates Congress' concern about the role large capacity magazines and firearms with the ability to accept these large capacity magazines play in

---

[63] H. Rep. No. 103-489, at 18.

[64] H. Rep. No. 103-489, at 19 (footnote omitted). The fact that 12 States place a limit on the magazine capacity allowed for hunting, usually 5 or 6 rounds, is consistent with this analysis. (See exhibit 7).

[65] H. Rep. 103-489, at 20.

[66] These four firearms are the Iver Johnson M-1 carbine, the Iver Johnson 50th Anniversary M-1 carbine, the Ruger Mini-14 autoloading rifle (without folding stock), and the Ruger Mini Thirty rifle. All of these weapons are manufactured in the United States and are not the subject of this study. In this regard, it should also be noted that Congress can distinguish between domestic firearms and foreign firearms and impose different requirements on the importation of firearms. For example, Congress may ban the importation of certain firearms although similar firearms may be produced domestically. See, for example, B-West Imports v. United States, 75 F.3d 633 (Fed. Cir. 1996).

crime.  The House Report for the bill makes reference to numerous crimes involving these magazines and weapons, including the following:[67]

> The 1989 Stockton, California, schoolyard shooting in which a gunman with a semiautomatic copy of an AK47 and 75-round magazines fired 106 rounds in less than 2 minutes.  Five children were killed and twenty-nine adults and children were injured.

> The 1993 shooting in a San Francisco, California, office building in which a gunman using 2 TEC DC9 assault pistols with 50-round magazines killed 8 people and wounded 6 others.

> A 1993 shooting on the Long Island Railroad that killed 6 people and wounded 19 others.  The gunman had a Ruger semiautomatic pistol, which he reloaded several times with 15-round magazines, firing between 30 to 50 rounds before he was overpowered.

The House Report also includes testimony from a representative of a national police officers' organization, which reflects the congressional concern with criminals' access to firearms that can quickly expel large amounts of ammunition:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before [re]loading.  Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip.  The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation.  The six-shot .38 caliber service revolver, standard law enforcement issue for years, is just no match against a criminal armed with a semiautomatic assault weapon.[68]

Accordingly, by passing the 1994 law, Congress signaled that firearms with the ability to accept detachable large capacity magazines are not particularly suitable for sporting purposes.  Although in 1989 we found the ability to accept a detachable large capacity military magazine was a military configuration feature, we must give it more weight, given this clear signal from Congress.

The passage of the 1994 ban on large capacity magazines has had another effect.  Under the 1994 ban, it generally is unlawful to transfer or possess a large capacity magazine

---

[67]  H. Rep. No. 103-489, at 15 (two of these examples involve handguns).

[68]  H. Rep. 103-489, at 13-14 (footnote omitted).

25

manufactured after September 13, 1994. Therefore, if we require the LCMM rifles to be modified so that they do not accept a large capacity military magazine in order to be importable, a person will not be able to acquire a newly manufactured large capacity magazine to fit the modified rifle. Thus, the modified rifle neither will be able to accept a grandfathered large capacity military magazine, nor can a new large capacity magazine be manufactured to fit it. Accordingly, today, making the ability to accept a large capacity military magazine disqualifying for importation will prevent the importation of firearms which have the ability to expel large amounts of ammunition quickly without reloading.

This was not the case in 1989 or prior to the 1994 ban.

It is important to note that even though Congress reduced the supply of large capacity military magazines by passing the 1994 ban, there are still vast numbers of grandfathered large capacity military magazines available that can be legally possessed and transferred. These magazines currently fit in the LCMM rifles. Therefore, the 1994 law did not eliminate the need to take further measures to prevent firearms imported into the United States from having the ability to accept large capacity military magazines, a nonsporting factor.

Another impetus for reevaluating the existing standard is the development of modified weapons. The 1989 report caused 43 different models of semiautomatic assault rifles to be banned from being imported into the United States. The effect of that determination was that nearly all semiautomatic rifles with the ability to accept detachable large capacity military magazines were denied importation. Accordingly, at the time, there was no need for the ability to accept such a magazine to be a determining factor in the sporting purposes test. This is no longer the case. As discussed earlier, manufacturers have modified the semiautomatic assault rifles disallowed from importation in 1989 by removing all of their military configuration features, except for the ability to accept a detachable magazine. As a result, semiautomatic rifles with the ability to accept detachable large capacity military magazines (and therefore quickly expel large amounts of ammunition) legally have been entering the United States in significant numbers. Accordingly, the development of these modified weapons necessitates reevaluating our existing standards.

Thus, in order to address Congress' concern with firearms that have the ability to expel large amounts of ammunition quickly, particularly in light of the resumption of these weapons coming into the United States, the ability to accept a detachable large capacity military magazine must be given greater weight in the sporting purposes analysis of the LCMM rifles than it presently receives.[69]

---

[69]  A firearm that can be easily modified to accept a detachable large capacity military magazine with only minor adjustments to the firearm or the magazine is considered to be a firearm with the ability to accept these magazines. The ROMAK4 is an example of such a firearm: With minor modifications to either the

26

**Derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found importable when certain military features were removed.**

All rifles that failed to meet the sporting purposes test in 1989 were found to represent a distinctive type of rifle distinguished by certain general characteristics that are common to the modern military assault rifle. Although the LCMM rifles are based on rifle designs excluded from importation under the 1989 standard, they all were approved for import when certain military features were removed. However, the LCMM rifles all still maintain some characteristics common to the modern military assault rifle. Because the outward appearance of most of the LCMM rifles continues to resemble the military assault rifles from which they are derived, we have examined the issue of outward appearance carefully. Some might prefer the rugged, utilitarian look of these rifles to more traditional sporting guns. Others might recoil from using these rifles for sport because of their nontraditional appearance. In the end, we concluded that appearance alone does not affect the LCMM rifles' suitability for sporting purposes. Available information leads us to believe that the determining factor for their use in crime is the ability to accept a detachable large capacity military magazine.

Use

In the 1989 study, ATF found that all rifles fairly typed as semiautomatic assault rifles should be treated the same. Accordingly, the report stated "[t]he fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type."[70] We adopt the same approach for the present study.

**Use for hunting:**

The information we collected on the actual use of the LCMM rifles for hunting medium or larger game suggests that, with certain exceptions, the LCMM rifles sometimes are used for hunting; however, their actual use in hunting is limited.[71] In fact, there are some

---

firearm or a large capacity magazine that was originally designed and produced for a semiautomatic assault rifle based on the AK47 design, the ROMAK4 has the ability to accept the magazine.

[70]   1989 report at 11.

[71]   We targeted the surveys toward the hunting of medium and larger game (e.g., turkey and deer) because the LCMM rifles chamber centerfire cartridges and therefore likely would be most suitable for hunting this type of game. We also learned that the LCMM rifles were used to shoot certain varmints (e.g., coyotes and groundhogs), which are generally considered to be pests, not game. Many commented that the LCMM

27

general restrictions and prohibitions on the use of any semiautomatic rifle for hunting game. Almost half of the States place restrictions on the use of semiautomatic rifles in hunting, mostly involving magazine capacity (5-6 rounds) and what can be hunted with the rifles (see exhibit 7).

Of the 198 hunting guides who responded to our survey, only 26 stated that they had clients who used the LCMM rifles on hunting trips during the past 2 hunting seasons and only 10 indicated that they recommend the LCMM rifles for hunting. In contrast, the vast majority of the guides (152) indicated that none of their clients used the LCMM rifles on hunting trips during the past 2 hunting seasons. In addition, the hunting guides indicated that the most common semiautomatic rifles used by their clients were those made by Browning and Remington.[72] We found significant the comments of the hunting guides indicating that the LCMM rifles were not widely used for hunting.

Of the 13 editors of hunting and shooting magazines who responded to our survey, only 2 stated that their publications recommend specific types of centerfire semiautomatic rifles for use in hunting medium or larger game. These two respondents stated that they recommend all rifles that are safe and of appropriate caliber for hunting, including the LCMM rifles. However, they did not recommend the LCMM rifles based on the Uzi design for hunting big game; these rifles use a 9mm cartridge, which is not an appropriate caliber for this type of game, according to the editors. It is important to note that the LCMM rifles use different cartridges. The LCMM rifles based on the FN-FAL, SIG SG550, and HK91 and 93 designs are chambered for either the .308 Winchester cartridge or the .223 Remington cartridge, depending on the specific model; the LCMM rifles based on the Uzi design are chambered for the 9mm Parabellum cartridge; and the majority of the LCMM rifles based on the AK47 design are chambered for the 7.62 x 39mm cartridge (some are chambered for the .223 Remington cartridge).

Of the five interest and information groups that responded to our survey, three supported the use of the LCMM rifles for hunting. However, one of these groups stated that the

---

rifles were particularly useful on farms and ranches because of their ruggedness, utilitarian design, and reliability.

[72] According to a 1996 study conducted for the Fish and Wildlife Service, only 2 percent of big game hunters surveyed used licensed hunting guides. Therefore, it should be noted that the information provided by the guides we surveyed may not be representative of all hunters. However, we believe that the hunting guides' information is reliable and instructive because of their high degree of experience with and knowledge of hunting.

28

ammunition used by the LCMM rifle models based on the Uzi design were inadequate for shooting at long distances (i.e., more than 100 yards).

Out of the 70 published articles reviewed from various shooting magazines, only 5 contained relevant information. One of these five articles stated that, in the appropriate calibers, the LCMM rifles could make "excellent" hunting rifles. Two of the articles stated that the 7.62 x 39mm cartridge (used in LCMM rifles based on the AK47 design) could be an effective hunting cartridge. One of the articles that recommended the rifles also recommended modifications needed to improve their performance in hunting. None of the articles suggested that LCMM rifles based on the Uzi design were good hunting rifles. Thus, although the LCMM rifles could be used in hunting, the articles provided limited recommendations for their use as hunting weapons.

In their usage guides, ammunition manufacturers recommend the .308 and the 7.62 x 39mm cartridges (used in LCMM rifles based on the FN-FAL and HK 91 designs, and the AK47 design respectively) for medium game hunting. However, the usage guides do not identify the 9mm cartridge (used in the Uzi design rifles) as being suitable for hunting.

A majority of the importers who provided information said that the LCMM rifles they import are used for hunting deer and similar animals. However, they provided little evidence that the rifles were especially suitable for hunting these animals. Two of the importers who responded also provided input from citizens in the form of letters supporting this position. The letters show a wide variety of uses for the LCMM rifles, including deer hunting, plinking, target shooting, home defense, and competitive shooting.

Our review of all of this information indicates that while these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting. We did not find any evidence that the ability to accept a large capacity military magazine serves any hunting purpose. Traditional hunting rifles have much smaller magazine capabilities. Furthermore, the mere fact that the LCMM rifles are used for hunting does not mean that they are particularly suitable for hunting or meet the test for importation.

**Use for organized competitive target shooting**:

Of the 31 competitive shooting groups we surveyed that stated they have events using high-power semiautomatic rifles, 18 groups stated that they permit the use of the LCMM rifles for all competitions. However, 13 respondents stated that they restrict or prohibit the LCMM rifles for some competitions, and one group stated that it prohibits the LCMM

29

rifles for all competitions. These restrictions and prohibitions generally were enacted for the following reasons:

1.    High-power rifle competitions generally require accuracy at ranges beyond the capabilities of the 9mm cartridge, which is used by the LCMM rifles based on the Uzi design.

2.   The models based on the AK47 design are limited to competitions of 200 yards or less because the 7.62 x 39mm cartridge, which is used by these models, generally has an effective range only between 300 and 500 yards.

3.   Certain matches require U.S. military service rifles, and none of the LCMM rifles fall into this category.

The LCMM rifles are permitted in all United States Practical Shooting Association (USPSA) rifle competitions. The USPSA Practical Shooting Handbook, Glossary of Terms, states that "[y]ou can use any safe firearm meeting the minimum caliber (9mm/.38) and power factor (125PF) requirements." The USPSA has stated that "rifles with designs based on the AR15, AK47, FN-FAL, HK91, HK93, and others are allowed and must be used to be competitive." Moreover, we received some information indicating that the LCMM rifles actually are used in practical shooting competitions.[73] However, we did not receive any information demonstrating that an LCMM rifle's ability to accept large capacity military magazines was necessary for its use in practical shooting competitions.

A couple of the interest groups recommended the LCMM rifles for organized competitive target shooting.

None of the 70 published articles read mentioned the use of the LCMM rifles in organized competitive target shooting.

All of the major ammunition manufacturers produce .308 Winchester ammunition (which is used in the LCMM rifle models based on the HK 91 and FN-FAL designs) and .223 Remington ammunition (which is used in the HK 93, the SIG SG550, and some of the study rifle models based on the AK47 design) specifically for competitive shooting for rifles. The major manufacturers and advertisers of 9mm ammunition (which is used in the LCMM rifles based on the Uzi design) identify it as being suitable for pistol target shooting and self-defense.

---

[73]    Merely because a rifle is used in a sporting competition, the rifle does not become a sporting rifle. 114 Cong. Rec. 27461-462 (1968).

30

A majority of the importers who provided information stated that the LCMM rifles they import are permitted in and suitable for organized competitive target shooting. Two of the importers who responded also provided input from citizens in the form of letters and petitions supporting this position. However, the importers provided little evidence that the rifles were especially suitable for organized competitive target shooting.

The information collected on the actual use of the LCMM rifles for organized competitive target shooting suggests that, with certain exceptions, the LCMM rifles usually may be used and sometimes are used for organized competitive target shooting; however, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use. The use of the rifles in competitive target shooting appears more widespread than for hunting and their use for practical shooting was the most significant. Although we are not convinced that practical shooting does in fact constitute a sporting purpose under section 925(d), we note that there was no information demonstrating that rifles with the ability to accept detachable large capacity military magazines were necessary for use in practical shooting. Once again, the presence of this military feature on LCMM rifles suggests that they are not generally recognized as particularly suitable for or readily adaptable to sporting purposes.

**Use in crime:**

To fully understand how the LCMM rifles are used, we also examined information available to us on their use in crime. Some disturbing trends can be identified, and it is clear the LCMM rifles are attractive to criminals.

The use of LCMM rifles in violent crime and firearms trafficking is reflected in the cases cited below. It should be noted that the vast majority of LCMM rifles imported during the period 1991-1997 were AK47 variants, which explains their prevalence in the cited cases.

North Philadelphia, Pennsylvania

From April 1995 to November 1996, a convicted felon used a straw purchaser to acquire at least 55 rifles, including a number of MAK90s. The rifles were then trafficked by the prohibited subject to individuals in areas known for their high crime rates. In one case, the rifles were sold from the parking lot of a local elementary school.
Oakland, California

On July 8, 1995, a 32-year-old Oakland police officer assisted a fellow officer with a vehicle stop in a residential area. As the first officer searched the rear compartment of the stopped vehicle, a subject from a nearby residence used a Norinco model NMH 90 to shoot the 32-year old officer in the back. The officer later died from the wound.

31

El Paso, Texas

On April 15, 1996, after receiving information from the National Tracing Center, ATF initiated an undercover investigation of a suspected firearms trafficker who had purchased 326 MAK90 semiautomatic rifles during a 6-month period. The individual was found to be responsible for illegally diverting more than 1,000 firearms over the past several years. One of the MAK90 rifles that the subject had purchased was recovered from the scene of a 1996 shootout in Guadalajara, Mexico, between suspected drug traffickers and Mexican authorities. Another MAK90 was recovered in 1997 from the residence of a former Mexican drug kingpin following his arrest for drug-related activities.

Charlotte, North Carolina

On May 24, 1996, four armed subjects—one with a MAK90 rifle—carried out a home invasion robbery during which they killed the resident with a 9mm pistol. All four suspects were arrested.

Dallas, Texas

In September 1997, an investigation was initiated on individuals distributing crack cocaine from a federally subsidized housing community. During repeated undercover purchases of the narcotics, law enforcement officials noticed that the suspects had firearms in their possession. A search warrant resulted in the seizure of crack cocaine, a shotgun, and a North China Industries model 320 rifle.

Chesterfield, Virginia

In November 1997, a MAK90 rifle was used to kill two individuals and wound three others at a party in Chesterfield, Virginia.

Orange, California

In December 1997, a man armed with an AKS 762 rifle and two other guns drove to where he was previously employed and opened fire on former coworkers, killing four and injuring three, including a police officer.

Baltimore, Maryland

In December 1997, a search warrant was served on a homicide suspect who was armed at the time with three pistols and a MAK90 rifle.

32

We also studied import and trace information to learn whether the LCMM rifles are used in crime.

Between 1991 and 1997, there were 425,114 LCMM rifles imported into the United States. This represents 7.6 percent of the approximately 5 million rifles imported during this period. The breakdown of the specific variants of LCMM rifles imported follows:

    AK-47 variants:      377,934
    FN-FAL variants:      37,534
    HK variants:           6,495
    Uzi variants:          3,141
    SIG SG550 variants:       10

During this same time period, ATF traced 632,802 firearms.[74]  This included 81,842 rifles of which approximately 3,176 were LCMM rifles.[75]  While this number is relatively low compared to the number of total traces, it must be viewed in light of the small number of LCMM rifles imported during this time period and the total number of rifles, both imported domestic, that were available in the United States.  A more significant trend is reflected in figure 1.

---

[74]  ATF traces crime guns recovered and submitted by law enforcement officials.  A crime gun is defined, for purposes of firearms tracing, as any firearm that is illegally possessed, used in a crime, or suspected by law enforcement of being used in a crime.  Trace information is used to establish links between criminals and firearms, to investigate illegal firearm trafficking, and to identify patterns of crime gun traces by jurisdiction.  A substantial number of firearms used in crime are not recovered by law enforcement agencies and therefore not traced.  In addition, not all recovered crime guns are traced.  Therefore, trace requests substantially underestimate the number of firearms involved in crimes, and trace numbers contain unknown statistical biases.  These problems are being reduced as more law enforcement agencies institute policies of comprehensive crime gun tracing.

[75]  The vast majority of LCMM rifles traced during this time period were AK47 variants.  Specifically, AK47 variants comprised 95.6 percent of the LCMM rifles traced.  This must be viewed within the context that 88 percent of the LCMM rifles imported during this period were AK47 variants.

33

Firearms Traces 1991-1997

| Year | Total Firearms Traced | Total Rifles Traced | Total Assault[76] Rifles Traced | Total LCMM Rifles Traced |
|---|---|---|---|---|
| 1991 | 42,442 | 6,196 | 656 | 7 |
| 1992 | 45,134 | 6,659 | 663 | 39 |
| 1993 | 54,945 | 7,690 | 852 | 182 |
| 1994 | 83,137 | 9,201 | 735 | 596 |
| 1995 | 76,847 | 9,988 | 717 | 528 |
| 1996 | 136,062 | 17,475 | 1,075 | 800 |
| 1997 | 194,235 | 24,633 | 1,518 | 1,024 |
| Cumulative Total | 632,802 | 81,842 | 6,216 | 3,176 |

Figure 1

The figures in this table show that between 1991 and 1994, trace requests involving LCMM rifles increased rapidly, from 7 to 596. During the same period, trace requests for assault rifles increased at a slower rate, from 656 to 735. The years 1991 to 1994 are significant because they cover a period between when the ban on the importation of semiautomatic assault rifles was imposed and before the September 13, 1994, ban on semiautomatic assault weapons was enacted. Thus, during the years leading up to the 1994 ban, traces of LCMM rifles were increasing much more rapidly than the traces of the rifles that had been the focus of the 1989 ban, as well as the rifles that were the focus of the 1994 congressional action.

We also compared patterns of importation with trace requests to assess the association of LCMM rifles with criminal involvement. The comparison shows that importation of LCMM rifles in the early 1990s was followed immediately by a rapid rise in the number of trace requests involving LCMM rifles. This is shown in figures 2 and 3.

---

[76] For purposes of this table, assault rifles include (1) semiautomatic assault rifles banned from importation in 1989 but still available domestically because they had been imported into the United States prior to the ban, (2) domestically produced rifles that would not have qualified for importation after 1989, and (3) semiautomatic assault rifles that were banned in 1994.

34



Figure 2



Figure 3

Two aspects of the relationship between importation and trace request patterns are significant. First, the rapid rise in traces following importation indicates that, at least in some cases, very little time elapsed between a particular LCMM rifle's importation and its recovery by law enforcement. This time lapse is known as "time to crime." A short time to crime can be an indicator of illegal trafficking. Therefore, trace patterns suggest what the case examples show: LCMM rifles have been associated with illegal trafficking. Second, while LCMM rifles have not been imported in large numbers since 1994,[77] the number of trace requests for LCMM rifles continues to rise. This reflects a sustained and

---

[77]     One reason is that there has been an embargo on the importation of firearms from China since May 1994.

35

continuing pattern of criminal association for LCMM rifles despite the fact that there were fewer new LCMM rifles available.[78]  Moreover, it is reasonable to conclude that if the importation of LCMM rifles resumes, the new rifles would contribute to the continuing rise in trace requests for them.[79]

All of the LCMM rifles have the ability to accept a detachable large capacity military magazine.  Thus, they all have the ability to expend large amounts of ammunition quickly.  In passing the 1994 ban on semiautomatic assault rifles and large capacity ammunition feeding devices, Congress found that weapons with this ability are attractive to criminals.[80]  Thus, we can infer that the LCMM rifles may be attractive to criminals because in some ways they remain akin to military assault rifles, particularly in their ability to accept a detachable large capacity military magazine.

---

[78]  The increase in trace requests also reflects the fact that law enforcement officials were making trace requests for all types of firearms much more frequently beginning in 1996.  There were 76,847 trace requests in 1995, 136,062 trace requests in 1996, and 194,235 trace requests in 1997.  Traces for assault rifles were increasing by approximately the same percentage as traces for LCMM rifles during these years.

[79]  In addition to looking at case studies and tracing and import information, we attempted to get information on the use of the LCMM rifles in crime by surveying national law enforcement agencies and organizations, as well as metropolitan police departments.  Twenty-three national law enforcement agencies and organizations were surveyed and five responded.  Three of the respondents stated they had no information.  The other two provided information that was either outdated or not specific enough to identify the LCMM rifles.

The 26 metropolitan police departments surveyed provided the following information:

17 departments had no information to provide.
5 departments stated that the LCMM rifles were viewed as crime guns.
1 department stated that the LCMM rifles were nonsporting.
2 departments stated that the LCMM rifles were used to hunt coyotes in their areas.
1 department stated that the LCMM rifles were used for silhouette target shooting.

[80]  H. Rep. No. 103-489, at 13, 18, 19.

36

## DETERMINATION

In 1989, ATF determined that the type of rifle defined as a semiautomatic assault rifle was not generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, ATF found that semiautomatic assault rifles were not importable into the United States. This finding was based, in large part, on ATF's determination that semiautomatic assault rifles contain certain general characteristics that are common to the modern military assault rifle. These characteristics were designed for killing and disabling the enemy and distinguish the rifles from traditional sporting rifles. One of these characteristics is a military configuration, which incorporates eight physical features: Ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF decided that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic assault rifle not importable.

Certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features, except for the ability to accept a detachable magazine. Significantly, most of these modified rifles not only still have the ability to accept a detachable magazine but, more specifically, still have the ability to accept a large capacity military magazine. It appears that only one of the current study rifles, the VEPR caliber .308 (an AK47 variant), does not have the ability to accept a large capacity military magazine and, therefore, is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found not to fall within the semiautomatic assault rifle type and were found to meet the sporting purposes test. Accordingly, these rifles were approved for import into the United States.

Members of Congress and others have expressed concerns that these modified semiautomatic assault rifles are essentially the same as the semiautomatic assault rifles determined to be not importable in 1989. In response to such concerns, the present study reviewed the current application of the sporting purposes test to the study rifles to determine whether the statute is being applied correctly and to ensure that the current use of the study rifles is consistent with the statute's criteria for importability.

Our review took another look at the entire matter. We reexamined the basic tenets of the 1989 study, conducted a new analysis of the physical features of the rifles, surveyed a wide variety of sources to acquire updated information relating to use and suitability, and assessed changes in law that might have bearing on the treatment of the study rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military

37

configuration features identified in 1989, other than the ability to accept a detachable magazine. Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test. Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem. The House Report to the 1994 law emphasizes that the ability to accept a large capacity magazine "serve[s] specific, combat-functional ends."[81] Moreover, this ability plays a role in increasing a firearm's "capability for lethality," creating "more wounds, more serious, in more victims."[82] Furthermore, the House Report noted semiautomatic assault weapons with this ability are the "weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[83]

Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose. The House Report to the 1994 law notes that, while most of the weapons covered by the assault weapon ban come equipped with detachable large capacity magazines, hunting rifles and shotguns typically have much smaller magazine capabilities, from 3 to 5 rounds.[84] Similarly, we found that a number of States limit magazine capacity for hunting to 5 to 6 rounds. We simply found no information showing that the ability to accept a detachable large capacity military magazine has any purpose in hunting or organized competitive target shooting.

Accordingly, we find that the ability to accept a detachable large capacity military magazine is a critical factor in the sporting purposes test that must be given the same weight as the other military configuration features identified in 1989.

The information we collected on the use and suitability of the LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes. Although our study found that the LCMM rifles, as a type, may sometimes be used for hunting, we found no evidence that they are commonly used for hunting. In fact, some of the rifles are unsuitable for certain types of hunting.

---

[81] H. Rep. No. 103-489, at 18.

[82] H. Rep. No. 103-489, at 19.

[83] H. Rep. No. 103-489, at 13.

[84] H. Rep. No. 103-489, at 19 (footnote omitted).

38

The information we collected also demonstrated that although the LCMM rifles, as a type, may be used for organized competitive target shooting, their suitability for these competitions is limited. There are even some restrictions or prohibitions on their use for certain types of competitions. In addition, we believe that all rifles which are fairly typed as LCMM rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of LCMM rifles as a whole should govern each rifle within this type. The findings as a whole simply did not satisfy the standard set forth in section 925(d)(3).

Finally, the information we gathered demonstrates that the LCMM rifles are attractive to certain criminals. We find that the LCMM rifles' ability to accept a detachable large capacity military magazine likely plays a role in their appeal to these criminals. In enacting the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress recognized the appeal large magazine capacity has to the criminal element.

Weighing all this information, the LCMM rifles, as a type, are not generally recognized as particularly suitable for or readily adaptable to sporting purposes. As ATF found in conducting its 1989 study, although some of the issues we confronted were difficult to resolve, in the end we believe the ultimate conclusion is clear and compelling. The ability of all of the LCMM rifles to accept a detachable large capacity military magazine gives them the capability to expel large amounts of ammunition quickly; this serves a function in combat and crime, but serves no sporting purpose. Given the high standard set forth in section 925(d)(3) and the Secretary's discretion in applying the sporting purposes test, this conclusion was clear.

This decision will in no way preclude the importation of true sporting firearms. It will prevent only the importation of firearms that cannot fairly be characterized as sporting rifles.

Individual importers with existing permits for, and applications to import involving, the LCMM rifles will be notified of this determination in writing. Each of these importers will be given an opportunity to respond and present additional information and arguments. Final action will be taken on permits and applications only after an affected importer has an opportunity to makes its case.

Exhibit

**THE WHITE HOUSE**

WASHINGTON

November 14, 1997

MEMORANDUM FOR THE SECRETARY OF THE TREASURY

SUBJECT:          Importation of Modified Semiautomatic
                  Assault-Type Rifles

The Gun Control Act of 1968 restricts the importation of
firearms unless they are determined to be particularly suitable
for or readily adaptable to sporting purposes. In 1989, the
Department of the Treasury (the Department) conducted a review
of existing criteria for applying the statutory test based on
changing patterns of gun use. As a result of that review,
43 assault-type rifles were specifically banned from impor-
tation. However, manufacturers have modified many of those
weapons banned in 1989 to remove certain military features
without changing their essential operational mechanism.
Examples of such weapons are the Galil and the Uzi.

In recent weeks Members of Congress have strongly urged that it
is again necessary to review the manner in which the Department
is applying the sporting purposes test, in order to ensure that
the agency's practice is consistent with the statute and current
patterns of gun use. A letter signed by 30 Senators strongly
urged that modified assault-type weapons are not properly
importable under the statute and that I should use my authority
to suspend temporarily their importation while the Department
conducts an intensive, expedited review. A recent letter from
Senator Dianne Feinstein emphasized again that weapons of this
type are designed not for sporting purposes but for the com-
mission of crime. In addition, 34 Members of the House of
Representatives signed a letter to Israeli Prime Minister
Binyamin Netanyahu requesting that he intervene to stop all
sales of Galils and Uzis into the United States. These
concerns have caused the Government of Israel to announce
a temporary moratorium on the exportation of Galils and Uzis
so that the United States can review the importability of
these weapons under the Gun Control Act.

Exhibit 1

2

The number of weapons at issue underscores the potential threat to the public health and safety that necessitates immediate action. Firearms importers have obtained permits to import nearly 600,000 modified assault-type rifles. In addition, there are pending before the Department applications to import more than 1 million additional such weapons. The number of rifles covered by outstanding permits is comparable to that which existed in 1989 when the Bush Administration temporarily suspended import permits for assault-type rifles. The number of weapons for which permits for importation are being sought through pending applications is approximately 10 times greater than in 1989. The number of such firearms for which import applications have been filed has skyrocketed from 10,000 on October 9, 1997, to more than 1 million today.

My Administration is committed to enforcing the statutory restrictions on importation of firearms that do not meet the sporting purposes test. It is necessary that we ensure that the statute is being correctly applied and that the current use of these modified weapons is consistent with the statute's criteria for importability. This review should be conducted at once on an expedited basis. The review is directed to weapons such as the Uzi and Galil that failed to meet the sporting purposes test in 1989, but were later found importable when certain military features were removed. The results of this review should be applied to all pending and future applications.

The existence of outstanding permits for nearly 600,000 modified assault-type rifles threatens to defeat the purpose of the expedited review unless, as in 1989, the Department temporarily suspends such permits. Importers typically obtain authorization to import firearms in far greater numbers than are actually imported into the United States. However, gun importers could effectively negate the impact of any Department determination by simply importing weapons to the maximum amount allowed by their permits. The public health and safety require that the only firearms allowed into the United States are those that meet the criteria of the statute.

Accordingly, as we discussed, you will:

1) Conduct an immediate expedited review not to exceed 120 days in length to determine whether modified semiautomatic assault-type rifles are properly importable under the statutory sporting purposes test. The results of this review will govern action on pending and future applications for import permits, which shall not be acted upon until the completion of this review.

Exhibit 1

3

    2) Suspend outstanding permits for importation of modified semiautomatic assault-type rifles for the duration of the 120-day review period. The temporary suspension does not constitute a permanent revocation of any license. Permits will be revoked only if and to the extent that you determine that a particular weapon does not satisfy the statutory test for importation, and only after an affected importer has an opportunity to make its case to the Department.



Exhibit 2

## STUDY RIFLE MODELS

**AK47 Variants:**                                          **FN-FAL Variants:**

| MAK90* | SA2000 | Saiga rifle | L1A1 Sporter |
| 314* | ARM | Galil Sporter | FAL Sporter |
| 56V* | MISR | Haddar | FZSA |
| 89* | MISTR | Haddar II | SAR4800 |
| EXP56A* | SA85M | WUM 1 | X FAL |
| SLG74 | Mini PSL | WUM 2 | C3 |
| NHM90* | ROMAK 1 | SLR95 | C3A |
| NHM90-2* | ROMAK 2 | SLR96 | LAR Sporter |
| NHM91* | ROMAK 4 | SLR97 | |
| SA85M | Hunter rifle | SLG94 | |
| SA93 | 386S | SLG95 | |
| A93 | PS/K | SLG96 | |
| AKS 762 | VEPR caliber | | |
| VEPR | 7.62 x 39mm | | |
| caliber .308 | | | |

**HK Variants:**                **Uzi Variants:**              **SIG SG550 Variants:**

| BT96 | Officers 9* | SG550-1 |
| Centurian 2000 | 320 carbine* | SG550-2 |
| SR9 | Uzi Sporter | |
| PSG1 | | |
| MSG90 | | |
| G3SA | | |
| SAR8 | | |

- These models were manufactured in China and have not been imported since the 1994 embargo on the importation of firearms from China.

Exhibit 3

<u>STUDY RIFLES</u>

The study rifles are semiautomatic firearms based on the AK47, FN-FAL, HK 91 and 93, Uzi, and SIG SG550 designs. Each of the study rifles is derived from a semiautomatic assault rifle. The following are some examples of specific study rifle models grouped by design type. In each instance, a semiautomatic assault rifle is shown above the study rifles for comparison.

<u>AK47 Variants</u>



AK47 semiautomatic assault rifle



MISR                    ARM

MAK90                   WUM 1

Exhibit 3

<u>FN-FAL Variants</u>



FN-FAL semiautomatic assault rifle

=========================================================================



L1A1 Sporter



SAR 4800

<u>HK 91 and 93 Variants</u>



HK91 semiautomatic assault rifle

=========================================================================



SR9



SAR 8

Exhibit 3

<u>Uzi Variants</u>



Uzi semiautomatic assault rifle

---



320 carbine

<u>SIG SG550 Variants</u>

The following illustration depicts the configuration of a semiautomatic assault rifle based on the SIG SG550 design. No illustrations of modified semiautomatic versions are available.



SIG SG550 semiautomatic assault rifle

Exhibit 4

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# FACTORING CRITERIA FOR WEAPONS

NOTE: The Bureau of Alcohol, Tobacco and Firearms reserves the right to preclude importation of any revolver or pistol which achieves an apparent qualifying score but does not adhere to the provisions of section 925(d)(3) of Amended Chapter 44, Title 18, U.S.C.

| PISTOL | | | | REVOLVER | | | |
|---|---|---|---|---|---|---|---|
| MODEL: | | | | MODEL: | | | |
| PREREQUISITES | | | | PREREQUISITES | | | |
| 1. The pistol must have a positive manually operated safety device.<br>2. The combined length and height must not be less than 10" with the height (right angle measurement to barrel without magazine or extension) being at least 4" and the length being at least 6" | | | | 1. Must pass safety test.<br>2. Must have overall frame (with conventional grips) length (not diagonal) of 4½" minimum.<br>3. Must have a barrel length of at least 3". | | | |
| INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL | | INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL | |
| OVERALL LENGTH | | | | BARREL LENGTH *(Muzzle to Cylinder Face)* | | | |
| FOR EACH 1/4" OVER 6" | 1 | | | LESS THAN 4" | 0 | | |
| FRAME CONSTRUCTION | | | | FOR EACH 1/4" OVER 4" | 1/2 | | |
| INVESTMENT CAST OR FORGED STEEL | 15 | | | FRAME CONSTRUCTION | | | |
| INVESTMENT CAST OR FORGED HTS ALLOY | 20 | | | INVESTMENT CAST OR FORGED STEEL | 15 | | |
| WEAPON WEIGHT W/MAGAZINE *(Unloaded)* | | | | INVESTMENT CAST OR FORGED HTS ALLOY | 20 | | |
| PER OUNCE | 1 | | | WEAPON WEIGHT *(Unloaded)* | | | |
| CALIBER | | | | PER OUNCE | 1 | | |
| .22 SHORT AND .25 AUTO | 0 | | | CALIBER | | | |
| .22 LR AND 7.65mm TO .380 AUTO | 3 | | | .22 SHORT TO .25 ACP | 0 | | |
| 9mm PARABELLUM AND OVER | 10 | | | .22 LR AND .30 TO .38 S&W | 3 | | |
| SAFETY FEATURES | | | | .38 SPECIAL | 4 | | |
| LOCKED BREECH MECHANISM | 5 | | | .357 MAG AND OVER | 5 | | |
| LOADED CHAMBER INDICATOR | 5 | | | MISCELLANEOUS EQUIPMENT | | | |
| GRIP SAFETY | 3 | | | ADJUSTABLE TARGET SIGHTS *(Drift or Click)* | 5 | | |
| MAGAZINE SAFETY | 5 | | | TARGET GRIPS | 5 | | |
| FIRING PIN BLOCK OR LOCK | 10 | | | TARGET HAMMER AND TARGET TRIGGER | 5 | | |
| MISCELLANEOUS EQUIPMENT | | | | SAFETY TEST | | | |
| EXTERNAL HAMMER | 2 | | | A Double Action Revolver must have a safety feature which automatically (or in a Single Action Revolver by manual operation) causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge. The safety device must withstand the impact of a weight equal to the weight of the revolver dropping from a distance of 36" in a line parallel to the barrel upon the rear of the hammer spur, a total of 5 times. | | | |
| DOUBLE ACTION | 10 | | | | | | |
| DRIFT ADJUSTABLE TARGET SIGHT | 5 | | | | | | |
| CLICK ADJUSTABLE TARGET SIGHT | 10 | | | | | | |
| TARGET GRIPS | 5 | | | | | | |
| TARGET TRIGGER | 2 | | | | | | |
| SCORE ACHIEVED<br>*(Qualifying score is 75 points)* | | | | SCORE ACHIEVED<br>*(Qualifying score is 45 points)* | | | |

Exhibit 5

## MILITARY CONFIGURATION

1.  <u>Ability to accept a detachable magazine</u>. Virtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. Additionally, some States have a limit on the magazine capacity allowed for hunting, usually five or six rounds.

2.  <u>Folding/telescoping stock</u>. Many military firearms incorporate folding or telescoping stocks. The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

3.  <u>Pistol grips</u>. The vast majority of military firearms employ a well-defined separate pistol grip that protrudes conspicuously beneath the action of the weapon. In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or organized competitive target competitions.

4.  <u>Ability to accept a bayonet</u>. A bayonet has distinct military purposes. First, it has a psychological effect on the enemy. Second, it enables soldiers to fight in close quarters with a knife attached to their rifles. No traditional sporting use could be identified for a bayonet.

5.  <u>Flash suppressor</u>. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon. From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Flash suppressors that also serve to dampen muzzle climb have a limited benefit in sporting uses by allowing the shooter to reacquire

Exhibit 5

the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

6. <u>Bipods</u>. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached. The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired as a fully automatic weapon. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles generally do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "slingswivel mount" or simply clamp onto the firearm.

7. <u>Grenade launcher</u>. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades. Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle by either screws or clamps. No traditional sporting application could be identified for a grenade launcher.

8. <u>Night sights</u>. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness. Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally not legal to hunt at night.

Exhibit 6

**[This document has been retyped for clarity.]**

MEMORANDUM TO FILE

FIREARMS ADVISORY PANEL

The initial meeting of the Firearms Advisory Panel was held in Room 3313, Internal Revenue Building, on December 10, 1968, with all panel members present. Internal Revenue Service personnel in attendance at the meeting were the Director, Alcohol and Tobacco Tax Division, Harold Serr; Chief, Enforcement Branch, Thomas Casey; Chief, Operations Coordination Section, Cecil M. Wolfe, and Firearms Enforcement Officer, Paul Westenberger. Deputy Assistant Commissioner Compliance, Leon Green, visited the meeting several times during the day.

The Director convened the meeting at 10:00 a.m. by welcoming the members and outlining the need for such an advisory body. He then introduced the Commissioner of Internal Revenue, Mr. Sheldon Cohen, to each panel member.

Mr. Cohen spoke to the panel for approximately fifteen minutes. He thanked the members for their willingness to serve on the panel, explained the role of the panel and some of the background which led to the enactment of the Gun Control Act of 1968. Commissioner Cohen explained to the panel members the conflict of interest provisions of regulations pertaining to persons employed by the Federal Government and requested that if any member had any personal interest in any matter that came under discussion or consideration, he should make such interest known and request to be excused during consideration of the matter.

Mr. Seer then explained to the panel the areas in which the Division would seek the advice of the panel and emphasized that the role of the panel would be advisory only, and that it was the responsibility of the Service to make final decisions. He then turned the meeting over to the moderator, Mr. Wolfe.

Mr. Wolfe explained the responsibility of the Service under the import provisions of the Gun Control Act and under the Mutual Security Act. The import provisions were read and discussed.

The panel was asked to assist in defining Asporting purposes≅ as used in the Act. It was generally agreed that firearms designed and intended for hunting and all types of organized competitive target shooting would fall within the sporting purpose category. A discussion was held on the so-called sport of Aplinking≅. It was the consensus that, while many persons

Exhibit 6

participated in the type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation since any firearm that could expel a projectile could be used for this purpose without having any characteristics generally associated with target guns.

The point system that had been developed by the Division and another point system formula suggested and furnished by the Southern Gun Distributors through Attorney Michael Desalle, was explained and demonstrated to the panel by Paul Westenberger. Each panel member was given copies of the formulas and requested to study them and endeavor to develop a formula he believed would be equitable and could be applied to all firearms sought to be imported.

A model BM59 Beretta, 7.62 mm, NATO Caliber Sporter Version Rifle was presented to the panel and their advice sought as to their suitability for sporting purposes. It was the consensus that these rifles do have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of this rifle together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle be authorized for importation. Importation, however, should include the restriction that these weapons must not possess combination flash suppressors/grenade adaptors with outside diameters greater than 20mm (.22 mm is the universal grade adaptor size).

The subject of ammunition was next discussed. Panel members agreed that incendiary and tracer small arms ammunition have no use for sporting purposes. Accordingly, the Internal Revenue Service will not authorize these types of small arms ammunition importation. All other conventional small arms ammunition for pistols, revolvers, rifles and shotguns will be authorized.

The meeting was adjourned at 4:00 p.m.

C.M. Wolfe

Exhibit 7

## STATE FISH AND GAME COMMISSION REVIEW

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Alabama | Not for turkey | |
| Alaska | | |
| Arizona | | Not more than five rounds |
| Arkansas | Not for turkey | |
| California | | |
| Colorado | | Not more than six rounds |
| Connecticut* | No rifles on public land | |
| Delaware | No rifles | |
| Florida | | Not more than five rounds |
| Georgia | Not for turkey | |
| Hawaii | | |
| Idaho | Not for turkey | |
| Illinois | Not for deer or turkey | |
| Indiana* | Not for deer or turkey | |
| Iowa | Not for deer or turkey<br>No restrictions on coyote or fox | |
| Kansas | | |
| Kentucky | | |
| Louisiana | Not for turkey | |
| Maine* | Not for turkey | |
| Maryland* | | |

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Massachusetts | Not for deer or turkey | |
| Michigan | Not for turkey | Not more than six rounds |
| Minnesota | | |
| Mississippi | Not for turkey | |
| Missouri | Not for turkey | Chamber and magazine not more than 11 rounds |
| Montana | | |
| Nebraska | | Not more than six rounds |
| Nevada | Not for turkey | |
| New Hampshire* | Not for turkey | Not more than five rounds |
| New Jersey | No rifles | |
| New Mexico | Not for turkey | |
| New York* | | Not more than six rounds |
| North Carolina | Not for turkey | |
| North Dakota | Not for turkey | |
| Ohio | Not for deer or turkey | |
| Oklahoma | | Not more than seven rounds for .22 caliber |
| Oregon* | | Not more than five rounds |
| Pennsylvania* | No semiautomatics | |

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Rhode Island | Prohibited except for woodchuck in summer | |
| South Carolina | Not for turkey | |
| South Dakota | | Not more than five rounds |
| Tennessee | Not for turkey | |
| Texas | | |
| Utah | Not for turkey | |
| Vermont | | Not more than six rounds |
| Virginia* | | |
| Washington | Not for turkey | |
| West Virginia | | |
| Wisconsin | | |
| Wyoming | | |

\* Limited restrictions (e.g., specified areas, county restrictions, populated areas, time of day).



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law. Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting. We are asking that you
voluntarily complete the enclosed survey to assist us
in gathering this information. We anticipate that the
survey will take approximately 15 minutes to complete.

Responses must be received no later than January 9,
1998; those received after that date cannot be included
in the review. Responses should be forwarded to the
Bureau of Alcohol, Tobacco and Firearms, Department HG,
P.O. Box 50860, Washington, DC 20091. We appreciate
any information you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

OMB No. 1512-0542

# ATF SURVEY OF HUNTING GUIDES
# FOR RIFLE USAGE
Page 1 of 2

*Please report only on those clients who **hunted medium game (for example, turkey) or larger game (for example, deer) with a rifle.***

*For the purposes of this survey, please count only individual clients and NOT the number of trips taken by a client. For example, if you took the same client on more than one trip, count the client only once.*

**1.** What is the approximate number of your clients who have ever used **manually operated rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**2.** What is the approximate number of your clients who have ever used **semiautomatic rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**3.** What is the approximate number of your clients who have ever used semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**4.** From your knowledge, for your clients who use **semiautomatic rifles**, please list the three most commonly used rifles.

| <u>Make</u> | <u>Model</u> | <u>Caliber</u> |
| --- | --- | --- |
| | | |
| | | |
| | | |

**5.** Do you **recommend** the use of any specific rifles by your clients?

_____Yes *(Continue to #6)*       _____No *(You are finished with the survey. Thank you.)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

OMB No. 1512-0542

# ATF SURVEY OF HUNTING GUIDES
## FOR RIFLE USAGE
### Page 2 of 2

**6.** If your answer to item 5 is "Yes", please identify the specific rifles you **recommend**.

| Make | Model | Caliber |
|------|-------|---------|
| | | |
| | | |
| | | |

**7.** Do you **recommend** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi**?

_____Yes *(Continue to #8)*        _____No *(You are finished with the survey. Thank you.)*

**8.** If your answer to item 7 is "Yes", please identify the specific rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** that you recommend.

| Make | Model | Caliber |
|------|-------|---------|
| | | |
| | | |
| | | |

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 1 | 28 | 0 | 0 | No | |
| A | 2 | 100 | 10 | 0 | Yes | No |
| A | 3 | 18 | 0 | 0 | No | |
| A | 4 | 120 | 40 | 0 | Yes | No |
| A | 5 | 12 | 0 | 0 | Yes | No |
| A | 6 | 80 | 40 | 0 | No | |
| A | 7 | 275 | 25 | 0 | No | |
| A | 8 | | | | | |
| A | 9 | 0 | 0 | 0 | | |
| A | 10 | 0 | | | | |
| A | 11 | 2 | 5 | 0 | Yes | Yes |
| A | 12 | 12 | 0 | 0 | Yes | No |
| A | 13 | 10 | 6 | 0 | No | No |
| A | 14 | 5 | 7 | 0 | No | |
| A | 15 | 0 | 0 | 0 | | |
| A | 16 | 20 | 0 | 0 | No | No |
| A | 17 | | | | | |
| A | 18 | 0 | 0 | 0 | No | |
| A | 19 | 17 | 6 | 0 | No | |
| A | 20 | 30 | 8 | 0 | No | |
| A | 21 | 117 | 7 | 0 | Yes | No |
| A | 22 | 160 | 0 | 0 | Yes | No |
| A | 23 | 23 | 1 | 0 | Yes | No |
| A | 24 | 100 | 5 | 0 | Yes | No |
| A | 25 | 210 | 10 | 0 | Yes | No |
| A | 26 | 12 | 4 | 1 | Yes | Yes |
| A | 27 | 24 | 3 | 0 | Yes | No |
| A | 28 | 20 | 15 | 0 | Yes | No |
| A | 29 | 4 | 0 | 0 | No | No |
| A | 30 | 4 | 0 | 0 | Yes | No |
| A | 31 | 100 | 5 | 0 | No | No |
| A | 32 | 1 | 0 | 0 | No | No |
| A | 33 | | | 0 | No | No |
| A | 34 | 142 | 1 | 0 | No | |
| A | 35 | 78 | 2 | 0 | Yes | No |
| A | 36 | 600 | 200 | | No | |
| A | 37 | 20 | 13 | 1 | No | |
| A | 38 | 45 | 15 | 0 | No | |
| A | 39 | 100 | 10 | 0 | No | |
| A | 40 | 80 | 6 | 2 | Yes | No |
| A | 41 | 250 | 25 | 0 | Yes | No |
| A | 42 | 4 | 0 | 0 | No | |
| A | 43 | 14 | 2 | 0 | No | No |
| A | 44 | 171 | 15 | 0 | Yes | No |
| A | 45 | 54 | 6 | 0 | Yes | No |
| A | 46 | 10 | 6 | 0 | No | |
| A | 47 | 0 | 0 | 0 | No | No |
| A | 48 | 24 | 0 | 0 | No | |
| A | 49 | 180 | 2 | 0 | Yes | No |
| A | 50 | | | | | |
| A | 51 | | | | | |

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 52 | 24 | 16 | 0 | No | |
| A | 53 | 600 | 100 | 12 | No | |
| A | 54 | 18 | 6 | 0 | No | |
| A | 55 | 0 | 0 | 0 | No | |
| A | 56 | 0 | 0 | 0 | No | |
| A | 57 | 40 | 4 | 0 | No | |
| A | 58 | | | | | |
| A | 59 | 40 | 10 | 0 | No | No |
| A | 60 | 60 | 2 | 0 | No | No |
| A | 61 | 63 | 4 | 0 | Yes | No |
| A | 62 | 40 | 4 | 0 | No | |
| A | 63 | 8 | 0 | 0 | Yes | No |
| A | 64 | 27 | 1 | 0 | Yes | No |
| A | 65 | 50 | 9 | 0 | Yes | No |
| A | 66 | 35 | 2 | 0 | No | |
| A | 67 | 6 | 0 | 0 | Yes | No |
| A | 68 | 6 | 3 | | No | |
| A | 69 | 50 | 20 | 0 | No | |
| A | 70 | | 0 | 0 | Yes | No |
| A | 71 | 27 | 1 | 0 | Yes | |
| A | 72 | 85 | 0 | 0 | Yes | No |
| A | 73 | 56 | 24 | 0 | Yes | No |
| A | 74 | 25 | 25 | 0 | Yes | No |
| A | 75 | 100 | 20 | 0 | No | |
| A | 76 | 50 | 15 | 3 | No | |
| A | 77 | 15 | 4 | 0 | No | |
| A | 78 | 12 | 0 | 0 | Yes | No |
| A | 79 | 75 | 0 | 0 | No | |
| A | 80 | | | | | |
| A | 81 | 0 | 0 | 0 | No | |
| A | 82 | 0 | 0 | 0 | No | |
| A | 83 | 12 | 4 | 0 | No | No |
| A | 84 | 40 | 0 | 0 | Yes | No |
| A | 85 | 24 | 0 | 0 | No | |
| A | 86 | 17 | 0 | 0 | No | No |
| A | 87 | 16 | 3 | 0 | Yes | No |
| A | 88 | 45 | 10 | 0 | No | |
| A | 89 | 11 | 7 | 7 | Yes | Yes |
| A | 90 | 35 | 1 | 0 | Yes | No |
| A | 91 | 25 | 2 | 0 | Yes | No |
| A | 92 | 0 | 0 | 0 | | |
| A | 93 | 75 | 40 | 0 | Yes | No |
| A | 94 | 60 | 2 | 0 | Yes | No |
| A | 95 | 26 | 0 | 0 | No | |
| A | 96 | 20 | 0 | | No | No |
| A | 97 | 65 | 11 | 0 | Yes | No |
| A | 98 | 40 | 5 | 0 | Yes | No |
| A | 99 | 26 | 5 | 0 | No | |
| A | 100 | 13 | 2 | 0 | No | |
| A | 101 | | | | | |
| A | 102 | 45 | 6 | 0 | No | No |

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 103 | 120 | 4 | 0 | No | |
| A | 104 | | | | Yes | |
| A | 105 | 150 | 50 | 0 | No | No |
| A | 106 | 80 | 20 | 0 | Yes | No |
| A | 107 | 40 | 0 | 0 | No | No |
| A | 108 | 10 | 0 | 0 | No | |
| A | 109 | 160 | 40 | 0 | Yes | No |
| A | 110 | 10 | 10 | 0 | No | No |
| A | 111 | 6 | 0 | 0 | No | |
| A | 112 | | | | | |
| A | 113 | 150 | 150 | 100 | Yes | Yes |
| A | 114 | 50 | 25 | 0 | No | No |
| A | 115 | 19 | 0 | 0 | Yes | No |
| A | 116 | 80 | 3 | 0 | No | |
| A | 117 | 40 | 10 | 0 | Yes | No |
| A | 118 | | | | | |
| A | 119 | 50 | 0 | 0 | Yes | No |
| A | 120 | 0 | 0 | 0 | No | |
| A | 121 | 0 | 0 | 0 | | |
| A | 122 | 120 | 15 | 0 | Yes | No |
| A | 123 | 10 | 0 | 0 | Yes | No |
| A | 124 | 22 | 0 | 0 | Yes | No |
| A | 125 | 40 | 40 | 20 | No | |
| A | 126 | 50 | 10 | 0 | Yes | No |
| A | 127 | 60 | 20 | 0 | Yes | No |
| A | 128 | 14 | 0 | 0 | No | No |
| A | 129 | 13 | 16 | 4 | No | |
| A | 130 | 80 | 4 | 0 | Yes | No |
| A | 131 | 12 | 2 | 0 | Yes | No |
| A | 132 | | 4 | 0 | Yes | No |
| A | 133 | 50 | 26 | 7 | No | No |
| A | 134 | 12 | 0 | 0 | No | |
| A | 135 | 2 | 10 | 3 | No | |
| A | 136 | 2 | 1 | 1 | Yes | No |
| A | 137 | 28 | 0 | 0 | Yes | No |
| A | 138 | 45 | 10 | | No | |
| A | 139 | 46 | 59 | 0 | Yes | No |
| A | 140 | | 0 | 0 | Yes | No |
| A | 141 | 40 | 10 | 0 | No | No |
| A | 142 | 70 | 20 | 0 | Yes | No |
| A | 143 | 50 | 3 | 0 | No | No |
| A | 144 | 60 | 6 | 0 | Yes | No |
| A | 145 | 140 | 0 | 0 | Yes | No |
| A | 146 | 20 | 4 | 1 | Yes | No |
| A | 147 | 10 | 1 | 0 | Yes | No |
| A | 148 | 0 | 0 | 0 | No | No |
| A | 149 | 37 | 0 | 0 | Yes | No |
| A | 150 | | | 0 | Yes | No |
| A | 151 | 6 | 10 | 0 | No | No |
| A | 152 | 110 | 5 | 0 | No | |
| A | 153 | 15 | 17 | | Yes | No |

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 154 | 18 | 4 | 0 | No | |
| A | 155 | 25 | 3 | 0 | Yes | No |
| A | 156 | 60 | 6 | 3 | No | |
| A | 157 | 20 | 0 | 0 | No | |
| A | 158 | 88 | 46 | 0 | No | No |
| A | 159 | 68 | 19 | 3 | Yes | Yes |
| A | 160 | 25 | 5 | 0 | No | |
| A | 161 | 15 | 0 | 0 | No | |
| A | 162 | 75 | 10 | 0 | No | |
| B | 1 | | | | No | |
| C | 1 | 25 | 0 | 0 | Yes | No |
| C | 2 | 55 | 10 | 6 | Yes | Yes |
| C | 3 | 60 | 30 | 0 | No | |
| C | 4 | 80 | 20 | 0 | No | |
| C | 5 | 10 | 0 | 0 | No | No |
| C | 6 | 25 | 6 | 0 | No | |
| C | 7 | 66 | 10 | 1 | No | |
| C | 8 | 24 | 0 | 0 | Yes | No |
| C | 9 | 10 | 15 | 15 | No | |
| C | 10 | 35 | 15 | 9 | Yes | Yes |
| C | 11 | | | 0 | No | |
| C | 12 | | | | | No |
| C | 13 | 25 | 10 | 0 | No | |
| C | 14 | 60 | 20 | 0 | Yes | No |
| C | 15 | 20 | 0 | 0 | Yes | No |
| C | 16 | 14 | 0 | 0 | No | |
| C | 17 | | 0 | 0 | Yes | No |
| C | 18 | 18 | 25 | 5 | Yes | Yes |
| C | 19 | 125 | 50 | 5 | Yes | No |
| C | 20 | 20 | 5 | 2 | No | |
| C | 21 | | 0 | 0 | Yes | No |
| C | 22 | 30 | 0 | 0 | No | No |
| C | 23 | 150 | 20 | 0 | Yes | No |
| C | 24 | 60 | 0 | 0 | No | |
| C | 25 | 16 | 7 | 6 | Yes | Yes |
| C | 26 | 300 | 650 | 400 | No | |
| C | 27 | 20 | 15 | 8 | Yes | Yes |
| C | 28 | 3 | 5 | 2 | No | |
| C | 29 | 45 | 6 | 0 | Yes | No |
| C | 30 | | | | No | |
| C | 31 | 30 | 0 | 0 | Yes | No |
| C | 32 | | | 0 | Yes | No |
| C | 33 | 35 | 4 | 0 | Yes | No |
| C | 34 | 25 | 5 | 0 | Yes | No |
| C | 35 | | | | Yes | No |

Hunting Guides

| Q4. Three most commonly used rifles | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A | 1 | | | |
| A | 2 | | | |
| A | 3 | | | |
| A | 4 | Browning | | BAR | 300 |
| A | 5 | | | |
| A | 6 | Remington | | 742 | 30.06 |
| A | 7 | Browning | | BAR | 30.06, .270, 7MM, 300 Mag |
| A | 8 | | | |
| A | 9 | | | |
| A | 10 | | | |
| A | 11 | Remington | | 740-7400 | 20, 30 |
| A | 12 | | | |
| A | 13 | Remington | | 700 | 7 mm mag |
| A | 14 | Remington | | 7400 | 270 |
| A | 15 | | | |
| A | 16 | | | |
| A | 17 | | | |
| A | 18 | | | |
| A | 19 | Browning | | | 30.06 |
| A | 20 | Remington | | 742 | 30.06 |
| A | 21 | | | |
| A | 22 | | | |
| A | 23 | Browning | | ? | 300 mag |
| A | 24 | Remington | | | 30.06 |
| A | 25 | Remington | | | 30.06 |
| A | 26 | Browning | | BAR | 30.06 |
| A | 27 | Remington | | | 30.06 |
| A | 28 | | ? | ? | 06 |
| A | 29 | | | |
| A | 30 | | | |
| A | 31 | Browning | | automatics | |
| A | 32 | | | |
| A | 33 | | | |
| A | 34 | Remington | | | .3006 |
| A | 35 | Browning | | | 7 mm |
| A | 36 | Browning | | | 30.06 |
| A | 37 | Browning | | BAR | 30.06 |
| A | 38 | Browning | | br | 7 mm, 300win, 30.06 |
| A | 39 | Remington | | 7600 | .270 win, .30-06, .280 rem |
| A | 40 | Browning | | Bar mark II | 300 win mag |
| A | 41 | Remington | | | |
| A | 42 | | | |
| A | 43 | Remington | | 7600 | 243 - 7 mm mag |
| A | 44 | | | | 30.06, 300 winmag, .338, 270 |
| A | 45 | Browning | | BAR Automatic | 30.06 |

Hunting Guides

| | | | | |
|---|---|---|---|---|
| Q4. Three most commonly used rifles | | | | |
| A | 46 | Browning | | BAR | 7 mm, 30.06 |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | Browning | | BAR | 7 mm mag/30.06 |
| A | 53 | Browning | | BAR | 30.06, 300 wm |
| A | 54 | Browning | | BAR | 30.06 |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Browning | | semi-auto | 300 mag |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | Browning | | | 30.06 |
| A | 62 | Browning | | | 7 mm |
| A | 63 | Browning | | BAR | .270 - 300 win mag |
| A | 64 | Browning | | BAR | 30.06 |
| A | 65 | Browning | | semi-auto | .308 |
| A | 66 | Browning | | | |
| A | 67 | | | | |
| A | 68 | Remington | | 7400 | 30.06 |
| A | 69 | Browning | | | |
| A | 70 | | | | |
| A | 71 | Browning | | Not sure | |
| A | 72 | | | | |
| A | 73 | Browning | | BARR | 30.06 |
| A | 74 | Browning | | BAR | 300 |
| A | 75 | Remington | | 7400 old 752 | 270 and 30.06 |
| A | 76 | Browning | | BAR | 308, 30.06, 300win, 338 win |
| A | 77 | Remington | | | 308 |
| A | 78 | Browning | | | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | 30 caliber or bigger for elk |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Browning | | | 30.06 and 7 mm |
| A | 88 | Browning | | BAR | 7 mm, .300, .270 |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 90 | Browning | | | 1 or 2 in over 50 years |
| A | 91 | Browning | | | 300 win mag |

Hunting Guides

| Q4. Three most commonly used rifles | | | | |
|---|---|---|---|---|
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | Browning | | BAR | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | Browning | | BAR | 300-06-270 |
| A | 98 | Browning | | | 300, 30.06 |
| A | 99 | Other | Savage | | 7 mm |
| A | 100 | Browning | | ? | 7 mm mag |
| A | 101 | | | | |
| A | 102 | Browning | Only 1 I recall | BAR | 30.06 |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | Browning | | BAR | 300 win mag |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Browning | | | 30.06 |
| A | 110 | Remington | | 700 | 30.06, 270, 7 mm |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Other | Weatherby | | 300 mag |
| A | 114 | Browning | | | 7 m mag |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Browning | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | Browning | | U/K | .338 mag |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | Remington | | 742 | 243, 30.06 |
| A | 127 | Winchester | | ? | 30.06 |
| A | 128 | Winchester | | | 270, 306 |
| A | 129 | Browning | | BAR | 7 mm and 243 |
| A | 130 | Browning | | | 30.06 |
| A | 131 | Browning | | BAR | .7 mm mag |
| A | 132 | Remington | | | 30.06 |
| A | 133 | | | AK 47 | 223 |
| A | 134 | | | | |
| A | 135 | Remington | | | 270 |
| A | 136 | Browning | | BAR | |
| A | 137 | | | | |

Hunting Guides

| | | | | | Q4. Three most commonly used rifles | |
|---|---|---|---|---|---|
| A | 138 | Winchester | | | 30.06 |
| A | 139 | Browning | | BAR | 270, 7 mm |
| A | 140 | Browning | | | 7 mm |
| A | 141 | | | | |
| A | 142 | Browning | | | 7 mm mag |
| A | 143 | | | | |
| A | 144 | Browning | | | 30.06 |
| A | 145 | | | | |
| A | 146 | Browning | | BDL | 7mg |
| A | 147 | Browning | | BAR | 308 |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Remington | | | |
| A | 151 | Browning | | BAR | 308 |
| A | 152 | Remington | | | various 270 - 338 |
| A | 153 | Browning | | | 30 |
| A | 154 | Browning | | BAR | 7 mm mag |
| A | 155 | | | | 30.06 |
| A | 156 | Other | BAR | | |
| A | 157 | | | | |
| A | 158 | Remington | | 280 | 280 |
| A | 159 | Browning | | | 7 mm mag |
| A | 160 | Remington | | Semiauto | 30.06 |
| A | 161 | | | | |
| A | 162 | Browning | | | 30.06 |
| B | 1 | | | | .308, 30-06, .270 |
| C | 1 | | | | |
| C | 2 | Other | AK-47 | Antelope Hunter | 30 |
| C | 3 | Browning | | Auto | 30.06 |
| C | 4 | Browning | | Bar | 7mm |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | Browning | | | 30.06 |
| C | 8 | | | | |
| C | 9 | Other | FN-FAL | | 308 |
| C | 10 | Remington | | 742 | 30.06 |
| C | 11 | Browning | | | 306 |
| C | 12 | | | | |
| C | 13 | Remington | | | .06 - 7mm |
| C | 14 | Browning | | BAR | 7mm |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | Ruger | | Ranch Rifle | 223 |
| C | 19 | Other | AK47 | | |
| C | 20 | Browning | | BAR | 300 win mag |

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| C | 21 | Other | Bolt-action or pump | | |
| C | 22 | | | | |
| C | 23 | Browning | | | 30.06 |
| C | 24 | | | | |
| C | 25 | Other | AK47 | | 7.62-39 |
| C | 26 | Other | HK | 93 | .308 |
| C | 27 | Browning | | BAR | 7mm |
| C | 28 | Other | Norinco | SKS Type 56 | 7.62X39 |
| C | 29 | Browning | | BAR | 30.06 -.300 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Browning | | | 3.06 - 7mm |
| C | 33 | Remington | | | 30.06 |
| C | 34 | Remington | | 741 | .270 - 30.06 |
| C | 35 | Remington | | | .270 |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Remington | | 7400 | 30.06 |
| A | 5 | | | | |
| A | 6 | Browning | | | 30.06 |
| A | 7 | Remington | | 700 | 30.03, 270, 7 mm |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | Winchester | | 100 | 30 |
| A | 12 | | | | |
| A | 13 | Winchester | | 70 | 300 mag |
| A | 14 | Remington | | 7400 | 30.06 |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | Remington | | 7400 | 30.06 |
| A | 20 | Browning | | | 7 mm mag |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | Browning | | | 30.06 |
| A | 25 | Browning | | | 30.03 to 300 mag |
| A | 26 | Remington | | Fieldmaster | 30.06 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | Remington | | automatics | |

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | Remington | | | 270 - 30.06 |
| A | 37 | Remington | | 7400 | 30.06 |
| A | 38 | | | | |
| A | 39 | Browning | | BAR | .270 win, 7 mm mag |
| A | 40 | Remington | | 7400 | 30.06 |
| A | 41 | Browning | | | |
| A | 42 | | | | |
| A | 43 | Browning | | BAR | 243 - 7 mm mag |
| A | 44 | | | | |
| A | 45 | | | | |
| A | 46 | Remington | | 1100 | 12 gauge |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | Remington | | 7400 | 30.06 |
| A | 53 | Remington | | 7400/742 | 30.06 |
| A | 54 | | | | |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Remington | | semi-auto | 30.06 |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | Other | Savage | | 7 mm mag |
| A | 62 | Remington | | | 30.06 |
| A | 63 | Remington | | 742 | .270 - 30.06 |
| A | 64 | | | | |
| A | 65 | Winchester | | semi-auto | .308 |
| A | 66 | Remington | | | |
| A | 67 | | | | |
| A | 68 | Remington | | 7400 | .308 |
| A | 69 | Remington | | | |
| A | 70 | | | | |
| A | 71 | Remington | | 742 | 30.06 |
| A | 72 | | | | |
| A | 73 | Remington | | | 30.06 |
| A | 74 | Remington | | ?600 | 30.06 |
| A | 75 | Browning | | BAR | 270/338 and 30.06 |
| A | 76 | Other | AK-47 | | 30 |
| A | 77 | Remington | | | 30.06 |

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 78 | Remington | | ? | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Remington | | | 30.06 |
| A | 88 | Remington | | 742, 7400 | 30.06. .270 |
| A | 89 | Other | Heckler-Koch | HK91 | 308 |
| A | 90 | Remington | | | |
| A | 91 | Remington | | | 30.06 |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | Remington | | 760 | .300, 30.06, 270 |
| A | 99 | Browning | | | 7 mm |
| A | 100 | Remington | | 742 | 30.06 |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Winchester | | | 308 |
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Remington | | 700 | 7 mm mag |
| A | 114 | Remington | | 742 Wingmaster | 30.06 |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Remington | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |

Hunting Guides

| Q4. Three most commonly used rifles | | | | |
|---|---|---|---|---|
| A | 124 | | . | |
| A | 125 | | | |
| A | 126 | Ruger | 22 | |
| A | 127 | Marlin | ? | .308 |
| A | 128 | Remington | | 7 m |
| A | 129 | | | |
| A | 130 | | | |
| A | 131 | Browning | BAR | 30.06 |
| A | 132 | | | |
| A | 133 | Ruger | Mini 14 | 223 |
| A | 134 | | | |
| A | 135 | Remington | | 243 |
| A | 136 | Other | HK 91 | |
| A | 137 | | | |
| A | 138 | Browning | | 308 |
| A | 139 | Remington | 742 | 30.06 - 6 mm |
| A | 140 | Remington | | 30.06 |
| A | 141 | | | |
| A | 142 | Browning | | 300 win mag |
| A | 143 | | | |
| A | 144 | Browning | | 7 mm mag |
| A | 145 | | | |
| A | 146 | Browning | BDL | 300 |
| A | 147 | | | |
| A | 148 | | | |
| A | 149 | | | |
| A | 150 | Winchester | | |
| A | 151 | Remington | 742 | 30.06 |
| A | 152 | Ruger | | various 270 - 338 |
| A | 153 | Winchester | | 30 |
| A | 154 | Browning | BAR | 30.06 |
| A | 155 | | | |
| A | 156 | Other | AK-47 | |
| A | 157 | | | |
| A | 158 | Winchester | | 338 |
| A | 159 | Remington | | 30.06 |
| A | 160 | | | |
| A | 161 | | | |
| A | 162 | Remington | 742 | 30.06, 270 |
| B | 1 | | | |
| C | 1 | | | |
| C | 2 | | | |
| C | 3 | Winchester | Auto | 30.06 |
| C | 4 | Browning | Bar | 338 |
| C | 5 | | | |
| C | 6 | | | |

Hunting Guides

| | | | | |
|---|---|---|---|---|
| Q4. Three most commonly used rifles | | | | |
| C | 7 | Remington | | | 30.06 |
| C | 8 | | | | |
| C | 9 | Other | Uzi | | 9mm |
| C | 10 | Other | AK-47 | Hunter | 7.62x39 |
| C | 11 | Other | Weatherby | | 300 |
| C | 12 | | | | |
| C | 13 | Winchester | | | .06 - 7mm |
| C | 14 | Browning | | | 300 |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | Other | AK-47 | | |
| C | 19 | SigArms | | 550-1 | |
| C | 20 | Ruger | | Mini 14 | .223 |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Remington | | 742 | 30.06 |
| C | 24 | | | | |
| C | 25 | Other | MAK-90 | | 7.62-39 |
| C | 26 | Other | HK | 91 | 0.223 |
| C | 27 | Remington | | 7400 Series | 30.06 |
| C | 28 | Remington | | 7600 | 30.06 |
| C | 29 | Remington | | 742 | .308 - 3.06 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Remington | | | 30.06 - 7mm |
| C | 33 | Browning | | | 300 win |
| C | 34 | Browning | | | .270 - 30.06 |
| C | 35 | Browning | | | 300 |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Ruger | | Mini 14 | 223 |
| A | 5 | | | | |
| A | 6 | Other | Savage | | 270 |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | Browning | | A-bolt | 270 |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | | | | |
| A | 25 | | | | |
| A | 26 | Other | China | SKS | 7.62x37 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | Winchester | | | 270 - 30.06 |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Ruger | | | 44 mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | Ruger | | | 223 - 30.06 |
| A | 44 | | | | |
| A | 45 | | | | |
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | Ruger | | Mini-14 | .223 |
| A | 54 | | | | |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Ruger | | semi-auto | 35 cal |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | | | | |
| A | 62 | Ruger | | Mini 14 | 223 |
| A | 63 | | | | |

Hunting Guides

| Q4. Three most commonly used rifles | | | | | |
|---|---|---|---|---|---|
| A | 64 | | | | |
| A | 65 | | | | |
| A | 66 | | | | |
| A | 67 | | | | |
| A | 68 | | | | |
| A | 69 | | | | |
| A | 70 | | | | |
| A | 71 | | | | |
| A | 72 | | | | |
| A | 73 | | | | |
| A | 74 | Browning | | BAR | 30.06 |
| A | 75 | | | | |
| A | 76 | Remington | | | 30.06, 270 |
| A | 77 | Browning | | | 300 |
| A | 78 | | | | |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | | | | |
| A | 88 | | | | |
| A | 89 | Other | Springfield Armory | FNG | 308 |
| A | 90 | | | | |
| A | 91 | | | | |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | | | | |
| A | 99 | | | | |
| A | 100 | | | | |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | | | | |

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Other | All | | 30.06 |
| A | 114 | Remington | | 721 | 270 |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | Browning | Remington | Shotguns | 12 gauge |
| A | 127 | Remington | | | .308 or 30.06 |
| A | 128 | Other | Savage | | 308 |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | | | | |
| A | 132 | | | | |
| A | 133 | Browning | | BAR | 7 mm |
| A | 134 | | | | |
| A | 135 | Browning | | 742 | 30.06 |
| A | 136 | Other | AK 47 | | |
| A | 137 | | | | |
| A | 138 | | | | |
| A | 139 | Other | Weatherby | | 300 m |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | |
| A | 143 | | | | |
| A | 144 | | | | |
| A | 145 | | | | |
| A | 146 | Ruger | | #1 | 7 mag |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Browning | | | |
| A | 151 | | | | |
| A | 152 | Browning | | | various 270 - 338 |
| A | 153 | | | | |
| A | 154 | Browning | | BAR | 8 mm mag |
| A | 155 | | | | |

Hunting Guides

| Q4. Three most commonly used rifles | | | | |
|---|---|---|---|---|
| A | 156 | Other | Uzi | | |
| A | 157 | | | | |
| A | 158 | Browning | | | 300 |
| A | 159 | | | | |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | | | | |
| C | 3 | Browning | | Auto | 270 |
| C | 4 | Browning | | Bar | 300 |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | | | | |
| C | 9 | Other | HK91 | | |
| C | 10 | Browning | | BAR | 30.06 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | Browning | | | 300 |
| C | 14 | | | | |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | | | | |
| C | 19 | | | | |
| C | 20 | Other | AK47 | | 7.62 x 39 |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Remington | | 742 | 308, 270 |
| C | 24 | | | | |
| C | 25 | | M1-A1 | | .223 |
| C | 26 | | | | |
| C | 27 | Winchester | Various | M1 Garand | 30.06 |
| C | 28 | | | | |
| C | 29 | | | M1A1 | 30.06 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | | | | |
| C | 33 | | | | |
| C | 34 | | | | |
| C | 35 | | | | |

Hunting Guides

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A | 1 | | | | |
| A | 2 | Ruger | | | 30.06 |
| A | 3 ' | | | | |
| A | 4 | Other | Weatherby | Mark V | 300 |
| A | 5 | | | | 30.06 |
| A | 6 | | | | |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | | | | |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | Winchester | | | 30.06, .270 |
| A | 22 | Remington | | 700 | 7 mm or larger |
| A | 23 | Winchester | | 70 | 25 to 30 |
| A | 24 | Remington | | 710 | 30.06 |
| A | 25 | | Any make | Bolt action | Does not recommend |
| A | 26 | Winchester | | 70 | 30.06 or larger |
| A | 27 | Other | Weatherby | | 300 |
| A | 28 | Other | bolt action | | 270 and up |
| A | 29 | | | | |
| A | 30 | | hunter's choice | | .270 |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | Winchester | | 70 | 300 win mag |
| A | 36 | | | | |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Remington | | | 30.06 - 300 win mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | | | | |
| A | 44 | | | | 30.06, 300winmag, 338, 270 |
| A | 45 | Browning | | Bolt Action | 25.06 - 328 |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | Other | Weatherby | | 300 mag |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Remington | | Bolt Action | 300 mag |
| A 62 | | | | |
| A 63 | Other | bolt action repeating rifles | | 30.06 to .338 winmag |
| A 64 | Winchester | | 70 | 338 |
| A 65 | Remington | | bolt action | 308,25-06,243,7 mm mag,30.06,22-250,300 mag all |
| A 66 | | | | |
| A 67 | Ruger | | #1 | 7 mm, 30.06, 7 mm mag |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | Other | | Bolt Action | 30.06 |
| A 71 | | | | 300 mag |
| A 72 | Other | Any make | Any model | 7 mm, 270, 30.06, 25.06 |
| A 73 | | | | |
| A 74 | Browning | | BAR | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | Browning | | Bolt action | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Remington | | 700 | 30.06, 7 mm, 270 |
| A 88 | | | | |
| A 89 | Other | Russian | SKS | 7.62 |
| A 90 | Other | Weatherby | | 7 mm mag |

Hunting Guides

| case | | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| A | 91 | Remington | | 700 | 7 mag |
| A | 92 | | | | |
| A | 93 | Winchester | | 70 | 300 mag |
| A | 94 | Other | Any bolt action | | 270 or larger |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | Other | Any bolt action | | 30 or larger, on semiauto same |
| A | 98 | | | | |
| A | 99 | | | | |
| A | 100 | | | | |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | Other | Weatherby | | 300 magnum |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Remington | | 70 | 7 mm |
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | | | | |
| A | 114 | | | | |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | | | | magnum |
| A | 118 | | | | |
| A | 119 | Remington | | 700 | 7 mm |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | | | | 300 mag, 338 mag, 30.06 |
| A | 127 | | | | |
| A | 128 | | | | |
| A | 129 | | | | |
| A | 130 | Remington | | 700 | 7 mm magnum |
| A | 131 | | | | |
| A | 132 | Other | Weatherby | | 300 mag |
| A | 133 | | | | |
| A | 134 | | | | |
| A | 135 | | | | |

Page 3 of 14

Hunting Guides

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | | Make | Other Make | Model | Caliber |
| A | 136 | | | | |
| A | 137 | Remington | | 700 | 7 mm |
| A | 138 | | | | |
| A | 139 | Browning | | BAR | 7 m or 270 |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | 30.06 |
| A | 143 | | | | |
| A | 144 | Browning | | | from 7 mm mag to 338 mag for deer and elk |
| A | 145 | Winchester | | | 30.06 |
| A | 146 | Browning | | BDL | 7 mag |
| A | 147 | Remington | | 700 BDL | 7 mm |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Browning | | Bolt action | |
| A | 151 | | | | |
| A | 152 | | | | |
| A | 153 | Remington | | 700 | 30 |
| A | 154 | | | | |
| A | 155 | Other | Weatherby | | 300 |
| A | 156 | | | | |
| A | 157 | | | | |
| A | 158 | | | | |
| A | 159 | Browning | Ruger | | 243, 30.06, 7 mm mag, 340 weather, .338 |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |
| B | 1 | | | | 7.62 x 39 |
| C | 1 | Other | Manually operated | | |
| C | 2 | Ruger | | 77 | 300 |
| C | 3 | | | | |
| C | 4 | | | | |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | Remington | | 700 | 270 |
| C | 9 | | | | |
| C | 10 | Other | HK | 91 | .308 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | | | | |
| C | 14 | Other | Bolt-action w/ belted mag | | Calibers, make and model mean nothing |
| C | 15 | Other | Bolt-action | | 30.06-7mm |
| C | 16 | | | | |
| C | 17 | Other | Bolt-action | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| C 18 | Ruger | | Ranch Rifle | 223 |
| C 19 | | | | .243 and larger |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | Other | Bolt-action | | 7mm mag |
| C 24 | | | | |
| C 25 | Other | Savage | | 7mm mag |
| C 26 | | | | |
| C 27 | Winchester | | 70 | 30.06 |
| C 28 | | | | |
| C 29 | Winchester | | 70 | 30.06 - .338 |
| C 30 | | | | |
| C 31 | Winchester | | Manual, bolt | 300 |
| C 32 | Remington | | All | 270 - 7mm |
| C 33 | Winchester | | 70 | 30.06 - .300 win |
| C 34 | Other | Bolt-action | | 270 or larger for elk and deer |
| C 35 | Other | Bolt-action or semiautos | | .270 or larger |
| A 1 | | | | |
| A 2 | Remington | | | 7 mm |
| A 3 | | | | |
| A 4 | Winchester | | 70 | 300 |
| A 5 | | | | |
| A 6 | | | | |
| A 7 | | | | |
| A 8 | | | | |
| A 9 | | | | |
| A 10 | | | | |
| A 11 | | | | |
| A 12 | | | | |
| A 13 | | | | |
| A 14 | | | | |
| A 15 | | | | |
| A 16 | | | | |
| A 17 | | | | |
| A 18 | | | | |
| A 19 | | | | |
| A 20 | | | | |
| A 21 | Remington | | 70 | 30.06 |
| A 22 | Winchester | | 70 | 7 mm or larger |
| A 23 | Remington | | 700 | 25 to 30 |
| A 24 | Remington | | | 300 Mag |
| A 25 | | | | |
| A 26 | Browning | | A bolt | 30.06 or larger |
| A 27 | | | | 300 win mag, 30.06 or 270 |

Page 5 of 14

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 28 | | | | |
| A 29 | | | | |
| A 30 | | hunter's choice | | .308 |
| A 31 | | | | |
| A 32 | | | | |
| A 33 | | | | |
| A 34 | | | | |
| A 35 | Remington | | 700  BDL | 7 mm |
| A 36 | | | | |
| A 37 | | | | |
| A 38 | | | | |
| A 39 | | | | |
| A 40 | Winchester | | | 30.06 - 300 win mag |
| A 41 | | | | |
| A 42 | | | | |
| A 43 | | | | |
| A 44 | | | | |
| A 45 | Remington | | Bolt Action | 25.06 - 328 |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | | | | |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Savage | Bolt Action | 7 mm mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Remington | | 700 | 300 win mag |
| A 65 | Other | Weatherby | | |
| A 66 | | | | |
| A 67 | Remington | | Bolt Action | 7 mm, 30.06, 7 mm mag |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Pump | 30.06 |
| A 71 | | | | 7 mm mag |
| A 72 | | | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 73 | | | | |
| A 74 | Winchester | | 7C | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | Remington | | Bolt Action | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Browning | | | 308, 7 mm, 30.06 |
| A 88 | | | | |
| A 89 | Other | Heckler-Koch | HK-91 | 308 |
| A 90 | | | | |
| A 91 | Winchester | | 70 | 300 mag |
| A 92 | | | | |
| A 93 | Browning | | Mark II | 300 mag, 280-270-25.06 |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | Other | Semi-auto | | 30 cal or larger |
| A 98 | | | | |
| A 99 | | | | |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Remington | | 700 | 300 win mag |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | Winchester | | | 300 mag, 30.06 |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 118 | | | | |
| A 119 | Other | Weatherby | | 300 |
| A 120 | | | | |
| A 121 | | | | |
| A 122 | | | | |
| A 123 | | | | |
| A 124 | | | | |
| A 125 | | | | |
| A 126 | | | | |
| A 127 | | | | |
| A 128 | | | | |
| A 129 | | | | |
| A 130 | | | | |
| A 131 | | | | |
| A 132 | Other | Weatherby | | 700 mag |
| A 133 | | | | |
| A 134 | | | | |
| A 135 | | | | |
| A 136 | | | | |
| A 137 | Other | Weatherby | | 300 |
| A 138 | | | | |
| A 139 | Remington | | 742 | 30.06 or 6 mm |
| A 140 | | | | |
| A 141 | | | | |
| A 142 | | | | 7 mm recommended for deer and elk |
| A 143 | | | | |
| A 144 | Other | Weatherby | | from 7 mm mag to 338 for deer |
| A 145 | Other | Weatherby | | 300 |
| A 146 | Browning | | BDC | 300 |
| A 147 | | | | |
| A 148 | | | | |
| A 149 | | | | |
| A 150 | Winchester | | Bolt Action | |
| A 151 | | | | |
| A 152 | | | | |
| A 153 | Remington | | 700 | 7 mm |
| A 154 | | | | |
| A 155 | Other | Weatherby | | 7 mm |
| A 156 | | | | |
| A 157 | | | | |
| A 158 | | | | |
| A 159 | Winchester | Remington | | 340 Weather - .338 mag |
| A 160 | | | | |
| A 161 | | | | |
| A 162 | | | | |

Page 8 of 14

Hunting Guides

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | | Make | Other Make | Model | Caliber |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | Browning | | | 300 |
| C | 3 | | | | |
| C | 4 | | | | |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | Remington | | 700 | 280 |
| C | 9 | | | | |
| C | 10 | Winchester | | 70 | .270 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | | | | |
| C | 14 | | | | |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | Other | Pump | | |
| C | 18 | Other | AK-47 | | |
| C | 19 | | | | 6mm |
| C | 20 | | | | |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Other | Bolt-action | | .30 |
| C | 24 | | | | |
| C | 25 | Other | Bolt-action | | 30.06 |
| C | 26 | | | | |
| C | 27 | Ruger | | 77 | .300 win mag |
| C | 28 | | | | |
| C | 29 | Remington | | 700 | 30.06-.338 |
| C | 30 | | | | |
| C | 31 | Remington | | Manual bolt | 300 |
| C | 32 | Browning | | All | .270 - 7mm |
| C | 33 | Ruger | | 77 | 30.06 - .300 win |
| C | 34 | | | | |
| C | 35 | | | | |
| A | 1 | | | | |
| A | 2 | Winchester | | | 375 |
| A | 3 | | | | |
| A | 4 | Winchester | | 70 | 270 |
| A | 5 | | | | |
| A | 6 | | | | |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 10 | | | | |
| A 11 | | | | |
| A 12 | | | | |
| A 13 | | | | |
| A 14 | | | | |
| A 15 | | | | |
| A 16 | | | | |
| A 17 | | | | |
| A 18 | | | | |
| A 19 | | | | |
| A 20 | | | | |
| A 21 | Remington | | 70 | .270 |
| A 22 | | | | |
| A 23 | Other | Any bolt action | 1-5 shotmag | 25 to 30 |
| A 24 | Other | Weatherby | | 300 mag |
| A 25 | | | | |
| A 26 | | | | |
| A 27 | | | | |
| A 28 | | | | |
| A 29 | | | | |
| A 30 | | | | |
| A 31 | | | | |
| A 32 | | | | |
| A 33 | | | | |
| A 34 | | | | |
| A 35 | | | | |
| A 36 | | | | |
| A 37 | | | | |
| A 38 | | | | |
| A 39 | | | | |
| A 40 | Ruger | | | 30.06 - 300 win mag |
| A 41 | | | | |
| A 42 | | | | |
| A 43 | | | | |
| A 44 | | | | |
| A 45 | Winchester | | Bolt Action | 25.06 - 328 |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | | | | |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Weatherby | Bolt Action | 338 mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Other | Weatherby Mark V | | 300 Wea Mag |
| A 65 | Winchester | Browning | | |
| A 66 | | | | |
| A 67 | Winchester | Bolt Action | | |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Bolt Action | 7 mm |
| A 71 | | | | |
| A 72 | | | | |
| A 73 | | | | |
| A 74 | Browning | | A Bolt | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | | | | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Other | Weatherby | | 300, 7 mm, 338 |
| A 88 | | | | |
| A 89 | Other | Springfield Armory | FNG | 308 |
| A 90 | | | | |
| A 91 | Ruger | | 77 | 300 mag |
| A 92 | | | | |
| A 93 | Ruger | | M77 | 270, 26-06, 300 mag |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | | | | |
| A 98 | | | | |
| A 99 | | | | |

Hunting Guides

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber | |
| A | 100 | | | | |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | Browning | | 1895 | 45-70 govt |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | | | | |
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | | | | |
| A | 114 | | | | |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | | | | |
| A | 118 | | | | |
| A | 119 | Other | Savage | | 270 or 30.06 |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | | | | |
| A | 127 | | | | |
| A | 128 | | | | |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | | | | |
| A | 132 | | | | |
| A | 133 | | | | |
| A | 134 | | | | |
| A | 135 | | | | |
| A | 136 | | | | |
| A | 137 | | | | |
| A | 138 | | | | |
| A | 139 | | | | |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | 300 winmag recommended |
| A | 143 | | | | |
| A | 144 | Remington | Weatherby | | from 270 to 338 for deer and elk |

Hunting Guides

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | | Make | Other Make | Model | Caliber |
| A | 145 | Remington | | | 270 |
| A | 146 | Ruger | | #1 | 7 mag |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | | | | All bolt action with a round nose point |
| A | 151 | | | | |
| A | 152 | | | | |
| A | 153 | | | | |
| A | 154 | | | | |
| A | 155 | | | | |
| A | 156 | | | | |
| A | 157 | | | | |
| A | 158 | | | | |
| A | 159 | | | | 300mag,416Rigby,375mag,270 mag,500 nitroxpress |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | Other | Sako | | 300 |
| C | 3 | | | | |
| C | 4 | | | | |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | | | | |
| C | 9 | | | | |
| C | 10 | Winchester | | 100 | .308 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | | | | |
| C | 14 | | | | |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | Other | Weatherby | | 243 to 300 |
| C | 18 | | | | |
| C | 19 | | | | |
| C | 20 | | | | |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | | | | |
| C | 24 | | | | |
| C | 25 | | | | |
| C | 26 | | | | |

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| C 27 | Springfield | | M Garard | 30.06 - 308 |
| C 28 | | | | |
| C 29 | Browning | | A bolt | 30.06 - .338 |
| C 30 | | | | |
| C 31 | | | | |
| C 32 | Ruger | | All | .270 - 7 mm |
| C 33 | Browning | | A bolt | 30.06 - 300 win |
| C 34 | | | | |
| C 35 | | | | |

Hunting Guides

| | case | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| Q 8. Recommended rifles based on AK47 et.al. | | | | | |
| A | 26 | AK47 | | | 7.62x37 |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 113 | FN-FAL | | | |
| A | 159 | AK47 | | | |
| C | 2 | AK47 | | Antelope and Varmints and Target Shooters | 30 |
| C | 10 | AK47 | | | 7.62x39 |
| C | 18 | AK47 | | | |
| C | 25 | AK47 | | | 7.62 |
| C | 27 | FN-FAL | | | 308 |
| A | 26 | | SKS | | 7.62x37 |
| A | 89 | HK91 | | | 308 |
| A | 113 | | HK 99 | | |
| C | 2 | AK47 | | Antelope and Varmints and Target Shooters | 243 |
| C | 10 | HK91 | | | 308 |
| C | 25 | | MAK 90 | | 7.62 |
| C | 27 | | Century | L1A1 | 308 |
| A | 89 | Other | Springfield Armory | FNG | 308 |
| A | 113 | HK93 | | | |
| C | 10 | HK93 | | | 223 |
| C | 25 | | M-15 | | 223 |
| C | 27 | HK91 | And clones | | 308 |

Page 1 of 1

**Additional Comments by Hunting Guides**

Additional comments:

(8)  The respondent answered questions 1, 2, 3, and 5 with "None of your business." He then stated in question 4: "It's none of your business what kind, make, model or how many guns law abiding citizens of the U.S. own, prefer to shoot."

(9)  The respondent wrote that he was no longer in business but that he had owned a waterfowl operation and upland bird operation (shotguns only). He added that assault rifles were not true sporting rifles and that they should be limited to use by the military and law enforcement agencies. However, he felt that true sporting weapons that can be modified into some "quasi-assault weapons" should not be restricted. He stated that he supported the effort to get military weapons off the streets but did not want the rights of true sportsmen to be affected.

(10) Although licensed, the respondent did not guide anyone during the past year.

(11) The respondent stated in question 6 that he recommends any legal caliber rifle that client is comfortable with and that is capable of killing the desired game.

(12) For question 6, the respondent replied that he didn't recommend any specific make or model, other than whatever his clients are most comfortable using so long as the weapons are legal for the particular game.

(15) The respondent stated that his organization was solely recreational wildlife watching and photography.

(17) The respondent did not answer the questions but informed us that it is illegal in Hawaii to hunt turkey with a rifle.

(23) The respondent stated that the study rifles were more suitable for militants than sportsmen. He added, "If they want to use these weapons let them go back to the service and use them to defend our country, not against it."

(25) The respondent stated that, in his 35 years of conducting big game hunts, he had never seen any of the study rifles used for hunting. He suggested that the rifles are made to kill people, not big game.

(26) The respondent recommended bolt-action rifles for his clients but stated that he doesn't demand that they use such rifles. The respondent recommended the study rifles in close-range situations in which there are multiple targets that may pose a danger to the hunter (e.g., coyotes, foxes, mountain lions, and bears).

(27) The respondent stated that he recommended the study rifles for hunting but not any specific make.

(32)  The respondent said that most of his clients are bow or pistol hunters.
      He said that there is little if any use for the study rifles in his
      outfitting service because it focuses on hunts of mountain lions and
      bighorn sheep.  However, he did recommend the study rifles on target
      ranges and in competitive shooting situations and cited his right to bear
      arms.

(35)  The respondent recommended bolt-action rifles for his clients.

(40)  The respondent stated that semiautomatic rifles (such as the AK47) and
      others are useful for predator hunting.

(41)  The respondent said that he recommended only ranges of calibers deemed
      suitable but not makes and models of specific rifles.

(44)  The respondent recommended the following calibers for hunting without any
      specific makes or models: 30.06, 300 Win mag, 338, and 270.

(47)  The respondent stated: "You are asking questions about certain makes of
      assault rifles, but you are going to end up going after ALL semiautomatic
      guns.  I've spent about 21 years HUNTING with shotguns and I've used
      semiautomatic models.  If you go down the list of times that one new law
      didn't end up being a whole sloo [sic] of other laws I would be surprised.
      Maybe some face-to-face with these weapons would be a good thing for
      politicians.  If they see how they are used in 'the Real World' then they
      may make better amendments."

(49)  The respondent specifically recommended the study rifles only for grizzly
      bears or moose.

(50)  The respondent stated that his business involved waterfowl hunting, which
      uses only shotguns.

(51)  The respondent replied: "It is my opinion this is a one sided survey, and
      does not tell the real meaning and purpose of the survey.  And that is to
      ban all sporting arms in the future.  The way this survey is presented is
      out of line."

(53)  The respondent stated: "I recommend to all my hunters that they join the
      NRA, vote Republican, and buy a good semi-auto for personal defense."

(57)  The respondent stated that most of his clients use bolt-action rifles.  He
      suggested that semiautomatics are not as accurate as bolt-action rifles.

(58)  The respondent stated that the survey did not pertain to his waterfowl
      hunting business since only shotguns are used.  He added that he did not
      believe semiautomatics in general present any more threat to the public
      than other weapons or firearms.  However, he suggested that cheaply made
      assault-type rifles imported from China and other countries are inaccurate
      and not suitable for hunting.

(59)  The respondent stated that he had no knowledge of the semiautomatic rifles
      beyond 30.06 or similar calibers for hunting.  He added that he did not
      have a use for "automatic" weapons.

(64) The respondent stated: "We need to look at weapons and determine what the designer's intent was for the weapon. We really don't need combat weapons in the hunting environment. I personally would refuse to guide for anyone carrying such a weapon."

(65) The respondent recommended the following calibers for hunting: 7mm, 30.06, .308, .708, 25.06, .243, 22.250, and 300 mag. However, he stated that the study rifles are of no use to the sporting or hunting community whatsoever.

(71) The respondent stated that he mainly hunts elk but did not recommend any additional information about specific firearms except for using 300 mag and 7 mm mag calibers.

(73) The respondent recommended any bolt-action or semiautomatic in the 30 or 7mm calibers. However, he stated that he doesn't allow his clients to use any models based on assault rifles: "They are not needed for hunting. A good hunter does not have these."

(78) The respondent recommended bolt-action rifles for hunting, particularly Browning and Remington.

(80) Although the respondent stated that he does not conduct guides, he did not see a reason to allow any rifles other those manufactured specifically for hunting and sport shooting: "All assault rifles are for fighting war and killing humans."

(82) The respondent stated that he used shotguns only.

(84) The respondent said that he did not allow semiautomatic or automatic rifles in his business. He specifically recommended manually operated rifles.

(90) The respondent stated that all the semiautomatics like AK47s are absolutely worthless and that he found no redeeming hunting value in any AK47 type of rifle. He further explained that the purpose of hunting is to use the minimum number of shells, not the maximum: "I have only known 1 [person] in 50 years to use an AK47. He shot the deer about 30 times. That wasn't hunting, it was murder." He suggested that he would be willing to testify in Congress against such weapons.

(92) The respondent stated that he had been contacted in error, as he was not in the hunting guide business.

(98) The respondent recommended any rifle that a client can shoot the best.

(101) The respondent wrote a letter saying that his business was too new to provide us with useful information about client use; however, he stated that the Chinese AK47 does a proficient job on deer and similar sizes of game and may be the only rifle that some poor people could afford. He said that he is willing to testify to Congress about the outrageous price of certain weapons.

(102) The respondent did not recommend rifles but recommended calibers .270, 30.06, .300, and 7mm.

(103)  The respondent stated that he had clients who used semiautomatic rifles, but he didn't know which makes or models.

(104)  The respondent recommended any legal weapons capable of killing game, "including the types mentioned under the 2nd amendment."

(105)  The respondent stated that the semiautomatic rifles used by his clients were Remingtons.

(112)  The respondent stated that he could not provide any useful information because his business was too new.

(113)  The respondent recommended whatever is available to knock down an elk. He recommended specific calibers: 30.06, 300, or 338.

(115)  The respondent questioned why anyone would use a semiautomatic firearm to hunt game: "Anyone using such horrible arms should be shot with one themselves. Any big game animal does not have a chance with a rifle and now you say people can use semiautomatic rifles."

(116)  The respondent had had three clients who used semiautomatics with 30.06 and 270-caliber ammunition; however, he didn't know the makes or models.

(118)  The survey questions were not answered, but the respondent wrote: "This is a stupid survey. No one contends they hunt much for big game with an AK47. The debate is over the right to own one, which the 2nd amendment says we can."

(119)  The respondent recommended bolt-action rifles for hunting.

(121)  The respondent stated that he uses only shotguns in his operation.

(122)  The respondent recommended rifles with the calibers of .270 - 30.06 or larger to the .300 mag or .338 mag. However, he said that anything other than a standard semiautomatic sporting rifle is illegal in Colorado, where his business is conducted.

(123)  The respondent, who is a bighorn sheep outfitter, stated that the semiautomatic rifles have no place in big game hunting. He recommended basic hunting rifles with calibers of 270 or 30.06.

(124)  The respondent, who hunts mainly deer and elk, recommended calibers 270, 30.06, 300 mag, 7mm, 8mm, or 338.

(125)  The respondent said that his clients did use semiautomatics, but he didn't have any specific information about which ones.

(126)  The respondent stated that the study rifles should remain in one's home or on private property. He would like to have some for personal use but would not recommend them for hunting. He further expressed his displeasure with the Brady bill and stated that criminals need to be held accountable for their actions.

(127)  The respondent, who hunts mostly elk and deer, said that the AK47 is not powerful enough to hunt elk; however, it may be ideal for smaller game, like deer or antelope. He recommended any rifles of 30.06 caliber or larger for hunting.

4

(131)   The respondent recommended bolt-action rifles for his clients with
        calibers .24, .25, 7 mm, or .30. He cited his preference because of
        fewer moving parts, their ease to fix, and their lack of sensitivity to
        weather conditions in the field. He added, however, that he had seen the
        study rifles used with good success.

(132)   The respondent stated that the study rifles are not worth anything in
        cold weather.

(133)   The respondent recommended handguns for hunting in calibers 41 or 44 mag.

(136)   The respondent did not recommend any rifles by make, but he did recommend
        a caliber of .308 or larger for elk.

(140)   The respondent recommended any good bolt or semiautomatic in 270 caliber
        and up. He added: "I feel the government is too involved in our lives
        and seek too much control over the people of our country. I am 65 yrs
        old and see more of our freedom lost every day. I believe in our country
        but I have little faith in [organizations] like the A.T.F."

(145)   The responded stated: "Don't send these guns out west. Thanks!"

(148)   The respondent did not hunt turkey or deer and had no additional
        information to provide.

(149)   The respondent said that he recommends specific rifles to his clients if
        they ask, usually 270 to 7mm caliber big game rifles.

(150)   The respondent recommended Winchester, Remington, or any other
        autoloading hunting rifle.

(152)   The respondent said that he recommended caliber sizes but not specific
        rifles.

(159)   The respondent recommended any gun with which a client can hit a target.
        He stated that the AK47 could be used for hunting and target shooting.

(174)   The respondent recommended bolt-action rifles to his clients.

(175)   The respondent said that most of his deer-hunting clients use bolt-action
        rifles, such as Rugers and Remingtons, in calibers of 30.06, 270, or 243.
        In his duck guide service, only shotguns are used.

(180)   The respondent wrote: "We agree people should not be allowed to have
        semiautomatics and automatics. This does not mean that you silly
        bastards in Washington need to push complete or all gun control."

(182)   The respondent felt that the survey is biased because it didn't ask about
        hunting varmints. He stated that many of the study rifles are suitable
        for such activity.

(184)   The respondent did not recommend single shots or automatics and only
        allows bolt action or pumps for use by his clients.

(188)   The respondent wrote that the study guns are good for small game hunting:
        "I have very good luck with them as they are small, easy to handle, fast-
        shooting and flat firing guns."

(192)   The respondent submitted a letter with the survey: "I do not recommend
        the use of semiautomatic weapons for hunting in my area. Most of these
        weapons are prone to be unreliable because the owner does not know how to
        properly care for them in adverse weather. The FN-FAL, HK91, HK93, and
        SIG SG550-1 are excellent and expensive weapons very much suited to
        competition shooting.

        "Have you surveyed the criminal element on their choice of weapons? I
        suspect the criminal use of the six weapons you mentioned do law-abiding
        citizens compare a very small percentage to the same weapon used. I
        realize that even one wrongful death is too many but now can you justify
        the over 300,000 deaths per year from government supported tobacco?

        "Gun control does not work - it never has and it never will. What we
        need are police that capture criminals and a court system with the
        fortitude to punish them for their crimes."

(198)   The respondent stated that this was his first year in and that it was
        mainly a bow-hunting business.

6



**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**WASHINGTON, D.C. 20226**

DIRECTOR

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law.  Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting.  We are asking that your
organization voluntarily complete the enclosed survey
to assist us in gathering this information.  We
anticipate that the survey will take approximately
15 minutes to complete.

Responses must be received no later than 30 days
following the date of this letter; those received after
that date cannot be included in the review.  Responses
should be forwarded to the Bureau of Alcohol, Tobacco
and Firearms, Department HSE, P.O. Box 50860,
Washington, DC 20091.  We appreciate any information
you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

OMB No. 1512-0542

## ATF SURVEY OF HUNTING/SHOOTING EDITORS
## FOR RIFLE USAGE
Page 1 of 2

**1.** Does your publication recommend specific types of centerfire semiautomatic rifles for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #3)*

2. If your answer to item 1 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

<u>Make</u>                 <u>Model</u>                          <u>Caliber</u>

_____

_____

_____

**3.** Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #5)*

_____Yes, in certain circumstances. Please explain _____

_____ *(Continue)*

**4.** If your answer to item 3 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles that you recommend **against** using for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

<u>Make</u>                 <u>Model</u>                          <u>Caliber</u>

_____

_____

_____

**5.** Does your publication recommend specific types of centerfire semiautomatic rifles for use in **high-power rifle competition?**

_____Yes *(Continue)* _____No *(Skip to #7)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

OMB No. 1512-0542

# ATF SURVEY OF HUNTING/SHOOTING EDITORS
## FOR RIFLE USAGE
### Page 2 of 2

**6.** If your answer to item 5 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

<u>Make</u>                    <u>Model</u>                         <u>Caliber</u>

_____

_____

_____

**7.** Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **high-power rifle competition**?

_____Yes *(Continue)* _____No *(Skip to #9)*

_____Yes, in certain circumstances.  Please explain _____

_____*(Continue)*

**8.** If your answer to item 7 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles your publication recommends **against** using for **high-power rifle competition**.

<u>Make</u>                    <u>Model</u>                         <u>Caliber</u>

_____

_____

_____

**9.** Have you or any other author who contributes to your publication written any articles since 1989 concerning the use of semiautomatic rifles and their suitability for use in hunting or organized competitive shooting? *(Exclude Letters to the Editor.)*

_____Yes *(Continue)*          _____No *(You are finished with the survey. Thank you.)*

**10.** If your answer to item 9 is "Yes", please submit a copy of the applicable article(s).  Any material you are able to provide will be very beneficial to our study.  Please indicate the publication, issue date and page for each article.

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

**Editors**

Comments:

2.  If your answer to item 1 is "Yes," please identify the specific centerfire
    rifles you recommend:

    (8)   Anything except Uzis.

    (9)   All study rifles except Uzi.

    (12)  See attached articles.

3.  Please explain circumstances to question 3: Does your publication recommend
    against the use of any semiautomatic rifles whose design is based on the AK
    47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi for use in hunting medium game
    (for example, turkey) or larger game (for example, deer)?

    (12)  When the caliber is inappropriate or illegal for the specific game
          species.

4.  Other rifle make recommendations in response to question 4: If your answer
    to item 3 is "Yes" or "Yes, in certain circumstances," please identify the
    specific rifles that you recommend against using for hunting medium game
    (for example, turkey) or larger game (for example, deer)?

    (12)  See attached articles.

The following two items are for the responses to question 6: If your answer
to item 5 is "Yes," please identify the specific centerfire semiautomatic
rifles you recommend:

Model

    (5)   Springfield M1A and Colt AR-15.

Caliber

    (5)   7.62m (M1A) and .223 (Colt).

The following items are for questions 9 and 10 on articles written and the
submission of these articles with the survey.

Article 1

    (8)   No articles enclosed.

    (9)   Semiautomatic Takes Tubb to HP Title.

    (10)  No articles attached.

Article 2

    (9)   AR-15 Spaceguns Invading Match.



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

DEC 10 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law.  Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting.  We are asking that your
organization voluntarily complete the enclosed survey
to assist us in gathering this information.  We
anticipate that the survey will take approximately
15 minutes to complete.

Responses must be received no later than 30 days
following the date of this letter; those received after
that date cannot be included in the review.  Responses
should be forwarded to the Bureau of Alcohol, Tobacco
and Firearms, Department FG, P.O. Box 50860,
Washington, DC 20091.  We appreciate any information
you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

OMB No. 1512-0542

## ATF SURVEY OF STATE FISH AND GAME COMMISSIONS
## FOR RIFLE USAGE
Page 1 of 2

State:_____

**1.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **high-power** rifles for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No *(Skip to #2)*

**1a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

_____

**2.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **semiautomatic** rifles for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No *(Skip to #3)*

**2a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

OMB No. 1512-0542

# ATF SURVEY OF STATE FISH AND GAME COMMISSIONS
## FOR RIFLE USAGE
### Page 2 of 2

_____ *(Continue)*

**3.** What, if any, is the minimum caliber or cartridge dimensions that may be used for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

Caliber: _____ **OR** Dimensions:_____

_____There is no minimum.

**4.** Does your commission or state collect any data on the types of rifles used in your state for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No (*You are finished with the survey. Thank you.*)

       **4a.** If "Yes", please provide hard copies of any such available data for the past two hunting seasons of 1995 and 1996. Any data that you provide will be most beneficial to our study.

       If you would like us to contact you regarding the data, please provide your name and phone number.

       Name:_____Phone:_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Survey Fish and Game Commissions for Rifle Usage

| STATE | Restrictions | | Minimum Caliber or Cartridge | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q5 |
| | HiPwr | Semiauto | Minimum Caliber | Minimum Cartridge | Collect Data |
| Alabama | Yes | Yes | Any center fire rifle | None | No |
| Alaska | Yes | No | No Centerfire for big game | | No |
| Arizona | No | Yes | .22 mag or larger | | No |
| Arkansas | Yes | No | None | None | No |
| California | No | No | See Question 1a | See Question 1a | No |
| Colorado | Yes | Yes | 0.24 | | No |
| Connecticut | Yes | Yes | | | |
| Delaware | Yes | Yes | | | |
| Florida | Yes | Yes | No rimfire for deer | | No |
| Georgia | Yes | No | .22 Centerfire or larger | | No |
| Hawaii | No | No | | | |
| Idaho | Yes | Yes | .22 rimfire | | No |
| Illinois | Yes | Yes | None | None | No |
| Indiana | Yes | Yes | None | | No |
| Iowa | Yes | Yes | not provided | | No |
| Kansas | Yes | Yes | .23 caliber or larger | | No |
| Kentucky | No | No | | | |
| Louisiana | Yes | No | .22 Centerfire | | No |
| Maine | Yes | No | .22 mag or larger | | No |
| Maryland | Yes | Yes | | | |
| Massachusetts | Yes | No | None | None | Yes |
| Michigan | Yes | Yes | .23 or larger | | No |
| Minnesota | Yes | No | 0.23 | 1.285" | No |
| Mississippi | Yes | No | None | None | No |
| Missouri | Yes | Yes | None | None | No |
| Montana | No | No | None | | No |
| Nebraska | No | No | | | |
| Nevada | No | No | | | No |
| New Hampshire | Yes | Yes | | above .22 rimfire | No |
| New Jersey | Yes | Yes | None | None | No |
| New Mexico | Yes | No | .24 centerfire or larger | | No |
| New York | Yes | Yes | Must be centerfire | | No |
| North Carolina | Yes | No | None | None | No |
| North Dakota | Yes | Yes | .22 Centerfire or larger | | No |
| Ohio | Yes | No | None | None | No |
| Oklahoma | Yes | Yes | .22 magnum | | No |
| Oregon | Yes | Yes | .22 or .24 or larger | | No |
| Pennsylvania | Yes | Yes | None | None | No |
| Rhode Island | Yes | Yes | | .229 maximum | No |
| South Carolina | Yes | No | Must be larger than .22 | | No |
| South Dakota | Yes | No | None | None | No |
| Tennessee | Yes | Yes | .24 or larger caliber | | No |
| Texas | Yes | No | None | None | No |
| Utah | Yes | No | | None | No |
| Vermont | Yes | No | | | No |
| Virginia | Yes | Yes | .23 caliber for deer | | No |
| Washington | Yes | Yes | .240 or larger for coyote | | No |
| West Virginia | No | No | | Any centerfire | No |
| Wisconsin | Yes | No | .22 caliber or larger | | No |
| Wyoming | Yes | No | | 23/100 bullet dia. | No |

**State Fish and Game Commissions**

Restrictions for High Powered Rifles

1a. Please cite law(s) and briefly describe the restrictions.

<u>Alabama</u>
(19) No automatic weapons, no silenced weapons.

<u>Alaska</u>
(23) Bison hunters must use a caliber capable of firing a 200-grain bullet
     having 2,000 pounds of energy at 100 yards.

<u>Arkansas</u>
(11) No rifles for turkey.

<u>California</u>
(22) Centerfire for big game, 10 gauge or smaller for resident small game.

<u>Colorado</u>
(10) Semiautomatic rifle may not hold more than 6 rounds.

<u>Connecticut</u>
(39) Shotgun only on public lands.  Can use any type of rifle on private land.

<u>Delaware</u>
(40) No rifles - shotguns/muzzle loaders only.

<u>Florida</u>
(25) Machine guns and silencers not permitted for any hunting.

<u>Georgia</u>
(29) No hi-power rifles allowed for turkey hunting.

<u>Hawaii</u>
(49) Must have discharge of 1200 foot pounds.

<u>Idaho</u>
(30) No hi-power rifles allowed for hunting turkey.

<u>Illinois</u>
(12) Turkey or deer may not be hunted with rifle.  Deer may not be hunted with
     muzzle loading rifle.  No restriction on rifles for coyote, fox, and
     woodchuck, etc.

<u>Indiana</u>
(34) No hi-power rifles allowed for deer or turkey hunting.  Limited
     restrictions for specified areas.

<u>Iowa</u>
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No
     difference if public or private lands.  For coyote or fox, there is no
     restriction on rifles, magazine size, or caliber.

<u>Kansas</u>
(33) Must use ammunition specifically designed for hunting.

1

<u>Louisiana</u>
(6)  No rifles for turkey hunting.  Rifles for deer hunting must be no smaller than .22 centerfire.

<u>Maine</u>
(32) No hi-power rifles for turkey and water fowl.  Some limited restrictions for specific areas.

<u>Maryland</u>
(42) Some restrictions based on county.  They are allowed in western and southern Maryland.  Shotguns only in and around Baltimore and Washington, D.C.

<u>Massachusetts</u>
(14) Rifles not permitted for hunting deer and turkey.

<u>Michigan</u>
(27) No turkey hunting with hi-power rifle.  No night hunting with hi-power rifle.  Deer hunting with hi-power rifle allowed only in lower southern peninsula.  Limited restrictions for specific areas.

<u>Minnesota</u>
(13) Caliber must be at least .23.  Ammunition must have a case length of at least 1.285".  .30 caliber M1 carbine cartridge may not be used.

<u>Mississippi</u>
(15) Restricts turkey hunting to shotguns.  However quadriplegics may hunt turkey with a rifle.

<u>Missouri</u>
(5)  Rifles not permitted for turkey.  Self loading firearms for deer may not have a combined magazine + chamber capacity of more than 11 cartridges.

<u>Nebraska</u>
(43) Allowed and frequently used, but magazine capacity maximum is six rounds.

<u>Nevada</u>
(1)  Answer to #3 refers to NAS 501.150 and NAS 503.142.  Not for turkey.

<u>New Hampshire</u>
(7)  Magazine capacity no more than 5 rounds.  Prohibits full metal jacket bullets for hunting.  Prohibits deer hunting with rifles in certain towns.

<u>New Jersey</u>
(17) No rifles.

<u>New Mexico</u>
(31) No hi-power rifles allowed for hunting turkey.

<u>New York</u>
(24) No semiautomatics with a magazine capacity of greater than 6 rounds; machineguns and silencers not permitted for any hunting.  Limited restrictions for specific areas.

<u>North Carolina</u>
(20) Centerfire rifles not permitted for turkey hunting.

2

North Dakota
(28) No hi-power rifles for turkey hunting.

Ohio
(3)  Prohibits high power rifles for turkey, deer and migratory birds.  High
     power rifles can be used on all other legal game animals.

Oklahoma
(8)  Centerfire rifles only for large game.  Magazines for .22 centerfire rifles
     may not hold more than 7 rounds.

Oregon
(2)  OAR 635-65-700(1) must be .24 caliber or larger center fire rifle, no full
     automatic; OAR 635-65-700(2) hunters shall only use centerfire rifle .22
     caliber; OAR-65-700(5) no military or full jacket bullets in original or
     altered form.  Limited restrictions for specific areas.

Pennsylvania
(16) Rifles not permitted in Philadelphia & Pittsburgh areas.

Rhode Island
(44) .22 center fire during the summer for woodchucks.

South Carolina
(18) No rifle for turkey, rifle for deer must be larger than .22 caliber

South Dakota
(50) Magazine not more than five rounds.

Tennessee
(37) No hi-power rifles allowed for turkey hunting.

Texas
(21) Rimfire ammunition not permitted for hunting deer, antelope, and bighorn
     sheep; machine guns and silencers not permitted for hunting any game
     animals.

Utah
(9)  No rifles for turkey hunting.

Vermont
(47) Turkey size less than 10 gauge.  Deer/moose/beer, no restriction on
     caliber.

Virginia
(48) 23 caliber or larger for deer and bear.  No restrictions for turkey.  No
     magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from
     county to county - approximately 90 different rifle restrictions in the
     State of Virginia based on the county restrictions.  Sawed-off firearms are
     illegal to own unless with a permit, if barrel less than 16 inches for
     rifle, and 18 inches for shotgun.

Washington
(46) Hunting turkey limited to shotguns.  Small game limited to shotguns.

3

<u>Wisconsin</u>
(36) No .22 rimfire rifles for deer hunting.

<u>Wyoming</u>
(4)  Big game and trophy animals, firearm must have a bore diameter of at least
     23/100 of an inch.


Restrictions for Semiautomatic Rifles

2a. Please cite law(s) and briefly describe the restrictions.

<u>Alabama</u>
(19) Turkey may not be hunted with a centerfire rifle or rimfire rifle.
     Semiautomatic rifles of proper caliber are legal for all types of hunting.
     No restrictions on magazine capacity, except wildlife management areas
     where centerfire rifles are restricted to 10 round max.

<u>Arizona</u>
(38) Magazine cannot hold more than 5 rounds.

<u>Colorado</u>
(10) Semiautomatic rifle may not hold more than 6 rounds.

<u>Connecticut</u>
(39) Shotgun only on public lands.  Any type of rifle can be used on private
     land.

<u>Delaware</u>
(40) No rifles - shotguns/muzzle loaders only.

<u>Florida</u>
(25) No semiautomatic centerfire rifles having a magazine capacity greater than
     5 rounds.

<u>Idaho</u>
(30) No hi-power rifles (including semiautomatic) allowed for turkey hunting.

<u>Illinois</u>
(12) See #1.

<u>Indiana</u>
(34) No hi-power rifles allowed for turkey hunting.

<u>Iowa</u>
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No
     difference in public or private land.  For coyote or fox, there is no
     restriction on rifle, magazine size, or caliber.

<u>Kansas</u>
(33) Must use ammunition specifically designed for hunting.

**Maryland**
(42) Some restrictions.  Based on county.  Shotguns only in and around Baltimore and Washington, D.C.

**Michigan**
(27) Unlawful to hunt with semiautomatic rifles capable of holding more than 6 rounds in magazine and barrel.  Rimfire (.22 cal) rifles excluded from restrictions.

**Missouri**
(5)  Combined magazine + chamber capacity may not be more than 11 cartridges.

**New Hampshire**
(7)  Turkey may not be hunted with rifles.  Rifles may not have magazine capacity of more than 5 cartridges.

**New Jersey**
(17) No rifles.

**New York**
(24) No semiautomatics with a magazine capacity of greater than 6 rounds.

**North Dakota**
(28) No hi-power rifles (including semiautomatics) may be used for hunting turkey.

**Oklahoma**
(8)  See #1.

**Oregon**
(2)  OAR 635-65-700(1) and (2) limits magazine capacity to no more than 5 cartridges.

**Pennsylvania**
(16) Semiautomatic rifles are not lawful for hunting in Pennsylvania.

**Rhode Island**
(44) Cannot use semiautomatic during the winter, only during the summer months for woodchucks (during daylight from April 1 to September 30).

**Tennessee**
(37) No hi-power rifles, including semiautomatics, allowed for turkey hunting.

**Vermont**
(47) Semiautomatic 5 rounds or less.

**Virginia**
(48) Semiautomatics are legal wherever rifles can be used.  23 caliber or larger for deer and bear.  No restrictions for turkey.  No magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from county to county - approximately 90 different rifle restrictions in the State of Virginia based on the county restrictions.  Sawed-off firearms are illegal to own unless with a permit, if barrel less than 16 inches for rifle, and 18 inches for shotgun.  Striker 12 - drums holds 12 or more rounds and is illegal.

<u>Washington</u>
(46) Cannot use fully automatic for hunting.

<u>West Virginia</u>
(45) Cannot use fully automatic firearms for hunting.

## Comments Provided by Law Enforcement Agencies

(1)     No research.

(2)     No research.

(3)     NOBLE and others forwarded information to a U.S. Senator on circumstances concerning police officers killed or injured by these weapons.  No data was provided.

(4)     No research.

(7)     The organization stated: "Most of the data available on guns and crime does not provide the detail needed to identify the types of guns listed. . . .  We have conducted several surveys that refer to assault rifles generically, including the Survey of Inmates in State Correctional Facilities 1991, Survey of Inmates in Local Jails 1995, and the Survey of Adults on Probation 1995.  The data on assault weapons has not been analyzed in the recently released Survey of Adults on Probation 1995 or in the yet to be released Survey of Inmates in Local Jails 1995.

"Our report Guns Used in Crime includes the results of an analysis of the stolen data from the FBI's National Crime Information Center database.  Our analysis was limited to general categories of guns and calibers of handguns.  The recent evaluation of the assault weapons ban funded by the National Institute of Justice analyzed a more recent set of the same data with an emphasis on assault weapons.  The results of this evaluation were reported in Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994."

"BJS [Bureau of Justice Statistics] supports the Firearms Research Information System (FARIS). . . .  This database contains firearms-related information from surveys, research, evaluations, and statistical reports. . . .  We queried this database for any research on assault weapons.  The results of the query include both the reports listed above, as well as several others.  Please note that in BJS's report Guns Used in Crime refers to the report Assault Weapons and Homicide in New York City prepared by one of our grantees.  While the data are from 1993, the report provides interesting insights into the use of assault weapons and homicide.  Another source of data on assault weapons and crime is the FBI's Law Enforcement Officers Killed and Assaulted series, which records the type of gun used in killings of police officers.  Several of the reports listed in the FARIS query used these data, including Cop Killers: Assault Weapons Attacks on America's Police, and Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines."

(9)     Guns in America: National Survey on Private Ownership and Use of Firearms (May 1997) states: The 1994 NSPOF (National Survey of Private Ownership of Firearms) estimates for the total number of privately owned firearms is 192 million: 65 million handguns, 70 million rifles, 49 million shotguns, and 8 million other long guns.



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law. Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting.

Although ATF is not required to seek public comment on this study, the agency would appreciate any factual, relevant information concerning the sporting use suitability of the rifles in question.

Your voluntary response must be received no later than 30 days from the date of this letter; those received after that date cannot be included in the review. Please forward your responses to the Bureau of Alcohol, Tobacco and Firearms, Department TA, P.O. Box 50860, Washington, DC 20091.

Sincerely yours,

John W. Magaw
Director

**Comments Provided by Industry Members and Trade Associations**

(12)    The respondent felt that definitions and usage should be subject to rulemaking. The respondent stated that limits on "sporting" use do not take into account firearms technology and its derivative uses among millions of disparate consumers. Millions of gun owners currently engage in informal target competition.

The respondent stated that the firearms are suitable for sporting purposes and that ATF's practice of making "ad hoc" revisions to import criteria disrupts legitimate commerce. The respondent recommends that all changes to criteria should be subject to rulemaking.

(19)    The respondent submitted a brochure and a statement supported by seven letters from FFL's who sell the SLR-95 and 97 and ROMAK 1 and 2. The respondent and all the supporting letters attest to the suitability of these guns for hunting because (1) they are excellent for deer or varmint hunting; (2) they are used by many for target shooting; (3) their ammunition is readily available and affordable; and (4) they are excellent for young/new hunters because of low recoil, an inexpensive purchase price, durability, and light weight, as well as being designed only for semiautomatic fire.

(20)    One respondent submitted results of its independently conducted survey, which consisted of 30 questions. The results of the survey suggest that 36 percent of those queried actually use AK47-type rifles for hunting or competition, 38 percent use L1A1-type rifles for hunting or competition, and 38 percent use G3-type rifles for hunting or competition. Other uses include home defense, noncompetitive target shooting, and plinking. Of those queried who do not currently own these types of rifles, 35 percent would use AK-type rifles for hunting or competition, 36 percent would use L1A1-type rifles for hunting or competition, and 37 percent would use G3-type rifles for hunting or competition.

(22)    The respondent claims that the majority of the study rifles' length and calibers can be used only for sporting purposes. The respondent asserts that the only technical detail remaining after the 1989 decision that is similar to a military rifle is the locking system. After 1989, the imported rifles have no physical features of military assault rifles. All have features which can be found on any semiautomatic sporting/hunting rifle.

However, the respondent writes that the Uzi-type carbines are "not suitable for any kind of sporting events other than law enforcement and military competitions because the caliber and locking system do not allow precise shooting over long distances."

1

(23)  One respondent, who imports the SAR-8 and SAR-4800 that are chambered for .308 Winchester ammunition, states that neither rifle possesses any of the characteristics of either the 1989 determination or the 1994 law.  The respondent states that both are permitted in match rifle and other competitions.  The respondent states that only two questions should be considered to determine hunting suitability of a rifle: Whether the caliber is adequate to take one or more game species and whether the gun is safe and reliable.  The respondent states that there is no factual or legal basis to conclude that the rifles are not "particularly suitable" for sporting purposes.

(24)  The respondent writes:  "The particular firearms differ from other guns that are universally acceptable only in cosmetic ways.  There is no functional difference between semiautomatic firearms based on the external features that have been keyed on in an attempt to implement the import restrictions of the 1994 Crime Bill.  As further attempts to differentiate functionally identical firearms by these features for the purposes of culling out those that might be politically suitable for an administrative import ban is wrong."

(25)  The respondent writes that the SLG95 was developed exclusively for hunting and competitive shooting.  The respondent points out that it is capable of single firing only and cannot be reassembled for use as an automatic weapon.  It is made for endurance and accuracy to 300 meters.

(26)  The respondent recommends AK47 variants specifically, but believes all study rifles are suitable or adaptable for sporting.  The respondent states that a Galil-chambered .308/.223 with a two-position rear sight, adjustable front sight, or scope mount channel, are reliable, durable, accurate, and suitable for hunting and organized competitive shooting.  The respondent states that the Uzi, which chambers 9mm and 40 S&W, two-position rear sight, and an adjustable front sight is suitable for organized competitive target shooting.

(27)  The respondent states that the SIG-SG550-1, in its original configuration, never possessed assault rifle features.  The respondent states that is was built as a semiautomatic, not a fully automatic that was converted or modified to semiautomatic.  It does have protruding pistol grip, and its ergonomics are geared toward its original design of goal-precision shooting.  The respondent says that the name "Sniper" was a marketing decision, and it is extremely popular in .223 competitions.  Its price isolates the gun to the competitor/collector.

(28) Letters from H&K users were submitted in support of their continued importation and use as sporting arms. Specifically, the SR9 and PSG1 were said to be clearly suitable and utilized daily for hunting and target shooting. The respondent states that sport is defined as "an active pastime, diversion, recreation" and that the use of these is all the justification needed to allow their importation. The PSG1 has been imported since 1974, and the SR9 since 1990. The semiautomatic feature dates to turn of the century.

The respondent states that the cost would dissuade criminals from using them. The respondent refers to ATF's reports "Crime Gun Analysis (17 Communities)" and "Trace Reports 1993-1996" to show that the H&K SR9 and PSG1 are not used in crime. In the 4-year period covered by the reports, not one was traced.

(29) The respondent faults the 1989 report both for not sufficiently addressing the issue of ready adaptability, as well as for the limited definition of sporting purposes. The respondent states that sport is defined as "that which diverts, and makes mirth; pastime, diversion." The respondent says that the NRA sponsors many matches, and personally attests to the FN-FAL and HK91 as being perfectly suitable for such matches. The respondent states that the rifles are also used for hunting deer, rabbits, and varmints. Further, the respondent remarks that the use of these rifles in crime is minuscule.

### Importer/Individual Letters

On January 15, 1998, the study group received a second submission from Heckler and Koch, dated January 14, 1998. It transmitted 69 letters from individuals who appeared to be answering an advertisement placed in <u>Shotgun News</u> by Heckler and Koch. The study group obtained a copy of the advertisement, which requested that past and current owners of certain H&K rifles provide written accounts of how they use or used these firearms. The advertisement stated that the firearms in question, the SR9 and the PSG1, were used for sporting purposes such as hunting, target shooting, competition, collecting, and informal plinking. The advertisement also referred to the 120-day study and the temporary ban on importation, indicating that certain firearms may be banned in the future.

<u>Synopses of Letters</u>:

1. The writer used his SR9 to hunt deer (photo included).

2. The writer used his SR9 to hunt deer (photo included).

3. The writer used his SR9 for informal target shooting and plinking.

4. The writer used his SR9 for target practice and recreation.

5. The writer (a police officer) used SR9 to hunt. Said that it's too heavy and expensive for criminals.

6.   The writer used his SR9 for competition.

7.   The writer used H&K rifles such as these around the farm to control wild dog packs.

8.   The writer used his SR9 to hunt deer.

9.   The writer used his SR9 to hunt, participate in target practice, and compete.

10.  The writer used his H&K rifles for informal target shooting.

11.  The writer used his SR9 to hunt elk because it's rugged, and to shoot targets.

12.  The writer used his SR9 to target practice.

13.  The writer used his HK91 to hunt varmints and compete in military rifle matches.

14.  The writer does not use the firearms but is familiar with their use for target shooting, hunting, and competition.

15.  The writer uses HK firearms for DCM marksmanship competition.

16.  The writer used his HK93 for 100-yard club matches and NRA-high power rifle matches.

17.  The writer does not own the firearms but enjoys shooting sports and collecting.

18.  The writer used his HK91 to hunt deer, boar, and mountain goat and in high-power match competitions.

19.  The writer used his SR9 to shoot targets and for competitions.

20.  The writer used his HK91 to shoot varmints, hunt small and big game, and shoot long-range silhouettes.

21.  The writer used his SR8 to hunt deer, target shoot, and plink.

22.  The writer used his HK93 to shoot in club competitions.

23.  The writer used his SR9 to shoot targets because the recoil does not impact his arthritis.

24.  The writer (a police officer) does not own the firearm but never sees HKs used in crime.

25.  The writer used his HKs for target shooting, competition, and collection.

26.  The writer does not own the firearms but likes recreational target shooting.

27.  Writer does not own the firearms but states, "Don't ban."

4

28. The writer used his SR9 for hunting deer, varmints, and groundhogs; for target shooting; and for occasional competitions.

29. The writer used his SR9 to hunt deer because it's accurate, rugged, and reliable.

30. The writer used his SR9 to hunt deer and elk.

31. The writer used his SR9 to target shoot.

32. The writer used his SR9 to hunt deer and target shoot.

33. The writer used his HK91 to shoot military rifle 100-yard competitions.

34. The writer used his SR9 for hunting varmints and coyotes, for target shooting, and for competitions.

35. The writer used his SR9 to hunt deer and target shoot.

36. The writer (a former FBI employee) used his SR9 for hunting varmints and for precision and target shooting.

37. The writer used his HK for target shooting and competition.

38. The writer used his SR9 for informal target shooting and plinking and his HK91 for bowling pin matches, high-power rifle competitions, informal target shooting, and plinking.

39. The writer used his SR9 to plink and shoot targets, saying it's too heavy for hunting.

40. The writer has an HK91 as part of his military collection and indicates it may be used for hunting.

41. The writer used his SR9 to target shoot.

42. The writer used his SR9 to hunt deer and target shoot.

43. The writer does not own the firearms but says, "Don't ban."

44. The writer used his SR9 and HK93 for hunting deer, for target shooting, and for home defense.

45. The writer states, "Don't ban."

46. Writer states, "Don't ban."

47. Writer states, "Don't ban."

48. The writer owns an SR9; no use was reported.

49. Writer used his SR9 to compete in club matches and "backyard competitions."

50. The writer used his HK to hunt boar and antelope.

5

51.  The writer states, "Don't ban."

52.  The writer (a police officer) does not own the firearms but states that the are not used by criminals.

53.  The writer used his HK91 to hunt deer.

54.  The writer (a police trainer) says that the PSG1 is used for police sniping and competitive shooting because it's accurate.  He says that it's too heavy to hunt with and has attached an article on the PSG1.

55.  The writer used her two PSG1s for target shooting and fun.

56.  The writer used his SR9 and PSG1 to hunt and target shoot.

57.  The writer used his two PSG1s to hunt and target shoot.

58.  The writer provides an opinion that the SR9 is used to hunt and target shoot.

59.  The writer used his PSG1 for hunting deer and informal target shooting.

60.  The writer used his PSG1 to target shoot and plink.

61.  The writer states, "Don't ban."

62.  The writer used his HK91 to target shoot.

63.  The writer used his HK91 to target shoot.

64.  The writer (a U.S. deputy marshall) used his SR9 to shoot at the range.

65.  The writer used his SR9 to hunt deer and coyotes.

66.  The writer used his SR9 to competitively target shoot.

67.  The writer used his SR9 to hunt deer and bear.

68.  The writer uses military-type rifles like these for predator control on the farm.

69.  The writer used his SR9 to target shoot, plink, and compete in DCM matches.

**Comments Provided by Interest Groups**

(7)  Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994, Final Report.  March 13, 1997.

(8)  Identical comments were received from five members of the JPFO. They are against any form of gun control or restriction regardless of the type of firearm.  References are made comparing gun control to Nazi Germany.

(9)  The respondent contends that police/military-style competitions, "plinking," and informal target shooting should be considered sporting.  Note: The narrative was provided in addition to survey that Century Arms put on the Internet.

The respondent questions ATF's definition of "sporting" purposes. The respondent contends that neither the Bill of Rights nor the Second Amendment places restrictions on firearms based on use.

(13)  Citing the 1989 report, the respondent states that the drafters of the report determined what should be acceptable sports, thus excluding "plinking."

The respondent states that appearance (e.g., military looking) is not a factor in determining firearms' suitability for sporting purposes.  It is their function or action that should determine a gun's suitability.  Over 50 percent of those engaged in Practical Rifle Shooting use Kalashnikov variants.  Further, citing U.S. vs. Smith (1973), the "readily adaptable" determination would fit all these firearms.

(14)  The respondent states that the vast majority of competitive marksmen shoot either domestic or foreign service rifles.  Only 2-3 participants at any of 12 matches fire bolt-action match rifles. If service rifles have been modified, they are permitted under NRA rule 3.3.1.

The respondent says that attempts to ban these rifles "is a joke."

(15)  The respondent states that these firearms are used by men and women alike throughout Nebraska.  All of the named firearms are used a lot all over the State for hunting.  The AK47 has the same basic power of a 30/30 Winchester.  All of these firearms function the same as a Browning BAR or a Remington 7400.  Because of their design features, they provide excellent performance.

(16)  The respondent states that the Bill of Rights does not show the second amendment connected to "sporting purposes."  The respondent says that all of the firearms in question are "service rifles," all can be used in highpower rifle competition (some better than others), but under no circumstances should "sporting use" be used as a test to determine whether they can be sold to the American public.  The respondent states that "sporting use" is a totally bogus question.

1

(17) The respondent's basic concern is that the scope of our survey is significantly too narrow (i.e., not responsive to the Presidential directive, too narrow to address the problem, and inadequate to the task). The respondent states, "We do not indicate that our determination will impact modifications made to skirt law. We rely on the opinions of the 'gun press.' At a minimum, the Bureau should deny importation of: any semiautomatic capable of accepting with a capacity of more than 10 rounds, and any semiautomatic rifle with a capacity to accept more rounds than permitted by the State with the lowest number of permitted rounds. Deny any semiautomatic that incorporates cosmetically altered 'rule-beating' characteristics. Deny any semiautomatic that can be converted by using parts available domestically to any of the 1994 banned guns/characteristics. Deny any semiautomatic manufactured by any entity controlled by a foreign government. OR manufactured by a foreign entity that also manufactures, assembles or exports assault-type weapons. Deny any semiautomatic that contains a part that is a material component of any assault type weapon made, assembled, or exported by the foreign entity which is the source of the firearm proposed to be imported."

"A material component of any assault type weapon, assembled or exported by the foreign entity, which is, the source of the firearms proposed to be imported. The gun press has fabricated 'sporting' events to justify these weapons. The manner in which we are proceeding is a serious disservice to the American people."

Attachments: <u>That Was Then, This is Now; Assault Weapons; Analysis, New Research, and Legislation; Assault Weapons and Accessories in America; and Cop Killers.</u> All authored by the Violence Policy Center.

(30) The respondent states, "At least for handguns, and among young adult purchasers who have a prior criminal history, the purchase of an assault-type firearm is an independent risk factor for later criminal activity on the part of the purchaser."

NOTE: The above study was for assault-type handguns used in criminal activity versus other handguns. The study involved only young adults, and caution should be used in extending these results to other adults and purchasers of rifles. However, the respondent states, it is plausible that findings for one class of firearms may pertain to another closely related class.

(31) <u>The 1996 National Survey of Fishing, Hunting and Wildlife-Associated Recreation.</u> The publication outlines 1996 expenditures for guide use and percentage of hunters using guides for both big game and small game hunting.

(32)   In a memo from the Center to Prevent Handgun Violence the sections
       are Legal Background, History of Bureau Application of the
       "Sporting Purposes" Test, The Modified Assault Rifles under Import
       Suspension Should Be Permanently Barred from Importation, [The
       Galils and Uzis Should Be Barred from Importation Because They Are
       Banned by the Federal Assault Weapon Statute, and All the Modified
       Assault Rifles Should Be Barred from Importation Because They Fail
       the Sporting Purposes Test].  The conclusion states:  "The modified
       assault rifles currently under suspended permits should be
       permanently barred from importation because they do not meet the
       sporting purposes test for importation under the Gun Control Act of
       1968 and because certain of the rifles [Galils and Uzis] also are
       banned by the 1994 Federal assault weapon law."

3

## Comments Provided by Individuals

(10) The respondent does not recommend the Uzi, but he highly recommends the others for small game and varmints. He feels that the calibers of these are not the caliber of choice for medium or large game; however, he believes that the SIG and H&K are the best-built semiautomatics available.

He can not and will not defend the Uzi, referring to it as a "piece of junk."

The respondent feels that because of their expense and their being hard to find, the study rifles (excluding the Uzi) would not be weapons of choice for illegal activities.

(11) The respondent questions ATF's definition of "sporting" and "organized shooting." He feels that ATF's definition is too narrow and based on "political pressure."

The respondent feels that the firearms are especially suitable for competitive shooting and hunting and that the restrictions on caliber and number of cartridges should be left to the individual States. He has shot competitively for 25 years.

(18) The respondent specifically recommends the MAK90 for hunting because its shorter length makes for easier movement through covered areas, it allows for quicker follow-up shots, its open sights allow one to come up upon a target more quickly, and it provides a quicker determination of whether a clear shot exists through the brush than with telescopic sighting.

(21) The respondent states that the second amendment discusses "arms," not "sporting arms." The respondent further states that taxpayer money was spent on this survey and ATF has an agenda. A gun's original intent (military) has nothing to do with how it is used now. "The solution to today's crime is much the same as it always has been, proper enforcement of existing laws, not the imposition of new freedom-restricting laws on honest people."

## Information on Articles Reviewed

(1) Describes limited availability of Uzi Model B sporter with thumbhole stock.

(2) Describes rifle and makes political statement concerning 1989 ban.

(3) Describes Chinese copy of Uzi with thumbhole stock.

(4) Quality sporting firearms from Russia.

(5) Short descriptions of rifles and shotguns available. Lead-in paragraph mentions hunting. Does not specifically recommend any of the listed weapons for hunting.

(6) Geared to retail gun dealers, provides list of available products. States L1A1 Sporter is pinpoint accurate and powerful enough for most North American big game hunting.

(7) Discusses the use of the rifle for hunting bear, sheep, and coyotes. Describes accuracy and ruggedness. NOTE: The rifle is a pre-1989 ban assault rifle.

(8) Deals primarily with performance of the cartridge. Makes statement that AK 47-type rifle is adequate for deer hunting at woods ranges.

(9) Discusses gun ownership in the United States. Highlighted text (not by writers) includes the National Survey of Private Ownership of Firearms that was conducted by Chilton Research Services of Drexel Hill, Pennsylvania during November and December 1994: 70 million rifles are privately held, including 28 million semiautomatics.

(10) Discusses pre-1989 ban configuration. Describes use in hunting, and makes the statement that "in the appropriate calibers, the military style autoloaders can indeed make excellent rifles, and that their ugly configuration probably gives them better handling qualities than more conventional sporters as the military discovered a long time ago."

(15) Not article - letter from Editor of Gun World magazine discussing "sport" and various competitions. Note: Attached submitted by Century Arms.

(16) Letter addressed to "To Whom It May Concern" indicating HK91 (not mentioned but illustrated in photos) is suitable for hunting and accurate enough for competition. Note: Submitted by Century Arms.

(17) Describes a competition developed to test a hunter's skill. Does not mention any of the rifles at issue.

(18) Not on point - deals with AR 15.

(19) Describes function, makes political statement.

(20) Discusses function and disassembly of rifle.

(21) Not on point - deals with AR 15 rifle.

1

(22) Discusses competition started to show sporting use of rifles banned for sale in California. Unknown if weapons in study were banned in California in 1990.

(23) Not on point - deals with national matches.

(24) Not on point - deals with various surplus military rifles.

(25) Deals with 7.62x39mm ammunition as suitable for deer hunting and mentions the use in SKS rifles, which is a military style semiautomatic but not a part of the study.

(26) Not on point - deals with reloading.

(27) Not on point - deals with reloading.

(28) Not on point - deals with AR15 rifles in competition.

(29) Not on point - deals with the SKS rifle.

(30) Not on point - deals with national matches.

(31) Not on point - deals with national matches.

(32) Not on point - deals with national matches.

(33) Not on point - deals with national matches at Camp Perry.

(34) Not on point - deals with national matches at Camp Perry.

(35) Not on point - deals with 1989 national matches at Camp Perry.

(36) Not on point - deals with Browning BAR sporting semiautomatic rifles.

(38) Not on point - deals with AR15, mentions rifle in caliber 7.62 x 39.

(39) Not on point - deals with bullet types.

(40) Not on point - deals with reloading.

(41) Discusses tracking in snow. Rifles mentioned do not include any rifles in study.

(42) Deals with deer hunting in general.

(43) Deals with rifles for varmint hunting. Does not mention rifles in study.

(44) Not on point - deals with hunting pronghorn antelope.

(45) Deals with various deer rifles.

(46) Not on point - deals with two Browning rifles' recoil reducing system.

(47) Not on point - deals with bolt-action rifles.

(48) Not on point - deals with ammunition.

(49) Deals with modifications to AR15 trigger for target shooting.

(50) Not on point - deals with M1 Garand as a target rifle.

(51) Not on point - deals with reloading.

(52) Deals with impact of banning semiautomatic rifles would have on competitors at Camp Perry.

(53) Deals with economic impact in areas near Camp Perry if semiautomatic rifles banned. Reprint from Akron Beacon Journal.

(54) Deals with training new competitive shooters - mentions sporting use of assault rifles, i.e., AR15.

(55) Not on point - article about Nelson Shew.

(56) Not on point - deals with reloading.

(57) Not on point - deals with shooting the AR15.

(58) Not on point - article about AR15 as target rifle.

(59) Not on point - article about well known competitive shooter.

(67) Not on point - deals with reloading.

(68) Discusses semiautomatic versions of M14.

(69) Discusses gas operation.

(70) Discusses right adjustment on M1 and M1A rifles.

(71) Discusses M1A and AR15-type rifles modified to remove them from assault weapon definition, and their use in competition.

(72) Deals with AR15 type rifle.

(73) Not on point - deals with AR15.

(74) Not on point - deals with target rifle based on AR15/M16.

(75) Not on point - deals with SKS rifle.

(76) Not on point - deals with reloading 7.62x39mm cartridge.

(77) Not on point - deals with reloading. Mentions 7.62x39mm.

(78) Not on point - deals with ammunition performance.

(79) Deals with .223 Remington caliber ammunition as a hunting cartridge.

(80) Describes M1A (semiautomatic copy of M14) as a target rifle.

(81) Not on point - deals with bullet design.

(82) Not on point - deals with ammunition performance.

**Information on Advertisements Reviewed**

(11) Indicates rifles are rugged, reliable and accurate.

(12) Describes rifles, lists price.

(13) Sporting versions of AK 47 and FAL.

(14) Sporting version of AK 47, reliable, accurate.

(61) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(62) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(63) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(64) Catalog of ammunition - lists uses for 9mm ammunition.

(65) Catalog of ammunition - lists uses for 9mm ammunition.

(66) Catalog of ammunition - lists recommended uses for 9mm ammunition.

# EXHIBIT F

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF
# Study on the Importability of Certain Shotguns



**Firearms and Explosives Industry Division**

**January 2011**

TABLE OF CONTENTS

Page

1. Executive Summary…………………………………………….      ii

2. Study on the Importability of Certain Shotguns……………..……      1

3. Background on Shotguns………………………………………….      1

4. Background on Sporting Suitability……………………….…………      1

5. Methodology……………………………………………………….      5

6. Analysis………………………………………………………...      7

      Scope of Sporting Purpose………………………..…….      7

      Suitability for Sporting Purposes…………………….………      8

7. Conclusion…………………………………………………………      13

8. Exhibits

    1. Shotgun Stock Style Comparison

    2. State Laws

    3. Sample Drum Magazine

    4. Integrated Rail System

    5. Bulk Measurements

    6. Forward Pistol Grip

## Study on the Importability of Certain Shotguns

### Executive Summary

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

The Gun Control Act of 1968 (GCA) generally prohibits the importation of firearms into the United States.[1] However, pursuant to 18 U.S.C. § 925(d), the GCA creates four narrow categories of firearms that the Attorney General must authorize for importation. Under one such category, subsection 925(d)(3), the Attorney General shall approve applications for importation when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").

After passage of the GCA in 1968, a panel was convened to provide input on the sporting suitability standards which resulted in factoring criteria for handgun importations. Then in 1989, and again in 1998, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted studies to determine the sporting suitability and importability of certain firearms under section 925(d)(3). However, these studies focused mainly on a type of firearm described as "semiautomatic assault weapons." The 1989 study determined that assault rifles contained a variety of physical features that distinguished them from traditional sporting rifles. The study concluded that there were three characteristics that defined semiautomatic assault rifles.[2]

The 1998 study concurred with the conclusions of the 1989 study, but included a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989."[3] Further, both studies concluded that the scope of "sporting purposes" did not include all lawful activity, but was limited to traditional sports such as hunting, skeet shooting, and trap shooting. This effectively narrowed the universe of firearms considered by each study because a larger number of firearms are "particularly suitable for or readily adaptable to a sporting purpose" if plinking[4] and police or military-style practical shooting competitions are also included as a "sporting purpose."[5]

Although these studies provided effective guidelines for determining the sporting purposes of rifles, ATF recognized that no similar studies had been completed to determine the sporting

---

[1] Chapter 44, Title 18, United States Code (U.S.C.), at 18 U.S.C. § 922(l).
[2] These characteristics were: (a) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights); (b) a semiautomatic version of a machinegun; and (c) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less. *1989 Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989 Study)* at 6-9.
[3] *1998 Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Rifles (1998 Study)* at 2.
[4] "Plinking" is shooting at random targets such as bottles and cans. 1989 Report at 10.
[5] *1989 Report* at 8-9; *1998 Study* at 18-19.

suitability of shotguns.  A shotgun study working group (working group) was assigned to perform a shotgun study under the § 925(d)(3) sporting purposes test.  The working group considered the 1989 and 1998 studies, but neither adopted nor entirely accepted findings from those studies as conclusive as to shotguns.

<u>Sporting Purpose</u>

Determination of whether a firearm is generally accepted for use in sporting purposes is the responsibility of the Attorney General (formerly the Secretary of the Treasury).  As in the previous studies, the working group considered the historical context of "sporting purpose" and that Congress originally intended a narrow interpretation of sporting purpose under § 925(d)(3).

While the 1989 and 1998 studies considered all rifles in making their recommendations, these studies first identified firearm features and subsequently identified those activities believed to constitute a legitimate "sporting purpose."  However, in reviewing the previous studies, the working group believes that it is appropriate to first consider the current meaning of "sporting purpose" as this may impact the "sporting" classification of any shotgun or shotgun features.  For example, military shotguns, or shotguns with common military features that are unsuitable for traditional shooting sports, may be considered "particularly suitable for or readily adaptable to sporting purposes" if military shooting competitions are considered a generally recognized sporting purpose.  Therefore, in determining the contemporary meaning of sporting purposes, the working group examined not only the traditional sports of hunting and organized competitive target shooting, but also made an effort to consider other shooting activities.

In particular, the working group examined participation in and popularity of practical shooting events as governed by formal rules, such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC), to determine whether it was appropriate to consider these events a "sporting purpose" under § 925(d)(3).  While the number of members reported for USPSA is similar to the membership for other shotgun shooting organizations,[6] the working group ultimately determined that it was not appropriate to use this shotgun study to determine whether practical shooting is "sporting" under § 925(d)(3).  A change in ATF's position on practical shooting has potential implications for rifle and handgun classifications as well.  Therefore, the working group believes that a more thorough and complete assessment is necessary before ATF can consider practical shooting as a generally recognized sporting purpose.

The working group agreed with the previous studies in that the activity known as "plinking" is "primarily a pastime" and could not be considered a recognized sport for the purposes of

---

[6] Organization websites report these membership numbers:  for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association, over 35,000 active members; National Skeet Shooting Association, nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

importation.[7]  Because almost any firearm can be used in that activity, such a broad reading of "sporting purpose" would be contrary to the congressional intent in enacting section 925(d)(3). For these reasons, the working group recommends that plinking not be considered a sporting purpose.  However, consistent with past court decisions and Congressional intent, the working group recognized hunting and other more generally recognized or formalized competitive events similar to the traditional shooting sports of trap, skeet, and clays.

<u>Firearm Features</u>

In reviewing the shotguns used for those activities classified as sporting purposes, the working group examined State hunting laws, rules, and guidelines for shooting competitions and shooting organizations; industry advertisement**s** and literature; scholarly and historical publications; and statistics on participation in the respective shooting sports.  Following this review, the working group determined that certain shotgun features are <u>not</u> particularly suitable or readily adaptable for sporting purposes.  These features include:

> (1) Folding, telescoping, or collapsible stocks;
> (2) bayonet lugs;
> (3) flash suppressors;
> (4) magazines over 5 rounds, or a drum magazine;
> (5) grenade-launcher mounts;
> (6) integrated rail systems (other than on top of the receiver or barrel);
> (7) light enhancing devices;
> (8) excessive weight (greater than 10 pounds for 12 gauge or smaller);
> (9) excessive bulk (greater than 3 inches in width and/or greater than 4 inches in depth);
> (10) forward pistol grips or other protruding parts designed or used for gripping the shotgun with the shooter's extended hand.

Although the features listed above do not represent an exhaustive list of possible shotgun features, designs or characteristics, the working group determined that shotguns with any one of these features are most appropriate for military or law enforcement use.  Therefore, shotguns containing any of these features are not particularly suitable for nor readily adaptable to generally recognized sporting purposes such as hunting, trap, sporting clay, and skeet shooting. Each of these features and an analysis of each of the determinations are included within the main body of the report.

---

[7] 1989 Study at 10; 1998 Study at 17.

## Study on the Importability of Certain Shotguns

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

## Background on Shotguns

A shotgun is defined by the GCA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger."[8]

Shotguns are traditional hunting firearms and, in the past, have been referred to as bird guns or "fowling" pieces. They were designed to propel multiple pellets of shot in a particular pattern that is capable of killing the game that is being hunted. This design and type of ammunition limits the maximum effective long distance range of shotguns, but increases their effectiveness for small moving targets such as birds in flight at a close range. Additionally, shotguns have been used to fire slugs. A shotgun slug is a single metal projectile that is fired from the barrel. Slugs have been utilized extensively in areas where State laws have restricted the use of rifles for hunting. Additionally, many States have specific shotgun seasons for deer hunting and, with the reintroduction of wild turkey in many States, shotguns and slugs have found additional sporting application.

Shotguns are measured by *gauge* in the United States. The gauge number refers to the "number of equal-size balls cast from one pound of lead that would pass through the bore of a specific diameter."[9] The largest commonly available gauge is 10 gauge (.0775 in. bore diameter). Therefore, a 10 gauge shotgun will have an inside diameter equal to that of a sphere made from one-tenth of a pound of lead. By far, the most common gauges are 12 (0.729 in. diameter) and 20 (0.614 in. diameter). The smallest shotgun that is readily available is known as a ".410," which is the diameter of its bore measured in inches. Technically, a .410 is a 67 gauge shotgun.

## Background on Sporting Suitability

The GCA generally prohibits the importation of firearms into the United States.[10] However, the statute exempts four narrow categories of firearms that the Attorney General shall authorize for importation. Originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968,[11] and amended by Title I of the GCA[12] enacted that same year, this section provides, in pertinent part:

---

[8] 18 U.S.C. § 921(a)(5).
[9] The Shotgun Encyclopedia at 106.
[10] 18 U.S.C. § 922(l).
[11] Pub. Law 90-351 (June 19, 1968).
[12] Pub. Law 90-618 (October 22, 1968).

> the Attorney General shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . . (3) is of a **type** that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.[13] (Emphasis added)

This section addresses Congress' concern that the United States had become a "dumping ground of the castoff surplus military weapons of other nations,"[14] in that it exempted only firearms with a generally recognized sporting purpose. In recognizing the difficulty in implementing this section, Congress gave the Secretary of the Treasury (now the Attorney General) the discretion to determine a weapon's suitability for sporting purposes. This authority was ultimately delegated to what is now ATF. Immediately after discussing the large role cheap imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.[15]

Indeed, Congress granted this discretion to the Secretary even though some expressed concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes. If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed through consumer preference in the marketplace....[16]

Since that time, ATF has been responsible for determining whether firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes under the statute.

---

[13] 18 U.S.C. § 925(d)(3). In pertinent part, 26 U.S.C. § 5845(a) includes "a shotgun having a barrel or barrels of less than 18 inches in length."
[14] 90 P.L. 351 (1968).
[15] S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).
[16] S. Rep. No. 1097, 90th Cong. 2d. Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and Burdick). In Gun South, Inc. v. Brady, 877 F.2d 858, 863 (11th Cir. 1989), the court, based on legislative history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

On December 10, 1968, the Alcohol and Tobacco Tax Division of the Internal Revenue Service (predecessor to ATF) convened a "Firearm Advisory Panel" to assist with defining "sporting purposes" as utilized in the GCA. This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel generally agreed that firearms designed and intended for hunting and organized competitive target shooting would fall into the sporting purpose criteria. It was also the consensus that the activity of "plinking" was primarily a pastime and therefore would not qualify. Additionally, the panel looked at criteria for handguns and briefly discussed rifles. However, no discussion took place on shotguns given that, at the time, all shotguns were considered inherently sporting because they were utilized for hunting or organized competitive target competitions.

Then, in 1984, ATF organized the first large scale study aimed at analyzing the sporting suitability of certain firearms. Specifically, ATF addressed the sporting purposes of the Striker-12 and Streetsweeper shotguns. These particular shotguns were developed in South Africa as law enforcement, security and anti-terrorist weapons. These firearms are nearly identical 12-gauge shotguns, each with 12-round capacity and spring-driven revolving magazines. All 12 rounds can be fired from the shotguns within 3 seconds.

In the 1984 study, ATF ruled that the Striker-12 and the Streetsweeper were not eligible for importation under 925(d)(3) because they were not "particularly suitable for sporting purposes." In doing this, ATF reversed an earlier opinion and specifically rejected the proposition that police or combat competitive shooting events were a generally accepted "sporting purpose." This 1984 study adopted a narrow interpretation of organized competitive target shooting competitions to include the traditional target events such as trap and skeet. ATF ultimately concluded that the size, weight and bulk of the shotguns made them difficult to maneuver in traditional shooting sports and, therefore, these shotguns were not particularly suitable for or readily adaptable to these sporting purposes. At the same time, however, ATF allowed importation of a SPAS-12 variant shotgun because its size, weight, bulk and *modified* configuration were such that it was particularly suitable for traditional shooting sports.[17] The Striker-12 and Streetsweeper were later classified as "destructive devices" pursuant to the National Firearms Act.[18]

In 1989, and again in 1998, ATF conducted studies to determine whether certain rifles could be imported under section 925(d)(3). The respective studies focused primarily on the application of the sporting purposes test to a type of firearm described as a "semiautomatic assault weapon." In both 1989 and 1998, ATF was concerned that certain semiautomatic assault weapons had been approved for importation even though they did not satisfy the sporting purposes test.

---

[17] Private letter Ruling of August 9, 1989 from Bruce L. Weininger, Chief, Firearms and Explosives Division.
[18] *See* ATF Rulings 94-1 *and* 94-2.

<u>1989 Study</u>

In 1989, ATF announced that it was suspending the importation of several semiautomatic assault rifles pending a decision on whether they satisfied the sporting criteria under section 925(d)(3). The 1989 study determined that assault rifles were a "type" of rifle that contained a variety of physical features that distinguished them from traditional sporting rifles. The study concluded that there were three characteristics that defined semiautomatic assault rifles:

(1) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights);
(2) semiautomatic version of a machinegun;
(3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[19]

The 1989 study then examined the scope of "sporting purposes" as used in the statute.[20] The study noted that "[t]he broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test.[21] The 1989 study concluded that a broad interpretation would render the statute useless. The study therefore concluded that neither plinking nor "police/combat-type" competitions would be considered sporting activities under the statute.[22]

The 1989 study concluded that semiautomatic assault rifles were "designed and intended to be particularly suitable for combat rather than sporting applications."[23] With this, the study determined that they were not suitable for sporting purposes and should not be authorized for importation under section 925(d)(3).

<u>1998 Study</u>

The 1998 study was conducted after "members of Congress and others expressed concern that rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable" under the 1989 study.[24] Specifically, many firearms found to be nonimportable under the 1989 study were later modified to meet the standards outlined in the study. These firearms were then legally imported into the country under section 925(d)(3). ATF commissioned the 1998 study on the sporting suitability of semiautomatic rifles to address concerns regarding these modified firearms.

---

[19] 1989 Report and Recommendation on the ATF Working Group on the Importability of Certain Semiautomatic Rifles (1989 Study).
[20] Id. at 8.
[21] Id.
[22] *Id.* At 9.
[23] *Id.* At 12.
[24] 1998 Study at 1.

The 1998 study identified the firearms in question and determined that the rifles shared an important feature—the ability to accept a large capacity magazine that was originally designed for military firearms. The report then referred to such rifles as Large Capacity Military Magazine rifles or "LCMM rifles."[25]

The study noted that after 1989, ATF refused to allow importation of firearms that had any of the identified non-sporting features, but made an exception for firearms that possessed only a detachable magazine. Relying on the 1994 Assault Weapons Ban, the 1998 study noted that Congress "sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting."[26] The study concluded by adopting the standards set forth in the 1989 study and by reiterating the previous determination that large capacity magazines are a military feature that bar firearms from importation under section 925(d)(3).[27]

Present Study

While ATF conducted the above mentioned studies on the sporting suitability of rifles, to date, no study has been conducted to address the sporting purposes and importability of shotguns. This study was commissioned for that purpose and to ensure that ATF complies with it statutory mandate under section 925(d)(3).

Methodology

To conduct this study, the working group reviewed current shooting sports and the sporting suitability of common shotguns and shotgun features. At the outset, the working group recognized the importance of acknowledging the inherent differences between rifles, handguns and shotguns. These firearms have distinct characteristics that result in specific applications of each weapon. Therefore, in conducting the study, the working group generally considered shotguns without regard to technical similarities or differences that exist in rifles or handguns.

The 1989 and 1998 studies examined particular features and made sporting suitability determinations based on the generally accepted sporting purposes of *rifles*. These studies served as useful references because, in recent years, manufacturers have produced shotguns with features traditionally found only on rifles. These features are typically used by military or law enforcement personnel and provide little or no advantage to sportsmen.

Following a review of the 1989 and 1998 studies, the working group believed that it was necessary to first identify those activities that are considered legitimate "sporting purposes" in the modern era. While the previous studies determined that only "the traditional sports of hunting and organized competitive target shooting" would be considered "sporting,"[28] the working group recognized that sporting purposes may evolve over time. The working group felt

---

[25] 1998 Study at 16.
[26] 1998 Study at 3.
[27] The 1994 Assault Weapons Ban expired Sept. 13, 2004, as part of the law's sunset provision.
[28] 1998 Study at 16

that the statutory language supported this because the term "generally recognized" modifies, not only firearms used for shooting activities, but also the shooting activities themselves. This is to say that an activity is considered "sporting" under section 925(d)(3) if it is generally recognized as such.[29] Therefore, activities that were "generally recognized" as legitimate "sporting purposes" in previous studies are not necessarily the same as those activities that are "generally recognized" as sporting purposes in the modern era. As stated above, Congress recognized the difficulty in legislating a fixed meaning and therefore gave the Attorney General the responsibility to make such determinations. As a result, the working group did not simply accept the proposition that sporting events were limited to hunting and traditional trap and skeet target shooting. In determining whether an activity is now generally accepted as a sporting purpose, the working group considered a broad range of shooting activities.

Once the working group determined those activities that are generally recognized as a "sporting purpose" under section 925(d)(3), it examined numerous shotguns with diverse features in an effort to determine whether any particular firearm was particularly suitable for or readily adaptable to those sports. In coming to a determination, the working group recognized that a shotgun cannot be classified as sporting merely because it may be used for a sporting purpose. During debate on the original bill, there was discussion about the meaning of the term "sporting purposes." Senator Dodd stated:

> Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event . . . . As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.[30]

In making a determination on any particular feature, the working group considered State hunting laws, currently available products, scholarly and historical publications, industry marketing, and rules and regulations of organization such as the National Skeet Shooting Association, Amateur Trapshooting Association, National Sporting Clays Association, Single Action Shooting Society, International Practical Shooting Confederation (IPSC), and the United States Practical Shooting Association (USPSA). Analysis of these sources as well as a variety of shotguns led the working group to conclude that certain shotguns were of a type that did not meet the requirements of section 925(d)(3), and therefore, could not lawfully be imported.

---

[29] ATF previously argued this very point in <u>Gilbert Equipment Company , Inc. v. Higgins</u>, 709 F.Supp. 1071, 1075 (S.D. Ala. 1989). The court agreed, noting, "according to Mr. Drake, the bureau takes the position…that an event has attained general recognition as being a sport before those uses and/or events can be 'sporting purposes' or 'sports' under section 925(d)(3). *See also* Declaration of William T. Drake, Deputy Director, Bureau of Alcohol, Tobacco and Firearms.

[30] 114 Cong. Rec. 27461-462 (1968).

Analysis

A. Scope of Sporting Purposes

In conducting the sporting purposes test on behalf of the Attorney General, ATF examines the physical and technical characteristics of a shotgun and determines whether those characteristics meet this statutory requirement. A shotgun's suitability for a particular sport depends upon the nature and requirements inherent to that sport. Therefore, determining a "sporting purpose" was the first step in this analysis under section 925(d)(3) and is a critical step of the process.

A broad interpretation of "sporting purposes" may include any lawful activity in which a shooter might participate and could include any organized or individual shooting event or pastime. A narrow interpretation of "sporting purposes" would clearly result in a more selective standard governing the importation of shotguns.

Consistent with previous ATF decisions and case law, the working group recognized that a sport or event must "have attained general recognition as being a 'sport,' before those uses and/or events can be 'sporting purposes' or 'sports' under Section 925(d)(3)."[31] The statutory language limits ATF's authority to recognize a particular shooting activity as a "sporting purpose," and therefore requires a narrow interpretation of this term. As stated however, the working group recognized that sporting purposes may change over time, and that certain shooting activities may become "generally recognized" as such.

At the present time, the working group continues to believe that the activity known as "plinking" is not a generally recognized sporting purpose. There is nothing in the legislative history of the GCA to indicate that section 925(d)(3) was meant to recognize every conceivable type of activity or competition that might employ a firearm. Recognition of plinking as a sporting purpose would effectively nullify section 925(d)(3) because it may be argued that *any* shotgun is particularly suitable for or readily adaptable to this activity.

The working group also considered "practical shooting" competitions. Practical shooting events generally measure a shooter's accuracy and speed in identifying and hitting targets while negotiating obstacle-laden shooting courses. In these competitions, the targets are generally stationary and the shooter is mobile, as opposed to clay target shooting where the targets are moving at high speeds mimicking birds in flight. Practical shooting consist of rifle, shotgun and handgun competitions, as well as "3-Gun" competitions utilizing all three types of firearm on one course. The events are often organized by local or national shooting organizations and attempt to categorize shooters by skill level in order to ensure competitiveness within the respective divisions. The working group examined participation in and popularity of practical shooting events as governed under formal rules such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC) to see

---

[31] Gilbert *at 1085.*

if it is appropriate to consider these events a legitimate "sporting purpose" under section 925(d)(3).

The USPSA currently reports approximately 19,000 members that participate in shooting events throughout the United States.[32]  While USPSA's reported membership is within the range of members for some other shotgun shooting organizations,[33] organizations involved in shotgun hunting of particular game such as ducks, pheasants and quail indicate significantly more members than any of the target shooting organizations.[34]  Because a determination on the sporting purpose of practical shooting events should be made only after an in-depth study of those events, the working group determined that it was not appropriate to use this shotgun study to make a definitive conclusion as to whether practical shooting events are "sporting" for purposes of section 925(d)(3).  Any such study must include rifles, shotguns and handguns because practical shooting events use all of these firearms, and a change in position by ATF on practical shooting or "police/combat-type" competitions may have an impact on the sporting suitability of rifles and handguns.  Further, while it is clear that shotguns are used at certain practical shooting events, it is unclear whether shotgun use is so prevalent that it is "generally recognized" as a sporting purpose.  If shotgun use is not sufficiently popular at such events, practical shooting would have no effect on any sporting suitability determination of shotguns.  Therefore, it would be impractical to make a determination based upon one component or aspect of the practical shooting competitions.

As a result, the working group based the following sporting suitability criteria on the traditional sports of hunting, trap and skeet target shooting.

B.  <u>Suitability for Sporting Purposes</u>

The final step in our review involved an evaluation of shotguns to determine a "type" of firearm that is "generally recognized as particularly suitable or readily adaptable to sporting purposes." Whereas the 1989 and 1998 studies were conducted in response to Congressional interest pertaining to a certain "type" of firearm, the current study did not benefit from a mandate to focus upon and review a particular type of firearm.  Therefore, the current working group determined that it was necessary to consider a broad sampling of shotguns and shotgun features that may constitute a "type."

Whereas rifles vary greatly in size, function, caliber and design, historically, there is less variation in shotgun design.  However, in the past several years, ATF has witnessed increasingly diverse shotgun design.  Much of this is due to the fact that some manufacturers are now applying rifle designs and features to shotguns.  This has resulted in a type of shotgun that has

---

[32] *See* www.uspsa.org.

[33] Organization websites report these membership numbers: for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association,  over 35,000 active members; National Skeet Shooting Association,  nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

[34] Organization websites report these membership numbers:  Ducks Unlimited, U.S adult 604,902 (Jan. 1, 2010); Pheasants/Quail Forever, over 130,000 North American members (2010) http://www.pheasantfest.org/page/1/PressReleaseViewer.jsp?pressReleaseId=12406.

features or characteristics that are based on tactical and military firearms. Following a review of numerous shotguns, literature, and industry advertisements, the working group determined that the following shotgun features and design characteristics are particularly suitable for the military or law enforcement, and therefore, offer little or no advantage to the sportsman. Therefore, we recognized that any shotgun with one or more of these features represent a "type" of firearm that is not "generally recognized as particularly suitable or readily adaptable to sporting purposes" and may not be imported under section 925(d)(3).

(1) Folding, telescoping or collapsible stock.

Shotgun stocks vary in style, but sporting stocks have largely resembled the traditional design.[35] Many military firearms incorporate folding or telescoping stocks. The main advantage of this feature is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded or retracted position, yet it is difficult to fire as accurately as can be done with an open or fully extended stock. While a folding stock or telescoping stock makes it easier to carry the firearm, its predominant advantage is for military and tactical purposes. A folding or telescoping stock is therefore not found on the traditional sporting shotgun. Note that certain shotguns may utilize adjustable butt plates, adjustable combs, or other designs intended only to allow a shooter to make small custom modifications to a shotgun. These are not intended to make a shotgun more portable, but are instead meant to improve the overall "fit" of the shotgun to a particular shooter. These types of adjustable stocks are sporting and are, therefore, acceptable for importation.

(2) Bayonet Lug.

A bayonet lug is generally a metal mount that allows the installation of a bayonet onto the end of a firearm. While commonly found on rifles, bayonets have a distinct military purpose. Publications have indicated that this may be a feature on military shotguns as well.[36] It enables soldiers to fight in close quarters with a knife attached to their firearm. The working group discovered no generally recognized sporting application for a bayonet on a shotgun.

(3) Flash Suppressor.

Flash suppressors are generally used on military firearms to disperse the muzzle flash in order to help conceal the shooter's position, especially at night. Compensators are used on military and commercial firearms to assist in controlling recoil and the "muzzle climb" of the shotgun. Traditional sporting shotguns do not have flash suppressors or compensators. However, while compensators have a limited benefit for shooting sports because they allow the shooter to quickly reacquire the target for a second shot, there is no particular benefit in suppressing muzzle flash in

---

[35] Exhibit 1.

[36] *A Collector's Guide to United States Combat Shotguns* at 156.

sporting shotguns. Therefore, the working group finds that flash suppressors are not a sporting characteristic, while compensators are a sporting feature. However, compensators that, in the opinion of ATF, actually function as flash suppressors are neither particularly suitable nor readily adaptable to sporting purposes.

(4) <u>Magazine over 5 rounds, or a Drum Magazine</u>.

A magazine is an ammunition storage and feeding device that delivers a round into the chamber of the firearm during automatic or semiautomatic firing.[37] A magazine is either integral (tube magazine) to the firearm or is removable (box magazine). A drum magazine is a large circular magazine that is generally detachable and is designed to hold a large amount of ammunition.

The 1989 Study recognized that virtually all modern military firearms are designed to accept large, detachable magazines. The 1989 Study noted that this feature provides soldiers with a large ammunition supply and the ability to reload rapidly. The 1998 Study concurred with this and found that, for rifles, the ability to accept a detachable large capacity magazine was not a sporting feature. The majority of shotguns on the market today contain an integral "tube" magazine. However, certain shotguns utilize removable box magazine like those commonly used for rifles.[38]

In regard to sporting purposes, the working group found no appreciable difference between integral tube magazines and removable box magazines. Each type allowed for rapid loading, reloading, and firing of ammunition. For example, "speed loaders" are available for shotguns with tube-type magazines. These speed loaders are designed to be preloaded with shotgun shells and can reload a shotgun with a tube-type magazine in less time than it takes to change a detachable magazine.

However, the working group determined that magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications. The majority of state hunting laws restrict shotguns to no more than 5 rounds.[39] This is justifiable because those engaged in sports shooting events are not engaging in potentially hostile or confrontational situations, and therefore do not require the large amount of immediately available ammunition, as do military service members and police officers.

Finally, drum magazines are substantially wider and have considerably more bulk than standard clip-type magazines. They are cumbersome and, when attached to the shotgun, make it more difficult for a hunter to engage multiple small moving targets. Further, drum magazines are generally designed to contain more than 5 rounds. Some contain as many as 20 or more

---

[37] Steindler's New Firearms Dictionary at 164.
[38] See Collector's Guide to United States Combat Shotguns at 156-7, noting that early combat shotguns were criticized because of their limited magazine capacity and time consuming loading methods.
[39] Exhibit 2.

rounds.[40]  While such magazines may have a military or law enforcement application, the working group determined that they are not useful for any generally recognized sporting purpose. These types of magazines are unlawful to use for hunting in most states, and their possession and manufacture are even prohibited or restricted in some states.[41]

(5) <u>Grenade Launcher Mount</u>.

Grenade launchers are incorporated into military firearms to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the firearm either by screws or clamps. Grenade launchers have a particular military application and are not currently used for sporting purposes.

(6) <u>Integrated Rail Systems</u>.[42]

This refers to a mounting rail system for small arms upon which firearm accessories and features may be attached.  This includes scopes, sights, and other features, but may also include accessories or features with no sporting purpose, including flashlights, foregrips, and bipods. Rails on the sides and underside of shotguns—including any accessory mount—facilitate installation of certain features lacking any sporting purpose.  However, receiver rails that are installed on the top of the receiver and barrel are readily adaptable to sporting purposes because this facilitates installation of optical or other sights.

(7) <u>Light Enhancing Devices</u>.

Shotguns are generally configured with either bead sights, iron sights or optical sights, depending on whether a particular sporting purpose requires the shotgun to be pointed or aimed.[43]  Bead sights allow a shooter to "point" at and engage moving targets at a short distance with numerous small projectiles, including birds, trap, skeet and sporting clays.  Iron and optical sights are used when a shooter, firing a slug, must "aim" a shotgun at a target, including deer, bear and turkeys.[44]  Conversely, many military firearms are equipped with sighting devices that utilize available light to facilitate night vision capabilities. Devices or optics that allow illumination of a target in low-light conditions are generally for military and law enforcement purposes and are not typically found on sporting shotguns because it is generally illegal to hunt at night.

---

[40] Exhibit 3.
[41] *See, e.g.,*  Cal Pen Code § 12020; N.J. Stat. § 2C:39-9.
[42] Exhibit 4.
[43] NRA Firearms Sourcebook at 178.
[44] Id.

(8) Excessive Weight.[45]

Sporting shotguns, 12 gauge and smaller, are lightweight (generally less than 10 pounds fully assembled),[46] and are balanced and maneuverable. This aids sportsmen by allowing them to carry the firearm over long distances and rapidly engage a target. Unlike sporting shotguns, military firearms are larger, heavier, and generally more rugged. This design allows the shotguns to withstand more abuse in combat situations.

(9) Excessive Bulk.[47]

Sporting shotguns are generally no more than 3 inches in width or more than 4 inches in depth. This size allows sporting shotguns to be sufficiently maneuverable in allowing hunters to rapidly engage targets. Certain combat shotguns may be larger for increased durability or to withstand the stress of automatic fire. The bulk refers to the fully assembled shotgun, but does not include magazines or accessories such as scopes or sights that are used on the shotgun. For both width and depth, shotguns are measured at the widest points of the action or housing on a line that is perpendicular to the center line of the bore. Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun. Width refers to the length of the top or bottom plane of the firearm and measures the distance between the sides of the shotgun. Neither measurement includes the shoulder stock on traditional sporting shotgun designs.

(10) Forward Pistol Grip or Other Protruding Part Designed or Used for Gripping the Shotgun with the Shooter's Extended Hand.[48]

While sporting shotguns differ in the style of shoulder stock, they are remarkably similar in fore-end design.[49] Generally, sporting shotguns have a foregrip with which the shooter's forward hand steadies and aims the shotgun. Recently, however, some shooters have started attaching forward pistol grips to shotguns. These forward pistol grips are often used on tactical firearms and are attached to those firearms using the integrated rail system. The ergonomic design allows for continued accuracy during sustained shooting over long periods of time. This feature offers little advantage to the sportsman. Note, however, that the working group believes that pistol grips for the trigger hand are prevalent on shotguns and are therefore generally recognized as particularly suitable for sporting purposes.[50]

While the features listed above are the most common non-sporting shotgun features, the working group recognizes that other features, designs, or characteristics may exist. Prior to importation, ATF will classify these shotguns based upon the requirements of section 925(d)(3). The working

---

[45] *See generally* Gilbert.
[46] Shotgun Encyclopedia 2001 at 264.
[47] Exhibit 5.
[48] Exhibit 6.
[49] *See* Exhibit 1. *See generally* NRA Firearms Sourcebook at 121-2.
[50] See Exhibit 1.

group expects the continued application of unique features and designs to shotguns that may include features or designs based upon traditional police or military tactical rifles. However, even if a shotgun does not have one of the features listed above, it may be considered "sporting" only if it meets the statutory requirements under section 925(d)(3). Further, the simple fact that a military firearm or feature *may* be used for a generally recognized sporting purposes is not sufficient to support a determination that it is sporting under 925(d)(3). Therefore, as required by section 925(d)(3), in future sporting classifications for shotguns, ATF will classify the shotgun as sporting only if there is evidence that its features or design characteristics are generally recognized as particularly suitable for or readily adaptable to generally recognized sporting purposes.

The fact that a firearm or feature was initially designed for military or tactical applications, including offensive or defensive combat, may indicate that it is not a sporting firearm. This may be overcome by evidence that the particular shotgun or feature has been so regularly used by sportsmen that it is generally recognized as particularly suitable for or readily adaptable to sporting purposes. Such evidence may include marketing, industry literature and consumer articles, scholarly and historical publications, military publications, the existence of State and local statutes and regulations limiting use of the shotgun or features for sporting purposes, and the overall use and the popularity of such features or designs for sporting purposes according to hunting guides, shooting magazines, State game commissioners, organized competitive hunting and shooting groups, law enforcement agencies or organizations, industry members and trade associations, and interest and information groups. Conversely, a determination that the shotgun or feature was originally designed as an improvement or innovation to an existing sporting shotgun design or feature will serve as evidence that the shotgun is sporting under section 925(d)(3). However, any new design or feature must still satisfy the sporting suitability test under section 925(d)(3) as outlined above.

The Attorney General and ATF are not limited to these factors and therefore may consider any other factor determined to be relevant in making this determination. The working group recognizes the difficulty in applying this standard but acknowledges that Congress specifically intended that the Attorney General perform this function. Therefore, the working group recommends that sporting determinations for shotguns not specifically addressed by this study be reviewed by a panel pursuant to ATF orders, policies and procedures, as appropriate.

## Conclusion

The purpose of section 925(d)(3) is to provide a limited exception to the general prohibition on the importation of firearms without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms…."[51] Our determinations will in no way preclude the importation of true sporting shotguns. While it will certainly prevent the importation of certain shotguns, we believe that

---

[51] 90 P.L. 351 (1968).

those shotguns containing the enumerated features cannot be fairly characterized as "sporting" shotguns under the statute.  Therefore, it is the recommendation of the working group that shotguns with any of the characteristics or features listed above not be authorized for importation.

<u>Shotgun Stock Style Comparison</u>

Exhibit 1

"Straight" or "English" style stock (Ruger Red Label):



"Pistol grip" style stock (Browning Citori):



"Pistol grip" style stock (Mossberg 935 Magnum Turkey):



"Thumbhole" style stock (Remington SP-10):



Stock with Separate Pistol Grip



<u>Hunting Statutes by State</u>                                                                                          Exhibit 2

| State | Gauge | Mag Restriction / plugged with one piece filler requiring disassembly of gun for removal | Attachments | Semi-Auto | Other |
|---|---|---|---|---|---|
| Alabama | 10 gauge or smaller; | (Species specific) 3 shells | | | 1 |
| Alaska | 10 gauge or smaller | | | | |
| Arizona | 10 gauge or smaller | 5 shells | | | |
| Arkansas | ≤ 10 gauge; some zones ≥ .410; ≥ 20 gauge for bear | (Species specific) 3 shells | | | |
| California | ≤ 10 gauge; Up to 12 gauge in some areas | (Species specific) 3 shells | | | |
| Colorado | ≥ 20 gauge; Game Mammals ≤ 10 gauge | 3 shells | | | |
| Connecticut | ≤ 10-gauge | (Species specific) 3 shells | telescopic sights | | |
| Delaware | 20, 16, 12, 10 gauge | 3 shells | Muzzleloaders may be equipped with scopes | | 2 |
| Florida | Muzzleloading firing ≥ 2 balls ≥ 20-gauge; Migratory birds ≤ 10-gauge; opossums - single-shot .41 -gauge shotguns | (Species specific) 3 shells | | | |
| Georgia | ≥ 20-gauge; Waterfowl ≤ 10-gauge | 5 shells | Scopes are legal | | |
| Hawaii | ≤ 10 gauge | (Species specific) 3 shells | | | |
| Idaho | | | some scopes allowed | | 3 |
| Illinois | 20 - 10 gauge; no .410 or 28 gauge allowed | 3 shells | | | |
| Indiana | | (Species specific) 3 shells | Laser sights are legal | | |

<u>Hunting Statutes by State</u>                                                                                     Exhibit 2

| State | | | | |
|---|---|---|---|---|
| **Iowa** | 10-, 12-, 16-, and 20-gauge | | | |
| **Kansas** | ≥ 20 gauge;  ≤ 10 gauge, | (Species specific) 3 shells | | |
| **Kentucky** | up to and including 10-gauge, includes .410- | (Species specific) 3 shells | Telescopic sights (scopes) | |
| **Louisiana** | ≤ 10 gauge | 3 shells | Nuisance Animals; infrared, laser sighting devices, or night vision devices | |
| **Maine** | 10 - 20 gauge | (Species specific) 3 shells | may have any type of sights, including scopes | Auto-loading illegal if hold more than 6 cartridges |
| **Maryland** | Muzzle loading ≥ 10 gauge ; Shotgun ≤ 10- gauge | (Species specific) 3 shells | may use a telescopic sight on muzzle loading firearm | |
| **Massachusetts** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Michigan** | any gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| **Minnesota** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Mississippi** | any gauge | (Species specific) 3 shells | Scopes allowed on primitive weapons | |
| **Missouri** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Montana** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Nebraska** | ≥ 20 gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| **Nevada** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | | |
| **New Hampshire** | 10 - 20 gauge | (Species specific) 3 shells | | |
| **New Jersey** | ≤ 10 gauge; ≥ 20 gauge; or .410 caliber | (Species specific) 3 shells | Require adjustable open iron, peep sight or scope affixed if hunting with slugs.  Telescopic sights Permitted | |
| **New Mexico** | ≥ 28 gauge, ≤ 10 gauge | (Species specific) 3 shells | | |
| **New York** | Big game ≥ 20 gauge | | scopes allowed | No semi-automatic firearm with a capacity to hold more than 6 rounds |

Hunting Statutes by State                                                                         Exhibit 2

| State | Gauge | Shells | Notes | Extra |
|-------|-------|--------|-------|-------|
| North Carolina | ≤ 10 gauge | (Species specific) 3 shells | | |
| North Dakota | ≥ 410 gauge; no ≤ 10 gauge | 3 shells (repealed for migratory birds) | | |
| Ohio | ≤ 10 gauge | (Species specific) 3 shells | | |
| Oklahoma | ≤ 10 gauge | (Species specific) 3 shells | | |
| Oregon | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | Scopes (permanent and detachable), and sights allowed for visually impaired | |
| Pennsylvania | ≤ 10 gauge; ≥ 12 gauge | (Species specific) 3 shells | | |
| Rhode Island | 10, 12, 16, or 20-gauge | 5 shells | | |
| South Carolina | | (Species specific) 3 shells | | |
| South Dakota | (Species specific) ≤ 10 gauge | 5 shells | | No auto-loading firearm holding > 6 cartridges |
| Tennessee | Turkey: ≥ 28 gauge | (Species specific) 3 shells | May be equipped with sighting devices | |
| Texas | ≤ 10 gauge | (Species specific) 3 shells | scoping or laser sighting devices used by disabled hunters | |
| Utah | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | | |
| Vermont | ≥ 12 gauge | (Species specific) 3 shells | | |
| Virginia | ≤ 10 gauge | (Species specific) 3 shells | | |
| Washington | ≤ 10 gauge | (Species specific) 3 shells | | |
| West Virginia | | | | |
| Wisconsin | 10, 12, 16, 20 and 28 gauge; no .410 shotgun for deer/bear | (Species specific) 3 shells | | |
| Wyoming | | | | 4 |

**1**  Shotgun/rifle combinations (drilling) permitted

**2**  large game training course - Students in optional proficiency qualification bring their own pre-zeroed, ≥ .243 , scoped shotgun

**3**  no firearm that, in combination with a scope, sling and/or any attachments, weighs more than 16 pounds

**4**  no relevant restrictive laws concerning shotguns

General Firearm Statutes by State                                                                                Exhibit 2

| State | Source | Semi-Auto Restrictions | Attachments | Prohibited* (in addition to possession of short-barrel or sawed-off shotguns by non-authorized persons, e.g., law enforcment officers for official duty purposes) |
|---|---|---|---|---|
| Alabama | Alabama Code, title 13: | | | |
| Alaska | Alaska Statutes 11.61.200.(h) | | | |
| Arizona | Arizona Rev. Statutes 13-3101.8. | single shot | silencer prohibited | |
| Arkansas | Arkansas Code Title 5, Chapter 73. | | | |
| California | California Penal Code, Part 4.12276. and San Diego Municipal Code 53.31. | San Diego includes under "assault weapon," any shotgun with a magazine capacity of more than 6 rounds | | "Assault weapons": Franchi SPAS 12 and LAW 12; Striker 12; Streetsweeper type S/S Inc. ; semiautomatic shotguns having both a folding or telescoping stock and a pistol grip protruding conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip; semiautomatic shotguns capable of accepting a detachable magazine; or shotguns with a revolving cylinder. |
| Colorado | 2 CCR 406-203 | | | |
| Connecticut | Connecticut Gen. Statutes 53-202a. | | | "Assault weapons": Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns |
| D.C | 7-2501.01. | | | |

General Firearm Statutes by State                                                                Exhibit 2

| | | | |
|---|---|---|---|
| **Delaware** | 7.I.§ 711. | | 7.I.§ 711. Hunting with automatic-loading gun prohibited; penalty<br>(a) No person shall hunt for game birds or game animals in this State, except as authorized by state-sanctioned federal depredation/conservation orders for selected waterfowl species, with or by means of any automatic-loading or hand-operated repeating shotgun capable of holding more than 3 shells, the magazine of which has not been cut off or plugged with a filler incapable of removal through the loading end thereof, so as to reduce the capacity of said gun to not more than 3 shells at 1 time, in the magazine and chamber combined.<br>(b) Whoever violates this section shall be guilty of a class C environmental misdemeanor.<br>(c) Having in one's possession, while in the act of hunting game birds or game animals, a gun that will hold more than 3 shells at one time in the magazine and chamber combined, except as authorized in subsection (a) of this section, shall be prima facie evidence of violation of this section. |
| **Florida** | Florida statutes, Title XLVI.790.001. | | |
| **Georgia** | | | |
| **Hawaii** | Hawaii Rev. Statutes, Title 10., 134-8. | silencer prohibited | |
| **Idaho** | Idaho Code, 18-3318. | | |
| **Illinois** | Code of Ordinances, City of Aurora 29-43. | Aurora includes under "assault weapon," any shotgun with a magazine capacity of more than 5 rounds | "Assault weapons": Street Sweeper and Striker 12 revolving cylinder shotguns or semiautomatic shotguns with either a fixed magazine with a capacity over 5 rounds or an ability to accept a detachable magazine and has at least a folding / telescoping stock or a pistol grip that protrudes beneath the action of firearm and which is separate and apart from stock |

General Firearm Statutes by State                                                      Exhibit 2

| State | Statute | | |
|---|---|---|---|
| **Indiana** | Indiana Code 35-47-1-10. and Municipal Code of the City of South Bend 13-95. | South Bend under "assault weapon" firearms which have threads, lugs, or other characteristics designed for direct attachment of a silencer, bayonet, flash suppressor, or folding stock; as well as any detachable magazine, drum, belt, feed strip, or similar device which can be readily made to accept more than 15. rounds | South Bend includes under "assault weapon," any shotgun with a magazine capacity of more than 9 rounds |
| **Iowa** | Iowa Code, Title XVI. 724.1. | | Includes as an offensive weapon, "a firearm which shoots or is designed to shoot more than one shot, without manual reloading, by a single function of the trigger" |
| **Kansas** | | | |
| **Kentucky** | Kentucky Revised Statutes- 150.360 | | |
| **Louisiana** | Louisiana RS 56:116.1 | | |
| **Maine** | Maine Revised Statutes 12.13.4.915.4.§11214. F. | | |
| **Maryland** | Maryland Code 5-101. | | "Assault weapons": F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; Steyr-AUG-SA semi-auto; Holmes model 88 shotgun; Mossberg model 500 Bullpup assault shotgun; Street sweeper assault type shotgun; Striker 12 assault shotgun in all formats;  Daewoo USAS 12 semi-auto shotgun |

General Firearm Statutes by State                                                                    Exhibit 2

| State | Statute | | |
|---|---|---|---|
| **Massachusetts** | Massachusetts Gen L. 140.121. | under "assault weapon": any shotgun with (fixed or detachable) magazine capacity of more than 5 rounds | "Assault weapons": revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; also "Large capacity weapon" includes any semiautomatic shotgun fixed with large capacity feeding device (or capable of accepting such), that uses a rotating cylinder capable of accepting more than 5 shells |
| **Michigan** | II.2.1. (2) | | |
| **Minnesota** | Minnesota Statutes 624.711 | | "Assault weapons": Street Sweeper and Striker-12 revolving cylinder shotgun types as well as USAS-12 semiautomatic shotgun type |
| **Mississippi** | Mississippi Code 97-37-1. | silencer prohibited | |
| **Missouri** | Code of State Regulations 10-7.410(1)(G) | | |
| **Montana** | | | |
| **Nebraska** | Nebraska Administrative Code Title 163 Chapter 4 001. | | |
| **Nevada** | Nevada Revised Statutes 503.150 1. | | |
| **New Hampshire** | | | |
| **New Jersey** | New Jersey Statutes 23:4-13.  and 23:4-44.  and New Jersey Rev. Statutes 2C39-1.w. | magazine  capacity of no more than 5 rounds | "Assault weapons": any shotgun with a revolving cylinder, e.g. "Street Sweeper" or "Striker 12" Franchi SPAS 12 and LAW 12 shotguns or USAS 12 semi-automatic type shotgun; also any semi-automatic shotgun with either a magazine capacity exceeding 6 rounds, a pistol grip, or a folding stock |
| **New Mexico** | New Mexico Administrative Code 19.31.6.7H., 19.31.11.10N. , 19.31.13.10M.  and 19.31.17.10N. | | |

General Firearm Statutes by State                                                                 Exhibit 2

| State | Statute | | | |
|---|---|---|---|---|
| **New York** | New York Consolidated Laws 265.00. 22. and Code of the City of Buffalo 1801B. | magazine capacity of no more than 5 rounds | sighting device making a target visible at night may classify a shotgun as an assault weapon | "Assault weapons": Any semiautomatic shotgun with at least two of the following:folding or telescoping stock;pistol grip that protrudes conspicuously beneath the action of the weapon;fixed magazine capacity in excess of five rounds;an ability to accept a detachable magazine; or any revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; Buffalo 1801B. Assault Weapon:(2) A center-fire rifle or shotgun which employs the force of expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which has:(a) A flash suppressor attached to the weapon reducing muzzle flash;(c) A sighting device making a target visible at night;(d) A barrel jacket surrounding all or a portion of the barrel, to dissipate heat therefrom; or(e) A multi-burst trigger activator.(3) Any stockless pistol grip shotgun. |
| **North Carolina** | North Carolina Gen. Statutes 14-288.8 | | silencer prohibited | |
| **North Dakota** | North Dakota Century Code 20.1-01-09. Section 20.1-04-10, SHOTGUN SHELL-HOLDING CAPACITY RESTRICTION, repealed/eliminated | | | |
| **Ohio** | Ohio Rev. Code 2923.11. and Columbus City Codes 2323.11. | magazine capacity of no more than 5 rounds | | semiautomatic shotgun that was originally designed with or has a fixed magazine or detachable magazine with a capacity of more than five rounds. Columbus includes under "Assault weapon" any semi-automatic shotgun with two or more of the following: pistol grip that protrudes conspicuously beneath the receiver of the weapon; folding, telescoping or thumbhole stock; fixed magazine capacity in excess of 5 standard 2-3/4, or longer, rounds; or ability to accept a detachable magazine; also any shotgun with revolving cylinder |
| **Oklahoma** | | | | |
| **Oregon** | Oregon Rev. Statutes 166.272. | | silencer prohibited | |
| **Pennsylvania** | Title 34 Sec. 2308. (a)(4) and (b)(1) | | | |
| **Rhode Island** | Rule 7, Part III, 3.3 and 3.4 | | | |
| **South Carolina** | SECTION 50-11-310. (E) and ARTICLE 3. SUBARTICLE 1. 123 40 | | | |

<u>General Firearm Statutes by State</u>                                                                                                    Exhibit 2

| State | Statute | | |
|-------|---------|---|---|
| **South Dakota** | South Dakota Codified Laws 22,1,2, (8) | silencer prohibited | |
| **Tennessee** | | | |
| **Texas** | | | |
| **Utah** | Utah Administrative Code R657-5-9. (1), R657-6-6. (1) and R657-9-7. | | |
| **Vermont** | | | |
| **Virginia** | Virginia Code 18.2-308. | magazine capacity no more than 7 rounds (not applicable for hunting or sport shooting) | "Assault weapons": Striker 12's commonly called a "streetsweeper," or any semi-automatic folding stock shotgun of like kind with a spring tension drum magazine capable of holding twelve shotgun shells prohibited |
| **Washington** | Washington Administrative Code 232-12-047 | | |
| **West Virginia** | West Virginia statute 8-12-5a. | | |
| **Wisconsin** | Wisconsin Administrative Code – NR 10.11 and NR 10.12 | | |
| **Wyoming** | Wyoming Statutes, Article 3. Rifles and Shotguns [Repealed] and 23-3-112. | silencer prohibited | |

Drum Magazine                                                                    Exhibit 3



<u>Integrated Rail System</u>                                    Exhibit 4

<u>Sporting</u>



<u>Sporting</u>



<u>Non-Sporting</u>                                    <u>Non-Sporting</u>

                                    

<u>Bulk Measurements</u>                                        Exhibit 5

Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun. Depth measurement "A" below is INCORRECT; it includes the trigger guard which is not part of the frame or receiver. Depth measurement "B" below is CORRECT; it measures only the depth of the frame or receiver:



Width refers to the length of the top or bottom pane of the firearm and measures the distance between the sides of the shotgun. Width measurement "A" below is CORRECT; it measures only the width of the frame or receiver. Width measurement "B" below is INCORRECT; it includes the charging handle which is not part of the frame or receiver:



<u>Forward Pistol Grip</u>                                                      Exhibit 6





[PAGE INTENTIONALLY LEFT BLANK]

# EXHIBIT G

# The Armed Citizen – A Five Year Analysis

## OVERVIEW OF SURVEY

For the period 1997 - 2001, reports from "The Armed Citizen" column of the NRA Journals were collected. There were 482 incidents available for inclusion in the analysis. All involved the use of firearms by private citizens in self defense or defense of others. No law enforcement related incidents were included. The database is self-selecting in that no non-positive outcomes were reported in the column.

## DATA ANALYSIS

As might be expected, the majority of incidents (52%) took place in the home. Next most common locale (32%) was in a business. Incidents took place in public places in 9% of reports and 7% occurred in or around vehicles.

The most common initial crimes were armed robbery (32%), home invasion (30%), and burglary (18%).

Overall, shots were fired by the defender in 72% of incidents. The average and median number of shots fired was 2. When more than 2 shots were fired, it generally appeared that the defender's initial response was to fire until empty. It appears that revolver shooters are more likely to empty their guns than autoloader shooters. At least one assailant was killed in 34% of all incidents. At least one assailant was wounded in an additional 29% of all incidents. Of the incidents where shots are fired by a defender, at least one assailant is killed in 53% of those incidents.

Handguns were used in 78% of incidents while long guns were used in 13%; in the balance the type of firearm was not reported. The most common size of handgun was the .35 caliber family (.38, .357, 9mm) at 61%, with most .38s apparently being of the 5 shot variety. Mouseguns (.380s and below) were at 23%, and .40 caliber and up at 15%.

The range of most incidents appears to be short but in excess of touching distance. It appears that most defenders will make the shoot decision shortly before the criminal comes within arm's length. Defenders frequently communicate with their attackers before shooting.

The firearm was carried on the body of the defender in only 20% of incidents. In 80% of cases, the firearm was obtained from a place of storage, frequently in another room.

Reloading was required in only 3 incidents. One of those involved killing an escaped lion with a .32 caliber revolver, which was eventually successful after 13 shots.

Multiple conspirators were involved in 36% of the incidents. However, there were no apparent cases of getaway drivers or lookouts acting as reinforcements for the criminal actor(s) once shooting starts. At the sound of gunfire, immediate flight was the most common response for drivers and lookouts.

When multiple conspirators were involved, the first tier was a two man action team. If another member was available, he was usually the driver of the getaway car and remained in the car. If a fourth conspirator was involved, he was stationed immediately outside the target location as a lookout for the

police or other possible intervening parties. The outside conspirators do not generally appear to be armed. It does appear that the trend over the period has increased from one weapon in the action team to two weapons.

The largest group of violent criminal actors was 7, a group that committed serial home invasions in Rochester NY. An alert and prepared homeowner, who saw them invade an adjacent home, accessed his shotgun, and dispatched them (2 killed and 1 seriously wounded) when they broke in his door.

Incidents rarely occurred in reaction time (i.e., ¼ second increments). Most commonly, criminals acted in a shark-like fashion, slowly circling and alerting their intended victims. The defender(s) then had time to access even weapons that were stored in other rooms and bring them to bear.

The most common responses of criminals upon being shot were to flee immediately or expire. With few exceptions, criminals ceased their advances immediately upon being shot. Even small caliber handguns displayed a significant degree of instant lethality (30 per cent immediate one shot kills) when employed at close range. Many criminal actors vocally expressed their fear of being shot when the defender displayed a weapon. Upon the criminals' flight, the "victims" frequently chased and captured or shot the criminals and held them for the authorities.

## CONCLUSIONS

1) Even small caliber weapons are adequate to solve the vast majority of incidents requiring armed self-defense.

2) Mindset of the potential victim was far more important than the type of weapon used. All the victims were willing to fight their opponents in order to survive. Although not common, in some cases bridge weapons, such as pens, were used to gain time to access the firearm.

3) Frequently, the defenders were aware that something was amiss before the action started and then placed themselves in position to access their weapons. Awareness of the surroundings appears to be a key element of successful defense.

4) The defenders had some measure of familiarity with their firearms. Although perhaps not trained in the formal sense, they appear to be able to access a firearm and immediately put it into action. At least one defender learned from a previous experience and made the firearm more accessible for subsequent use.

5) Training or practice with a firearm should include a substantial amount of accessing the firearm from off body locations, such as drawers, underneath counters, etc.

6) This analysis does not present a view of the totality of armed self-defense in that non-positive outcomes were not available for inclusion in the database. The analysis may, however, be useful in helping to describe a methodology for successful armed self-defense. This methodology might be described as:

1. Be aware,
2. Be willing to fight,
3. Have a weapon accessible,

4. Be familiar enough with the weapon to employ it without fumbling,
5. When ready, communicate, both verbally and non-verbally, to the attacker that resistance will be given, and
6. If the attacker does not withdraw, counterattack without hesitation.

## Data Tables

| Location of Incident | |
|---|---|
| Business | 32% |
| Home | 52% |
| Public | 9% |
| In or around Vehicle | 7% |

| Shots Fired by Type of Location | No | Yes |
|---|---|---|
| Business | 33% | 72% |
| Home | 25% | 75% |
| Public | 29% | 71% |
| In or around Vehicle | 35% | 65% |
| Grand Total | 28% | 72% |

| Number of Shots Fired | |
|---|---|
| Average | 2.2 |
| Median | 2 |
| Mode | 1 |
| Max | 20 |

| Gun Type | |
|---|---|
| Handgun | 78% |
| Long Gun | 13% |
| Unknown | 8% |

| Body Carry by Type of Location | No | Yes |
|---|---|---|
| Business | 69% | 31% |
| Home | 94% | 6% |
| Public | 49% | 51% |
| In or around Vehicle | 65% | 35% |
| Overall | 80% | 20% |

| Multiple Assailants by Type of Location | No | Yes |
|---|---|---|
| Business | 76% | 24% |
| Home | 72% | 28% |
| Public | 62% | 38% |
| Retail Business | 52% | 48% |
| In or around Vehicle | 49% | 51% |
| Overall | 64% | 36% |

© 2002 Firearms Safety Training LLC